## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN CIVIL LIBERTIES UNION
   125 Broad Street
   New York, NY 10004

                         Plaintiff,

                      v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; UNITED STATES
IMMIGRATION AND CUSTOMS
ENFORCEMENT; DEPARTMENT OF
HOMELAND SECURITY OFFICE OF
INSPECTOR GENERAL

                        Defendants.

**COMPLAINT FOR
INJUNCTIVE AND
DECLARATORY RELIEF**

Civil Action No._____

## INTRODUCTION

1.      This is an action under the Freedom of Information Act ("FOIA"),

5 U.S.C. § 552, for injunctive, declaratory and other appropriate relief regarding agency

records requested by Plaintiff American Civil Liberties Union ("ACLU") from Defendant

Department of Homeland Security ("DHS"), seeking, principally, (i) the expedited

processing and release of responsive agency records by Defendant DHS Office of

Inspector General ("OIG"); and (ii) the performance of an adequate search for responsive

records by Defendant United States Immigration and Customs Enforcement ("ICE").

2.      On June 27, 2007, the ACLU submitted a FOIA request to

Defendant DHS, the Health Resources and Services Administration ("HRSA") and the

United States Public Health Service ("PHS") seeking, *inter alia*, records pertaining to the

deaths of immigrants in DHS custody, including any reports of investigations into such deaths (the "Request").

3.    The ACLU submitted the Request after learning from press reports and other public information of the deaths of certain immigration detainees in DHS's custody. Several of these deaths had been attributed to deficient medical care provided to those detainees despite the Government's duty to supply adequate medical care and treatment to them. The press reports indicated that in-custody deaths are not reported publicly and are not tracked or consistently investigated by any government agency. The reports also came on the heels of an audit by the Defendant OIG finding serious problems with the delivery of health care at four of five detention facilities reviewed.

4.    The ACLU requested expedited processing of its Request under the applicable FOIA provisions, citing both the ongoing risk of death or serious bodily injury to the hundreds of thousands of people detained by ICE each year, and the public's urgent need to be informed of the federal government's activities in this area. The little information already available to the public suggested strongly that the federal government—which is ultimately responsible for the health and welfare of persons detained pursuant to its authority—may need to do more to ensure that immigration detainees are not caused to suffer and die by deficient health care.

5.    Despite the importance of the issues underlying the Request, ICE and OIG – the DHS agencies charged with primary responsibility for identifying and producing the records called for by the Request – have not fulfilled their obligations under FOIA. Although ICE has provided the ACLU with certain documents responsive to the Request, press reports that detail documents obtained by the media, as well as

Defendants' own policies and procedures, indicate that many documents responsive to the Request have not been identified or produced.

6.       Moreover, despite ICE's agreement with the ACLU that the significant public attention directed to the issues underlying the Request warranted expedited processing, OIG refused to grant expedited processing of the Request without justification. Expedited processing is statutorily required for any FOIA request where a delay could reasonably be expected to pose an imminent threat to the life or physical safety of an individual, or where the request is made by a person primarily engaged in disseminating information and urgency exists to inform the public concerning actual or alleged governmental activity. 5 U.S.C. §552(a)(6)(v)(III) and (II). Nonetheless, nearly a year after the ACLU submitted the Request, OIG has yet to produce *any* responsive records to the ACLU or otherwise provide a final response to the Request, despite its presumptive obligation under FOIA to do so within 20 days of the Request.

7.       Deaths of in-custody immigration detainees, and the medical care and treatment afforded to those detainees, have been the subject of recent Congressional inquiries and proposed legislation. In addition, a number of front-page stories in major national newspapers demonstrate that the government activity that is the subject of the Request is of ongoing and increasing public concern. The public's urgent need to know about the federal government's activities with respect to this problem is impeded by the Defendants' refusal to comply with their obligations under the FOIA. While the agencies delay, in clear violation of the FOIA, more immigration detainees are being imperiled by the ongoing and apparently pervasive nature of the agencies' actions and inactions regarding immigration detainee health care. The ACLU accordingly files this Complaint

to obtain prompt judicial intervention to order the Defendants' compliance with its obligations under the FOIA.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. § 552(a)(4)(B). This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C §§ 701-706. Venue is proper in this district under 5 U.S.C. § 552(a)(4)(B).

## PARTIES

9.     Plaintiff ACLU is a nationwide, non-profit and non-partisan organization with over 500,000 members. Its primary functions include educating the public on a broad array of issues affecting protections and guarantees extended by the United States Constitution and engaging in various advocacy efforts related to the promotion of individual rights. The ACLU publishes newsletters, news briefings, right-to-know handbooks, and other materials that are disseminated to the public. The ACLU also disseminates information to the public through its website. The website addresses civil liberties issues in depth, provides features on civil liberties issues in the news, and contains hundreds of documents that relate to the issues addressed by the ACLU. The website includes features on information obtained through the FOIA.

10.     Founded in 1972 by the ACLU, the National Prison Project ("NPP") seeks to ensure constitutional conditions of confinement and strengthen prisoners' and detainees' rights through class action litigation, advocacy, and public education. The NPP's policy priorities include preventing domestic torture; protecting prisoners' and detainees' health, safety, and human dignity; assuring domestic oversight

of prisons, jails, and immigration detention facilities; and promoting sound correctional policies. The NPP publishes a semiannual journal, coordinates a nationwide network of litigators and advocates, and provides expert advice and technical assistance to local community groups and lawyers throughout the country.

11.    Defendant DHS is a department within the executive branch of the United States Government. Defendants ICE and OIG are components within DHS. All Defendants are executive departments or other establishments in the executive branch of the Government and, therefore, are "agencies" within the meaning of 5 U.S.C. § 552(f)(1). Upon information and belief, Defendants have custody or control of the records that Plaintiff seeks.

12.    Defendant ICE was formed pursuant to the Homeland Security Act of 2002, P.L. 107-296, and merged, in whole or in part, the United States Customs Service, United States Immigration and Naturalization Service and United States Federal Protective Service. As such, ICE is the largest investigative arm of DHS. (*About Us: ICE Operations*, *available at* www.ice.gov/about/operations.htm) (last visited on June 25, 2008). ICE operates and oversees other federal, state and private organizations' operation of, detention centers throughout the United States in which many immigrants are detained pending resolution of their immigration proceedings. (ICE Fact Sheet *Public Information: Immigration Detention Facilities*, May 29, 2008, *available at* www.ice.gov/pi/dro/facilities.htm) (last visited on June 25, 2008). ICE is responsible for ensuring safe and humane conditions of confinement for its detainees, including the provision of reliable, consistent, appropriate and cost-effective health services. (ICE Fact Sheet *DRO: Detainee Health Care*, May 7, 2008, *available at* www.ice.gov/pi/news/

factsheets/detaineehealthcare.htm) (last visited on June 25, 2008). Since the creation of ICE in 2003, ICE has detained nearly 1.5 million individuals. (*Id.*) On any given day, ICE and the facilities under its supervision house approximately 33,000 immigration detainees at over 300 detention centers nationwide. (*Id.*)

13.    Defendant OIG was formed pursuant to the Homeland Security Act of 2002, P.L. 107-296, and is responsible for conducting and supervising independent and objective audits, investigations and inspections relating to the programs and operations of DHS, including the health care services provided at the detention facilities operated by ICE. (*See* DHS Office of Inspector General, *Purpose* and *Mission Statement*, *available at* www.dhs.gov/xoig) (last visited on June 25, 2008).

14.    PHS is a division of the United States Department of Health and Human Services run by the Surgeon General, who reports to the Assistant Secretary for Health and, in turn, the Secretary of the Department of Health and Human Services ("HHS"). (*See* USPHS, *Questions and Answers: Overview, available at* www.usphs.gov/questionsanswers/overview.aspx) (last visited on June 25, 2008). PHS is charged with protecting, promoting and advancing health and safety within the United States. (*See* USPHS, *About the Commissioned Corps: Mission*, available at www.usphs.gov/AboutUs/mission.aspx) (last visited on June 25, 2008).

15.    HHS is the principal agency of the United States government charged with protecting the health of Americans and providing essential human services. (*See* Mike Leavitt, *HHS: What We Do, available at* www.hhs.gov/about/whatwedo.html) (last visited on June 25, 2008). HHS's programs are administered by eight agencies within PHS and three human services agencies. (*Id.*)

16. HRSA is an agency within the HHS that is primarily charged with improving access to health care services for people who are uninsured, isolated or medically vulnerable. (*See* HRSA, *About HRSA, available at* www.hrsa.gov/about/ default.htm) (last visited on June 25, 2008).

17. The Division of Immigration Health Services ("DIHS") provides or arranges for health care services for immigration detainees in ICE custody. (*See* DIHS, *About Us, available at* www.icehealth.org/aboutUs/aboutUs.shtm) (last visited on June 25, 2008).

### THE FOIA REQUEST

18. On June 13, 2007, the ACLU filed a class action Complaint on behalf of immigration detainees at the San Diego Correctional Facility ("SDCF"), one of the many detention facilities that are used to house immigrants in the custody of ICE. Citing numerous examples based on the personal experiences of the eleven named plaintiffs as well as other current and former SDCF detainees, the Complaint contained detailed allegations of grossly inadequate health care and treatment provided to immigrants detained at the facility, and the needless suffering and avoidable death that they continually faced.

19. On the same day, the Washington Post published an article regarding the medical care received by immigration detainees at detention facilities run by Defendant ICE. (Darryl Fears, *Illegal Immigrants Received Poor Care In Jail, Lawyers Say*, Wash. Post, June 13, 2007.) The article chronicled the lack of adequate medical treatment afforded to certain current and former immigration detainees, and quoted a report by OIG that found "instances of non-compliance" regarding the provision

of health care, "including timely initial and responsive medical care," in four of five detention facilities studied. (*Id.*)

      20.    On June 26, 2007, the New York Times published a related front-page article regarding DHS's failure to enforce standards of adequate medical care for immigration detainees. (Nina Bernstein, *New Scrutiny as Immigrants Die in Custody*, N.Y. Times, June 26, 2007.) The article quoted a sworn declaration of the warden of one of the largest detention facilities used by ICE, the York County Prison in Pennsylvania, stating that DHS "has made it difficult, if not impossible, to meet the constitutional requirements of providing adequate health care to inmates that have a serious need for that care." (*Id.*) The article stated that, since 2004, 62 immigration detainees had died while in ICE custody, and that ICE declined to release any information about these deaths. (*Id.*) According to the article "[g]etting details about those who die in custody is a difficult undertaking." (*Id.*) The article also noted that OIG had announced a "special review" of two immigration detainees' deaths. (*Id.*)

      21.    The next day, on June 27, 2007, Tom Jawetz, Immigration Detention Staff Attorney for the NPP, submitted the FOIA Request to DHS, HRSA and PHS, detailing the need for public disclosure of information concerning the circumstances surrounding, and investigations related to, immigration detainee deaths. (Exhibit 1.) By the Request, Plaintiff sought disclosure by DHS, HRSA and PHS of six categories of records (the "Records"):

    (1)    A complete list of individuals who have died while detained in ICE custody since January 1, 2004. For each death listed, Plaintiff asked DHS, HRSA and PHS to include:

        (a)    Complete name;

(b)    Alien number;

(c)    Date on which detention began;

(d)    Date of death;

(e)    List of all facilities where the detainee was housed along with dates of detention; and

(f)    Location at time of death.

(2)    For each individual whose death is included in (1), all records:

(a)    Pertaining to the cause of death;

(b)    Pertaining to requests for medical help by anyone, including the deceased, his/her family members, and fellow detainees;

(c)    Pertaining to Treatment Authorization Requests (TARs) submitted to the Division of Immigration Health Services (DIHS), including any DIHS responses to those TARs;

(d)    Pertaining to reports of investigations into the circumstances surrounding the death, including all after-action reports and critical incident reports;

(e)    Pertaining to whether any of the detainees who died were diagnosed with terminal illnesses while in immigration detention or beforehand;

(f)    Pertaining to whether any of the detainees who died were taken to outside hospitals for treatment, and if so, the names of those hospitals and the dates of treatment;

(g)    Pertaining to whether and how ICE notified families of the deaths of detained family members;

(h)    Pertaining to whether and how ICE notified consular officials of the deaths of detained persons;

(i)    Pertaining to whether and how state, county, local officials and review boards were notified of the deaths;

(3)    All records, including written and electronic correspondence, pertaining to deaths in ICE custody;

(4)    All records, including policies, procedures, or guidelines provided to or maintained by Contract Detention Facilities, Service Processing Centers, and Intergovernmental Service Agreement facilities relating to deaths in detention, including memoranda and training materials;

(5)    All records identifying the manner by which Defendant agencies or any of their components track deaths in detention; and

(6)    All records, including written and electronic correspondence, generated in response to requests for information from the Washington Post and the New York Times about immigrant detainee medical care and deaths, and in reaction to those articles. This request pertains specifically to records generated in preparation for and in response to two articles: (a) Darryl Fears, *Illegal Immigrants Received Poor Care in Jail, Lawyers Say*, Washington Post, June 13, 2007; and (b) Nina Bernstein, *New Scrutiny as Immigrants Die in Custody*, N.Y. Times, June 26, 2007.

22.    The ACLU asked for expedited processing of the Request pursuant to 5 U.S.C. § 552(a)(6)(E) and applicable regulations. This request, if granted, would have required the agencies to prioritize the Request over other, less urgent FOIA requests. The ACLU explained that the Request qualified for expedited processing on two independent grounds. First, the Request satisfied 5 U.S.C. § 552(a)(6)(E)(v)(I) because a lack of expedited disclosure of the Records could "reasonably be expected to pose an imminent threat to the life or physical safety" of immigrants in ICE custody. Second, the Request satisfied 5 U.S.C. § 552(a)(6)(E)(v)(II) and warranted expedited processing because, as the recent media attention had demonstrated, there was an urgency to provide information to the public about actual or alleged government activities surrounding immigration detainee deaths. In addition, the Request established that the ACLU is an organization primarily engaged in disseminating information and, therefore, is entitled to expedited treatment of its Request for that information.

**DEFENDANTS' INITIAL RESPONSE AND INCREASED PUBLIC SCRUTINY**

23.    By letter dated June 28, 2007, PHS acknowledged receipt of the ACLU's Request, indicated that it had initiated a search for responsive records, and notified the ACLU that it was granting the ACLU a limited fee waiver. By letter dated

July 20, 2007, HHS informed the ACLU that PHS had searched the Office of the Surgeon General and had not located any responsive documents.

24.     By letter dated July 10, 2007, HRSA acknowledged receipt of the ACLU's Request and suggested that the ACLU contact it again in twenty days to determine the status of HRSA's response.

25.     By letter dated July 11, 2007, DHS acknowledged receipt of the Request. (Exhibit 2.)  DHS declined to grant the request for expedited treatment alleging, without explanation, that the ACLU had "failed to demonstrate a particular urgency to inform the public about the government activity involved in the request beyond the public's right to know about government activity generally." (*Id.*)  The letter informed the ACLU that DHS had referred the Request to ICE and OIG for "processing and direct response," and that it would also "query the DHS Executive Secretariat for records responsive" to the Request.  (*Id.*)

26.     On or about July 12, 2007, ICE's Public Affairs Office issued a document entitled "Public Affairs Guidance" in response to the FOIA Request and in recognition of the increased media coverage of, and public attention to, the deficient medical care provided to immigration detainees and the circumstances surrounding immigration detainee deaths.  (Exhibit 3.)

27.     By letter dated July 18, 2007, OIG acknowledged receipt of the Request.  (Exhibit 4.)  OIG also declined to grant the ACLU's request for expedited treatment, claiming that the ACLU had "not provided any evidence that information dissemination is [its] main professional activity," and had not "adequately demonstrated a particular urgency to inform the public regarding the subject matter" of the Request.  (*Id.*)

28.    By letter dated July 24, 2007, ICE's FOIA Office acknowledged receipt of the Request through DHS.  (Exhibit 5.)  ICE's FOIA Office also declined to grant the Request expedited treatment, copying the wording of DHS's July 11 letter.

29.    By letter dated July 30, 2007, ICE informed the ACLU that ICE "may" encounter some delay in processing the Request and noted that, although its goal was to respond within the 20 business days required by 5 U.S.C. § 552(a)(6)(A)(i), it was invoking the maximum 10-day extension to reply, applicable in "unusual circumstances," under 5 U.S.C. 552(a)(6)(B), and that "there are currently 2352 open requests ahead of yours."

30.    By letter dated August 7, 2007, HRSA notified the ACLU that it had located only eight pages of documents responsive to the Request, through DIHS, and enclosed those pages.  (Exhibit 6.)  The pages consist of three *revised* Standard Operating Procedures, promulgated August 2006, regarding the process by which the agencies were to be notified of detainee deaths, the manner and database in which those deaths were tracked, and the investigations and reviews of those deaths that were to be undertaken. (*Id.*)  HRSA further informed the ACLU that ICE has sole ownership of all immigration detainee medical records.  (*Id.*)

31.    By letter dated September 27, 2007, OIG, on behalf of the DHS Privacy Office, released to the ACLU a single page of records responsive to the Request.

32.    On October 4, 2007, the United States House of Representatives Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law (the "Subcommittee") held a hearing on "Detention and Removal: Immigration Detainee Medical Care."

- 12 -

33.    On or about October 26, 2007, ICE responded to requests by Representatives Thompson, Sanchez, Jackson Lee and Clarke, all of whom were members of the United States House of Representatives' Committee on Homeland Security, for information regarding the medical care that immigrants receive while in ICE's custody. (Exhibit 7.) Among other things, ICE disclosed that, since Fiscal Year 2004, 69 immigration detainees had died while in its custody. ICE did not disclose names or other identifying information for those 69 detainees. (*Id.*)

## THE ACLU REQUESTS RECONSIDERATION OF THE DEFENDANTS' DECISIONS NOT TO GRANT EXPEDITED PROCESSING

34.    On or about November 5, 2007, the ACLU sent letters to OIG and ICE requesting reconsideration of the Defendants' initial denial of the ACLU's request for expedited processing of the FOIA Request. In support of its request for reconsideration, and as evidence of the urgency and public importance of the Request, the ACLU cited the recent Congressional hearing on the adequacy of health care provided to immigration detainees and the increasing media coverage since the FOIA Request had been filed. (Exhibits 8 and 9.) The ACLU also requested reconsideration of OIG and ICE's determination that the ACLU's Request did not qualify for expedited processing because of Defendants' claim that the ACLU is not primarily engaged in disseminating information. (*Id.*)

35.    By letter dated November 15, 2007, ICE notified the ACLU that it had reconsidered its decision to deny expedited processing to the Request and had now determined that the Request qualified for expedited treatment because the subject of the Request "exceed[s] the public's right to know about government activity generally."

(Exhibit 10.) ICE also determined that the Request qualified for expedited processing on the basis that there was an urgent need to inform the public about the subject of the Request. In this respect, ICE noted that "news coverage" is a "good gauge of public interest … and a preliminary search of the internet and other sources does reveal that the subject of deaths in the custody of [ICE] is a topic of substantial news coverage." (*Id.*)

### DEFENDANT ICE'S UNREASONABLE SEARCH AND INSUFFICIENT PRODUCTION

36.     By letter dated January 4, 2008, ICE provided its "final response" to the FOIA Request and produced approximately 800 pages of documents to the ACLU. ICE provided this final response not only on behalf of itself, but also on behalf of the Division of Immigration Health Services, which had been placed under its control for purposes of responding to FOIA requests. (Exhibit 11.)

37.     ICE improperly redacted certain information from the documents it produced and improperly withheld at least 18 pages of responsive records in their entirety. ICE cited multiple FOIA provisions that permit agencies responding to FOIA requests to exempt certain types of records from disclosure, but ICE did not explain the application of those exemptions to the specific records withheld or redacted in its January 4 letter. In fact, eight of the pages of responsive records withheld by ICE appear to be the eight pages of *revised* Standard Operating Procedures, promulgated August 2006, that HRSA had produced to the ACLU several months earlier. Neither HRSA nor ICE, however, produced or identified the standard operating procedures in effect prior to August 2006, although these documents were responsive to the ACLU's Request.

38.    One of the documents produced to the ACLU by ICE is a list

entitled "Detainee Deaths – 2004 – November 2007" (the "Detainee Death List"). That

list includes the names of 66 immigration detainees who died while in the custody of

ICE, as well as certain other information sought by the Request, including "Location of

Last Detention," date of birth, date of death, "Location of Death," and "Cause of Death"

for each individual listed. The Detainee Death List, which ICE apparently used to limit

the scope of its search and production, appears to identify only the detainees who had

died during the period from January 1, 2004 through August 13, 2007. In fact, an

individual in ICE custody died on December 5, 2007, one month prior to ICE's response

to the Request. (*See* Sandra Hernandez, *Decision to Expand Detention Center Follows

Man's Death*, the L.A. Daily Journal, December 21, 2007.) Accordingly, upon

information and belief, a reasonable search of the records in the custody or under the

control of ICE would have located other detainees who died prior to ICE's final response.

39.    The majority of the records produced to the ACLU by ICE consist

of, in ICE's words, "(1) Detainee Treatment, Authorization and Consultation Forms, (2)

Detainee Medical records, and (3) Significant Event Notification Reports." (Exhibit 12.)

ICE's January 4, 2008 letter admitted that it had failed to locate or produce any such

documents (or any other requested documents) specific to three detainees that were

included among the 66 individuals identified in the Detainee Death List: Cezar Rioz-

Martinez, Samou Fankeu and Ignacio Sarabia-Vallasenor. (*Id.*) The January 4 letter and

the enclosed documents demonstrate that ICE is aware of the deaths of Messrs. Rioz-

Martinez, Fankeu and Sarabia-Vallasenor, and the details provided in the Detainee Death

List (*e.g.*, "Cause of Death") strongly suggest that documentation relating to these deaths

must exist.  Upon information and belief, a reasonable search of the records in the custody or under the control of ICE would have located such documents.

40.    ICE states that it "medically screen[s]" each detainee "after arriving in ICE custody." (Exhibit 3.)  Accordingly, upon information and belief, a reasonable search of the records in the custody or under the control of ICE would have located medical records pertaining to each of the detainees who died while in ICE's custody.  However, despite its apparent reliance on the production of "Medical Records" in lieu of the specific documents sought by the Request, ICE failed to produce any medical records for the majority of those detainees.  ICE did not identify any exemption from the disclosure requirements of the FOIA that would justify withholding medical records of any of the deceased detainees.

41.    ICE identified only 35 pages of records generated in response to requests for information from, or in reaction to the identified articles published by, the Washington Post and the New York Times about immigration detainee medical care and deaths.  Upon information and belief, a reasonable search of the records in the custody or under the control of ICE would have located additional responsive documents, including internal ICE electronic communications generated in reaction to the articles published by the New York Times and the Washington Post that were identified in the Request.

42.    ICE unjustifiably withheld ten of the 35 pages that it identified as responsive to the request for documents related to the New York Times and Washington Post articles.  According to an e-mail sent to the ACLU by the ICE FOIA office, the "ten pages are specific to one individual's medical care, which you do not have consent to have" and were withheld in reliance on 5 U.S.C. § 552 of the FOIA.  (Exhibit 12.)

- 16 -

Section 552 exempts medical files from disclosure if disclosure would constitute a clearly unwarranted invasion of personal privacy. *See* 5 U.S.C. § 552. ICE provided no explanation for withholding these documents while producing a number of medical records related to other deceased detainees.

43.    As part of a highly publicized four-part series detailing the deficient medical care and treatment provided to immigration detainees, the Washington Post recently published a number of documents that appear to have been under the custody and control of ICE. (*See, generally,* http://www.washingtonpost.com/carelessdetention, last visited on June 25, 2008.)  Many of these documents are encompassed by ACLU's requests for records pertaining to any requests for medical treatment made by or on behalf of detainees who subsequently died and for "[a]ll records, including written and electronic correspondence, pertaining to deaths in ICE custody." (*See* Exhibit 13 (ICE-internal email regarding medical treatment of a detainee identified on ICE's Detainee Death List noting that his death is "[a]nother death that needs to be added to the roster..."); Exhibit 14 ("Sick Call Slip" submitted by detainee identified on ICE's Detainee Death List to request medical treatment).)

44.    Accordingly, upon information and belief, a reasonable search of documents in the custody or control of ICE would have located additional documents responsive to these requests.  However, ICE did not produce any "Sick Call Slips" or any other requests for medical treatment by or on behalf of detainees who subsequently died, nor did ICE produce the emails published by the Washington Post or any similar documents.  In fact, ICE produced only 45 pages of documents in response to the ACLU's request for all records, including emails, related to detainee deaths.

45.    ICE did not identify any exemption from the disclosure requirements of FOIA that would justify withholding the documents referenced in paragraphs 42 and 43.

46.    In August 2006, ICE issued a revised Standard Operating Procedure on internal "Mortality Notification" to "establish and maintain a database of All Deaths Among ICE-Detention and Removal Operations (DRO) Detainees" (the "Mortality Notification Standard Operating Procedures"). (Exhibit 15.) Also in August 2006, ICE issued a revised Standard Operating Procedure on an internal "Mortality Database" to "maintain a current ICE mortality database and electronic mortality files on ICE detainee deaths" (the "Mortality Database Standard Operating Procedures"). (Exhibit 16.) However, neither these Standard Operating Procedures (prior to the 2006 revisions) nor any documents generated pursuant to them were produced by ICE.

47.    In fact, ICE claimed that a search of DIHS records produced only eight records responsive to the Request, and that they were being withheld in their entirety. Upon information and belief, these eight records withheld by ICE are among the records already produced to the ACLU by DIHS, which include the Standard Operating Procedures referenced above. Accordingly, upon information and belief, a reasonable search of the records in the custody or under the control of ICE would have returned additional documents responsive to the ACLU's specific request for documents relating to the manner or procedures by which DHS or any of its components track detainee deaths.

48.    ICE did not identify any exemption from the disclosure requirements of the FOIA that would justify withholding the documents referenced in paragraph 47.

49.    The Mortality Notification Standard Operating Procedures required the generation of "Mortality Reviews," including summaries of cases, past medical records and autopsy reports, for each detainee who died while in ICE's custody. (*See* Exhibit 15.) In August 2006, a revised Standard Operating Procedure on internal "Mortality Review" was issued to "establish a procedure for ensuring mortality review of all detainee deaths that occur in ICE custody" (the "Mortality Review Standard Operating Procedures"). (*See* Exhibit 17.) The Mortality Review Standard Operating Procedures required the generation and dissemination of "Mortality Reviews" and Summary Memoranda to the Deputy Assistant Director, Detention Management, including "(i) the deceased's medical history, (ii) cause of death, (iii) identified strengths, weaknesses, and/or errors in IDH and/or ICE policies and procedures, and (iv) medical recommendations for corrective action." (*Id.*)

50.    Upon information and belief, certain documents that were produced pursuant to these or other procedures have been published by the Washington Post. (*See* Exhibit 18 (excerpts of an ICE report into the circumstances surrounding Yusif Osman's death while in ICE custody); Exhibit 19 (excerpts of a DHS report into the circumstances surrounding Joseph Dantica's death while in ICE custody); Exhibit 20 (excerpts of an ICE report into the circumstances surrounding Victor Alfonso Arellano's death while in ICE custody. Accordingly, upon information and belief, a reasonable search of documents in the custody or under the control of ICE would have located

records encompassed by the ACLU's specific request for documents relating to reports of investigation into the circumstances surrounding the deaths of the 66 detainees it identified as having died while in its custody. ICE did not produce any such documents.

51.    ICE did not identify any exemption to the disclosure requirements of the FOIA that would justify withholding documents relating to investigations into the circumstances surrounding detainee deaths.

52.    Documents generated in connection with ICE's Mortality Notification, Mortality Review and Mortality Database Standard Operating Procedures would be responsive to the ACLU's specific request for electronic records relating to detainee deaths. Furthermore, certain documents responsive to the ACLU's request for electronic records relating to immigration detainee deaths have been published by the Washington Post. (*See* Exhibit 21 (excerpts from a deputy warden complaining of "quite a few problems" with DIHS and noting that detainee deaths would be blamed on local facilities.) Accordingly, upon information and belief, a reasonable search of the records in the custody or under the control of ICE would have returned additional responsive documents. ICE did not produce any electronic records generated pursuant to the revised Standard Operating Procedures.

53.    On May 5, 2008, the New York Times published a lengthy article on the death of Boubacar Bah, a Guinean man who died on May 30, 2007 after being severely injured four months earlier while in custody in an ICE detention facility. Upon information and belief, the New York Times obtained from Mr. Bah's lawyer a set of records that were produced by ICE in response to the lawyer's FOIA request. Those records included 57 pages of documents that had been generated and marked "proprietary

information – not for distribution" by Corrections Corporation of America, Inc., the company running the detention facility on behalf of ICE. (Nina Bernstein, *Few Details on Immigrants Who Died in Custody*, N.Y. Times, May 5, 2008.) These documents detail, *inter alia*, how guards and government employees, after Bah fell and injured his head, "shackled and pinned [Bah] to the floor of the medical unit as he moaned and vomited, then left [him] in a disciplinary cell for more than 13 hours, despite repeated notations that he was unresponsive and intermittently foaming at the mouth." (*Id.*)

54.    Documents generated by Corrections Corporation of America, Inc. in connection with the death of Mr. Bah after sustaining an injury while in custody in an ICE detention facility are responsive to the ACLU's specific request for written or electronic records pertaining to detainee deaths in ICE's custody. Accordingly, upon information and belief, a reasonable search of documents in the custody or under the control of ICE would have located records encompassed by the ACLU's Request. ICE did not produce any such documents.

55.    ICE did not identify any exemption to the disclosure requirements of the FOIA that would justify withholding documents relating to detainee deaths in ICE's custody.

56.    In October 2007, ICE advised Representatives Sanchez and Thompson in writing that ICE "[a]s soon as practicable … prepares a letter of condolence for the next of kin" upon the death of a detainee in its custody. (Exhibit 7.) Accordingly, upon information and belief, a reasonable search of documents in the custody or under the control of ICE would have located documents responsive to the ACLU's specific request for documents relating to the notification of the families or consular officials of

detainees who died while in ICE's custody. However, ICE did not produce any documents responsive to that specific request.

57.    ICE did not identify any exemption to the disclosure requirements of the FOIA that would justify withholding the documents referenced in paragraph 56.

58.    On or about March 3, 2008, the ACLU filed an administrative appeal of ICE's final response to the FOIA Request, challenging both the thoroughness of the search and ICE's decision to withhold, in full or in part, various records (the "ICE Appeal"). (*See* Exhibit 22.)

59.    By letter dated March 5, 2008, DHS's Office of General Counsel acknowledged receipt of the ICE Appeal. (*See* Exhibit 23.)

60.    To date, ICE has not issued any decision or determination regarding the ICE Appeal.

**DEFENDANT OIG'S UNREASONABLE FAILURE TO GRANT EXPEDITED PROCESSING, CONDUCT AN ADEQUATE SEARCH OR TIMELY PRODUCE DOCUMENTS**

61.    On or about November 14, 2007, while the ACLU's request for reconsideration of OIG's initial denial of expedited processing remained pending, OIG called Mr. Jawetz to discuss the FOIA Request. (*See* Exhibit 24.) OIG claimed that the search necessary to respond to the Request would be difficult because of the breadth of the Request. OIG suggested that a list of specific names of individuals who had died while in ICE custody would be helpful to OIG's search efforts. (*See id.*) OIG also advised Mr. Jawetz that, should the ACLU limit the Request to only "Reports of Investigation" prepared by OIG (excluding exhibits to such reports and related documents), the Request could be processed on a "fast-track" basis. (*See id.*)

62.    On November 16, 2007, the ACLU provided OIG, by e-mail, a list of names or other identifying information for 24 of the at least 66 individuals who had died while in ICE custody since 2004, noting that the ACLU was aware that the OIG had investigated, or had received requests to investigate, the deaths of several of the identified individuals. The ACLU emphasized that, while the provided information could assist OIG in its search for records responsive to the Request, a search for those names alone would be insufficient because the list was incomplete and the Request sought, in part, to uncover the very information—identification of all of the detainees who died while in ICE custody—that OIG claimed was necessary to conduct a search for responsive records. The ACLU further confirmed that it was not modifying its FOIA Request and continued to seek all records, including written and electronic correspondence, pertaining to deaths in ICE custody. (*Id.*)

63.    On November 28, 2007, OIG responded to the ACLU by e-mail, suggesting that it would limit its search to records relating to the individuals identified by the ACLU on November 21. OIG also said that its previous offer to produce only its Reports of Investigation on a "fast-track" basis was not meant to imply that OIG had granted the ACLU's request for reconsideration of OIG's denial of expedited processing and that, because the ACLU had not agreed to forego its right to other responsive records, OIG would not commit to "fast-track" treatment of the Request. (*Id.*)

64.    On December 3, 2007, the ACLU contacted OIG again by e-mail to ascertain the status of the ACLU's request that OIG reconsider its initial denial of expedited processing. The ACLU noted that ICE had since responded to the ACLU's identical request for reconsideration of that agency's initial denial of expedited

processing and had properly reversed its decision. The ACLU also noted that DHS and ICE were in possession of information unavailable to the ACLU or the public, including names and other identifying information for all individuals who had died while in ICE custody, and that OIG should be able to ascertain that information without the ACLU's assistance. (*Id.*) In fact, by letter dated November 16, 2007, ICE already had provided its list of 66 names of detainees who died while in its custody from January 2004 to November 2007 to the New York Times, in response to a separate FOIA Request. (Exhibit 25.) That information was not provided to the ACLU until January 4, 2008. (*See supra*, ¶ 36 (Detainee Death List identifying immigration detainees who died during period from January 1, 2004 through August 13, 2007).)

65.    On December 7, 2007, OIG informed the ACLU that it would not entertain the request for reconsideration of OIG's refusal to grant the FOIA Request expedited processing, and that the request for reconsideration should have been directed to the DHS Associate General Counsel. (Exhibit 24.)

66.    Accordingly, by letter dated that same day, the ACLU filed a formal appeal of OIG's determination not to grant the FOIA Request expedited processing with the DHS Associate General Counsel (the "OIG Appeal"). The OIG Appeal detailed the growing significance and public importance of deaths of immigrants detained by DHS, as demonstrated by increasing Congressional and media attention, as well as ICE's decision to reverse its earlier denial of expedited processing with respect to the same Request. The OIG Appeal also reemphasized that the ACLU is an organization primarily engaged in the dissemination of information to the public. (Exhibit 26.)

- 24 -

67.    By letter dated January 4, 2008, the DHS Office of General Counsel denied the OIG Appeal, purportedly because that Appeal had not been filed within 60 days of OIG's initial determination. (Exhibit 27.) The letter also advised the ACLU that DHS's denial of the OIG Appeal was DHS's final action on the matter and that the ACLU could obtain judicial review of this decision. The letter did not address the merits of the OIG Appeal.

68.    By e-mail dated January 25, 2008, the ACLU provided OIG with the purportedly complete list of the 66 immigration detainees that had died while in ICE's custody from January 2004 to November 2007, along with the name of an additional detainee who had died on December 5, 2007, for the purpose of providing further assistance to OIG in its search for records responsive to the Request. (Exhibit 28.)

69.    On February 15, 2008, the ACLU contacted OIG by e-mail to inquire about the status of OIG's search for records responsive to the Request and the expected timing of its production of those records. (*Id.*) Later that day, OIG responded and indicated that it had "received some interim search responses, but it is not completely done." (*Id.*)

70.    By e-mail dated March 18, 2008, the ACLU again sought information concerning the status of OIG's search. (*Id.*) The next day, OIG informed the ACLU that OIG had "completed [its] search for records responsive to [the ACLU's] request . . . and [had] determined that OIG has approximately 500 pages of documents responsive to your request as it is written," but that, because of the "volume and complexity" of the responsive records, the Request would be placed "back in the queue to await processing." OIG again offered to "process the request in a more timely manner" if

the ACLU would agree to limit the scope of the Request to only the formal Reports of Investigation produced by OIG. OIG clarified in subsequent e-mails that it would not agree to produce the Reports of Investigation quickly unless the ACLU agreed to abandon the remainder of the Request or file a separate request for documents other than the Reports of Investigation, which request would be "treated as a March 2008 request" and placed at the back of the line. Accordingly, by e-mail dated March 26, 2008, the ACLU rejected OIG's proposal. (*Id.*)

71.     On April 24, 2008, the ACLU again requested, by e-mail, an update on the status of OIG's response to the Request. (*Id.*) The e-mail also informed OIG that the ACLU had recently learned of the death of another immigration detainee, Mr. Ahmed Tender, in September 2005, and sought assurances that any records pertaining to Mr. Tender would be included in OIG's production.

72.     On April 25, 2008, OIG responded to the ACLU, claiming that "there are several requests still ahead of yours in the queue" and that it remained unable to estimate when the records responsive to the Request would be reviewed and produced to the ACLU. (*Id.*) OIG also refused to include in its eventual production any records relating to Mr. Tender, ostensibly because OIG had already conducted its search. Although records relating to Mr. Tender's death were encompassed by the ACLU's Request, OIG advised the ACLU that it "will need to submit a separate FOIA request for that information."

73.     On May 5, 2008, the New York Times printed a front-page story highlighting, among other things, the lack of transparency concerning the circumstances surrounding the deaths of immigration detainees in ICE custody, focusing on the

particularly disturbing story of the death of Mr. Boubacar Bah at the Elizabeth Detention

Center in New Jersey in February 2007. (*Few Details on Immigrants Who Died in U.S.*

*Custody*, N.Y. Times, May 5, 2008.)  That morning, the ACLU forwarded a copy of the

New York Times article to OIG by e-mail and again requested reconsideration of OIG's

denial of the ACLU's request for expedited processing, noting that "the New York Times

story today again demonstrates that the government's efforts to investigate deaths in

custody are of special importance to the public." (*Id.*)

74.    On May 11, 2008, the investigative broadcast news magazine 60

Minutes aired a detailed story concerning immigration detainee deaths and the lack of

publicly available information relating to those deaths.  That same day, the Washington

Post began to publish a highly publicized four-part series detailing the deficient medical

care and treatment provided to immigration detainees.  (Dana Priest, Amy Goldstein,

*System of Neglect:  As Tighter Immigration Policies Strain Federal Agencies, The*

*Detainees in Their Care Often Pay a Heavy Cost*, Wash. Post, May 11, 2008; Dana

Priest, Amy Goldstein, *In Custody, In Pain:  Beset by Medical Problems as She Fights*

*Deportation, A U.S. Resident Struggles to Get the Treatment She Needs*, Wash. Post, May

12, 2008; Dana Priest, Amy Goldstein, *Suicides Point to Gaps in Treatment:  Errors in*

*Psychiatric Diagnoses and Drugs Plague Strained Immigration System*, Wash. Post, May

13, 2008; Dana Priest, Amy Goldstein, *Some Detainees Are Drugged For Deportation:*

*Immigrants Sedated Without Medical Reason*, Wash. Post, May 14, 2008.)  The entire

series, along with additional articles, internal ICE and DIHS records, and multimedia

presentations can be found at http://www.washingtonpost.com/carelessdetention.

75.     On May 12, 2008, OIG responded by e-mail to the ACLU's May 5 request for reconsideration of the previous denials of the ACLU's request for expedited processing. OIG recognized that "this issue has received quite a bit of media attention of late" but claimed that only the DHS Office of General Counsel could reverse the previous determination. Notwithstanding the refusal to reconsider denial of expedited processing, OIG claimed that the Request was suddenly "up in [its] queue" and that OIG had "begun processing the records" for production to the ACLU. However, OIG also indicated that it likely would still take a significant amount of time to produce the Records to the ACLU. By e-mail also dated May 12, 2008, an employee of OIG who was copied on OIG's response further delaying the agency's production of records to the ACLU replied to that e-mail by stating: "WELL DONE!" (emphasis in original). (Exhibit 28.)

76.     As of the date of this Complaint, OIG still has not produced any records responsive to the Request to the ACLU.

77.     Public interest in immigration detainees' deaths while in ICE custody, in the meantime, has only increased. Indeed, on June 4, 2008, the Subcommittee held a second hearing on "Problems with Immigration Detainee Medical Care," at which Julie Myers, Assistant Secretary for Homeland Security for ICE, was called to testify under oath about immigration detainee medical care and deaths. (*See* U.S. House of Representatives, Committee on the Judiciary, *June 4, 2008 Hearing Information, available at* http://judiciary.house.gov/oversight.aspx?ID=447 (last visited on June 25, 2008).)

## CAUSES OF ACTION

78.     Plaintiff hereby incorporates paragraphs 1-77 of this Complaint as if fully set forth herein.

79.     Defendants DHS, ICE and OIG's failure to make promptly available the records sought by the ACLU's Request violates the FOIA, 5 U.S.C. § 552(a)(3)(A) and 5 U.S.C. § 552(a)(6)(A)(i), and Defendants' corresponding regulations. The ACLU has exhausted its administrative remedies under 5 U.S.C. § 552(a)(6)(C)(i).

80.     Defendants DHS, ICE and OIG's failure to timely respond to the ACLU's Request violates the FOIA, 5 U.S.C. § 552(a)(6)(A)(i), and the Defendants' corresponding regulations. The ACLU has exhausted its administrative remedies under 5 U.S.C. § 552(a)(6)(C)(i).

81.     Defendant OIG's failure to grant the ACLU's request for expedited processing violates the FOIA, 5 U.S.C. § 552(a)(6)(E) and Defendant DHS and OIG's corresponding regulations. The ACLU has exhausted its administrative remedies under 5 U.S.C. § 552(a)(6)(E)(iii).

82.     Defendant DHS, ICE and OIG's failure to make a reasonable effort to search for records responsive to the ACLU's Request violates the FOIA, 5 U.S.C. § 552(a)(a)(3)(C), and Defendants' corresponding regulations. The ACLU has exhausted its administrative remedies under 5 U.S.C. § 552(a)(6)(C)(i).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court:

83.     Order Defendants DHS, ICE and OIG to expedite the proceedings in this action;

84.     Enjoin Defendants from withholding the requested Records;

85.     Order Defendants to produce the Records, which have been improperly withheld from Plaintiff;

86.     Award Plaintiff its costs and reasonable attorney fees in this action, pursuant to 5 U.S.C. § 552(a)(4)(E); and

87.     Grant such other and further relief as the Court may deem just and proper.

Dated: Washington, D.C.
        June 25, 2008

Respectfully submitted,

Of Counsel:

By: _____
        Margaret K. Pfeiffer (D.C. Bar No. 358723)
        Lee Ann McCall (D.C. Bar No. 445740)
        1701 Pennsylvania Avenue, N.W.
        Washington, D.C. 20006-5805
        Tel.(202) 956-7500
        Fax (202) 956-6330

Natalie N. Kuehler
Benjamin R. Walker
125 Broad Street
New York, NY 10004
Tel. (212) 558-4000
Fax (212) 558-3588

Tom-Tsvi M. Jawetz
American Civil Liberties
Union Foundation
National Prison Project
915 15th Street, NW
Washington, DC 20005
Tel. (202) 393-4930
Fax (202) 393-4931

Judy Rabinovitz
American Civil Liberties
Union Foundation
Immigrants' Rights Project
125 Broad Street
New York, NY 10004
Tel. (212) 549-2500
Fax (212) 549-2654

# EXHIBIT 1

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT

**ACLU**

AMERICAN CIVIL LIBERTIES UNION

FOUNDATION

June 27, 2007

U.S. Department of Homeland Security
Privacy Office
Mail Stop 0550
245 Murray Lane, S.W.
Washington, DC 20528-0550

Health Resources and Services Administration
Office of Communications
FOIA Requester Service Center
5600 Fishers Ln., Room 14-18
Rockville, MD 20857

U.S. Public Health Service
Freedom of Information Office
5600 Fishers Ln., Room 17A-46
Rockville, MD 20857

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

ELIZABETH ALEXANDER
DIRECTOR
ATTORNEY AT LAW

NATIONAL OFFICE
125 BROAD STREET, 18TH FL.
NEW YORK, NY 10004-2400
T/212.549.2500

OFFICERS AND DIRECTORS
NADINE STROSSEN
PRESIDENT

ANTHONY D. ROMERO
EXECUTIVE DIRECTOR

RICHARD ZACKS
TREASURER

**Re: FOIA Request Related to Deaths in Immigration Detention**

Dear Freedom of Information Officers:

This letter constitutes a request (Request) pursuant to the Freedom of Information Act, 5 U.S.C. § 552 (FOIA). The Request is submitted on behalf of the National Prison Project (NPP) of the American Civil Liberties Union (ACLU). NPP is also requesting expedited processing for this request, pursuant to 5 U.S.C. § 552(a)(6)(E) and agency regulations, and a fee waiver, pursuant to 5 U.S.C. § 552(a)(4)(A)(iii). The request is simultaneously being filed with the U.S. Department of Homeland Security, the Health Resources and Services Administration, and the U.S. Public Health Service.

## BACKGROUND

Recent news reports indicate that individuals detained by U.S. Immigration and Customs Enforcement (ICE) have died as a result of grossly inadequate medical care. Until recently, it was unknown how many individuals had died in ICE custody. Such deaths are not publicly reported and no government agency appears to be charged with the task of tracking and investigating such deaths. One attempt by the ACLU to account for in-custody deaths identified 20 deaths since 2004; this list was generated through a review of publicly available documents and correspondence with immigrants' rights advocates around the

country.  However, according to a figure recently released by ICE to The New York Times, the number of immigrant detainee deaths since 2004 is actually 64.[1]

The circumstances surrounding many of these deaths are highly disturbing and demand further investigation and oversight.  In one account, a Korean woman detained at a privately-run facility in Albuquerque, New Mexico complained for weeks about her need for medical attention.[2]  Despite her deteriorating health, the woman received little attention until she was transferred to a local hospital where she died.[3]  In February 2007, a detainee held in Hackensack, New Jersey, was denied powerful prescription medication despite experiencing crippling pain; according to other detainees, the man's severe distress was common knowledge at the jail, and he committed suicide after five agonizing days.[4]

Just yesterday, The New York Times published a front page story describing two other in-custody deaths.[5]  Sandra Kenley, a lawful permanent resident of more than 30 years, died in December 2005 after being detained in two Virginia regional jails for approximately seven weeks.  Prior to being taken into custody, Ms. Kenley notified airport immigration inspectors of her serious medical conditions, which included a scheduled surgery to treat her fibroid tumor and uterine bleeding.  She complained until her death of continued hemorrhaging and the jails' refusal to provide her with necessary prescription medications.

One year later, while detained in yet another Virginia regional jail, Abdoullai Sall died approximately ten weeks after entering immigration custody.  Throughout his detention, Sall complained to jail officials that he was not receiving the proper medication for his serious medical condition, and attempts by his immigration attorney to notify the jail of his client's worsening health were largely ignored.

Recent press attention to deaths in detention reveals just how little information is available about this problem.  According to the ICE Detention Standards, when an immigrant detainee dies in custody, the Assistant District Director for Detention and Removal Operations (DRO) is supposed to notify the District Director, the Assistant Regional Director for DRO, and the Director of Field Operations at ICE Headquarters.[6]  A local representative of the U.S. Public Health Service is to receive medical reports within 48 hours of the death, and both the family of the deceased and consular officials are to be notified about the death.[7]

The Department of Homeland Security's Office of Inspector General (OIG) publicly released a report in January 2007 detailing a series of problems with the

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[1] Nina Bernstein, *New Scrutiny as Immigrants Die in Custody*, N.Y. Times, June 26, 2007.
[2] Barbara Ferry, *Crackdown's Fallout*, The New Mexican, May 20, 2007.
[3] *Id.*
[4] Nina Bernstein, *One Immigrant Family's Hopes Lead to a Jail Cell Suicide*, N.Y. Times, Feb. 23, 2007.
[5] Bernstein, *supra* note 1.
[6] INS Detention Standard, Terminal Illness, Advance Directives, and Death (Sept. 20, 2000), 6-7.
[7] *Id.*

treatment of immigrant detainees at five facilities.[8]  One problem highlighted by
the OIG was that four of the five facilities reviewed showed serious problems
with the delivery of adequate health services.  Although the report made a general
reference to one suicide death at the Passaic County Jail,[9] it made no mention of
at least three other deaths that occurred at the San Diego Correctional Facility.
The OIG also releases semiannual reports to Congress that contain sporadic and
vague references to investigations into in-custody deaths.  Such reports provide
little useful information to assure the public that meaningful investigations are
conducted into each death, and that steps are taken to guarantee that detainees
receive necessary medical services before it is too late.[10]

Over the last ten years, the United States has dramatically increased the use of
detention for individuals in civil immigration proceedings.  In 1997, the number
of immigrants detained in the custody of U.S. Immigration and Naturalization
Service on a given day was approximately 13,000.[11]  Just ten years later, ICE has
funding to detain 27,500 individuals at any given time.[12]  As the nation considers
comprehensive immigration reform legislation, it is likely that ICE will receive
funding to detain many thousands more.  This issue will only grow in importance
over the coming years, and it is essential that the federal government—which is
ultimately responsible for the health and welfare of individuals detained pursuant
to its authority—do more to ensure that immigrant detainees do not suffer and die
unnecessarily.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

## RECORDS REQUESTED

Please disclose:

1. A complete list of individuals who have died while detained in ICE
   custody since January 1, 2004.   For each death listed, please include:
   a. Complete name;
   b. Alien number;
   c. Date on which detention began;
   d. Date of death;
   e. List of all facilities where the detainee was housed along with
      dates of detention; and

---

[8] Department of Homeland Security, Office of Inspector General, *Treatment of Immigration
Detainees Housed at Immigration and Customs Enforcement Facilities*, OIG-07-07 (Dec. 2006).
[9] *Id.* at 29.
[10] The OIG recently began a "special review" of two in-custody deaths, and is considering the ICE
Detention Standards that pertain to in-custody deaths and medical care.  The ACLU hopes that the
results of the OIG review are made public, and that the OIG make recommendations to ensure that
preventable deaths are reduced and that all deaths are properly investigated by an independent
government body.
[11] U.S. Department of Justice, Office of the Federal Detention Trustee, *Detention Needs
Assessment and Baseline Report: A Compendium of Federal Detention Statistics*, at
http://www.usdoj.gov/ofdt/.
[12] U.S. Immigration and Customs Enforcement, *ICE Accomplishments in Fiscal Year 2006* (May
15, 2007), *at* http://www.ice.gov/pi/news/factsheets/2006accomplishments.htm.

     f. Location at time of death.

2. For each individual whose death is included in (1), all records:

    a. Pertaining to the cause of death;

    b. Pertaining to requests for medical help by anyone, including the deceased, his/her family members, and fellow detainees;

    c. Pertaining to Treatment Authorization Requests (TARs) submitted to the Division of Immigration Health Services (DIHS), including any DIHS responses to those TARs;

    d. Pertaining to reports of investigations into the circumstances surrounding the death, including all after-action reports and critical incident reports;

    e. Pertaining to whether any of the detainees who died were diagnosed with terminal illnesses while in immigration detention or beforehand;

    f. Pertaining to whether any of the detainees who died were taken to outside hospitals for treatment, and if so, the names of those hospitals and the dates of treatment;

    g. Pertaining to whether and how ICE notified families of the deaths of detained family members;

    h. Pertaining to whether and how ICE notified consular officials of the deaths of detained persons;

    i. Pertaining to whether and how state, county, local officials and review boards were notified of the deaths.

3. All records, including written and electronic correspondence, pertaining to deaths in ICE custody.

4. All records, including policies, procedures, or guidelines provided to or maintained by Contract Detention Facilities, Service Processing Centers, and Intergovernmental Service Agreement facilities relating to deaths in detention, including memoranda and training materials.

5. All records identifying the manner by which your agency or any of its components track deaths in detention.

6. All records, including written and electronic correspondence, generated in response to requests for information from the Washington Post and The New York Times about immigrant detainee medical care and deaths, and in reaction to those articles. This request pertains specifically to records generated in preparation for and in response to two articles: (a) Darryl Fears, *Illegal Immigrants Received Poor Care in Jail, Lawyers Say*, Washington Post, June 13, 2007; and (b) Nina Bernstein, *New Scrutiny as Immigrants Die in Custody*, N.Y. Times, June 26, 2007.

## THE REQUESTOR

The ACLU is a nationwide, nonprofit, nonpartisan organization dedicated to protecting human rights and civil rights in the U.S. It is the largest civil liberties organization in the country, with offices in 50 states and over 500,000 members. The ACLU is specifically dedicated to holding the U.S. government accountable

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

to universal human rights principles in addition to rights guaranteed by the U.S. Constitution.

Furthermore, the ACLU publishes newsletters, news briefings, right-to-know handbooks, and other materials that are disseminated to the public. These materials are widely available to everyone, including tax-exempt organizations, not-for-profit groups, law students and faculty, for no cost or for a nominal fee through its public education department. The ACLU also disseminates information through its heavily subscribed website, http://www.aclu.org. The website addresses civil liberties issues in depth, provides features on civil liberties issues in the news, and contains hundreds of documents that relate to the issues addressed by the ACLU. The website includes features on information obtained through the FOIA. *See, e.g.*, http://www.aclu.org/patriot_foia/index.html. The ACLU also publishes an electronic newsletter, which is distributed to subscribers by e-mail.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Accordingly, the ACLU is an organization whose "main professional activity or occupation is information dissemination." 6 C.F.R. § 5.5(d)(3). The ACLU is also a "representative of the news media" for purposes of 45 C.F.R. § 5.5. Finally, the ACLU meets the criterion laid out in *National Sec. Archive v. U.S. Dep't of Defense*, where a representative of the news media is defined as an entity that "gathers information of potential interest to a segment of the public" and "uses its editorial skills to turn raw materials into a distinct work, and distributes that work to an audience." *National Sec. Archive v. U.S. Dep't of Defense*, 880 F.2d 1381,1387 (D.C. Cir. 1989).

## EXPEDITED PROCESSING

We request Track 1 expedited treatment for this FOIA request. This request qualifies for expedited treatment pursuant 5 U.S.C. § 552(a)(6)(E) and applicable regulations.

As demonstrated above, there is a "compelling need" for expedited processing sought by the ACLU. 5 U.S.C. § 552(a)(6)(E)(i)(I). The lack of expedited disclosure of records related to these deaths in detention could "reasonably be expected to pose an imminent threat to the life or physical safety of an individual." 5 U.S.C. § 552(a)(6)(E)(v)(I); 6 C.F.R. § 5.5(d)(1)(i).

Moreover, there exists a clear "urgency to inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v)(II). *See also* 6 C.F.R. § 5.5(d)(1)(ii) (expedited processing is warranted where there is "[a]n urgency to inform the public about an actual or alleged federal government activity.").

The ACLU is therefore entitled to expedited processing of this request.

## FEE WAIVER

The ACLU requests a total waiver of fees on the grounds that disclosure of the requested records is in the public interest and because disclosure "is likely to contribute significantly to the public understanding of the activities or operations of the government and is not primarily in the commercial interest of the requester[s]." 5 U.S.C. § 552(a)(4)(A)(iii). *See also* 45 C.F.R. § 5.45. This Request aims at furthering public understanding of government conduct, and specifically to help the public determine whether civil detainees in the custody of Immigration and Customs Enforcement are treated in a manner than comports with our nation's values. On account of these factors, the ACLU has not been charged fees associated with responding to FOIA requests on numerous occasions.[13]

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

In any event, as discussed *supra*, the ACLU qualifies as a "representative of the news media" and the records are not sought for commercial use. Accordingly, should fees be assessed for the processing of this Request, such fees should be "limited to reasonable standard charges for document duplication." 5 U.S.C. § 552(a)(4)(A)(ii)(II).

The ACLU is therefore entitled to a total waiver of fees associated with this request and should, in no event, be required to pay more than reasonable standard charges for document duplication alone.

\* \* \*

Thank you for your consideration of this request. If this request is denied in whole or part, the ACLU asks that you justify all deletions by reference to specific exemptions of the FOIA. We expect you to release all segregable portions of otherwise exempt material. We reserve the right to appeal a decision to withhold any information, or to deny expedited processing or a waiver of fees. We look forward to your reply to the request for expedited processing within ten (10) business days, as required under 5 U.S.C. § 552(a)(6)(E)(ii)(I).

---

[13] The following are recent examples of requests for which agencies did not charge the ACLU fees associated with responding to a FOIA request: (1) The Department of State did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in April 2005; (2) The National Institute of Standards and Technology did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in April 2005; (3) The Office of Science and Technology Policy in the Executive Office of the President did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in August 2003; (4) The Federal Bureau of Investigation did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in August 2002; (5) The Office of Intelligence Policy and Review did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in August 2002; (6) and The Office of Information and Privacy in the Department of Justice did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in August 2002.

Notwithstanding your decision on the matter of expedited processing, we look forward to your reply to the records request within twenty (20) business days, as required under 5 U.S.C. § 552(a)(6)(A)(I).[14]

Please respond to Tom Jawetz, Immigration Detention Staff Attorney, ACLU National Prison Project, 915 15th St. NW, 7th Floor, Washington, DC 20005, telephone: (202) 548-6610, email: tjawetz@npp-aclu.org. Also, please notify us in advance if the costs for photocopying the documents exceed $100. We eagerly await your response, and thank you for your assistance.

*  *  *

Under penalty of perjury, I certify, to the best of my knowledge and belief, that the above information is true and correct.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Tom Jawetz
Immigration Detention Staff Attorney
ACLU National Prison Project
915 15th Street, NW
7th Floor
Washington, DC 20005
Tel: (202) 548-6610
Fax: (202) 393-4931

---

[14] Pursuant to the Department of Health and Human Services regulations, a reply by HRSA and PHS is due within ten working days after this request has been received. 45 C.F.R. § 5.35(b)(1).

# EXHIBIT 2

**U.S. Department of Homeland Security**
Washington, DC 20528

 **Homeland Security**

July 11, 2007

Mr. Tom Jawetz
Immigration Detention Staff Attorney
ACLU National Prison Project
915 15th Street, NW
7th Floor
Washington, DC 20005

Re: **DHS/OS/PRIV 07-933/Jawetz request**

Dear Mr. Jawetz:

This acknowledges receipt of your Freedom of Information Act (FOIA) request to the Department of Homeland Security (DHS), dated June 27, 2007. Your request was received in this office on July 2, 2007. You are seeking the following information:

1. A complete list of individuals who have died while detained in ICE custody since January 1, 2004. to include the following:
    a. Complete name;
    b. Alien number;
    c. Date on which detention began;
    d. Date of death;
    e. List of all facilities where the detainee was housed along with dates of detention; and
    f. Location at time of death.
2. For each individual whose death is included in (1), all records:
    a. Pertaining to the cause of death;
    b. Pertaining to requests for medical help by anyone, including the deceased, his/her family members, and fellow detainees;
    c. Pertaining to Treatment authorization Requests (TARs) submitted to the Division of Immigration Health Services (DIHS), including any DIHS responses to those TARs;
    d. Pertaining to reports of investigations into the circumstances surrounding the death, including all after-action reports and critical incident reports;
    e. Pertaining to whether any of the detainees who died were diagnosed with terminal illness while in immigration detention or beforehand;
    f. Pertaining to whether any of the detainees who died were taken to outside hospitals for treatment and if so, the names of those hospitals and the dates of treatment;
    g. Pertaining to whether and how ICE notified families for the deaths of the detained family members;
    h. Pertaining to whether and how state, county, local officials and review boards were notified of the deaths.
3. All records, including written and electronic correspondence, pertaining to deaths in ICE custody.
4. All records including policies, procedures, or guidelines provided to or maintained by Contract Detention Facilities relating to deaths in detention, including memoranda and training materials.

5. All records identifying the manner by which your agency or any of its components track deaths in detention.
6. All records, including written and electronic correspondence, generated in response to requests for information from the Washington Post and the New York Times about immigration detainee medical care and deaths, and in reaction to those articles. This request pertains specifically to records generated in preparation for and in response to two articles: (a) Darryl Fears, Illegal Immigrants Received Poor Care in Jail, Lawyers Say, Washington Post, June 13, 2007; and (b) Nina Bernstein, New Scrutiny as Immigrants Die in Custody, N.Y. Times, June 26, 2007.

As it relates to your request for expedited treatment, your request is denied.

Under the DHS FOIA regulation, expedited processing of a FOIA request is warranted if the request involves "circumstances in which the lack of expedited treatment could reasonably be expected to pose an imminent threat to the life or physical safety of an individual," 6 C.F.R. § 5.5(d)(1)(i), or "an urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information," 6 C.F.R. § 5.5(d)(l)(ii). Requesters that seek expedited processing must submit a statement explaining in detail the basis for the request, and that statement must be certified by the requester to be true and correct. 6 C.F.R. § 5.5(d)(3).

Your request for expedited processing is denied because you do not qualify for either category. You failed to demonstrate a particular urgency to inform the public about the government activity involved in the request beyond the public's right to know about government activity generally. Your letter was conclusory in nature and did not present any facts to justify a grant of expedited processing under the applicable standards.

As it relates to your fee waiver request, your request will be held in abeyance pending the quantification of responsive records. The DHS FOIA Regulations, 6 CFR § 5.11(k)(2), set forth six factors to examine in determining whether the applicable legal standard for a fee waiver has been met: (1) Whether the subject of the requested records concerns "the operations or activities of the government;" (2) Whether the disclosure is "likely to contribute" to an understanding of government operations or activities; (3) Whether disclosure of the requested information will contribute to the understanding of the public at large, as opposed to the individual understanding of the requestor or a narrow segment of interested persons; (4) Whether the contribution to public understanding of government operations or activities will be "significant;" (5) Whether the requester has a commercial interest that would be furthered by the requested disclosure; and (6) Whether the magnitude of any identified commercial interest to the requestor is sufficiently large in comparison with the public interest in disclosure, that disclosure is primarily in the commercial interest of the requestor. If any responsive records are located, we will consider these factors in our evaluation of your request for a fee waiver.

In the event that you fee waiver is denied, we shall charge you for records in accordance with the DHS Interim FOIA regulations as they apply to non-commercial requestors. As a non-commercial requestor you will be charged 10-cents a page for duplication, although the first 100 pages are free, as are the first two hours of search time, after which you will pay the per quarter-hour rate of the searcher. You will be promptly notified once a determination is made regarding your fee waiver request.

Upon initial review of your request, I have determined that the information you are seeking is under the purview of more than one DHS component. Therefore, in addition to processing your request within this office, I am referring your request to the following DHS components for processing and direct response to you:

- **U.S. Immigration and Customs Enforcement** (ICE): You may contact the FOIA Officer for ICE, Catrina Pavlik-Keenan, by writing to U.S. Immigration and Customs Enforcement, 800

North Capitol Street, N.W., 5th Floor, Suite 585, Washington, D.C. 20528 or by calling 202-732-0300.

- **Office of the Inspector General** (OIG):  You may contact the FOIA Officer for OIG, Nikki Gramian, by writing to U.S. Department of Homeland Security, Office of the Inspector General, 245 Murray Drive, Bldg. 410, Mail Stop - 2600, Washington, D.C. 20528-0001 or by calling 202-254-4001.

As it relates to this office, we will query the DHS Executive Secretariat for records responsive to your request.  If there are any additional DHS components that you would like us to search, please advise this office.  A list of DHS components may be found at:  http://www.dhs.gov/xabout/structure/index.shtm.

Due to the increasing number of FOIA requests received by this office, we may encounter some delay in processing your request.  Per Section 5.5(a) of the DHS FOIA regulations, 6 C.F.R. Part 5, the Department processes FOIA requests according to their order of receipt.  Although DHS' goal is to respond within 20 business days of receipt of your request, the FOIA does permit a 10-day extension of this time period.  As your request seeks numerous documents that will necessitate a thorough and wide-ranging search, DHS will invoke a 10-day extension for your request, as allowed by Title 5 U.S.C. § 552(a)(6)(B).  If you care to narrow the scope of your request, please contact our office.  We will make every effort to comply with your request in a timely manner; however, there are currently 49 open requests ahead of yours.

If you deem the decision to deny expedited treatment of your request an adverse determination, you may exercise your appeal rights.  Should you wish to do so, you must send your appeal within 60 days of receipt of this letter to:  Associate General Counsel (General Law), U.S. Department of Homeland Security, Washington, D.C. 20528, following the procedures outlined in Subpart A, Section 5.9, of the DHS Regulations.  Your envelope and letter should be marked "Freedom of Information Act Appeal."  Copies of the DHS regulations are available at:  www.dhs.gov/foia.

If you need to contact this office again concerning your request, please refer to **DHS/OS/PRIV 07-933/Jawetz request**.  This office can be reached at 866-431-0486.

Sincerely,

Vania T. Lockett
Associate Director, Disclosure & FOIA Operations

# EXHIBIT 3

*Office of Public Affairs*
**U.S. Department of Homeland Security**

# Public Affairs Guidance



**U.S. Immigration and Customs Enforcement**

**July 12, 2007**

Contact: ICE Public Affairs
202-514-2648

## Response to ACLU allegations on ICE Detainee Medical Care

### Allegations:

The American Civil Liberties Union filed a Freedom of Information Act (FOIA) request to obtain information about the nature of 62 deaths of people in immigration detention since 2004.

Immigration and Customs Enforcement (ICE) reported 62 detainee deaths since 2004, but ICE refused to provide any details about the nature or causes of the deaths.

The "high number" of deaths in detention raise concerns about the quality of care provided to ICE detainees. It is imperative that information about these deaths be revealed to the public.

The ACLU believes that deficient medical care for prisoners is a leading cause of death in immigration detention, based on complaints it has received from detainees and information about nearly 20 detainee deaths since 2004, including those featured in yesterday's *New York Times* story.

This month, the ACLU filed a lawsuit against the San Diego Correctional Facility (SDCF), an ICE facility run by Corrections Corporation of America (CCA), the largest for-profit correctional services provider.

In its lawsuit, the ACLU challenged flawed medical care policies and the denial of needed treatment by the U.S. Public Health Service and the Division of Immigration Health Services resulting in the unnecessary suffering and deaths of numerous detainees at SDCF.

People are suffering unnecessarily in ICE custody. Deficient medical care seems to be a systemic problem, which is why we are trying to obtain more information about these deaths.

ACLU wants to know whether ICE—or any independent monitoring agency—keeps track of the deaths of immigrant detainees, who are often housed in county jails around the country alongside criminal detainees, or in one of numerous crowded immigration detention facilities managed by private prison companies.

The ACLU applauds the news that the Department of Homeland Security Office of the Inspector General (OIG) will be conducting a "special review" of two in-custody deaths, and urges the OIG to publicly release the findings of those reviews and make recommendations to ensure that preventable deaths are reduced and that all deaths are properly investigated by an independent government body.

The OIG releases semiannual reports to Congress that contain sporadic and vague references to investigations into in-custody deaths. Such reports provide little useful information to assure the

public that meaningful investigations are conducted into each death, and that steps are taken to guarantee that detainees receive necessary medical services before it is too late.

Absent transparency about these deaths in detention, we can assume that ICE has something to hide.

**Statement:**

- As the population ICE detains typically has little preventive or ongoing medical care, it's sadly not surprising that health issues are prevalent and some chronic conditions result in death.

- ICE is committed to providing all immigration detainees in our care with humane and safe detention environments and ensuring that adequate medical services are available. ICE spends more than $72 million annually on detainee medical issues and the medical staff who provide or arranges health care for detainees have the same medical certifications as those serving the U.S. Bureau of Prisons and most major medical institutions across the nation.

- Nearly one million individuals came through detention facilities in the same time period covered by the allegations you have cited. Each of them received taxpayer-funded medical treatment, including a comprehensive health screening, or care management provided not by ICE, but by the Division of Immigration Health Services of the Department of Health and Human Services' Health Resources and Services Administration (DIHS), for a total of $259 million.

- Each ICE detainee is medically screened after arriving in ICE custody. Last year, of the 115,088 screenings, 24% (27,525 individuals) were identified as having chronic conditions, mostly hyper tension or diabetes. Many of these detainees would not have identified their medical ailment or received medical care and treatment were it not for the comprehensive screening process.

- Given that the population of aliens detained by ICE tripled between 2001 and 2006 (from approximately 95,000 to approximately 283,000), we are pleased that GAO reports show, in the vast majority of cases, that the agency is complying with the National Detention Standards governing alien detention facilities.

- On any given day, U.S. Immigration and Customs Enforcement (ICE) houses up to 27,500 immigration detainees in more than 325 facilities nationwide. ICE takes our charge to adhere to these standards seriously, conducting comprehensive annual audits of detention facilities using more than 300 officers specifically trained to perform these audits. This exceeds the American Correctional Association and other leading industry groups' recommendation of audits of correctional facilities every three years.

- We don't believe that only healthy individuals should be accountable for violating the law, while others should get a pass. When we do detain those with illnesses, ICE has a moral obligation to care for them, which we uphold each and every day in a manner of which the American people can be proud.

## Detention/Medical Standards

**Talking Points**

- On any given day, U.S. Immigration and Customs Enforcement (ICE) houses up to 27,500 immigration detainees in more than 325 facilities nationwide. ICE takes our charge to adhere to these standards seriously, conducting comprehensive annual audits of detention facilities using more than 300 officers specifically trained to perform these audits. This exceeds the American Correctional Association and other leading industry groups' recommendation of audits of correctional facilities every three years.

- Whenever ICE identifies potential challenges regarding standards at a detention facility, the facility is required to develop a plan to address the situation. ICE follows up with a comprehensive review within 90 days.

- It is also important to note that the length of stay in an ICE detention facility is considerably shorter than that of a correctional facility. In 2006, the average stay was 33 nights.

- ICE is committed to maintaining safe, secure and humane detention conditions and invests heavily in the welfare of the detained alien population.

- In FY 2006, ICE spent approximately $98 million dollars providing medical care to detainees and $335,000 for detainee legal materials.

- Nearly one million individuals came through detention facilities in the same time period covered by the stories. Each of them received taxpayer-funded medical treatment, including a comprehensive health screening, or care management provided not by ICE, but by the Division of Immigration Health Services of the Department of Health and Human Services' Health Resources and Services Administration (DIHS), for a total of $259 million.

- Last year alone, DIHS identified chronic conditions in 24% of detainees that they screened. In each case of a death, the local medical examiner is notified and makes a determination whether an autopsy or further investigation is warranted.

### Statistics, if asked

Percentages of detention facilities (2-19-07)

65% Intergovernmental Agreements with state and local jails/prisons
19% Contract Detention Facilities (Commercial)
14% Service Processing Centers (ICE owned)
2%  Bureau of Prisons

FY04: 233,000 aliens detained, 29 died
FY05: 237,000 detained, 15 died
FY06: 284,000 detained, 17 died
FY07 (through May): 245,000 detained, 2 died

## Detailed Case by Case response (DRO):

**Alleged medical malpractice (current situation unknown) CANNOT RELEASE INFO PER OPLA SUSAN MATHIS WITHOUT WAIVER BASED ON DHS PRIVACY OFFICE POLICY**



: DIHS CASE

**Allegation:**

**DIHS Response:**

b6
b7c

**Criminal History**

NOT DIHS

**CANNOT RELEASE INFO PER OPLA SUSAN MATHIS WITHOUT WAIVER BASED ON DHS PRIVACY OFFICE POLICY**

**Allegation:**

████████████████████████████████████████████████████

*DIHS Response:*

████████████████████████████████████████████████████

████████████████████ NOT DIHS

**CANNOT RELEASE INFO PER OPLA SUSAN MATHIS WITHOUT WAIVER BASED ON DHS PRIVACY OFFICE POLICY**

**Allegation:**

████████████████████████████████████████████████████

*DIHS Response:*

████████████████████████████████████████████████████

████████████████████ NOT DIHS

**CANNOT RELEASE INFO PER OPLA SUSAN MATHIS WITHOUT WAIVER BASED ON DHS PRIVACY OFFICE POLICY**

**Allegation:**

████████████████████████████████████████████████████

b6
b7c

Alleged DECEASED due to medical malpractice or while in ICE custody. This material is releasable.

Sandra Kenley, Barbados:

**NOT DIHS**

**Allegation:** Who allegedly did not get medicine for a large uterine fibroid before she died in December at the Hampton Roads Regional Jail in Portsmouth, Va.

***DIHS Response:*** There are no medicines prescribed to treat a uterine fibroid other than perhaps aspirin or other mild pain medicine to deal with any discomfort. Furthermore, the autopsy proved that the cause of death was totally unrelated to a uterine fibroid. On December 18, 2005, the detainee fell out her bed striking her head on a bin used for storage. She was discovered at 3:31 PM, EMS was called at 3:33 PM and an ambulance responded at 3:44PM. She was found to be in cardiac arrest at the local emergency room, and was pronounced dead at 4:32 PM. An autopsy was performed, and revealed that "death must be attributed to acute coronary insufficiency, or cardiac arrhythmia, brought on by a chronically enlarged heart, due to long-standing hypertension." Death was not due to head injury or a uterine fibroid.

**Abdoulai Sall, Sierra Leone: NOT DIHS**

**Allegation:** Who allegedly did not get treatment for a kidney ailment before he died in December at the Piedmont Regional Jail in Va.

***DIHS Response:*** On December 2, 2006, the detainee was seen by other detainees to fall to the floor from a standing position. Correctional officers responded to a disturbance report issued at the location, found the detainee on the floor, and called a medical emergency over the radio. The officers initiated life support, and continued life support until an ambulance responded. The detainee was transported to the emergency room (ER), arriving at 2:55AM hours. The ER staff continued to perform life support until 3:06 AM hours, when the detainee was pronounced dead. An autopsy is being performed, and the results are pending.

**Nery Romero, El Salvador:  NOT DIHS**

**Allegation:** Who allegedly did not have access to pain medicine he had been taking after a motorcycle injury before he was found hanging in his cell in February at the Bergen County jail in N.J.

***DIHS Response:*** On February 12, 2007 at 11:10 PM hours, the detainee was found hanging in his cell with a sheet tied around his neck. Life support was initiated until an ambulance arrived. The detainee was taken to an emergency room, where he was pronounced dead at 2349 hours. The detainee arrived to the jail on February 9, 2007. He was specifically asked about mental health conditions including suicidal thoughts, attempts, and other signs and symptoms suggesting a risk for self harm. The detainee denied these signs, symptoms, or history relating to suicide. An autopsy has been ordered, and is pending.

**Young Sook Kim:  NOT DIHS**

**Allegation:** Who died at the New Mexico Regional Jail in Albuquerque in September 2006.

***DIHS Response:*** The detainee arrived to the detention facility in late August 2006, and was under care for diabetes. On September 4, 2006, she complained of nausea and abdominal pain, and was referred to the local emergency room for evaluation and treatment. She was admitted to the hospital. Subsequent evaluation revealed advanced cancer of the pancreas. She remained in the hospital until her death on September 11, 2006.

**Richard Rust, died at Oakdale Center, LA NOT DIHS**

**Allegation:** At the Oakdale Center in Louisiana (5/2004)

***DIHS Response:***  On May 29, 2004 at 1820 hours, a correctional officer called for medical assistance after finding the detainee unconscious in the barber shop.  Witnesses report that the detainee had just finished playing basketball, entered the barber shop, and passed out.  Life support was administered by the correctional officer and a staff nurse who responded.  An ambulance arrived and transported the detainee to a local hospital, and was pronounced dead at 1924 hours.  An autopsy was done, and reports the cause of death as, "cardiac arrhythmia, due to acute exacerbation of heart failure, due to massive dilated and hypertrophic cardiomyopathy, due to interstitial fibrosis of heart."

## Nelson Enriquez, Etowah Center, AL NOT DIHS

**Allegation:** At the Etowah Center in Alabama (8/2004)

***DIHS Response:***  On August 11, 2004, the detainee was found lying in a fetal position on the floor of his cell.  He had apparently been sitting on the toilet when he blacked out, striking his head on the floor or the wall.  When he was found, he had a pulse and was breathing.  Medical assistance was called.  The detainee stopped breathing in the presence of Gadsden Fire Emergency Medical Service personnel, who began life support.  The detainee was transported to a local hospital, where he was pronounced dead at 4:05AM hours.  An autopsy was performed, and lists the cause of death as "thrombus occluding one of the coronary arteries" and "arteriosclerotic cardiovascular disease."

## Rev. Joseph Dantica, Krome, FL  DIHS

**Allegation:** Krome Center in Miami (11/2004)

***DIHS Response:***  The detainee arrived to the detention facility on October 30, 2004, reported a history of hypertension and was taking medication "for the prostate."  He had medication with him that he brought from Haiti in unmarked containers, including a medication in an envelope with the word "diazepam" written in pencil on the envelope.  The medical staff evaluated him, and prescribed medication for his hypertension.  On November 2, 2004 at approximately 9:00 AM, during a legal visit, the detainee vomited and complained of abdominal pain.  The facility medical staff responded, transported him to the medical clinic for observation, and shortly thereafter sent him to the emergency room via ambulance.  He was admitted to the local hospital in the afternoon of the same day.  On November 3, 2004 at 10:00PM, ICE was notified by the hospital that the detainee was pronounced dead at 8:46 PM that day.  An autopsy was done, and lists the cause of death as acute and chronic pancreatitis.

## Heq Sung Soo, Passaic County NOT DIHS

**Allegation:** Passaic County Jail in N.J (2/2005)

***DIHS Response:***  On January 20, 2005, the detainee attempted to hang himself in his cell.  He was not seriously injured.  He was taken to a local hospital and admitted.  On January 22, 2005, he was transferred from the local hospital to an inpatient psychiatric hospital for treatment, and stayed at the hospital until February 11, 2005.  According to the Discharge Summary from the psychiatric hospital, "It is the general consensus of the ITU treatment team that this patient has reached maximum benefit from this course of hospitalization, has not demonstrated any self-destructive behavior at this facility and shall now be returned to the custody of the INS."  He was placed in the receiving area of the jail for observation.

On February 15, 2005, the detainee was placed into the Segregation-Disciplinary Unit (SDU) of the jail for observation and due to behavioral problems.  The SDU cell was monitored by a camera, which has a live feed to the Control Unit.

On February 16, 2005, at approximately 8:45AM, the detainee committed suicide by hanging in his cell using a string from a blanket. He was transported to a local hospital immediately following the incident, and was pronounced dead at 9:45AM hours.

### Maria Filomena Merchan, ramsey County Jail, NOT DIHS

**Allegation:** Ramsey County Jail in St. Paul (4/2006)

***DIHS Response***: At approximately 8:40AM on April 3, 2006, the detainee fell out of her bunk and was transported to the local hospital for evaluation. She was admitted to the hospital and diagnosed with a serious, chronic infection of the brain with parasites which caused bleeding in the brain. She was eventually removed from life support on April 13, 2006, and died shortly thereafter.

### Ingacio Sarabia-Villasenor, CCA San Diego DIHS

**Allegation:** CCA in San Diego (1/2005)

***DIHS Response***: On January 4, 2005, witnesses report that the detainee fell to the floor while in the shower and stopped breathing. The witnesses notified correctional officers, who alerted Emergency Medical Services and began life support. The facility medical staff also provided life support until an ambulance arrived. The detainee was taken to a local emergency room, where life support was continued until 7:42 PM, when he was pronounced dead. An autopsy determined the cause of death as "sudden cardiac arrest due to ischemic heart disease due to coronary atherosclerosis."

### General ICE Detainee Medical Care Talking points:

### Background

- Today, ICE spends more than $72 million annually on detainee medical issues and more than 260,000 detainees come through the system each year. ICE is committed to providing all immigration detainees in our care with humane and safe detention environments and ensuring that adequate medical services are available.

- The Division of Immigration Health Services (DIHS), a component of the Department of Health and Human Services' Health Resources and Services Administration, provides or arranges for health care services for illegal aliens detained by ICE. This relationship dates back to 1891 when the Immigration Act authorized the Public Health Service to examine and quarantine aliens at Ellis Island.

### Medical Screenings and Care

- DIHS completes on-site physicals, intake screenings and identifies potential chronic care issues for detainees in ICE custody.

- The detainee population at ICE is normally composed of a relatively young and healthy population. The average length of stay is about 30 days, but could be longer as determined by ICE. Many are identified with preexisting medical ailments and other chronic conditions, such as hypertension or diabetes.

- The most common chronic conditions seen at DIHS medical facilities are diabetes and hypertension. According to the Center for Disease Control and Prevention, 7% of Americans have diabetes and 28% have hypertension.

- In Fiscal Year 2006, DIHS staffed facilities provided the following:

  o 4,311 chronic disease visits for hypertension representing 41% of the total chronic visits

- o   2,497 chronic disease visits for diabetes representing 24% of the total chronic visits
- o   942 referrals made to medical specialist
- o   16,312 on-site dental visits

- Each detainee that is identified with a chronic care issue is treated and educated on self-care needs, and appropriate treatment and follow-up are coordinated. Any case that is identified by the Case Management Branch, from a jail, is also monitored and provided the necessary and appropriate care needed at that time. DIHS medical staff and the Epidemiology branch also monitor TB cases to assure continuity of care even when the detainee is to be released from custody or returned to their country of origin.

- In ICE-owned service processing centers and certain designated contract detention facilities, detainee **health services are provided** _**on-site**_ by U.S. Public Health Service commissioned officers (e.g., physicians, dentists, pharmacists, psychologists, nurses) that are assigned to the DIHS.

- At most other contract detention facilities and local jails, _**on-site**_ **medical care is provided** to detainees through commercial contracts or intergovernmental service agreements (IGSAs).

- Whoever the service provider, ICE detainees receive appropriate and cost effective health services consistent with community standards and the ICE mission.

- At non-ICE detention facilities, immigration detainees receive the same medical care as U.S. citizen detainees of the facility.

### Terminal Illness, Advance Directives and Death

- The current ICE policy is that when detainees die in our care or when allegations of medical impropriety arise, ICE refers the case to the Office of Professional Responsibility for investigation.

- All ICE-owned or contracted facilities have policies addressing the care of terminally-ill patients in our custody.

- When a detainee is hospitalized, even though ICE retains the authority to make administrative decisions affecting the detainee, like visitation, the hospital assumes medical decision-making authority consistent with the contract, including the patients drug regimen, lab tests, x-rays and treatments.

- If a detainee dies while in ICE custody, it is our policy to notify the next of kin and to include an account of the medical details.

# ICE #

_U.S. Immigration and Customs Enforcement (ICE) was established in March 2003 as the largest investigative arm of the Department of Homeland Security. ICE is comprised of five integrated divisions that form a 21st century law enforcement agency with broad responsibilities for a number of key homeland security priorities._

# EXHIBIT 4



*Office of the Inspector General*
**U.S. Department of Homeland Security**
Washington, DC 20528

**JUL 18 2007**

Tom Jawetz
Immigration Detention Staff Attorney
ACLU National Prison Project
915 15th Street, N.W.
Washington, D.C.  20005

SUBJECT:  Freedom of Information Act Request No. 2007-246

Dear Mr. Jawetz:

This letter acknowledges receipt of your Freedom of Information Act (FOIA) request dated June 27, 2007, to the Privacy Office for the Department of Homeland Security (DHS).  You have requested expedited review and a fee waiver.  The Privacy Office referred your request to the Office of Inspector General (OIG) on July 12, 2007.  Your request was assigned the above-referenced FOIA tracking number.

As to your request for expedited review, 5 U.S.C. § 552(a)(6)(E)(i) states that "each agency shall promulgate regulations … providing for expedited processing of requests for records." There are two categories of requests that merit expedited review under DHS FOIA regulations: (1) requests for which a "lack of expedited treatment could reasonably be expected to pose an imminent threat to the life or physical safety of an individual;" or (2) where there is "an urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information."  6 C.F.R. §§ 5.5(d)(1)(i), (ii).

It appears that you have requested expedited treatment on the basis of "an urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information."  6 C.F.R. § 5.5(d)(ii).  Under DHS FOIA regulations, a requester seeking expedited treatment on this basis, "if not a full-time member of the news media, must establish that he or she is a person whose main professional activity or occupation is information dissemination, though it need not be his or her sole occupation."  6 C.F.R. § 5.5(d)(iii).  Such requests must also "establish a particular urgency to inform the public about the government activity involved in the request, beyond the public's right to know about government activity generally."  Id.

Based on my review of the information contained in your request, I am denying your request for expedited processing.  You have not provided any evidence that information dissemination is your main professional activity, nor have you adequately demonstrated a particular urgency to inform the public regarding the subject matter of your request, beyond the public's general right to know about government activity.

Since your request does not meet the criteria for expedited review, OIG will place your request in the queue for processing in the order in which it was received.  Simple requests are answered more quickly and will be placed on the fast track of our multi-track processing system.  More complex requests, including those calling for a particularly large volume of records, are segregated into a group designated as Project Requests.  These requests require significantly more processing time and are processed separately in the order in which received.  Unfortunately, we cannot predict exactly when your request will be processed, as we currently have a backlog of such requests.  The OIG is devoting additional staff and resources to reducing this backlog and using its best efforts to process all requests with due diligence on a first-in, first-out basis.

Regarding your fee status request, I am denying your request for "representative of the news media" status.  DHS FOIA regulations specifically define "representative of the news media" as "any person actively gathering news for an entity that is organized and operated to publish or broadcast news to the public."  6 C.F.R. §§ 5.11(b)(6).  Based on the information contained in your letter, I am denying your request for this fee status because you have not presented a convincing argument that ACLU is an entity organized and operated to publish or broadcast news to the public.  See id.

Although your request for "representative of the news media" status is denied, you are entitled to two hours of search time and 100 pages of releasable records free of any charges.  6 C.F.R. § 5.11(d)(3).  Should search time exceed two hours and duplication costs exceed 100 pages, we will charge you in accordance with DHS FOIA regulations.  In accordance with DHS regulations, this letter also confirms your agreement to incur all applicable fees involved in the processing of your request, up to the amount of $25.00.  6 C.F.R. § 5.11.

We are holding your request for a fee waiver in abeyance pending the review and quantification of responsive records.

You have the right to appeal my denial determination of your expedited review request.  Your appeal must be in writing and **received** within 60 days of the date of this response.  Please address any appeal to:

Associate General Counsel (General Law)
Department of Homeland Security
Washington, D.C.  20528.

Both the envelope and letter of appeal must be clearly marked, "Freedom of Information Act/Privacy Act Appeal."  Your appeal letter must also clearly identify the OIG's response.  Additional information on submitting an appeal is set forth in the Department of Homeland Security regulations at 6 C.F.R. § 5.9.

Please refer to the above-referenced tracking number if you contact us regarding your request.  Our mailing address is DHS/Office of Inspector General/STOP 2600, 246 Murray Drive, Building 410, Washington, D.C.  20528.  If we need additional information, we will contact you.

If you have questions, you may contact Ms. Nikki Gramian, FOIA/PA Analyst, at (202) 254-4001.  Thank you.

Sincerely,

Katherine R. Gallo
Assistant Counsel to the Inspector General

# EXHIBIT 5



U.S. Department of Homeland Security
425 I Street, NW
Washington, DC  20536

## U.S. Immigration and Customs Enforcement

July 24, 2007

Mr. Tom Jawetz
ACLU
915 15th Street, NW 7th Floor
Washington, DC 20005

Re: **07-FOIA-52835**

Dear Mr. Jawetz:

This acknowledges receipt of your June 27, 2007 Freedom of Information Act (FOIA) request to the Department of Homeland Security (DHS), seeking deaths in immigration detention.  Your request was received in this office on July 24, 2007.

As it relates to your request for expedited treatment, your request is denied.

Under the DHS FOIA regulation, expedited processing of a FOIA request is warranted if the request involves "circumstances in which the lack of expedited treatment could reasonably be expected to pose an imminent threat to the life or physical safety of an individual," 6 C.F.R. § 5.5(d)(1)(i), or "an urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information," 6 C.F.R. § 5.5(d)(l)(ii).  Requesters that seek expedited processing must submit a statement explaining in detail the basis for the request, and that statement must be certified by the requester to be true and correct.  6 C.F.R. § 5.5(d)(3).

Your request for expedited processing is denied because you do not qualify for either category.  You failed to demonstrate a particular urgency to inform the public about the government activity involved in the request beyond the public's right to know about government activity generally.  Your letter was conclusory in nature and did not present any facts to justify a grant of expedited processing under the applicable standards.

FOR MEDIA/EDUCATIONAL REQUESTERS:

Provisions of the FOIA allow us to recover part of the cost of complying with your request.  We shall charge you for records in accordance with the DHS FOIA regulations as they apply to media requestors.  As a media/educational requestor you will be charged 10-cents a page for duplication, although the first 100 pages are free.  [We will construe the submission of your request as an agreement to pay up to $25.00.  You will be contacted before any further fees are accrued.]

We have queried the appropriate component of DHS for responsive records. If any responsive records are located, they will be reviewed for determination of releasability. Please be assured that one of the processors in our office will respond to your request as expeditiously as possible. We appreciate your patience as we proceed with your request.

Your request has been assigned reference number **07-FOIA-52835.** Please refer to this identifier in any future correspondence. You may contact this office at 1-866-633-1182 or 202-732-0310.

Sincerely,

Catrina M. Pavlik-Keenan
FOIA Officer

# EXHIBIT 6



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of Communications
Health Resources and
  Services Administration
5600 Fishers Lane, Rm. 14-15
Rockville MD 20857

August 7, 2007

Mr. Tom Jawetz
Immigration Detention Staff Attorney
American Civil Liberties Union Foundation
National Prison Project
915 15th Street, N.W., 7th Floor
Washington, DC 20005

RE: Freedom of Information Act Case Number HRSA 07-149

Dear Mr. Jawetz:

This is in response to your request for various documents pertaining to the deaths of
individuals detained by U.S. Immigration and Customs Enforcement, which you
requested under the FOIA.

Our Bureau of Primary Health Care, Division of Immigration Health Services has
advised me that other than the enclosed policy and procedures, HRSA has no
additional documents.   The Department of Homeland Security, Bureau of
Immigration and Customs Enforcement have sole ownership of detainee medical
records.

The Department of Health and Human Services' policy calls for the fullest
responsible disclosure consistent with the requirements of administrative necessity
and confidentiality which are recognized by the FOIA, 5 U.S.C. 552, and the
Department's implementing Public Information Regulations, 45 CFR Part 5.

In accordance with the FOIA, Section 5.42(2), the Department of Health and Human
Services has established a policy that FOIA fees of $25 or less will be waived.  As a
result, the fee associated with this FOIA response has been waived.

If I can assist you further, please call this office at (301) 443-2865.

Sincerely,

Hazel Hargrove
Hazel Hargrove
Freedom of Information Specialist

Enclosures

**Division of Immigration Health Services**
**National Policy**
**Chapter 3 – Administrative Management**

**3.10.2 Deaths**.  In the event of a detainee death the Associate Director for Field Operations and the Medical Director are to be notified immediately by phone.  If neither can be reached, the Deputy Director or Director is to be notified. All medical records should be secured and the HSA is to Fedex the original and fax a copy to Headquarters immediately (see SOP 3.10.2, Mortality Notification).

> **3.10.2.1. Mortality Review**.  A review will be conducted after any detainee death while in ICE custody, to include those in SPCs, contract detention facilities, inter-governmental service agreement facilities (see SOP 3.10.2.1).

> **3.10.2.2. Mortality Database**.  A database will be maintained on all deaths while in ICE custody, to include those in SPCs, contract detention facilities, and inter-governmental service agreement facilities (see SOP 3.10.2.2).

# STANDARD OPERATING PROCEDURE
## Mortality Notification
### SOP 3.10.2

Rev. 8/28/06

**PURPOSE: TO ESTABLISH AND MAINTAIN A DATABASE OF ALL DEATHS AMONG ICE-DETENTION AND REMOVAL OPERATIONS (DRO) DETAINEES, TO ASSIGN RESPONSIBILITIES AND TIME PARAMETERS FOR MORTALITY REPORTS AND REVIEWS REFLECTING ICE DETENTION STANDARDS, AND TO REVIEW CASES TO INSURE THE PROVISION OF HIGH QUALITY MEDICAL SERVICES.**

I.    **Notification of Mortality.**

    A.  **Immediate notification is required as follows:**
        1.  Service Processing Center (SPC)
            a.  Officer in charge (OIC) $\rightarrow$ Field Office Director (FOD) $\rightarrow$ Immigrations and Customs Enforcement (ICE), Detention and Removal (DRO) Headquarters (HQ).
            b.  Clinical Director (CD) and Health Services Administrator (HSA) $\rightarrow$ Associate Directors, Operations Branch and Medical Services Branch $\rightarrow$ Director, Division of Immigration Health Services (DIHS).

        2.  Contract Detention Facility (CDF)
            a.  Public Health Services (PHS) staffed CDF, as above.
            b.  Non-PHS staffed CDF.
                i) OIC $\longrightarrow$ FOD $\rightarrow$ ICE DRO HQ

                ii) ICE DRO HQ $\rightarrow$ DIHS HQ

        3.  Inter-Governmental Service Agreement (IGSA) facilities follow process for non-PHS staffed CDF above.

    B.  **Reference ICE Detention Standard, "Terminal Illness, Advanced Directives, and Death"**
        1.  Section III, E, 6a2, Medical Reports, "Within 48 hours, the Assistant District Director (ADD)/DRO shall send all available medical reports to the local representative of the U.S. Public Health Service (USPHS)".
        2.  For SPCs and PHS-staffed contract detention centers, the local USPHS

representative shall be the HSA on-site, who shall forward via FedEx all reports listed in section-C below to the DIHS Medical Director.

3. For non-PHS staffed CDFs and IGSA facilities, the ADD/DRO shall forward all medical reports via FedEx to the DIHS Medical Director. Medical Services Branch a the following address:

1220 L Street, NW
Suite 500
Washington, DC 20005
Phone: 202-514-3339

## C. Documents required to be submitted to DIHS HQ

1. Mortality Review
   a. For SPC and PHS-staffed CDF, use QMD 006 form
   b. For non-PHS staffed CDF and IGSA facilities:
      i) The local health authority on-site shall prepare a summary of the case, to include the detainee's name, alien number, date of birth, place of death, brief clinical synopsis of events leading to death (including staff response), and past medical history.
      ii) If the death occurred in the community hospital, length of hospitalization or emergency care provided shall be included.
2. Death Certificate (copy)
3. Autopsy Report, when available
4. Original Medical Record

## STANDARD OPERATING PROCEDURE
### Mortality Review
SOP 3.10.2.1

New SOP

8/28/06

## PURPOSE: TO ESTABLISH A PROCEDURE FOR ENSURING MORTALITY REVIEW OF ALL DETAINEE DEATHS THAT OCCUR IN ICE CUSTODY.

**I.    Mortality Review**

A.  A mortality review shall be conducted on each detainee death by DIHS or the relevant health authority to (i) determine the appropriateness of clinical care, (ii) ascertain if corrective action in a system's policies, procedures, and/or practices is warranted, and (iii) identify trends that require further study and analysis.

B.  For SPCs and PHS-staffed CDFs:

1.  A mortality review must be conducted on a detainee's death within 30 days of the alien's passing. Form QMD 006 will be utilized for this purpose.

2.  If an autopsy report or relevant report of investigation is pending, the mortality review will still meet the 30-day requirement, with an addendum to the report when the outstanding document is received.

3.  The on-site HSA will be responsible for collecting the following documents and forwarding them via Fed-Ex to the DIHS Medical Director: (i) mortality review, (ii) copy of death certificate, (iii) autopsy report, and (iv) original medical record.

C.  For non-PHS staffed CDFs, IGSAs, and BOP facilities:

1.  The local health authority shall perform a mortality review according to the policy of the contract or government agency.

2.  The local health authority shall provide to the DIHS Medical Director <u>no later than</u> 45 days from the date of the detainee's death a copy of its completed mortality review or a formal summary of the case, to include the detainee's name, alien number, date of birth, place of death, brief clinical synopsis of events leading to death (including staff response), and past medical information. If the

death occurred in the community hospital, length of hospitalization or emergency care provided shall also be included.

3. The DIHS National Information Systems Consultant will be responsible for collecting the following documents and forwarding them to the DIHS Medical Director: (i) mortality review or synopsis, (ii) copy of death certificate, (iii) autopsy report, and (iv) medical and/or hospitalization records.

4. The DIHS Medical Director or designee shall determine whether to perform any further review of the mortality. If a further mortality review is deemed necessary, then a second reviewer will be identified by the DIHS Medical Director to perform the mortality review. If it is deemed that a further review is not necessary, then the mortality review will be considered complete.

## II. Dissemination of Mortality Review Findings

A. To ICE:

1. For SPCs and PHS-staffed CDFs:

HQ DIHS will prepare a summary memorandum to the Deputy Assistant Director, Detention Management, no later than 45 days from the date of death, that outlines: (i) the deceased's medical history, (ii) cause of death, (iii) identified strengths, weaknesses, and/or errors in DIHS and/or ICE policies and procedures, and (iv) medical recommendations for corrective action. A copy of the autopsy report, if applicable, will be attached to the DIHS summary.

2. For non-PHS staffed CDFs, IGSAs, and BOP facilities:

Irregardless of whether DIHS or the local health authority finalizes the mortality review, HQ DIHS will provide a summary memorandum to the Deputy Assistant Director, Detention Management, no later than 60 days from the date of death, that outlines: (i) the deceased's medical history, (ii) cause of death, (iii) identified strengths, weaknesses, and/or errors in DIHS and/or ICE policies and procedures, and (iv) medical recommendations for corrective action. A copy of the autopsy report, if applicable, will be attached to the DIHS summary.

B. To Performance Improvement Personnel:

1. For SPCs and PHS-staffed CDFs:

The DIHS Medical Director, in conjunction with the DIHS Executive Council, will identify those detainee deaths where a medical quality concern, health standards violation, or sentinel event may have had a contributory or causal effect on a detainee's death and convene a mortality review committee meeting of

appropriate staff or refer the case to the **DIHS National Performance Improvement Consultant** for appropriate action.

2. For non-PHS staffed CDFs, IGSAs, and BOP facilities:

The DIHS Medical Director, in conjunction with the DIHS Executive Council, will identify those detainee deaths where a medical quality concern, health standards violation, or sentinel event may have had a contributory or causal effect on a detainee's death and make recommendations to ICE Performance Improvement Personnel regarding the need for on-site special assessment or for changes in medically-based operational policies and procedures.  Unless DIHS is requested to do so, it will be the responsibility of ICE to contact these non-DIHS staffed facilities regarding any recommended changes in policy or procedure.

# STANDARD OPERATING PROCEDURE
## Mortality Database
SOP 3.10.2.2

New SOP

Rev. 8/28/06

## PURPOSE:  TO MAINTAIN A CURRENT ICE MORTALITY DATABASE AND ELECTRONIC MORTALITY FILES ON ICE DETAINEE DEATHS.

A.  The DIHS National Information Systems Consultant will maintain and update a Microsoft Excel spreadsheet with information on all detainee deaths that occur in ICE custody, to include aliens held at SPCs, CDFs, IGSAs, and BOP facilities.  The spreadsheet will be located on the DIHS Headquarters Share Drive at the following location S:\ICE Detainee Death Roster\detaineedeathsOCT2003-present.xls, and include all of the information listed in Sections (B) and (C) below.

B.  At a minimum, preliminary information regarding each detainee death will be entered into the database immediately, or the next working day if event occurs during off-hours.  An electronic SEN notification will provide the official notification of death. The Office of the DIHS Director receives the electronic SEN notification concurrently with the Headquarters Office of Detention and Removals (HQDRO) and the ICE Joint Intake Center. The SEN will be distributed to the DIHS National Information Systems Consultant.

C.  All data entered into the spreadsheet will be properly formatted, indexed, and/or coded to ensure that each field or column of information is available for sorting and immediate retrieval of information.

D.  The DIHS National Information Systems Consultant will enter the following elements of information into the database for each detainee death unless a given piece of information is not relevant to a particular case:

   1.  Detainee's full name
   2.  Alien number
   3.  Date of birth
   4.  Country of birth
   5.  Date, time, location of death, type of facility, and field office
   6.  Cause of death, preliminary and/or confirmed

7. Office of Medical Examiner/Coroner
8. Autopsy information, if applicable, to include date performed and findings
9. SEN notification date and tracking number
10. Mandatory notifications, to include dates of notification to DRO, ICE Office of Professional Responsibility (OPR), ICE Office of Inspector General (OIG), local police departments, consulates, and next of kin.
11. Investigations, to include date and source of request, name of investigating agency or facility, and date of completion
12. ICE-DIHS on-site special assessment, to include date initiated and date completed
13. Mortality review, to include date initiated and date completed
14. Comments

E. The DIHS National Information Systems Consultant will attach the following reports and/or findings to the mortality database via e-link, unless a particular document does not apply to a given case:

1. Medical history and relevant information from detainee's medical record
2. Autopsy report
3. Death certificate
4. All reports of investigation
5. All special assessments and on-site reviews related to the death or medical standards violations
6. Mortality review

F. Collection of Information for Database

1. For SPCs and PHS-staffed CDFs, all documentation listed in Section I(C) and (D) above shall be collected from the originating source (e.g., hospital, coroner's officer, mortuary) by the local HSA and forwarded to the DIHS National Information Systems Consultant as soon as the documents become available.

2. For non-PHS staffed CDFs, IGSAs, and BOP facilities, all documentation listed in Section I(C) and (D) above shall be collected by the DIHS National Information Systems Consultant and maintained for entry into the database as soon as the documents become available.

3. The HQ Detention Health Liaison Officer (DHLO) will assist DIHS staff in any situation where a facility administrator or medical authority refuses to release mortality-related documentation or reports to the DIHS staff without specific authorization from ICE.

# EXHIBIT 7

*Office of the Assistant Secretary*
**U.S. Department of Homeland Security**
425 I Street, NW
Washington, DC 20536

OCT 2 6 2007



**U.S. Immigration
and Customs
Enforcement**

The Honorable Yvette Clarke
Subcommittee on Transportation and
   Infrastructure Protection
Subcommittee on Management,
   Investigations and Oversight
Committee on Homeland Security
U.S. House of Representatives
Washington, DC 20510

Dear Congresswoman Clarke:

Thank you for your September 7, 2007, correspondence, co-signed by Chairman Thompson,
Chairwomen Sanchez and Jackson Lee, regarding the medical care aliens receive while in
U.S. Immigration and Customs Enforcement (ICE) custody, and the number of alien deaths that
have occurred while in detention. You will find responses to each of your questions below:

*1. When an undocumented alien is taken into custody by ICE, on average, how long is an alien
detained before he/she receives a medical evaluation? What type of medical emergencies or
illnesses warrant immediate medical attention? What steps do ICE personnel take to find out
whether detainees have critical conditions that require immediate and/or ongoing treatment?*

ICE health policy is that all detainees receive an initial health screening upon arrival at a detention
facility to identify past and current medical conditions and determine the appropriate medical,
mental health and/or dental treatment for each detainee. Immediate attention is provided to
detainees who present a danger or an imminent risk of danger to self or others, such as contagious
infectious diseases, uncontrolled mental health disorders, inability to provide for daily living
activities (elderly or infirm), and other conditions that would deteriorate if not seen immediately by
medical personnel. Detainees also receive a health appraisal and physical examination within 14
days of arrival at a facility to identify medical conditions that require monitoring and/or treatment.

*2. On average, how many examinations from a medical professional can an undocumented
alien expect to receive while in ICE custody? How do those detainees suffering from chronic
medical conditions typically receive medical attention?*

At a minimum, at least two examinations are performed for every detainee. The first is the health
screening performed within 12 hours of arrival at a facility, and the second is a history and
physical examination performed within 14 days of arrival. A detainee with a medical condition
would be identified for treatment and monitoring during the screening and/or examination,
followed by scheduled/unscheduled appointments as needed. Scheduled visits include
appointments made in advance for ambulatory care or specialty care clinics. Unscheduled visits
are performed as needed to attend to emergent or urgent conditions.

*3. What is the procedure for an immigrant detainee to request medical attention, and how are
detainees informed of this procedure? From the time a request for medical attention is received
by a detention facility, how long does it normally take for a detainee to see a medical
professional?*

The ICE detention standard on Medical Care requires that all detainees, regardless of
classification, have access to sick call. Each facility must have a mechanism that allows detainees

The Honorable Yvette Clarke
Page 2

the opportunity to request healthcare services provided by a physician or other qualified medical officer in a clinical setting and a procedure in place to ensure that all request slips are received by the health service provider in a timely manner. The sick call process allows detainees to access non-emergent medical services, and all facilities are required to have regularly scheduled times when medical personnel will be available to see detainees who have requested medical services. For emergent or urgent medical services, detainees may notify any correctional officer or other facility personnel that a problem is occurring, and medical staff or 911 will be called immediately.

*4. If an immigrant detainee is taking prescribed medication, what is the procedure to ensure that the detainee is able to continue taking his/her medication throughout detention? Does ICE have a policy that would prevent the transfer of prescribed medication from a family member to ICE personnel to subsequently provide to a detainee?*

A medical professional assesses the detainee's health and treatment, and orders any needed medications. Medical care provided at each detention facility includes access to all necessary prescription medications. Prescriptions written for detainees by the medical staff are filled either by an on-site pharmacy or a local pharmacy in the community. If a prescription medication is not readily available and the detainee has a supply of the medication or can obtain a supply of the medication from a family member, the medication may be used, as long as the facility's medical staff can verify the validity of the medication to prevent contraband from entering a facility. Under these circumstances, the detainee's own medication is used only until the facility's medical provider can obtain a secure source.

*5. What type of language translation services does ICE or a detention center provide, if any, during the medical examination of an immigrant detainee?*

If language difficulties prevent the healthcare provider or officer from sufficiently communicating with a detainee for purposes of completing a medical screening or health evaluation, the officer is required to obtain translation assistance. The ICE detention standard on Medical Care allows for such assistance to be provided by another officer or by a professional service. ICE most commonly provides translation services through its contracts with AT&T Language Line and Language Services Associates.

*6. Upon the death of an immigrant detainee, what is the procedure to inform immediate family members? What type of investigation and/or accounting, if any, does ICE perform to ensure a complete medical evaluation is conducted and a proper record is kept after an immigrant dies in custody? What responsibilities does ICE have with respect to human remains in its custody? Is an autopsy performed in all cases?*

ICE policy provides for chaplain involvement in communicating news of the serious illness or death of a detainee to family members. The chaplain will telephone the person named as the next of kin in the United States to communicate the circumstances surrounding the death. As soon as practical, ICE prepares a letter of condolence for the next of kin.

ICE provides seven calendar days for family members to claim the remains of a loved one. If a family wishes to claim the remains, but cannot afford the transportation costs, ICE may assist the family by transporting the body to a location in the United States. If family members cannot be located or decline to claim the body of the deceased, ICE will notify the appropriate consulate, which will also have seven days to assume responsibility for the body. In the event that neither family nor consulate claims the remains, ICE will arrange for the burial, consistent with local and federal procedures. If the detainee's records indicate U.S. military service, ICE will contact the Department of Veterans Affairs to determine the deceased's eligibility for burial benefits.

DRO reports all detainee deaths to the ICE Office of Professional Responsibility (OPR) and the DHS Office of the Inspector General (OIG) so that they have an opportunity to conduct an independent review or investigation into the circumstances of any detainee's passing. Deaths are

The Honorable Yvette Clarke
Page 3

also referred to the local medical examiner or coroner's office, which will decide whether to perform an autopsy.

The Division of Immigration Health Services (DIHS) performs a Root Cause Analysis for all deaths at ICE Service Processing Centers and Contract Detention Facilities. At ICE's request, DIHS performs or arranges for a medical review of the case for deaths that occur at non-DIHS-staffed facilities.

**7.  What are the differences in medical care allowed or provided between DIHS Detainee Covered Services Package and the ICE Detention Standard on Medical Care?**

The primary difference between the DIHS Detainee Covered Services Package and ICE Detention Standard on Medical Care is the location where the care is received. Both the DIHS Detainee Covered Services Package and the ICE Detention Standards on Medical Care are designed to assure that ICE detainees receive appropriate and necessary medical care. The ICE Detention Standards for Medical Care describe the contracted minimum scope of services provided by a detention facility. The DIHS Covered Services Package describes additional services above and beyond those contained in the contract with the facilities. The DIHS Detainee Covered Services Package is a fiscal document describing, in general, the services for which the Federal Government will reimburse community healthcare providers who see ICE detainees. This document is directed at off-site care. ICE Detention Standards on Medical Care is a description of administrative standards which ICE requires facilities to meet when housing detainees. This document is directed at on-site care.

**8.  Please confirm the number of undocumented aliens that have died while in the administrative custody of ICE since 2004, and provide: dates, last facility where the immigrant detainee was housed, number of examinations by a medical practitioner while in custody, and cause of death.**

I have enclosed a roster of those detainee deaths that occurred in ICE custody. Since Fiscal Year 2004, there have been 69 detainee deaths. The number of examinations by a medical practitioner for 14 of the detainees is included. However, the remaining detainees' information would require a manual search because the Intra-Government Service Agencies keep these records, not ICE. We will provide this information to your office when is it available.

Over the past 4 fiscal years, as illustrated in the chart below, detainee deaths that occurred while in ICE custody have declined overall even though the detained population has increased.

| Fiscal year | Deaths | Population | Per Capita |
|-------------|--------|-----------|------------|
| 2004 | 25 | 204,663 | 0.0122% |
| 2005 | 16 | 206,600 | 0.0077% |
| 2006 | 17 | 225,905 | 0.0075% |
| 2007 | 11 | 254,609 | 0.0043% |

Please contact my office if you have additional questions.

Sincerely,

Julie Myers

Julie L. Myers
Assistant Secretary

Enclosure



*Office of the Assistant Secretary*
**U.S. Department of Homeland Security**
425 I Street, NW
Washington, DC 20536

OCT 2 6 2007

**U.S. Immigration
and Customs
Enforcement**

The Honorable Sheila Jackson Lee
Chairwoman
Subcommittee on Transportation Security
    and Infrastructure Protection
Committee on Homeland Security
U.S. House of Representatives
Washington, DC 20510

Dear Madam Chairwoman:

Thank you for your September 7, 2007, correspondence, co-signed by Chairman Thompson,
Chairwoman Sanchez and Congresswoman Clarke, regarding the medical care aliens receive
while in U.S. Immigration and Customs Enforcement (ICE) custody, and the number of alien
deaths that have occurred while in detention. You will find responses to each of your questions
below:

*1. When an undocumented alien is taken into custody by ICE, on average, how long is an alien
detained before he/she receives a medical evaluation? What type of medical emergencies or
illnesses warrant immediate medical attention? What steps do ICE personnel take to find out
whether detainees have critical conditions that require immediate and/or ongoing treatment?*

ICE health policy is that all detainees receive an initial health screening upon arrival at a detention
facility to identify past and current medical conditions and determine the appropriate medical,
mental health and/or dental treatment for each detainee. Immediate attention is provided to
detainees who present a danger or an imminent risk of danger to self or others, such as contagious
infectious diseases, uncontrolled mental health disorders, inability to provide for daily living
activities (elderly or infirm), and other conditions that would deteriorate if not seen immediately by
medical personnel. Detainees also receive a health appraisal and physical examination within 14
days of arrival at a facility to identify medical conditions that require monitoring and/or treatment.

*2. On average, how many examinations from a medical professional can an undocumented
alien expect to receive while in ICE custody? How do those detainees suffering from chronic
medical conditions typically receive medical attention?*

At a minimum, at least two examinations are performed for every detainee. The first is the health
screening performed within 12 hours of arrival at a facility, and the second is a history and
physical examination performed within 14 days of arrival. A detainee with a medical condition
would be identified for treatment and monitoring during the screening and/or examination,
followed by scheduled/unscheduled appointments as needed. Scheduled visits include
appointments made in advance for ambulatory care or specialty care clinics. Unscheduled visits
are performed as needed to attend to emergent or urgent conditions.

*3. What is the procedure for an immigrant detainee to request medical attention, and how are
detainees informed of this procedure? From the time a request for medical attention is received
by a detention facility, how long does it normally take for a detainee to see a medical
professional?*

The ICE detention standard on Medical Care requires that all detainees, regardless of
classification, have access to sick call. Each facility must have a mechanism that allows detainees

**www.ice.gov**

The Honorable Sheila Jackson Lee
Page 2

the opportunity to request healthcare services provided by a physician or other qualified medical officer in a clinical setting and a procedure in place to ensure that all request slips are received by the health service provider in a timely manner. The sick call process allows detainees to access non-emergent medical services, and all facilities are required to have regularly scheduled times when medical personnel will be available to see detainees who have requested medical services. For emergent or urgent medical services, detainees may notify any correctional officer or other facility personnel that a problem is occurring, and medical staff or 911 will be called immediately.

*4. If an immigrant detainee is taking prescribed medication, what is the procedure to ensure that the detainee is able to continue taking his/her medication throughout detention? Does ICE have a policy that would prevent the transfer of prescribed medication from a family member to ICE personnel to subsequently provide to a detainee?*

A medical professional assesses the detainee's health and treatment, and orders any needed medications. Medical care provided at each detention facility includes access to all necessary prescription medications. Prescriptions written for detainees by the medical staff are filled either by an on-site pharmacy or a local pharmacy in the community. If a prescription medication is not readily available and the detainee has a supply of the medication or can obtain a supply of the medication from a family member, the medication may be used, as long as the facility's medical staff can verify the validity of the medication to prevent contraband from entering a facility. Under these circumstances, the detainee's own medication is used only until the facility's medical provider can obtain a secure source.

*5. What type of language translation services does ICE or a detention center provide, if any, during the medical examination of an immigrant detainee?*

If language difficulties prevent the healthcare provider or officer from sufficiently communicating with a detainee for purposes of completing a medical screening or health evaluation, the officer is required to obtain translation assistance. The ICE detention standard on Medical Care allows for such assistance to be provided by another officer or by a professional service. ICE most commonly provides translation services through its contracts with AT&T Language Line and Language Services Associates.

*6. Upon the death of an immigrant detainee, what is the procedure to inform immediate family members? What type of investigation and/or accounting, if any, does ICE perform to ensure a complete medical evaluation is conducted and a proper record is kept after an immigrant dies in custody? What responsibilities does ICE have with respect to human remains in its custody? Is an autopsy performed in all cases?*

ICE policy provides for chaplain involvement in communicating news of the serious illness or death of a detainee to family members. The chaplain will telephone the person named as the next of kin in the United States to communicate the circumstances surrounding the death. As soon as practical, ICE prepares a letter of condolence for the next of kin.

ICE provides seven calendar days for family members to claim the remains of a loved one. If a family wishes to claim the remains, but cannot afford the transportation costs, ICE may assist the family by transporting the body to a location in the United States. If family members cannot be located or decline to claim the body of the deceased, ICE will notify the appropriate consulate, which will also have seven days to assume responsibility for the body. In the event that neither family nor consulate claims the remains, ICE will arrange for the burial, consistent with local and federal procedures. If the detainee's records indicate U.S. military service, ICE will contact the Department of Veterans Affairs to determine the deceased's eligibility for burial benefits.

DRO reports all detainee deaths to the ICE Office of Professional Responsibility (OPR) and the DHS Office of the Inspector General (OIG) so that they have an opportunity to conduct an independent review or investigation into the circumstances of any detainee's passing. Deaths are

The Honorable Sheila Jackson Lee
Page 3

also referred to the local medical examiner or coroner's office, which will decide whether to perform an autopsy.

The Division of Immigration Health Services (DIHS) performs a Root Cause Analysis for all deaths at ICE Service Processing Centers and Contract Detention Facilities. At ICE's request, DIHS performs or arranges for a medical review of the case for deaths that occur at non-DIHS-staffed facilities.

***7. What are the differences in medical care allowed or provided between DIHS Detainee Covered Services Package and the ICE Detention Standard on Medical Care?***

The primary difference between the DIHS Detainee Covered Services Package and ICE Detention Standard on Medical Care is the location where the care is received. Both the DIHS Detainee Covered Services Package and the ICE Detention Standards on Medical Care are designed to assure that ICE detainees receive appropriate and necessary medical care. The ICE Detention Standards for Medical Care describe the contracted minimum scope of services provided by a detention facility. The DIHS Covered Services Package describes additional services above and beyond those contained in the contract with the facilities. The DIHS Detainee Covered Services Package is a fiscal document describing, in general, the services for which the Federal Government will reimburse community healthcare providers who see ICE detainees. This document is directed at off-site care. ICE Detention Standards on Medical Care is a description of administrative standards which ICE requires facilities to meet when housing detainees. This document is directed at on-site care.

***8. Please confirm the number of undocumented aliens that have died while in the administrative custody of ICE since 2004, and provide: dates, last facility where the immigrant detainee was housed, number of examinations by a medical practitioner while in custody, and cause of death.***

I have enclosed a roster of those detainee deaths that occurred in ICE custody. Since Fiscal Year 2004, there have been 69 detainee deaths. The number of examinations by a medical practitioner for 14 of the detainees is included. However, the remaining detainees' information would require a manual search because the Intra-Government Service Agencies keep these records, not ICE. We will provide this information to your office when is it available.

Over the past 4 fiscal years, as illustrated in the chart below, detainee deaths that occurred while in ICE custody have declined overall even though the detained population has increased.

| Fiscal year | Deaths | Population | Per Capita |
|---|---|---|---|
| 2004 | 25 | 204,663 | 0.0122% |
| 2005 | 16 | 206,600 | 0.0077% |
| 2006 | 17 | 225,905 | 0.0075% |
| 2007 | 11 | 254,609 | 0.0043% |

Please contact my office if you have additional questions.

Sincerely,

Julie L. Myers
Assistant Secretary

Enclosure

*Office of the Assistant Secretary*

**U.S. Department of Homeland Security**
425 I Street, NW
Washington, DC 20536

OCT 2 6 2007



**U.S. Immigration
and Customs
Enforcement**

The Honorable Loretta Sanchez
Chairwoman
Subcommittee on Border, Maritime and
    Global Counterterrorism
Committee on Homeland Security
U.S. House of Representatives
Washington, DC  20510

Dear Madam Chairwoman:

Thank you for your September 7, 2007, correspondence, co-signed by Chairman Thompson,
Chairwoman Jackson Lee and Congresswoman Clarke, regarding the medical care aliens receive
while in U.S. Immigration and Customs Enforcement (ICE) custody, and the number of alien
deaths that have occurred while in detention.  You will find responses to each of your questions
below:

*1. When an undocumented alien is taken into custody by ICE, on average, how long is an alien
detained before he/she receives a medical evaluation?  What type of medical emergencies or
illnesses warrant immediate medical attention?  What steps do ICE personnel take to find out
whether detainees have critical conditions that require immediate and/or ongoing treatment?*

ICE health policy is that all detainees receive an initial health screening upon arrival at a detention
facility to identify past and current medical conditions and determine the appropriate medical,
mental health and/or dental treatment for each detainee.  Immediate attention is provided to
detainees who present a danger or an imminent risk of danger to self or others, such as contagious
infectious diseases, uncontrolled mental health disorders, inability to provide for daily living
activities (elderly or infirm), and other conditions that would deteriorate if not seen immediately by
medical personnel.  Detainees also receive a health appraisal and physical examination within 14
days of arrival at a facility to identify medical conditions that require monitoring and/or treatment.

*2. On average, how many examinations from a medical professional can an undocumented
alien expect to receive while in ICE custody?  How do those detainees suffering from chronic
medical conditions typically receive medical attention?*

At a minimum, at least two examinations are performed for every detainee.  The first is the health
screening performed within 12 hours of arrival at a facility, and the second is a history and
physical examination performed within 14 days of arrival.  A detainee with a medical condition
would be identified for treatment and monitoring during the screening and/or examination,
followed by scheduled/unscheduled appointments as needed.  Scheduled visits include
appointments made in advance for ambulatory care or specialty care clinics.  Unscheduled visits
are performed as needed to attend to emergent or urgent conditions.

*3. What is the procedure for an immigrant detainee to request medical attention, and how are
detainees informed of this procedure?  From the time a request for medical attention is received
by a detention facility, how long does it normally take for a detainee to see a medical
professional?*

The ICE detention standard on Medical Care requires that all detainees, regardless of
classification, have access to sick call.  Each facility must have a mechanism that allows detainees

The Honorable Loretta Sanchez
Page 2

the opportunity to request healthcare services provided by a physician or other qualified medical officer in a clinical setting and a procedure in place to ensure that all request slips are received by the health service provider in a timely manner. The sick call process allows detainees to access non-emergent medical services, and all facilities are required to have regularly scheduled times when medical personnel will be available to see detainees who have requested medical services. For emergent or urgent medical services, detainees may notify any correctional officer or other facility personnel that a problem is occurring, and medical staff or 911 will be called immediately.

**4. If an immigrant detainee is taking prescribed medication, what is the procedure to ensure that the detainee is able to continue taking his/her medication throughout detention? Does ICE have a policy that would prevent the transfer of prescribed medication from a family member to ICE personnel to subsequently provide to a detainee?**

A medical professional assesses the detainee's health and treatment, and orders any needed medications. Medical care provided at each detention facility includes access to all necessary prescription medications. Prescriptions written for detainees by the medical staff are filled either by an on-site pharmacy or a local pharmacy in the community. If a prescription medication is not readily available and the detainee has a supply of the medication or can obtain a supply of the medication from a family member, the medication may be used, as long as the facility's medical staff can verify the validity of the medication to prevent contraband from entering a facility. Under these circumstances, the detainee's own medication is used only until the facility's medical provider can obtain a secure source.

**5. What type of language translation services does ICE or a detention center provide, if any, during the medical examination of an immigrant detainee?**

If language difficulties prevent the healthcare provider or officer from sufficiently communicating with a detainee for purposes of completing a medical screening or health evaluation, the officer is required to obtain translation assistance. The ICE detention standard on Medical Care allows for such assistance to be provided by another officer or by a professional service. ICE most commonly provides translation services through its contracts with AT&T Language Line and Language Services Associates.

**6. Upon the death of an immigrant detainee, what is the procedure to inform immediate family members? What type of investigation and/or accounting, if any, does ICE perform to ensure a complete medical evaluation is conducted and a proper record is kept after an immigrant dies in custody? What responsibilities does ICE have with respect to human remains in its custody? Is an autopsy performed in all cases?**

ICE policy provides for chaplain involvement in communicating news of the serious illness or death of a detainee to family members. The chaplain will telephone the person named as the next of kin in the United States to communicate the circumstances surrounding the death. As soon as practical, ICE prepares a letter of condolence for the next of kin.

ICE provides seven calendar days for family members to claim the remains of a loved one. If a family wishes to claim the remains, but cannot afford the transportation costs, ICE may assist the family by transporting the body to a location in the United States. If family members cannot be located or decline to claim the body of the deceased, ICE will notify the appropriate consulate, which will also have seven days to assume responsibility for the body. In the event that neither family nor consulate claims the remains, ICE will arrange for the burial, consistent with local and federal procedures. If the detainee's records indicate U.S. military service, ICE will contact the Department of Veterans Affairs to determine the deceased's eligibility for burial benefits.

DRO reports all detainee deaths to the ICE Office of Professional Responsibility (OPR) and the DHS Office of the Inspector General (OIG) so that they have an opportunity to conduct an independent review or investigation into the circumstances of any detainee's passing. Deaths are

The Honorable Loretta Sanchez
Page 3

also referred to the local medical examiner or coroner's office, which will decide whether to perform an autopsy.

The Division of Immigration Health Services (DIHS) performs a Root Cause Analysis for all deaths at ICE Service Processing Centers and Contract Detention Facilities. At ICE's request, DIHS performs or arranges for a medical review of the case for deaths that occur at non-DIHS-staffed facilities.

### 7. What are the differences in medical care allowed or provided between DIHS Detainee Covered Services Package and the ICE Detention Standard on Medical Care?

The primary difference between the DIHS Detainee Covered Services Package and ICE Detention Standard on Medical Care is the location where the care is received. Both the DIHS Detainee Covered Services Package and the ICE Detention Standards on Medical Care are designed to assure that ICE detainees receive appropriate and necessary medical care. The ICE Detention Standards for Medical Care describe the contracted minimum scope of services provided by a detention facility. The DIHS Covered Services Package describes additional services above and beyond those contained in the contract with the facilities. The DIHS Detainee Covered Services Package is a fiscal document describing, in general, the services for which the Federal Government will reimburse community healthcare providers who see ICE detainees. This document is directed at off-site care. ICE Detention Standards on Medical Care is a description of administrative standards which ICE requires facilities to meet when housing detainees. This document is directed at on-site care.

### 8. Please confirm the number of undocumented aliens that have died while in the administrative custody of ICE since 2004, and provide: dates, last facility where the immigrant detainee was housed, number of examinations by a medical practitioner while in custody, and cause of death.

I have enclosed a roster of those detainee deaths that occurred in ICE custody. Since Fiscal Year 2004, there have been 69 detainee deaths. The number of examinations by a medical practitioner for 14 of the detainees is included. However, the remaining detainees' information would require a manual search because the Intra-Government Service Agencies keep these records, not ICE. We will provide this information to your office when is it available.

Over the past 4 fiscal years, as illustrated in the chart below, detainee deaths that occurred while in ICE custody have declined overall even though the detained population has increased.

| Fiscal year | Deaths | Population | Per Capita |
|---|---|---|---|
| 2004 | 25 | 204,663 | 0.0122% |
| 2005 | 16 | 206,600 | 0.0077% |
| 2006 | 17 | 225,905 | 0.0075% |
| 2007 | 11 | 254,609 | 0.0043% |

Please contact my office if you have additional questions.

Sincerely,

Julie Myers

Julie L. Myers
Assistant Secretary

Enclosure

www.ice.gov

*Office of the Assistant Secretary*
**U.S. Department of Homeland Security**
425 I Street, NW
Washington, DC 20536



**U.S. Immigration
and Customs
Enforcement**

OCT 2 5 2007

The Honorable Bennie G. Thompson
Chairman
Committee on Homeland Security
U.S. House of Representatives
Washington, DC 20510

Dear Mr. Chairman:

Thank you for your September 7, 2007, correspondence, co-signed by Chairwomen Sanchez and Jackson Lee as well as Congresswoman Clarke, regarding the medical care aliens receive while in U.S. Immigration and Customs Enforcement (ICE) custody, and the number of alien deaths that have occurred while in detention. You will find responses to each of your questions below:

*1. When an undocumented alien is taken into custody by ICE, on average, how long is an alien detained before he/she receives a medical evaluation? What type of medical emergencies or illnesses warrant immediate medical attention? What steps do ICE personnel take to find out whether detainees have critical conditions that require immediate and/or ongoing treatment?*

ICE health policy is that all detainees receive an initial health screening upon arrival at a detention facility to identify past and current medical conditions and determine the appropriate medical, mental health and/or dental treatment for each detainee. Immediate attention is provided to detainees who present a danger or an imminent risk of danger to self or others, such as contagious infectious diseases, uncontrolled mental health disorders, inability to provide for daily living activities (elderly or infirm), and other conditions that would deteriorate if not seen immediately by medical personnel. Detainees also receive a health appraisal and physical examination within 14 days of arrival at a facility to identify medical conditions that require monitoring and/or treatment.

*2. On average, how many examinations from a medical professional can an undocumented alien expect to receive while in ICE custody? How do those detainees suffering from chronic medical conditions typically receive medical attention?*

At a minimum, at least two examinations are performed for every detainee. The first is the health screening performed within 12 hours of arrival at a facility, and the second is a history and physical examination performed within 14 days of arrival. A detainee with a medical condition would be identified for treatment and monitoring during the screening and/or examination, followed by scheduled/unscheduled appointments as needed. Scheduled visits include appointments made in advance for ambulatory care or specialty care clinics. Unscheduled visits are performed as needed to attend to emergent or urgent conditions.

*3. What is the procedure for an immigrant detainee to request medical attention, and how are detainees informed of this procedure? From the time a request for medical attention is received by a detention facility, how long does it normally take for a detainee to see a medical professional?*

The ICE detention standard on Medical Care requires that all detainees, regardless of classification, have access to sick call. Each facility must have a mechanism that allows detainees the opportunity to request healthcare services provided by a physician or other qualified medical officer in a clinical setting and a procedure in place to ensure that all request slips are received by the health service

The Honorable Bennie G. Thompson
Page 2

provider in a timely manner. The sick call process allows detainees to access non-emergent medical services, and all facilities are required to have regularly scheduled times when medical personnel will be available to see detainees who have requested medical services. For emergent or urgent medical services, detainees may notify any correctional officer or other facility personnel that a problem is occurring, and medical staff or 911 will be called immediately.

*4. If an immigrant detainee is taking prescribed medication, what is the procedure to ensure that the detainee is able to continue taking his/her medication throughout detention? Does ICE have a policy that would prevent the transfer of prescribed medication from a family member to ICE personnel to subsequently provide to a detainee?*

A medical professional assesses the detainee's health and treatment, and orders any needed medications. Medical care provided at each detention facility includes access to all necessary prescription medications. Prescriptions written for detainees by the medical staff are filled either by an on-site pharmacy or a local pharmacy in the community. If a prescription medication is not readily available and the detainee has a supply of the medication or can obtain a supply of the medication from a family member, the medication may be used, as long as the facility's medical staff can verify the validity of the medication to prevent contraband from entering a facility. Under these circumstances, the detainee's own medication is used only until the facility's medical provider can obtain a secure source.

*5. What type of language translation services does ICE or a detention center provide, if any, during the medical examination of an immigrant detainee?*

If language difficulties prevent the healthcare provider or officer from sufficiently communicating with a detainee for purposes of completing a medical screening or health evaluation, the officer is required to obtain translation assistance. The ICE detention standard on Medical Care allows for such assistance to be provided by another officer or by a professional service. ICE most commonly provides translation services through its contracts with AT&T Language Line and Language Services Associates.

*6. Upon the death of an immigrant detainee, what is the procedure to inform immediate family members? What type of investigation and/or accounting, if any, does ICE perform to ensure a complete medical evaluation is conducted and a proper record is kept after an immigrant dies in custody? What responsibilities does ICE have with respect to human remains in its custody? Is an autopsy performed in all cases?*

ICE policy provides for chaplain involvement in communicating news of the serious illness or death of a detainee to family members. The chaplain will telephone the person named as the next of kin in the United States to communicate the circumstances surrounding the death. As soon as practical, ICE prepares a letter of condolence for the next of kin.

ICE provides seven calendar days for family members to claim the remains of a loved one. If a family wishes to claim the remains, but cannot afford the transportation costs, ICE may assist the family by transporting the body to a location in the United States. If family members cannot be located or decline to claim the body of the deceased, ICE will notify the appropriate consulate, which will also have seven days to assume responsibility for the body. In the event that neither family nor consulate claims the remains, ICE will arrange for the burial, consistent with local and federal procedures. If the detainee's records indicate U.S. military service, ICE will contact the Department of Veterans Affairs to determine the deceased's eligibility for burial benefits.

DRO reports all detainee deaths to the ICE Office of Professional Responsibility (OPR) and the DHS Office of the Inspector General (OIG) so that they have an opportunity to conduct an independent

The Honorable Bennie G. Thompson
Page 3

review or investigation into the circumstances of any detainee's passing. Deaths are also referred to the local medical examiner or coroner's office, which will decide whether to perform an autopsy.

The Division of Immigration Health Services (DIHS) performs a Root Cause Analysis for all deaths at ICE Service Processing Centers and Contract Detention Facilities. At ICE's request, DIHS performs or arranges for a medical review of the case for deaths that occur at non-DIHS-staffed facilities.

**7. What are the differences in medical care allowed or provided between DIHS Detainee Covered Services Package and the ICE Detention Standard on Medical Care?**

The primary difference between the DIHS Detainee Covered Services Package and ICE Detention Standard on Medical Care is the location where the care is received. Both the DIHS Detainee Covered Services Package and the ICE Detention Standards on Medical Care are designed to assure that ICE detainees receive appropriate and necessary medical care. The ICE Detention Standards for Medical Care describe the contracted minimum scope of services provided by a detention facility. The DIHS Covered Services Package describes additional services above and beyond those contained in the contract with the facilities. The DIHS Detainee Covered Services Package is a fiscal document describing, in general, the services for which the Federal Government will reimburse community healthcare providers who see ICE detainees. This document is directed at off-site care. ICE Detention Standards on Medical Care is a description of administrative standards which ICE requires facilities to meet when housing detainees. This document is directed at on-site care.

**8. Please confirm the number of undocumented aliens that have died while in the administrative custody of ICE since 2004, and provide: dates, last facility where the immigrant detainee was housed, number of examinations by a medical practitioner while in custody, and cause of death.**

I have enclosed a roster of those detainee deaths that occurred in ICE custody. Since Fiscal Year 2004, there have been 69 detainee deaths. The number of examinations by a medical practitioner for 14 of the detainees is included. However, the remaining detainees' information would require a manual search because the Intra-Government Service Agencies keep these records, not ICE. We will provide this information to your office when is it available.

Over the past 4 fiscal years, as illustrated in the chart below, detainee deaths that occurred while in ICE custody have declined overall even though the detained population has increased.

| Fiscal year | Deaths | Population | Per Capita |
|-------------|--------|-----------|------------|
| 2004 | 25 | 204,663 | 0.0122% |
| 2005 | 16 | 206,600 | 0.0077% |
| 2006 | 17 | 225,905 | 0.0075% |
| 2007 | 11 | 254,609 | 0.0043% |

Please contact my office if you have additional questions.

Sincerely,

*Julie Myers*

Julie L. Myers
Assistant Secretary

Enclosure

# EXHIBIT 8

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT

**ACLU**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

November 5, 2007

Nikki Gramian
FOIA/PA Analyst
DHS/Office of Inspector General
STOP 2600
246 Murray Drive, Building 410
Washington, DC 20528

**Re: FOIA Request Number 2007-246**

Dear Ms. Gramian:

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

ELIZABETH ALEXANDER
DIRECTOR
ATTORNEY AT LAW

NATIONAL OFFICE
125 BROAD STREET, 18TH FL.
NEW YORK, NY 10004-2400
T/212.549.2500

OFFICERS AND DIRECTORS
NADINE STROSSEN
PRESIDENT

ANTHONY D. ROMERO
EXECUTIVE DIRECTOR

RICHARD ZACKS
TREASURER

I write in connection with your letter acknowledging receipt of my Freedom of Information Act (FOIA) request, dated June 27, 2007. In your response, dated July 18, 2007, you indicate that the Office of the Inspector General determined that the ACLU National Prison Project failed to demonstrate that this request merited expedited review. I write to ask that you reconsider this determination in light of both the ACLU's historic role as an organization that collects and disseminates information publicly, and the public's urgent need for the requested information.

Your denial was based on two grounds. First, you concluded that the ACLU failed to demonstrate that our main professional activity is information dissemination, even if that is not our sole occupation. As I explained in my initial request, gathering information and disseminating it to the public is at the absolute <u>core</u> of what the ACLU is all about. As the largest civil liberties organization in the country, with offices in 50 states and over 500,000 members, the ACLU is in a unique position to collect and disseminate information that is of critical importance to the public. One of the principal means by which information is then disseminated to the public by the ACLU is through newsletters, news briefings, and right-to-know handbooks. The ACLU's website is heavily trafficked and our electronic newsletters are available by subscription. The ACLU disseminates information via dozens of podcasts, *see* http://www.aclu.org/multimedia/podcasts/index.html, and endeavors through all of our work to advance public access to information.

Most relevant to this request, the ACLU frequently utilizes FOIA requests to obtain documents of vital importance to the public, and the ACLU then disseminates information obtained through these FOIA requests to the public. For instance, the ACLU filed a FOIA request on October 7, 2003, demanding the release of information about detainees held overseas by the United States. Over 100,000 pages of documents ultimately obtained by the ACLU pursuant to a court

order are now available directly to the public on the ACLU website. See http://www.aclu.org/safefree/torture/torturefoia.html. Similarly, in August 2002, the ACLU filed a FOIA request to find out how the Federal Bureau of Investigation was using its surveillance powers. In response, the government conceded that expedited processing of that request was warranted, and documents ultimately produced pursuant to court order are now available directly to the public on the ACLU website. Id.

The second basis for your denial of expedited processing was that the ACLU failed to demonstrate a particular urgency to inform the public about the documents requested. As you are no doubt aware, this FOIA request involves the circumstances surrounding the deaths of people held in ICE custody and the government's apparent failure to adequately prevent, investigate, or track such deaths. The FOIA request was filed on June 26, 2007, just one day after the New York Times revealed in a front page story that 62 people had died in U.S. Immigration and Customs Enforcement (ICE) custody since 2004. Nina Bernstein, New Scrutiny as Immigrants Die in Custody, N.Y. TIMES, June 26, 2007. According to the article, "[n]o government body is charged with accounting for deaths in immigration detention" and ICE "declined to release information about the 62 detention deaths since 2004." Id.

The significance of this issue has only grown in importance since this FOIA request was filed. Major newspapers have continued to report on in-custody deaths and have questioned whether the ICE, the Office of the Inspector General, and other branches of the Department of Homeland Security will conduct investigations into these deaths. See, e.g., Darryl Fears, 3 Jailed Immigrants Die in a Month; Medical Mistreatment Alleged; Federal Agency Denies Claims, WASHINGTON POST, Aug. 15, 2007; Greg Krikorian, Dead Detainee's Family Alleges Medical Mistreatment, L.A. TIMES, Aug. 11, 2007. The editorial boards of the Miami Herald, New York Times, and Washington Post have all expressed concern about this issue, and some have called on Congress to investigate poor medical care and in-custody deaths.

In fact, on October 4, 2007, the House Immigration Subcommittee held a hearing on "Detention and Removal: Immigration Detainee Medical Care." At that hearing, Gary Mead, ICE's Assistant Director for Detention and Removal revealed for the first time that 66 people had died since 2004—presumably four people had died in the three and a half months following the release of the New York Times article. Two of the other witnesses who spoke before Congress were relatives of detainees who died in ICE custody during the period covered in this FOIA request. In connection with her nomination hearing, Assistant Secretary Julie Myers has also been asked numerous questions about deaths in detention and the government's efforts to investigate in-custody deaths.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Not only is this request timely, it is literally about life and death issues—issues that are of utmost importance to the public.  Please reconsider your decision to deny this request for expedited treatment.  I eagerly await your response.

Sincerely,

Tom Jawetz
Immigration Detention Staff Attorney
ACLU National Prison Project
915 15th Street, NW
7th Floor
Washington, DC 20005
Tel: (202) 548-6610
Fax: (202) 393-4931

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Encls.



*Office of the Inspector General*
**U.S. Department of Homeland Security**
Washington, DC 20528

**Homeland
Security**

**⁊JUL 18 2007**

Tom Jawetz
Immigration Detention Staff Attorney
ACLU National Prison Project
915 15th Street, N.W.
Washington, D.C. 20005

SUBJECT:  Freedom of Information Act Request No. 2007-246

Dear Mr. Jawetz:

This letter acknowledges receipt of your Freedom of Information Act (FOIA) request dated June 27, 2007, to the Privacy Office for the Department of Homeland Security (DHS).  You have requested expedited review and a fee waiver.  The Privacy Office referred your request to the Office of Inspector General (OIG) on July 12, 2007.  Your request was assigned the above-referenced FOIA tracking number.

As to your request for expedited review, 5 U.S.C. § 552(a)(6)(E)(i) states that "each agency shall promulgate regulations … providing for expedited processing of requests for records." There are two categories of requests that merit expedited review under DHS FOIA regulations: (1) requests for which a "lack of expedited treatment could reasonably be expected to pose an imminent threat to the life or physical safety of an individual;" or (2) where there is "an urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information." 6 C.F.R. §§ 5.5(d)(1)(i), (ii).

It appears that you have requested expedited treatment on the basis of "an urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information." 6 C.F.R. § 5.5(d)(ii).  Under DHS FOIA regulations, a requester seeking expedited treatment on this basis, "if not a full-time member of the news media, must establish that he or she is a person whose main professional activity or occupation is information dissemination, though it need not be his or her sole occupation." 6 C.F.R. § 5.5(d)(iii).  Such requests must also "establish a particular urgency to inform the public about the government activity involved in the request, beyond the public's right to know about government activity generally." Id.

Based on my review of the information contained in your request, I am denying your request for expedited processing.  You have not provided any evidence that information dissemination is your main professional activity, nor have you adequately demonstrated a particular urgency to inform the public regarding the subject matter of your request, beyond the public's general right to know about government activity.

**www.dhs.gov**

Since your request does not meet the criteria for expedited review, OIG will place your request in the queue for processing in the order in which it was received. Simple requests are answered more quickly and will be placed on the fast track of our multi-track processing system. More complex requests, including those calling for a particularly large volume of records, are segregated into a group designated as Project Requests. These requests require significantly more processing time and are processed separately in the order in which received. Unfortunately, we cannot predict exactly when your request will be processed, as we currently have a backlog of such requests. The OIG is devoting additional staff and resources to reducing this backlog and using its best efforts to process all requests with due diligence on a first-in, first-out basis.

Regarding your fee status request, I am denying your request for "representative of the news media" status. DHS FOIA regulations specifically define "representative of the news media" as "any person actively gathering news for an entity that is organized and operated to publish or broadcast news to the public." 6 C.F.R. §§ 5.11(b)(6). Based on the information contained in your letter, I am denying your request for this fee status because you have not presented a convincing argument that ACLU is an entity organized and operated to publish or broadcast news to the public. See id.

Although your request for "representative of the news media" status is denied, you are entitled to two hours of search time and 100 pages of releasable records free of any charges. 6 C.F.R. § 5.11(d)(3). Should search time exceed two hours and duplication costs exceed 100 pages, we will charge you in accordance with DHS FOIA regulations. In accordance with DHS regulations, this letter also confirms your agreement to incur all applicable fees involved in the processing of your request, up to the amount of $25.00. 6 C.F.R. § 5.11.

We are holding your request for a fee waiver in abeyance pending the review and quantification of responsive records.

You have the right to appeal my denial determination of your expedited review request. Your appeal must be in writing and **received** within 60 days of the date of this response. Please address any appeal to:

Associate General Counsel (General Law)<br>
Department of Homeland Security<br>
Washington, D.C. 20528.

Both the envelope and letter of appeal must be clearly marked, "Freedom of Information Act/Privacy Act Appeal." Your appeal letter must also clearly identify the OIG's response. Additional information on submitting an appeal is set forth in the Department of Homeland Security regulations at 6 C.F.R. § 5.9.

Please refer to the above-referenced tracking number if you contact us regarding your request. Our mailing address is DHS/Office of Inspector General/STOP 2600, 246 Murray Drive, Building 410, Washington, D.C. 20528. If we need additional information, we will contact you.

If you have questions, you may contact Ms. Nikki Gramian, FOIA/PA Analyst, at (202) 254-4001.  Thank you.

Sincerely,

Katherine R. Gallo
Assistant Counsel to the Inspector General

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



June 27, 2007

U.S. Department of Homeland Security
Privacy Office
Mail Stop 0550
245 Murray Lane, S.W.
Washington, DC 20528-0550

Health Resources and Services Administration
Office of Communications
FOIA Requester Service Center
5600 Fishers Ln., Room 14-18
Rockville, MD 20857

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

ELIZABETH ALEXANDER
DIRECTOR
ATTORNEY AT LAW

NATIONAL OFFICE
125 BROAD STREET, 18TH FL.
NEW YORK, NY 10004-2400
T/212.549.2500

OFFICERS AND DIRECTORS
NADINE STROSSEN
PRESIDENT

ANTHONY D. ROMERO
EXECUTIVE DIRECTOR

RICHARD ZACKS
TREASURER

U.S. Public Health Service
Freedom of Information Office
5600 Fishers Ln., Room 17A-46
Rockville, MD 20857

**Re: FOIA Request Related to Deaths in Immigration Detention**

Dear Freedom of Information Officers:

This letter constitutes a request (Request) pursuant to the Freedom of Information Act, 5 U.S.C. § 552 (FOIA). The Request is submitted on behalf of the National Prison Project (NPP) of the American Civil Liberties Union (ACLU). NPP is also requesting expedited processing for this request, pursuant to 5 U.S.C. § 552(a)(6)(E) and agency regulations, and a fee waiver, pursuant to 5 U.S.C. § 552(a)(4)(A)(iii). The request is simultaneously being filed with the U.S. Department of Homeland Security, the Health Resources and Services Administration, and the U.S. Public Health Service.

## BACKGROUND

Recent news reports indicate that individuals detained by U.S. Immigration and Customs Enforcement (ICE) have died as a result of grossly inadequate medical care. Until recently, it was unknown how many individuals had died in ICE custody. Such deaths are not publicly reported and no government agency appears to be charged with the task of tracking and investigating such deaths. One attempt by the ACLU to account for in-custody deaths identified 20 deaths since 2004; this list was generated through a review of publicly available documents and correspondence with immigrants' rights advocates around the

country. However, according to a figure recently released by ICE to The New York Times, the number of immigrant detainee deaths since 2004 is actually 64.[1]

The circumstances surrounding many of these deaths are highly disturbing and demand further investigation and oversight. In one account, a Korean woman detained at a privately-run facility in Albuquerque, New Mexico complained for weeks about her need for medical attention.[2] Despite her deteriorating health, the woman received little attention until she was transferred to a local hospital where she died.[3] In February 2007, a detainee held in Hackensack, New Jersey, was denied powerful prescription medication despite experiencing crippling pain; according to other detainees, the man's severe distress was common knowledge at the jail, and he committed suicide after five agonizing days.[4]

Just yesterday, The New York Times published a front page story describing two other in-custody deaths.[5] Sandra Kenley, a lawful permanent resident of more than 30 years, died in December 2005 after being detained in two Virginia regional jails for approximately seven weeks. Prior to being taken into custody, Ms. Kenley notified airport immigration inspectors of her serious medical conditions, which included a scheduled surgery to treat her fibroid tumor and uterine bleeding. She complained until her death of continued hemorrhaging and the jails' refusal to provide her with necessary prescription medications.

One year later, while detained in yet another Virginia regional jail, Abdoullai Sall died approximately ten weeks after entering immigration custody. Throughout his detention, Sall complained to jail officials that he was not receiving the proper medication for his serious medical condition, and attempts by his immigration attorney to notify the jail of his client's worsening health were largely ignored.

Recent press attention to deaths in detention reveals just how little information is available about this problem. According to the ICE Detention Standards, when an immigrant detainee dies in custody, the Assistant District Director for Detention and Removal Operations (DRO) is supposed to notify the District Director, the Assistant Regional Director for DRO, and the Director of Field Operations at ICE Headquarters.[6] A local representative of the U.S. Public Health Service is to receive medical reports within 48 hours of the death, and both the family of the deceased and consular officials are to be notified about the death.[7]

The Department of Homeland Security's Office of Inspector General (OIG) publicly released a report in January 2007 detailing a series of problems with the

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[1] Nina Bernstein, *New Scrutiny as Immigrants Die in Custody*, N.Y. Times, June 26, 2007.
[2] Barbara Ferry, *Crackdown's Fallout*, The New Mexican, May 20, 2007.
[3] *Id.*
[4] Nina Bernstein, *One Immigrant Family's Hopes Lead to a Jail Cell Suicide*, N.Y. Times, Feb. 23, 2007.
[5] Bernstein, *supra* note 1.
[6] INS Detention Standard, Terminal Illness, Advance Directives, and Death (Sept. 20, 2000), 6-7.
[7] *Id.*

treatment of immigrant detainees at five facilities.[8]  One problem highlighted by the OIG was that four of the five facilities reviewed showed serious problems with the delivery of adequate health services.  Although the report made a general reference to one suicide death at the Passaic County Jail,[9] it made no mention of at least three other deaths that occurred at the San Diego Correctional Facility.  The OIG also releases semiannual reports to Congress that contain sporadic and vague references to investigations into in-custody deaths.  Such reports provide little useful information to assure the public that meaningful investigations are conducted into each death, and that steps are taken to guarantee that detainees receive necessary medical services before it is too late.[10]

Over the last ten years, the United States has dramatically increased the use of detention for individuals in civil immigration proceedings.  In 1997, the number of immigrants detained in the custody of U.S. Immigration and Naturalization Service on a given day was approximately 13,000.[11]  Just ten years later, ICE has funding to detain 27,500 individuals at any given time.[12]  As the nation considers comprehensive immigration reform legislation, it is likely that ICE will receive funding to detain many thousands more.  This issue will only grow in importance over the coming years, and it is essential that the federal government—which is ultimately responsible for the health and welfare of individuals detained pursuant to its authority—do more to ensure that immigrant detainees do not suffer and die unnecessarily.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

## RECORDS REQUESTED

Please disclose:

1.  A complete list of individuals who have died while detained in ICE custody since January 1, 2004.  For each death listed, please include:
    a.  Complete name;
    b.  Alien number;
    c.  Date on which detention began;
    d.  Date of death;
    e.  List of all facilities where the detainee was housed along with dates of detention; and

---

[8] Department of Homeland Security, Office of Inspector General, *Treatment of Immigration Detainees Housed at Immigration and Customs Enforcement Facilities*, OIG-07-07 (Dec. 2006).
[9] *Id.* at 29.
[10] The OIG recently began a "special review" of two in-custody deaths, and is considering the ICE Detention Standards that pertain to in-custody deaths and medical care.  The ACLU hopes that the results of the OIG review are made public, and that the OIG make recommendations to ensure that preventable deaths are reduced and that all deaths are properly investigated by an independent government body.
[11] U.S. Department of Justice, Office of the Federal Detention Trustee, *Detention Needs Assessment and Baseline Report: A Compendium of Federal Detention Statistics, at* http://www.usdoj.gov/ofdt/.
[12] U.S. Immigration and Customs Enforcement, *ICE Accomplishments in Fiscal Year 2006* (May 15, 2007), *at* http://www.ice.gov/pi/news/factsheets/2006accomplishments.htm.

f. Location at time of death.
2. For each individual whose death is included in (1), all records:
   a. Pertaining to the cause of death;
   b. Pertaining to requests for medical help by anyone, including the deceased, his/her family members, and fellow detainees;
   c. Pertaining to Treatment Authorization Requests (TARs) submitted to the Division of Immigration Health Services (DIHS), including any DIHS responses to those TARs;
   d. Pertaining to reports of investigations into the circumstances surrounding the death, including all after-action reports and critical incident reports;
   e. Pertaining to whether any of the detainees who died were diagnosed with terminal illnesses while in immigration detention or beforehand;
   f. Pertaining to whether any of the detainees who died were taken to outside hospitals for treatment, and if so, the names of those hospitals and the dates of treatment;
   g. Pertaining to whether and how ICE notified families of the deaths of detained family members;
   h. Pertaining to whether and how ICE notified consular officials of the deaths of detained persons;
   i. Pertaining to whether and how state, county, local officials and review boards were notified of the deaths.
3. All records, including written and electronic correspondence, pertaining to deaths in ICE custody.
4. All records, including policies, procedures, or guidelines provided to or maintained by Contract Detention Facilities, Service Processing Centers, and Intergovernmental Service Agreement facilities relating to deaths in detention, including memoranda and training materials.
5. All records identifying the manner by which your agency or any of its components track deaths in detention.
6. All records, including written and electronic correspondence, generated in response to requests for information from the Washington Post and The New York Times about immigrant detainee medical care and deaths, and in reaction to those articles. This request pertains specifically to records generated in preparation for and in response to two articles: (a) Darryl Fears, *Illegal Immigrants Received Poor Care in Jail, Lawyers Say*, Washington Post, June 13, 2007; and (b) Nina Bernstein, *New Scrutiny as Immigrants Die in Custody*, N.Y. Times, June 26, 2007.

**THE REQUESTOR**

The ACLU is a nationwide, nonprofit, nonpartisan organization dedicated to protecting human rights and civil rights in the U.S. It is the largest civil liberties organization in the country, with offices in 50 states and over 500,000 members. The ACLU is specifically dedicated to holding the U.S. government accountable

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

to universal human rights principles in addition to rights guaranteed by the U.S. Constitution.

Furthermore, the ACLU publishes newsletters, news briefings, right-to-know handbooks, and other materials that are disseminated to the public. These materials are widely available to everyone, including tax-exempt organizations, not-for-profit groups, law students and faculty, for no cost or for a nominal fee through its public education department. The ACLU also disseminates information through its heavily subscribed website, http://www.aclu.org. The website addresses civil liberties issues in depth, provides features on civil liberties issues in the news, and contains hundreds of documents that relate to the issues addressed by the ACLU. The website includes features on information obtained through the FOIA. *See, e.g.,* http://www.aclu.org/patriot_foia/index.html. The ACLU also publishes an electronic newsletter, which is distributed to subscribers by e-mail.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Accordingly, the ACLU is an organization whose "main professional activity or occupation is information dissemination." 6 C.F.R. § 5.5(d)(3). The ACLU is also a "representative of the news media" for purposes of 45 C.F.R. § 5.5. Finally, the ACLU meets the criterion laid out in *National Sec. Archive v. U.S. Dep't of Defense*, where a representative of the news media is defined as an entity that "gathers information of potential interest to a segment of the public" and "uses its editorial skills to turn raw materials into a distinct work, and distributes that work to an audience." *National Sec. Archive v. U.S. Dep't of Defense*, 880 F.2d 1381,1387 (D.C. Cir. 1989).

## EXPEDITED PROCESSING

We request Track 1 expedited treatment for this FOIA request. This request qualifies for expedited treatment pursuant 5 U.S.C. § 552(a)(6)(E) and applicable regulations.

As demonstrated above, there is a "compelling need" for expedited processing sought by the ACLU. 5 U.S.C. § 552(a)(6)(E)(i)(I). The lack of expedited disclosure of records related to these deaths in detention could "reasonably be expected to pose an imminent threat to the life or physical safety of an individual." 5 U.S.C. § 552(a)(6)(E)(v)(I); 6 C.F.R. § 5.5(d)(1)(i).

Moreover, there exists a clear "urgency to inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v)(II). *See also* 6 C.F.R. § 5.5(d)(1)(ii) (expedited processing is warranted where there is "[a]n urgency to inform the public about an actual or alleged federal government activity.").

The ACLU is therefore entitled to expedited processing of this request.

### FEE WAIVER

The ACLU requests a total waiver of fees on the grounds that disclosure of the requested records is in the public interest and because disclosure "is likely to contribute significantly to the public understanding of the activities or operations of the government and is not primarily in the commercial interest of the requester[s]." 5 U.S.C. § 552(a)(4)(A)(iii). *See also* 45 C.F.R. § 5.45. This Request aims at furthering public understanding of government conduct, and specifically to help the public determine whether civil detainees in the custody of Immigration and Customs Enforcement are treated in a manner than comports with our nation's values. On account of these factors, the ACLU has not been charged fees associated with responding to FOIA requests on numerous occasions.[13]

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

In any event, as discussed *supra*, the ACLU qualifies as a "representative of the news media" and the records are not sought for commercial use. Accordingly, should fees be assessed for the processing of this Request, such fees should be "limited to reasonable standard charges for document duplication." 5 U.S.C. § 552(a)(4)(A)(ii)(II).

The ACLU is therefore entitled to a total waiver of fees associated with this request and should, in no event, be required to pay more than reasonable standard charges for document duplication alone.

\*   \*   \*

Thank you for your consideration of this request. If this request is denied in whole or part, the ACLU asks that you justify all deletions by reference to specific exemptions of the FOIA. We expect you to release all segregable portions of otherwise exempt material. We reserve the right to appeal a decision to withhold any information, or to deny expedited processing or a waiver of fees. We look forward to your reply to the request for expedited processing within ten (10) business days, as required under 5 U.S.C. § 552(a)(6)(E)(ii)(I).

---

[13] The following are recent examples of requests for which agencies did not charge the ACLU fees associated with responding to a FOIA request: (1) The Department of State did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in April 2005; (2) The National Institute of Standards and Technology did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in April 2005; (3) The Office of Science and Technology Policy in the Executive Office of the President did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in August 2003; (4) The Federal Bureau of Investigation did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in August 2002; (5) The Office of Intelligence Policy and Review did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in August 2002; (6) and The Office of Information and Privacy in the Department of Justice did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in August 2002.

Notwithstanding your decision on the matter of expedited processing, we look forward to your reply to the records request within twenty (20) business days, as required under 5 U.S.C. § 552(a)(6)(A)(I).[14]

Please respond to Tom Jawetz, Immigration Detention Staff Attorney, ACLU National Prison Project, 915 15th St. NW, 7th Floor, Washington, DC 20005, telephone: (202) 548-6610, email: tjawetz@npp-aclu.org.  Also, please notify us in advance if the costs for photocopying the documents exceed $100.  We eagerly await your response, and thank you for your assistance.

*  *  *

Under penalty of perjury, I certify, to the best of my knowledge and belief, that the above information is true and correct.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Tom Jawetz
Immigration Detention Staff Attorney
ACLU National Prison Project
915 15th Street, NW
7th Floor
Washington, DC 20005
Tel: (202) 548-6610
Fax: (202) 393-4931

---

[14] Pursuant to the Department of Health and Human Services regulations, a reply by HRSA and PHS is due within ten working days after this request has been received.  45 C.F.R. § 5.35(b)(1).

# EXHIBIT 9

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT

**ACLU**

AMERICAN CIVIL LIBERTIES UNION

FOUNDATION

November 5, 2007

Catrina M. Pavlik-Keenan
FOIA Officer
U.S. Department of Homeland Security
425 I St., NW
Washington, DC 20536

**Re: 07-FOIA-52835**

Dear Ms. Pavlik-Keenan:

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

ELIZABETH ALEXANDER
DIRECTOR
ATTORNEY AT LAW

NATIONAL OFFICE
125 BROAD STREET, 18TH FL.
NEW YORK, NY 10004-2400
T/212.549.2500

OFFICERS AND DIRECTORS
NADINE STROSSEN
PRESIDENT

ANTHONY D. ROMERO
EXECUTIVE DIRECTOR

RICHARD ZACKS
TREASURER

I write in connection with your letter acknowledging receipt of my Freedom of Information Act (FOIA) request, dated June 27, 2007. In your response, dated July 24, 2007, you indicate that U.S. Immigration and Customs Enforcement determined that the ACLU National Prison Project failed to demonstrate that this request merited expedited processing. I write to ask that you reconsider this determination in light of both the ACLU's historic role as an organization that collects and disseminates information publicly, and the public's urgent need for the requested information.

Your denial was based on the ACLU's apparent failure to "demonstrate a particular urgency to inform the public about the government activity involved in the request beyond the public's right to know about government activity generally." You also stated that the request was "conclusory" in nature.

As you are no doubt aware, this FOIA request involves the circumstances surrounding the deaths of people held in ICE custody and the government's apparent failure to adequately prevent, investigate, or track such deaths. The FOIA request was filed on June 26, 2007, just <u>one day</u> after the New York Times revealed in a front page story that 62 people had died in U.S. Immigration and Customs Enforcement (ICE) custody since 2004. Nina Bernstein, <u>New Scrutiny as Immigrants Die in Custody</u>, N.Y. TIMES, June 26, 2007. According to the article, "[n]o government body is charged with accounting for deaths in immigration detention" and ICE "declined to release information about the 62 detention deaths since 2004." <u>Id</u>.

The significance of this issue has only grown in importance since this FOIA request was filed. Major newspapers have continued to report on in-custody deaths and have questioned whether the ICE, the Office of the Inspector General, and other branches of the Department of Homeland Security will conduct investigations into these deaths. <u>See</u>, <u>e.g.</u>, Darryl Fears, <u>3 Jailed Immigrants Die in a Month; Medical Mistreatment Alleged; Federal Agency Denies Claims</u>,

WASHINGTON POST, Aug. 15, 2007; Greg Krikorian, <u>Dead Detainee's Family Alleges Medical Mistreatment</u>, L.A. TIMES, Aug. 11, 2007. The editorial boards of the Miami Herald, New York Times, and Washington Post have all expressed concern about this issue, and some have called on Congress to investigate poor medical care and in-custody deaths.

In fact, on October 4, 2007, the House Immigration Subcommittee held a hearing on "Detention and Removal: Immigration Detainee Medical Care." At that hearing, Gary Mead, ICE's Assistant Director for Detention and Removal revealed for the first time that 66 people had died since 2004—presumably four people had died in the three and a half months following the release of the New York Times article. Two of the other witnesses who spoke before Congress were relatives of detainees who died in ICE custody during the period covered in this FOIA request. In connection with her nomination hearing, Assistant Secretary Julie Myers has also been asked numerous questions about deaths in detention and the government's efforts to investigate in-custody deaths.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Although your letter did not question whether the ACLU qualifies as a person primarily engaged in disseminating information, the ACLU clearly satisfies this requirement as well. Gathering information and disseminating it to the public is at the absolute <u>core</u> of what the ACLU is all about. As the largest civil liberties organization in the country, with offices in 50 states and over 500,000 members, the ACLU is in a unique position to collect and disseminate information that is of critical importance to the public. One of the principal means by which information is then disseminated to the public by the ACLU is through newsletters, news briefings, and right-to-know handbooks. The ACLU's website is heavily trafficked and our electronic newsletters are available by subscription. The ACLU disseminates information via dozens of podcasts, *see* http://www.aclu.org/multimedia/podcasts/index.html, and endeavors through all of our work to advance public access to information.

Most relevant to this request, the ACLU frequently utilizes FOIA requests to obtain documents of vital importance to the public, and the ACLU then disseminates information obtained through these FOIA requests to the public. For instance, the ACLU filed a FOIA request on October 7, 2003, demanding the release of information about detainees held overseas by the United States. Over 100,000 pages of documents ultimately obtained by the ACLU pursuant to a court order are now <u>available directly to the public</u> on the ACLU website. <u>See</u> http://www.aclu.org/safefree/torture/torturefoia.html. Similarly, in August 2002, the ACLU filed a FOIA request to find out how the Federal Bureau of Investigation was using its surveillance powers. In response, <u>the government conceded that expedited processing of that request was warranted,</u> and documents ultimately produced pursuant to court order are <u>now available directly to the public</u> on the ACLU website. <u>Id</u>.

Not only is this request timely, it is literally about life and death issues—issues that are of utmost importance to the public.  Please reconsider your decision to deny this request for expedited treatment.  I eagerly await your response.

Sincerely,

Tom Jawetz
Immigration Detention Staff Attorney
ACLU National Prison Project
915 15th Street, NW
7th Floor
Washington, DC 20005
Tel: (202) 548-6610
Fax: (202) 393-4931

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Encls.

3



U.S. Department of Homeland Security
425 I Street, NW
Washington, DC 20536

**U.S. Immigration
and Customs
Enforcement**

July 24, 2007

Mr. Tom Jawetz
ACLU
915 15th Street, NW 7th Floor
Washington, DC 20005

Re: **07-FOIA-52835**

Dear Mr. Jawetz:

This acknowledges receipt of your June 27, 2007 Freedom of Information Act (FOIA) request to the Department of Homeland Security (DHS), seeking deaths in immigration detention. Your request was received in this office on July 24, 2007.

As it relates to your request for expedited treatment, your request is denied.

Under the DHS FOIA regulation, expedited processing of a FOIA request is warranted if the request involves "circumstances in which the lack of expedited treatment could reasonably be expected to pose an imminent threat to the life or physical safety of an individual," 6 C.F.R. § 5.5(d)(1)(i), or "an urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information," 6 C.F.R. § 5.5(d)(l)(ii). Requesters that seek expedited processing must submit a statement explaining in detail the basis for the request, and that statement must be certified by the requester to be true and correct. 6 C.F.R. § 5.5(d)(3).

Your request for expedited processing is denied because you do not qualify for either category. You failed to demonstrate a particular urgency to inform the public about the government activity involved in the request beyond the public's right to know about government activity generally. Your letter was conclusory in nature and did not present any facts to justify a grant of expedited processing under the applicable standards.

FOR MEDIA/EDUCATIONAL REQUESTERS:

Provisions of the FOIA allow us to recover part of the cost of complying with your request. We shall charge you for records in accordance with the DHS FOIA regulations as they apply to media requestors. As a media/educational requestor you will be charged 10-cents a page for duplication, although the first 100 pages are free. [We will construe the submission of your request as an agreement to pay up to $25.00. You will be contacted before any further fees are accrued.]

We have queried the appropriate component of DHS for responsive records. If any responsive records are located, they will be reviewed for determination of releasability. Please be assured that one of the processors in our office will respond to your request as expeditiously as possible. We appreciate your patience as we proceed with your request.

Your request has been assigned reference number **07-FOIA-52835.** Please refer to this identifier in any future correspondence. You may contact this office at 1-866-633-1182 or 202-732-0310.

Sincerely,

Catrina M. Pavlik-Keenan
FOIA Officer

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

ELIZABETH ALEXANDER
DIRECTOR
ATTORNEY AT LAW

NATIONAL OFFICE
125 BROAD STREET, 18TH FL.
NEW YORK, NY 10004-2400
T/212.549.2500

OFFICERS AND DIRECTORS
NADINE STROSSEN
PRESIDENT

ANTHONY D. ROMERO
EXECUTIVE DIRECTOR

RICHARD ZACKS
TREASURER

June 27, 2007

U.S. Department of Homeland Security
Privacy Office
Mail Stop 0550
245 Murray Lane, S.W.
Washington, DC 20528-0550

Health Resources and Services Administration
Office of Communications
FOIA Requester Service Center
5600 Fishers Ln., Room 14-18
Rockville, MD 20857

U.S. Public Health Service
Freedom of Information Office
5600 Fishers Ln., Room 17A-46
Rockville, MD 20857

**Re: FOIA Request Related to Deaths in Immigration Detention**

Dear Freedom of Information Officers:

This letter constitutes a request (Request) pursuant to the Freedom of Information Act, 5 U.S.C. § 552 (FOIA). The Request is submitted on behalf of the National Prison Project (NPP) of the American Civil Liberties Union (ACLU). NPP is also requesting expedited processing for this request, pursuant to 5 U.S.C. § 552(a)(6)(E) and agency regulations, and a fee waiver, pursuant to 5 U.S.C. § 552(a)(4)(A)(iii). The request is simultaneously being filed with the U.S. Department of Homeland Security, the Health Resources and Services Administration, and the U.S. Public Health Service.

## BACKGROUND

Recent news reports indicate that individuals detained by U.S. Immigration and Customs Enforcement (ICE) have died as a result of grossly inadequate medical care. Until recently, it was unknown how many individuals had died in ICE custody. Such deaths are not publicly reported and no government agency appears to be charged with the task of tracking and investigating such deaths. One attempt by the ACLU to account for in-custody deaths identified 20 deaths since 2004; this list was generated through a review of publicly available documents and correspondence with immigrants' rights advocates around the

country.  However, according to a figure recently released by ICE to The New York Times, the number of immigrant detainee deaths since 2004 is actually 64.[1]

The circumstances surrounding many of these deaths are highly disturbing and demand further investigation and oversight.  In one account, a Korean woman detained at a privately-run facility in Albuquerque, New Mexico complained for weeks about her need for medical attention.[2]  Despite her deteriorating health, the woman received little attention until she was transferred to a local hospital where she died.[3]  In February 2007, a detainee held in Hackensack, New Jersey, was denied powerful prescription medication despite experiencing crippling pain; according to other detainees, the man's severe distress was common knowledge at the jail, and he committed suicide after five agonizing days.[4]

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Just yesterday, The New York Times published a front page story describing two other in-custody deaths.[5]  Sandra Kenley, a lawful permanent resident of more than 30 years, died in December 2005 after being detained in two Virginia regional jails for approximately seven weeks.  Prior to being taken into custody, Ms. Kenley notified airport immigration inspectors of her serious medical conditions, which included a scheduled surgery to treat her fibroid tumor and uterine bleeding.  She complained until her death of continued hemorrhaging and the jails' refusal to provide her with necessary prescription medications.

One year later, while detained in yet another Virginia regional jail, Abdoullai Sall died approximately ten weeks after entering immigration custody.  Throughout his detention, Sall complained to jail officials that he was not receiving the proper medication for his serious medical condition, and attempts by his immigration attorney to notify the jail of his client's worsening health were largely ignored.

Recent press attention to deaths in detention reveals just how little information is available about this problem.  According to the ICE Detention Standards, when an immigrant detainee dies in custody, the Assistant District Director for Detention and Removal Operations (DRO) is supposed to notify the District Director, the Assistant Regional Director for DRO, and the Director of Field Operations at ICE Headquarters.[6]  A local representative of the U.S. Public Health Service is to receive medical reports within 48 hours of the death, and both the family of the deceased and consular officials are to be notified about the death.[7]

The Department of Homeland Security's Office of Inspector General (OIG) publicly released a report in January 2007 detailing a series of problems with the

---

[1] Nina Bernstein, *New Scrutiny as Immigrants Die in Custody*, N.Y. Times, June 26, 2007.
[2] Barbara Ferry, *Crackdown's Fallout*, The New Mexican, May 20, 2007.
[3] *Id.*
[4] Nina Bernstein, *One Immigrant Family's Hopes Lead to a Jail Cell Suicide*, N.Y. Times, Feb. 23, 2007.
[5] Bernstein, *supra* note 1.
[6] INS Detention Standard, Terminal Illness, Advance Directives, and Death (Sept. 20, 2000), 6-7.
[7] *Id.*

treatment of immigrant detainees at five facilities.[8]  One problem highlighted by the OIG was that four of the five facilities reviewed showed serious problems with the delivery of adequate health services.  Although the report made a general reference to one suicide death at the Passaic County Jail,[9] it made no mention of at least three other deaths that occurred at the San Diego Correctional Facility.  The OIG also releases semiannual reports to Congress that contain sporadic and vague references to investigations into in-custody deaths.  Such reports provide little useful information to assure the public that meaningful investigations are conducted into each death, and that steps are taken to guarantee that detainees receive necessary medical services before it is too late.[10]

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Over the last ten years, the United States has dramatically increased the use of detention for individuals in civil immigration proceedings.  In 1997, the number of immigrants detained in the custody of U.S. Immigration and Naturalization Service on a given day was approximately 13,000.[11]  Just ten years later, ICE has funding to detain 27,500 individuals at any given time.[12]  As the nation considers comprehensive immigration reform legislation, it is likely that ICE will receive funding to detain many thousands more.  This issue will only grow in importance over the coming years, and it is essential that the federal government—which is ultimately responsible for the health and welfare of individuals detained pursuant to its authority—do more to ensure that immigrant detainees do not suffer and die unnecessarily.

## RECORDS REQUESTED

Please disclose:

1.  A complete list of individuals who have died while detained in ICE custody since January 1, 2004.   For each death listed, please include:
    a.  Complete name;
    b.  Alien number;
    c.  Date on which detention began;
    d.  Date of death;
    e.  List of all facilities where the detainee was housed along with dates of detention; and

---

[8] Department of Homeland Security, Office of Inspector General, *Treatment of Immigration Detainees Housed at Immigration and Customs Enforcement Facilities*, OIG-07-07 (Dec. 2006).
[9] *Id.* at 29.
[10] The OIG recently began a "special review" of two in-custody deaths, and is considering the ICE Detention Standards that pertain to in-custody deaths and medical care.  The ACLU hopes that the results of the OIG review are made public, and that the OIG make recommendations to ensure that preventable deaths are reduced and that all deaths are properly investigated by an independent government body.
[11] U.S. Department of Justice, Office of the Federal Detention Trustee, *Detention Needs Assessment and Baseline Report: A Compendium of Federal Detention Statistics, at* http://www.usdoj.gov/ofdt/.
[12] U.S. Immigration and Customs Enforcement, *ICE Accomplishments in Fiscal Year 2006* (May 15, 2007), *at* http://www.ice.gov/pi/news/factsheets/2006accomplishments.htm.

  f. Location at time of death.
2. For each individual whose death is included in (1), all records:
  a. Pertaining to the cause of death;
  b. Pertaining to requests for medical help by anyone, including the deceased, his/her family members, and fellow detainees;
  c. Pertaining to Treatment Authorization Requests (TARs) submitted to the Division of Immigration Health Services (DIHS), including any DIHS responses to those TARs;
  d. Pertaining to reports of investigations into the circumstances surrounding the death, including all after-action reports and critical incident reports;
  e. Pertaining to whether any of the detainees who died were diagnosed with terminal illnesses while in immigration detention or beforehand;
  f. Pertaining to whether any of the detainees who died were taken to outside hospitals for treatment, and if so, the names of those hospitals and the dates of treatment;
  g. Pertaining to whether and how ICE notified families of the deaths of detained family members;
  h. Pertaining to whether and how ICE notified consular officials of the deaths of detained persons;
  i. Pertaining to whether and how state, county, local officials and review boards were notified of the deaths.
3. All records, including written and electronic correspondence, pertaining to deaths in ICE custody.
4. All records, including policies, procedures, or guidelines provided to or maintained by Contract Detention Facilities, Service Processing Centers, and Intergovernmental Service Agreement facilities relating to deaths in detention, including memoranda and training materials.
5. All records identifying the manner by which your agency or any of its components track deaths in detention.
6. All records, including written and electronic correspondence, generated in response to requests for information from the Washington Post and The New York Times about immigrant detainee medical care and deaths, and in reaction to those articles. This request pertains specifically to records generated in preparation for and in response to two articles: (a) Darryl Fears, *Illegal Immigrants Received Poor Care in Jail, Lawyers Say*, Washington Post, June 13, 2007; and (b) Nina Bernstein, *New Scrutiny as Immigrants Die in Custody*, N.Y. Times, June 26, 2007.

## THE REQUESTOR

The ACLU is a nationwide, nonprofit, nonpartisan organization dedicated to protecting human rights and civil rights in the U.S. It is the largest civil liberties organization in the country, with offices in 50 states and over 500,000 members. The ACLU is specifically dedicated to holding the U.S. government accountable

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

to universal human rights principles in addition to rights guaranteed by the U.S. Constitution.

Furthermore, the ACLU publishes newsletters, news briefings, right-to-know handbooks, and other materials that are disseminated to the public. These materials are widely available to everyone, including tax-exempt organizations, not-for-profit groups, law students and faculty, for no cost or for a nominal fee through its public education department. The ACLU also disseminates information through its heavily subscribed website, http://www.aclu.org. The website addresses civil liberties issues in depth, provides features on civil liberties issues in the news, and contains hundreds of documents that relate to the issues addressed by the ACLU. The website includes features on information obtained through the FOIA. *See, e.g.*, http://www.aclu.org/patriot_foia/index.html. The ACLU also publishes an electronic newsletter, which is distributed to subscribers by e-mail.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Accordingly, the ACLU is an organization whose "main professional activity or occupation is information dissemination." 6 C.F.R. § 5.5(d)(3). The ACLU is also a "representative of the news media" for purposes of 45 C.F.R. § 5.5. Finally, the ACLU meets the criterion laid out in *National Sec. Archive v. U.S. Dep't of Defense*, where a representative of the news media is defined as an entity that "gathers information of potential interest to a segment of the public" and "uses its editorial skills to turn raw materials into a distinct work, and distributes that work to an audience." *National Sec. Archive v. U.S. Dep't of Defense*, 880 F.2d 1381,1387 (D.C. Cir. 1989).

## EXPEDITED PROCESSING

We request Track 1 expedited treatment for this FOIA request. This request qualifies for expedited treatment pursuant 5 U.S.C. § 552(a)(6)(E) and applicable regulations.

As demonstrated above, there is a "compelling need" for expedited processing sought by the ACLU. 5 U.S.C. § 552(a)(6)(E)(i)(I). The lack of expedited disclosure of records related to these deaths in detention could "reasonably be expected to pose an imminent threat to the life or physical safety of an individual." 5 U.S.C. § 552(a)(6)(E)(v)(I); 6 C.F.R. § 5.5(d)(1)(i).

Moreover, there exists a clear "urgency to inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v)(II). *See also* 6 C.F.R. § 5.5(d)(1)(ii) (expedited processing is warranted where there is "[a]n urgency to inform the public about an actual or alleged federal government activity.").

The ACLU is therefore entitled to expedited processing of this request.

5

**FEE WAIVER**

The ACLU requests a total waiver of fees on the grounds that disclosure of the requested records is in the public interest and because disclosure "is likely to contribute significantly to the public understanding of the activities or operations of the government and is not primarily in the commercial interest of the requester[s]." 5 U.S.C. § 552(a)(4)(A)(iii). *See also* 45 C.F.R. § 5.45. This Request aims at furthering public understanding of government conduct, and specifically to help the public determine whether civil detainees in the custody of Immigration and Customs Enforcement are treated in a manner than comports with our nation's values. On account of these factors, the ACLU has not been charged fees associated with responding to FOIA requests on numerous occasions.[13]

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

In any event, as discussed *supra*, the ACLU qualifies as a "representative of the news media" and the records are not sought for commercial use. Accordingly, should fees be assessed for the processing of this Request, such fees should be "limited to reasonable standard charges for document duplication." 5 U.S.C. § 552(a)(4)(A)(ii)(II).

The ACLU is therefore entitled to a total waiver of fees associated with this request and should, in no event, be required to pay more than reasonable standard charges for document duplication alone.

\* \* \*

Thank you for your consideration of this request. If this request is denied in whole or part, the ACLU asks that you justify all deletions by reference to specific exemptions of the FOIA. We expect you to release all segregable portions of otherwise exempt material. We reserve the right to appeal a decision to withhold any information, or to deny expedited processing or a waiver of fees. We look forward to your reply to the request for expedited processing within ten (10) business days, as required under 5 U.S.C. § 552(a)(6)(E)(ii)(I).

---

[13] The following are recent examples of requests for which agencies did not charge the ACLU fees associated with responding to a FOIA request: (1) The Department of State did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in April 2005; (2) The National Institute of Standards and Technology did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in April 2005; (3) The Office of Science and Technology Policy in the Executive Office of the President did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in August 2003; (4) The Federal Bureau of Investigation did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in August 2002; (5) The Office of Intelligence Policy and Review did not charge the ACLU fees associated with the ACLU in August 2002; (6) and The Office of Information and Privacy in the Department of Justice did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in August 2002.

Notwithstanding your decision on the matter of expedited processing, we look forward to your reply to the records request within twenty (20) business days, as required under 5 U.S.C. § 552(a)(6)(A)(I).[14]

Please respond to Tom Jawetz, Immigration Detention Staff Attorney, ACLU National Prison Project, 915 15th St. NW, 7th Floor, Washington, DC 20005, telephone: (202) 548-6610, email: tjawetz@npp-aclu.org.  Also, please notify us in advance if the costs for photocopying the documents exceed $100.  We eagerly await your response, and thank you for your assistance.

*   *   *

Under penalty of perjury, I certify, to the best of my knowledge and belief, that the above information is true and correct.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Tom Jawetz
Immigration Detention Staff Attorney
ACLU National Prison Project
915 15th Street, NW
7th Floor
Washington, DC 20005
Tel: (202) 548-6610
Fax: (202) 393-4931

---

[14] Pursuant to the Department of Health and Human Services regulations, a reply by HRSA and PHS is due within ten working days after this request has been received.  45 C.F.R. § 5.35(b)(1).

7



**U.S. Department of Homeland Security**

425 I Street, NW
Washington, DC 20536

**U.S. Immigration
and Customs
Enforcement**

November 15, 2007

Mr. Tom Jawetz
Immigration Detention Staff Attorney
ACLU National Prison Project
915 15th Street, NW, 7th Floor
Washington, DC 20005

Re: **07-FOIA-52835**

Dear Mr. Jawetz:

This letter responds to your November 5, 2007 letter which requested that our office reconsider your request for expedited processing for your Freedom of Information Act (FOIA) request 07-FOIA-52835.

*Under the DHS FOIA regulation, expedited processing of a FOIA request is warranted if the request involves "circumstances in which the lack of expedited treatment could reasonably be expected to pose an imminent threat to the life or physical safety of an individual," 6 C.F.R. § 5.5(d)(1)(i), or "an urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information," 6 C.F.R. § 5.5(d)(l)(ii). Requesters that seek expedited processing must submit a statement explaining in detail the basis for the request, and that statement must be certified by the requester to be true and correct. 6 C.F.R. § 5.5(d)(3).*

I have reconsidered your request for expedited treatment and I have decided that you have demonstrated that the subject of your FOIA request would exceed the public's right to know about government activity generally. A good gauge of public interest is news coverage, and a preliminary search of the internet and other sources does reveal that the subject of deaths in the custody of Immigration and Customs Enforcement (ICE) is a topic of substantial news coverage.

If you need to contact us about this request, please refer to **07-FOIA-52835.** You may contact this office at (202) 732-0300.

Sincerely,

Catrina M. Pavlik-Keenan
FOIA Officer

# EXHIBIT 10



**U.S. Department of Homeland Security**

425 I Street, NW
Washington, DC 20536

## U.S. Immigration and Customs Enforcement

November 15, 2007

Mr. Tom Jawetz
Immigration Detention Staff Attorney
ACLU National Prison Project
915 15th Street, NW, 7th Floor
Washington, DC 20005

Re: **07-FOIA-52835**

Dear Mr. Jawetz:

This letter responds to your November 5, 2007 letter which requested that our office reconsider your request for expedited processing for your Freedom of Information Act (FOIA) request 07-FOIA-52835.

*Under the DHS FOIA regulation, expedited processing of a FOIA request is warranted if the request involves "circumstances in which the lack of expedited treatment could reasonably be expected to pose an imminent threat to the life or physical safety of an individual," 6 C.F.R. § 5.5(d)(1)(i), or "an urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information," 6 C.F.R. § 5.5(d)(l)(ii). Requesters that seek expedited processing must submit a statement explaining in detail the basis for the request, and that statement must be certified by the requester to be true and correct. 6 C.F.R. § 5.5(d)(3).*

I have reconsidered your request for expedited treatment and I have decided that you have demonstrated that the subject of your FOIA request would exceed the public's right to know about government activity generally. A good gauge of public interest is news coverage, and a preliminary search of the internet and other sources does reveal that the subject of deaths in the custody of Immigration and Customs Enforcement (ICE) is a topic of substantial news coverage.

If you need to contact us about this request, please refer to **07-FOIA-52835.** You may contact this office at (202) 732-0300.

Sincerely,

Catrina M. Pavlik-Keenan
FOIA Officer

# EXHIBIT 11



U.S. Department of Homeland Security
425 I Street, NW
Washington, DC 20536

**U.S. Immigration
and Customs
Enforcement**

January 4, 2008

Mr. Tom Jawetz
American Civil Liberties Union
National Prison Project
915 15th Street NW, 7th Floor
Washington, DC 20005

Re: **FOIA Case Number 07-FOIA-52835**

Dear Mr. Jawetz:

This is the final response to your Freedom of Information Act (FOIA) request to Immigration and Customs Enforcement (ICE), dated June 27, 2007, and received by this office on July 24, 2007. You have requested the following:

1. A complete list of individuals who have died while detained in ICE custody since January 1, 2004. for each death listed, please include:
   a. Complete Name;
   b. Alien Number;
   c. Date on which detention began;
   d. Date of death;
   e. List of facilities where the detainee was housed along with dates of detention; and
   f. Location at time of death.
2. For each individual whose death is included in (1), all records:
   a. Pertaining to the cause of death;
   b. Pertaining to requests for medical help by anyone, including the deceased, his/her family members, and fellow detainees;
   c. Pertaining to Treatment Authorization Requests (TARs) submitted to the Division of Immigration Heath Services (DIHS), including any DIHS responses to those TARs;
   d. Pertaining to reports of investigations into the circumstances surrounding the death, including all after-action reports and critical incident reports;
   e. Pertaining to whether any of the detainees who died were diagnosed with terminal illnesses while in immigration detention or beforehand;
   f. Pertaining to whether any of the detainees who died were taken to outside hospitals for treatment, and if so, the names of those hospitals and the dates of treatment;
   g. Pertaining to whether and how ICE notified families of the deaths of detained family members;
   h. Pertaining to whether and how ICE notified consular officials of the deaths of detained persons;
   i. Pertaining to whether and how state, county, local officials and review boards were notified of the deaths.
3. All records, including written and electronic correspondence, pertaining to deaths in ICE custody.

4.  All records, including policies, procedures, or guidelines provided to or maintained by Contract Detention Facilities, Service Processing Centers, and Intergovernmental Service Agreement facilities relating to deaths in detention, including memoranda and training materials.
5.  All records identifying the manner by which your agency or any of its components track deaths in detention.
6.  All records, including written and electronic correspondence, generated in response to requests for information from the Washington Post and The New York Times about immigrant detainee medical care and deaths, and in reaction to those articles. This request pertains specifically to records generated in preparation for and in response to two articles: (a) Darryl Fears, Illegal Immigrants Received Poor Care in Jail, Lawyers Say, Washington Post, June 13, 2007; and (b) Nina Bernstein, New Scrutiny as Immigrants Die in Custody, N.Y. Times, June 26, 2007.

Your request has been processed under the FOIA, 5 U.S.C. § 552.

A search for records responsive to item 1 of your request produced a total of 4 pages. The documents have been reviewed and are being released to you in their entirety.

With regard to item 2 of your request, a search of the Office of Detention and Removal Operations (DRO) and the Division of Immigration Health Services (DIHS) produced a total of 789 pages. The documents have been reviewed and portions are being withheld pursuant to Exemptions 6 and 7(C) of the FOIA.

These records consist of the following three types of documents: (1) Detainee Treatment, Authorization & Consultation forms, (2) Detainee Medical records, and (3) Significant Event Notification reports. Although a thorough and comprehensive search of files in DRO and DIHS was conducted, records for the following individuals could not be located:

Cezar Rioz-Martinez
Samou Fankeu
Ignacio Sarabia-Vallasenor

For your convenience, I have included a list that details what responsive records were located for each individual.

With regard to item 3 of your request, a search of the Office of Detention and Removal Operations and the Office of the Executive Secretariat produced a total of 45 pages. The documents have been reviewed and 20 pages are being released to you in their entirety. Portions of 25 pages are being withheld pursuant to Exemptions 2 and 6 of the FOIA.

With regard to item 4 of your request, a search of the Office of Detention and Removal Operations was conducted. Records responsive to this portion of your request can be found in the ICE Detention Operations Manual located at the following address:

http://www.ice.gov/partners/dro/opsmanual/index.htm

With regard to item 5 of your request, a search of the Division of Immigration Health Services produced a total of 8 pages. The documents have been reviewed and are being withheld in their entirety pursuant to Exemption 2 of the FOIA.

With regard to item 6 of your request, a search of the ICE FOIA Office and the Office of Public Affairs produced a total of 35 pages. The documents have been reviewed and 13 pages are being released to you

in their entirety. Portions of 2 pages are being withheld pursuant to Exemptions 6 and 7(C) of the FOIA. Finally, 10 pages are being withheld in their entirety pursuant to Exemptions 2 and 5 of the FOIA.

Portions of 816 pages have been withheld as described below.

**FOIA Exemption 2(high)** protects information applicable to internal administrative and personnel matters, such as operating rules, guidelines, and manual of procedures of examiners or adjudicators, to the extent that disclosure would risk circumvention of an agency regulation or statute, impede the effectiveness of an agency's activities, or reveal sensitive information that may put the security and safety of an agency activity or employee at risk. Whether there is any public interest in disclosure is legally irrelevant. Rather, the concern under high 2 is that a FOIA disclosure should not benefit those attempting to violate the law and avoid detection.

**FOIA Exemption 2(low)** protects information applicable to internal administrative personnel matters to the extent that the information is of a relatively trivial nature and there is no public interest in the document.

**FOIA Exemption 6** exempts from disclosure personnel or medical files and similar files the release of which would cause a clearly unwarranted invasion of personal privacy. This requires a balancing of the public's right to disclosure against the individual's right privacy. The types of documents and/or information that we have withheld may consist of social security numbers, home addresses, dates of birth, or various other documents and/or information belonging to a third party that are considered personal. The privacy interests of the individuals in the records you have requested outweigh any minimal public interest in disclosure of the information. Any private interest you may have in that information does not factor into the aforementioned balancing test.

**FOIA Exemption 7(C)** protects records or information compiled for law enforcement purposes that could reasonably be expected to constitute an unwarranted invasion of personal privacy. This exemption takes particular note of the strong interests of individuals, whether they are suspects, witnesses, or investigators, in not being unwarrantably associated with alleged criminal activity. That interest extends to persons who are not only the subjects of the investigation, but those who may have their privacy invaded by having their identities and information about them revealed in connection with an investigation. Based upon the traditional recognition of strong privacy interest in law enforcement records, categorical withholding of information that identifies third parties in law enforcement records is ordinarily appropriate. As such, I have determined that the privacy interest in the identities of individuals in the records you have requested clearly outweigh any minimal public interest in disclosure of the information. Please note that any private interest you may have in that information does not factor into this determination.

Eighteen pages have been withheld as described below.

**FOIA Exemption 2(high)** protects information applicable to internal administrative and personnel matters, such as operating rules, guidelines, and manual of procedures of examiners or adjudicators, to the extent that disclosure would risk circumvention of an agency regulation or statute, impede the effectiveness of an agency's activities, or reveal sensitive information that may put the security and safety of an agency activity or employee at risk. Whether there is any public interest in disclosure is legally irrelevant. Rather, the concern under high 2 is that a FOIA disclosure should not benefit those attempting to violate the law and avoid detection.

**FOIA Exemption 2(low)** protects information applicable to internal administrative personnel matters to the extent that the information is of a relatively trivial nature and there is no public interest in the document.

**FOIA Exemption 5** protects from disclosure those inter- or intra-agency documents that are normally privileged in the civil discovery context. The three most frequently invoked privileges are the deliberative process privilege, the attorney work-product privilege, and the attorney-client privilege. After carefully reviewing the responsive documents, I have determined that the responsive documents qualify for protection under the deliberative process privilege. The deliberative process privilege protects the integrity of the deliberative or decision-making processes within the agency by exempting from mandatory disclosure opinions, conclusions, and recommendations included within inter-agency or intra-agency memoranda or letters. The release of this internal information would discourage the expression of candid opinions and inhibit the free and frank exchange of information among agency personnel.

You have a right to appeal the above withholding determination. Should you wish to do so, you must send your appeal and a copy of this letter, within 60 days of the date of this letter, to: Associate General Counsel (General Law), U.S. Department of Homeland Security, Washington, D.C. 20528, following the procedures outlined in the DHS regulations at 6 C.F.R. § 5.9. Your envelope and letter should be marked "FOIA Appeal." Copies of the FOIA and DHS regulations are available at www.dhs.gov/foia.

Provisions of the FOIA and Privacy Act allow us to recover part of the cost of complying with your request. In this instance, because the cost is below the $14 minimum, there is no charge.[1]

If you need to contact our office about this matter, please refer to case number **07-FOIA-52835**. This office can be reached at (202) 732-0300 or (866) 633-1182.

Sincerely,

Catrina M. Pavlik-Keenan
FOIA Officer

---

[1] 6 CFR § 5.11(d)(4).

# EXHIBIT 12

## Jawetz, Tom

| | |
|---|---|
| **From:** | Pavlik-Keenan, Catrina M [catrina.m.pavlik-keenan@dhs.gov] on behalf of ICE-FOIA [ice-foia@dhs.gov] |
| **Sent:** | Friday, February 15, 2008 4:26 PM |
| **To:** | Jawetz, Tom |
| **Cc:** | Plofker, Howard TSA OCC |
| **Subject:** | RE: 07-FOIA-52835 |

Mr. Jawetz:  We do not do Vaughn Indexes for FOIA requests that are not in litigation.  What I can tell you is that 10 pages are specific to one individual's medical care, which you do not have consent to have.  The 8 pages consist of a Standard Operating Procedure that used by DIHS.   In the bottom of your response letter it indicated how to appeal.

Regard, Ms. Pavlik-Keenan, ICE FOIA Officer

---

**From:** Jawetz, Tom [mailto:tjawetz@npp-aclu.org]
**Sent:** Friday, February 15, 2008 10:18 AM
**To:** ICE-FOIA
**Subject:** 07-FOIA-52835

To Whom It May Concern:

On January 4, 2008, Immigration and Customs Enforcement produced over 800 pages of documents in response to FOIA request 07-FOIA-52835.  ICE also withheld in full eighteen (18) pages of responsive documents.  Eight (8) pages of records that responded to Item 5 of the request and ten (10) pages of records that responded to Item 6 of the request were withheld in full.  Any appeal of the decision to withhold records is due March 4, 2008.

Earlier today I telephoned your office to request that the eighteen (18) pages that were withheld in their entirety be further defined in a Vaughn index.  Such an index would identify each document separately, rather than as a group of eight (8) or ten (10) pages, and would explain the dates of those pages, the authors and recipients, and other non-exempt information that would contextualize the withholding decision.  Vaughn indexes are often extremely useful in helping requestors decide whether or not to appeal the withholding decision, and can therefore save the agency the time that would be required to adjudicate any such appeal.  I spoke with Ryan Law, who instructed me to put my request in writing.

Please let me know whether this request will be accommodated.  Given the pending deadline for my appeal—March 4, 2008—I would appreciate a response as promptly as possible.

Thanks very much,

Tom Jawetz
Immigration Detention Staff Attorney
ACLU National Prison Project
915 15th Street NW
7th Floor
Washington, DC 20005
(202) 393-4930 (tel)
(202) 393-4931 (fax)
(202) 548-6610 (direct)

# EXHIBIT 13

**From:**       Aker, Diane
**Sent:**       Tuesday, August 14, 2007 6:58 AM
**To:**         ▓▓▓▓▓▓▓▓▓▓▓
**Subject:**    Fw: Guevara-Lorano, Juan A# 078 915 795 and Pineda-Reyes, Adalberto A# 094 957 377

▓▓▓▓▓▓▓▓▓▓▓

Another death that needs to be added to the roster..

Diane

Sent: Mon Aug 13 14:16:59 2007
Subject: RE: Guevara-Lorano, Juan A# 078 915 795 and Pineda-Reyes, Adalberto A# 094 957
377

Bob,

the HSA verbally confirmed that.  The detainee was prescribed Tylenol. The detainee was
not seen or evaluated by an RN, midlevel or physician.

A positive PPD was documented on 7/29/2007 and the detainee did not receive an xray until
8/5/2007.  At the time of the incident on 8/12/2007, the detainee was seen and examined by
EMTs.  There is no documentation to support that he was seen and evaluated by their
physician.



The HSA informed me that their staff physician works M - Th, 8 - 5PM, and is on call.

If you need additional information, please do not hesitate to contact me.

▓▓▓▓

# EXHIBIT 14

- WRITE YOUR PROBLEM IN THE AREA BELOW, AND THE DATE YOUR PROBLEM BEGAN
- ONLY ONE SLIP PER PROBLEM

1 FAVOR DE ESCRIBIR SOLAMENTE SU PROBLEMA MEDICO Y POR CUANTO TIEMPO LO HA TENIDO
2 POR FAVOR, NO MAS QUE UN PROBLEMA EN ESTA HOJA
3 PONGA UN CIRCULO PARA MARCAR LA ATENCION QUE USTED BUSCA

1 (MEDICAL / MEDICA)

I NEED MEDICINE FOR PAIN
All MY BONES HURT. THANK YOU

2. DENTAL

3 PSYCHOLOGY / PSYCOLOGO:

NAME / NOMBRE: ROBERTO LEDESMA

A - NUMBER / A - NUMERO: 78528918

POD / HOUSING UNIT (UNIDAD / HABITACION) K.P 115

HERE FOR / AQUI PARA: IMMIGRATION    0    U.S. MARSHALL SERVICE

Date Received / Collected by Nursing_____ Date / Triaged_____
Date Responded / Completed_____

NOV 27 2005

# EXHIBIT 15

# STANDARD OPERATING PROCEDURE
## Mortality Notification
### SOP 3.10.2

Rev. 8/28/06

**PURPOSE: TO ESTABLISH AND MAINTAIN A DATABASE OF ALL DEATHS AMONG ICE-DETENTION AND REMOVAL OPERATIONS (DRO) DETAINEES, TO ASSIGN RESPONSIBILITIES AND TIME PARAMETERS FOR MORTALITY REPORTS AND REVIEWS REFLECTING ICE DETENTION STANDARDS, AND TO REVIEW CASES TO INSURE THE PROVISION OF HIGH QUALITY MEDICAL SERVICES.**

**I.**    **Notification of Mortality.**

    **A. Immediate notification is required as follows:**
       1. Service Processing Center (SPC)
          a.   Officer in charge (OIC) $\longrightarrow$ Field Office Director (FOD) $\longrightarrow$ Immigrations and Customs Enforcement (ICE), Detention and Removal (DRO) Headquarters (HQ).
          b.   Clinical Director (CD) and Health Services Administrator (HSA) $\longrightarrow$ Associate Directors, Operations Branch and Medical Services Branch $\longrightarrow$ Director, Division of Immigration Health Services (DIHS).

       2. Contract Detention Facility (CDF)
          a.   Public Health Services (PHS) staffed CDF, as above.
          b.   Non-PHS staffed CDF.
            i) OIC $\longrightarrow$ FOD $\longrightarrow$ ICE DRO HQ

            ii) ICE DRO HQ $\longrightarrow$ DIHS HQ

       3. Inter-Governmental Service Agreement (IGSA) facilities follow process for non-PHS staffed CDF above.

    **B. Reference ICE Detention Standard, "Terminal Illness, Advanced Directives, and Death"**
       1. Section III, E, 6a2, Medical Reports, "Within 48 hours, the Assistant District Director (ADD)/DRO shall send all available medical reports to the local representative of the U.S. Public Health Service (USPHS)".
       2. For SPCs and PHS-staffed contract detention centers, the local USPHS

representative shall be the HSA on-site, who shall forward via FedEx all reports listed in section-C below to the DIHS Medical Director.

3.  For non-PHS staffed CDFs and IGSA facilities, the ADD/DRO shall forward all medical reports via FedEx to the DIHS Medical Director. Medical Services Branch a the following address:

    1220 L Street, NW
    Suite 500
    Washington, DC 20005
    Phone: 202-514-3339

**C. Documents required to be submitted to DIHS HQ**
  1.  Mortality Review
      a.  For SPC and PHS-staffed CDF, use QMD 006 form
      b.  For non-PHS staffed CDF and IGSA facilities:
          i)  The local health authority on-site shall prepare a summary of the case, to include the detainee's name, alien number, date of birth, place of death, brief clinical synopsis of events leading to death (including staff response), and past medical history.
          ii) If the death occurred in the community hospital, length of hospitalization or emergency care provided shall be included.
  2.  Death Certificate (copy)
  3.  Autopsy Report, when available
  4.  Original Medical Record

# EXHIBIT 16

# STANDARD OPERATING PROCEDURE
## Mortality Database
SOP 3.10.2.2

New SOP

Rev. 8/28/06

PURPOSE:  TO MAINTAIN A CURRENT ICE MORTALITY DATABASE AND ELECTRONIC MORTALITY FILES ON ICE DETAINEE DEATHS.

A.  The DIHS National Information Systems Consultant will maintain and update a Microsoft Excel spreadsheet with information on all detainee deaths that occur in ICE custody, to include aliens held at SPCs, CDFs, IGSAs, and BOP facilities.  The spreadsheet will be located on the DIHS Headquarters Share Drive at the following location S:\ICE Detainee Death Roster\detaineedeathsOCT2003-present.xls, and include all of the information listed in Sections (B) and (C) below.

B.  At a minimum, preliminary information regarding each detainee death will be entered into the database immediately, or the next working day if event occurs during off-hours.  An electronic SEN notification will provide the official notification of death. The Office of the DIHS Director receives the electronic SEN notification concurrently with the Headquarters Office of Detention and Removals (HQDRO) and the ICE Joint Intake Center. The SEN will be distributed to the DIHS National Information Systems Consultant.

C.  All data entered into the spreadsheet will be properly formatted, indexed, and/or coded to ensure that each field or column of information is available for sorting and immediate retrieval of information.

D.  The DIHS National Information Systems Consultant will enter the following elements of information into the database for each detainee death unless a given piece of information is not relevant to a particular case:

1.  Detainee's full name
2.  Alien number
3.  Date of birth
4.  Country of birth
5.  Date, time, location of death, type of facility, and field office
6.  Cause of death, preliminary and/or confirmed

7. Office of Medical Examiner/Coroner
8. Autopsy information, if applicable, to include date performed and findings
9. SEN notification date and tracking number
10. Mandatory notifications, to include dates of notification to DRO, ICE Office of Professional Responsibility (OPR), ICE Office of Inspector General (OIG), local police departments, consulates, and next of kin.
11. Investigations, to include date and source of request, name of investigating agency or facility, and date of completion
12. ICE-DIHS on-site special assessment, to include date initiated and date completed
13. Mortality review, to include date initiated and date completed
14. Comments

E. The DIHS National Information Systems Consultant will attach the following reports and/or findings to the mortality database via e-link, unless a particular document does not apply to a given case:

1. Medical history and relevant information from detainee's medical record
2. Autopsy report
3. Death certificate
4. All reports of investigation
5. All special assessments and on-site reviews related to the death or medical standards violations
6. Mortality review

F. Collection of Information for Database

1. For SPCs and PHS-staffed CDFs, all documentation listed in Section I(C) and (D) above shall be collected from the originating source (e.g., hospital, coroner's officer, mortuary) by the local HSA and forwarded to the DIHS National Information Systems Consultant as soon as the documents become available.

2. For non-PHS staffed CDFs, IGSAs, and BOP facilities, all documentation listed in Section I(C) and (D) above shall be collected by the DIHS National Information Systems Consultant and maintained for entry into the database as soon as the documents become available.

3. The HQ Detention Health Liaison Officer (DHLO) will assist DIHS staff in any situation where a facility administrator or medical authority refuses to release mortality-related documentation or reports to the DIHS staff without specific authorization from ICE.

# EXHIBIT 17

# STANDARD OPERATING PROCEDURE
## Mortality Review
SOP 3.10.2.1

New SOP

8/28/06

## PURPOSE: TO ESTABLISH A PROCEDURE FOR ENSURING MORTALITY REVIEW OF ALL DETAINEE DEATHS THAT OCCUR IN ICE CUSTODY.

I.  **Mortality Review**

A.  A mortality review shall be conducted on each detainee death by DIHS or the relevant health authority to (i) determine the appropriateness of clinical care, (ii) ascertain if corrective action in a system's policies, procedures, and/or practices is warranted, and (iii) identify trends that require further study and analysis.

B.  For SPCs and PHS-staffed CDFs:

1.  A mortality review must be conducted on a detainee's death within 30 days of the alien's passing. Form QMD 006 will be utilized for this purpose.

2.  If an autopsy report or relevant report of investigation is pending, the mortality review will still meet the 30-day requirement, with an addendum to the report when the outstanding document is received.

3.  The on-site HSA will be responsible for collecting the following documents and forwarding them via Fed-Ex to the DIHS Medical Director: (i) mortality review, (ii) copy of death certificate, (iii) autopsy report, and (iv) original medical record.

C.  For non-PHS staffed CDFs, IGSAs, and BOP facilities:

1.  The local health authority shall perform a mortality review according to the policy of the contract or government agency.

2.  The local health authority shall provide to the DIHS Medical Director no later than 45 days from the date of the detainee's death a copy of its completed mortality review or a formal summary of the case, to include the detainee's name, alien number, date of birth, place of death, brief clinical synopsis of events leading to death (including staff response), and past medical information. If the

death occurred in the community hospital, length of hospitalization or emergency care provided shall also be included.

3. The DIHS National Information Systems Consultant will be responsible for collecting the following documents and forwarding them to the DIHS Medical Director: (i) mortality review or synopsis, (ii) copy of death certificate, (iii) autopsy report, and (iv) medical and/or hospitalization records.

4. The DIHS Medical Director or designee shall determine whether to perform any further review of the mortality. If a further mortality review is deemed necessary, then a second reviewer will be identified by the DIHS Medical Director to perform the mortality review. If it is deemed that a further review is not necessary, then the mortality review will be considered complete.

## II.    Dissemination of Mortality Review Findings

A. To ICE:

1. For SPCs and PHS-staffed CDFs:

HQ DIHS will prepare a summary memorandum to the Deputy Assistant Director, Detention Management, no later than 45 days from the date of death, that outlines: (i) the deceased's medical history, (ii) cause of death, (iii) identified strengths, weaknesses, and/or errors in DIHS and/or ICE policies and procedures, and (iv) medical recommendations for corrective action. A copy of the autopsy report, if applicable, will be attached to the DIHS summary.

2. For non-PHS staffed CDFs, IGSAs, and BOP facilities:

Irregardless of whether DIHS or the local health authority finalizes the mortality review, HQ DIHS will provide a summary memorandum to the Deputy Assistant Director, Detention Management, no later than 60 days from the date of death, that outlines: (i) the deceased's medical history, (ii) cause of death, (iii) identified strengths, weaknesses, and/or errors in DIHS and/or ICE policies and procedures, and (iv) medical recommendations for corrective action. A copy of the autopsy report, if applicable, will be attached to the DIHS summary.

B. To Performance Improvement Personnel:

1. For SPCs and PHS-staffed CDFs:

The DIHS Medical Director, in conjunction with the DIHS Executive Council, will identify those detainee deaths where a medical quality concern, health standards violation, or sentinel event may have had a contributory or causal effect on a detainee's death and convene a mortality review committee meeting of

appropriate staff or refer the case to the **DIHS National Performance Improvement Consultant** for appropriate action.

2. For non-PHS staffed CDFs, IGSAs, and BOP facilities:

The DIHS Medical Director, in conjunction with the DIHS Executive Council, will identify those detainee deaths where a medical quality concern, health standards violation, or sentinel event may have had a contributory or causal effect on a detainee's death and make recommendations to ICE Performance Improvement Personnel regarding the need for on-site special assessment or for changes in medically-based operational policies and procedures. Unless DIHS is requested to do so, it will be the responsibility of ICE to contact these non-DIHS staffed facilities regarding any recommended changes in policy or procedure.

# EXHIBIT 18

Detention and Removal Operations
U.S. Department of Homeland Security
880 Front Street Ste. 2242
San Diego. CA 92101



**U.S. Immigration
and Customs
Enforcement**

July 18, 2006

MEMORANDUM FOR: ▓▓▓▓▓▓▓▓
                   Field Office Director
                   San Diego, CA.

THROUGH: ▓▓▓▓▓▓▓▓▓▓▓

FROM: ▓▓▓▓▓▓▓▓▓▓
             Deportation Officer
             Otay Detention Facility

SUBJECT:           Death of a Detainee in Custody

**Introduction:**

On June 27, 2006, Detainee Yusif OSMAN, A# 77 987 986 died of a heart attack while in custody of Immigration and Customs Enforcement. By the authority of Contract number ODT-5-C-0003, Corrections Corporation of America (CCA) was directly responsible for the supervision, and control of OSMAN. The Public Health Service (PHS) is tasked to assist with the care of the detained population to include OSMAN before his demise.

**Issues/Concerns**

After each call for help was received and upon arrival at the cell both officers on two separate occasions did not enter OSMAN'S cell. They stood on the tier, looked through the cell door window and observed OSMAN lying on the ground. The reasoning is stated in A.W.▓▓▓▓▓▓ report (tab #5, page 2).

▓▓▓▓▓ and ▓▓▓▓ did not adequately make direct verbal contact with OSMAN to ascertain if OSMAN could or could not clearly communicate and report his condition in the English language. According to CCA reports, the Officers relied upon ▓▓▓▓▓▓'s translation advising them about what OSMAN was saying and or doing. After observing OSMAN lying on the ground, both Officers walked away leaving OSMAN un-attended.

Between 2:50 a.m. until 3:30 a.m., the Officers did not physically access the cell and touch OSMAN. Officer ▓▓▓▓ arrived on scene with a wheel chair at 3:30 a.m. and then entered into the cell accompanied by Officer ▓▓▓▓▓▓.

After the second notification by ▓▓▓▓▓ was received, Control Officer ▓▓▓ contacted the Medical Unit; and received an order to bring OSMAN to the clinic. That directive was not immediately followed. Officer ▓▓▓▓ continued to perform routine duties while working his way towards the clinic instead of placing emphasis on getting the apparently ill detainee to the clinic.

#4  At 0230 at night the detainees are locked in their cells where the only visual are two approximately 4x 24 inch windows on the upper half of the cell door.  The CCA officers report that at night the light in the cell is out and hallway lighting outside is diminished and each officer carries a flashlight.  Without opening the cell door to assess the detainee it would be difficult to know if he was in fact praying or in distress. Officers report that they cannot open the door without there being two officers on site.  No request was made by officers for an additional officer so that detainee complaint can be assessed.



Interviewer: WHO PRONOUNCED THE DETAINEE DEAD?
Ms. ██████ I don't know...
Interviewer: WHAT HAPPENDED NEXT?
Ms. ██████: The EMS left and we returned to medical.
Interviewer: DID ANYONE STAY WITH THE DETAINEE?
Ms. ██████ No...

# EXHIBIT 19



. Department of Homeland Security
Krome Asylum Pre-Screening Office
18201 SW 12ᵗʰ Street
Miami, FL 33194

**U.S. Citizenship
and Immigration
Services**

# Interoffice Memorandum

**To:** Memo to File

**From:** ████████████  *μC*
APSO

**Date:** November 12, 2004

**Re:** A#27 041 999, DANTICA, Joseph Nosius

However, before Officer ████could respond, PHS representative made statements in front of counsel that he believed Applicant was faking because Applicant kept looking at him randomly. PHS Representative then went on to demonstrate that when he moved Applicant's head up and down, Applicant maintained his head rigid as opposed to limp, thus not allowing his head to fall back. PHS Representative stated that was another way he determined Applicant was faking symptoms. Attorney John Patrick Pratt vigorously contradicted PHS representative, stated that he did not believe vomit could be faked, and stated that the Applicant was very ill, and his medications should not have been removed.

# EXHIBIT 20

El Centro, CA 92243
(760) 336-4644

To:     Timothy Shack, M.D.
        Medical Director
        Division of Immigration Health Services

From:   CDR Carlos Duchesne, M.D.
        Clinical Director
        El Centro Medical Referral Center

Re:     Detainee Victor Alfonso Arellano

This is a case summary of the death of detainee Victor Alfonso Arellano # 077991267.

# Division of Immigration Health Services

*El Centro ICE Medical Facility*
**1115 North Imperial Avenue**
**El Centro, CA 92243**
**(760) 336-4644**



**Off the record observations and recommendations.**

1. The clinical staff at all levels fails to recognize early signs and symptoms of meningitis. In an advanced AIDS patient with CD4 counts of less than 100 and without proper prophylaxis treatment a severe headache associated with nausea and vomiting must raise the suspicion of a CNS toxoplasmosis or a Cryptococcal meningoencephalitis. Pt was evaluated multiple times and an effort to rule out those infections was not even mentioned.

2. It was brought to my attention by the San Pedro HSA and some staff members that the Clinical Director mandated all providers to hold lab work to all new detainees. They are only allowed to order labs if the detainee is in the institution for more than 30 days. I am sure that there must be a reason why this was mandated but that practice is particularly dangerous with many chronic care cases and specially HIV/AIDS patients. Labs for AIDS patients (CD4 count and HIV RNA by PCR) must be performed ASAP to know their immune status and were you are standing in reference to disease control and meds. In this particular case it took them 22 days to perform the lab work.

3. Failure to address alternative prophylaxis medications to avoid opportunistic infections. There was no real evidence of allergic reaction to bactrim, azythromycin or dapsone as the patient claimed. Allergy testing and possible desensitization was very important in a case like this. Medications like fluconazole and itraconazole could have prevented infection with Cryptococcus. Use of atovaquon or pentamidine is useful for PCP prevention. There was no documentation (provided) that prophylaxis was necessary.

4. Inappropriate use of Cipro with incorrect dosing. Cipro was ordered by the physician for the treatment of URI. The dose was ordered as 500 mg po stat then 250 mg daily for the next 4 days. Resistance to Cipro by many organisms is well documented. In an immuno-supressed AIDS patient this antibiotic for treatment of URI is completely useless.

# EXHIBIT 21

# YORK COUNTY PRISON



THOMAS H. HOGAN
WARDEN

TELEPHONE 840-7580
AREA CODE 717
FAX 840-7204

3400 CONCORD ROAD
YORK, PENNSYLVANIA 17402-9007

TO:

FROM:     Roger Thomas        *Roger S. Thomas*
          Deputy Warden

DATE:     11/28/05

RE:       Division of Immigration Health Services (DIHS)

As you know, we have had quite a few problems with DIHS of late. While it may appear that they are simply trying to save the government money by looking at detainee medical expenses, in my opinion they have set up an elaborate system that is primarily interested in delaying and/or denying medical care to detainees. You are my contact person with the Philadelphia District so I feel it is my responsibility to keep you informed of the problems DIHS has caused.

Let me explain:

1.     In order to receive authorization for detainee medical care, you must fill out a Treatment Authorization Request (TAR). Although the space to request treatment is only ¾ of an inch, DIHS demands that we provide:

    a.     Physicians Diagnoses
    b.     What are we requesting
    c.     Duration of the complaint
    d.     Date of complaint
    e.     Precipitating factors
    f.     What are the symptoms
    g.     What treatments/meds have been provided
    h.     Provide progress notes/substantiating information

Demanding that all that information be jammed into a ¾ inch space is not something an agency would do if the agency were interested in things running smoothly.

2.  Regardless of how serious the request is, DIHS has a habit of "sitting" on TAR's. The latest example (Mei Ying Xiao) was a 13-day delay. If DIHS were truly interested in providing a service (instead of delaying service) they wouldn't sit on a request for nearly 2 weeks.

3.  Many times when we do receive a response it is not given an approval or denial. Instead DIHS requests further information. This further delays treatment.

4.  Many times when DIHS requests further information it is for things they _know_ we would not have (e.g. X-rays from 1997, or mammogram from a recently incarcerated detainee). When we receive detainees from BICE we _never_ receive medical records and DIHS knows that. I am sure that DIHS would state that they are only trying to obtain information to make a decision. To request information, however, that they know or should know we do not have serves only to delay authorization for necessary health care.

5.  If DIHS requests additional information and they don't receive it in what they consider "a timely manner", then the case is closed and a new TAR is required. Our policy is to send the entire medical record to DIHS but that doesn't count. I have no idea how long a "timely manner" is but it is certainly shorter than the 13 days DIHS takes while they sit on TAR's. If they close the case, that delays treatment.

6.  While our medical department must prepare elaborate TAR's to request authorization, all DIHS has to do to stop the process is to demand ridiculous information (e.g. X-rays from 1997 for a detainee received in 2005). DIHS is in the position of "placing the ball back in our court" with one 10 word sentence. In the guise of seeking information they have deliberately delayed treatment.

7.  If a TAR is returned unapprovable or denied, then the case is locked and in order to open the case our medical department must start the process all over again. An example of a case that is "unapprovable" occurred recently. One of the Doctors at DIHS wanted to "watch" the case of the detainee with lumps in her breasts. He can't possibly watch the case because he is located in Washington D.C. _Our_ medical staff will watch the case and we don't work for DIHS. According to DIHS we are to keep DIHS informed of any changes. In the meantime, however, they have completely closed the case. They will never even ask how the detainee is doing. DIHS seeks to deny necessary treatment while making it appear as if they are truly interested in the detainees well being.

8.  While DIHS has informed you verbally that they are responsible for their medical decisions they have never put that in writing. I don't believe they will without pages of legal caveats. If something went wrong and a detainee died after following one of the recommendations from DIHS, I believe that an army of BICE attorneys would suddenly appear claiming that our medical department did not give them enough information for DIHS to make a decision. Therefore, it would be _our_ medical department's fault that the detainee died.

9.  There is nothing easy about working with DIHS. If something can be delayed, it is delayed. If it can be denied, it is denied. If something can be made difficult, it is made difficult. Most importantly, if there is some bureaucratic procedure that will delay/deny treatment to a detainee, place the "ball back in our medical department's court" and "cover the backsides" of DIHS, you can be assured that DIHS will do it.

10. I am attaching copies of TAR's to support what I have stated. You may do what you want with this information. You are my contact for the Philadelphia District. I have not and will not tell a massive Washington D.C. Bureaucracy like DIHS what to do. I can only state that I will not participate in the denial or delay of what our medical department feels is necessary health care. If DIHS refuses to authorize medical care then I will ask you to move the detainee to a location that concurs with DIHS. If you refuse to move the detainee then BICE will assume the cost of that necessary care.

# EXHIBIT 22

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT

**ACLU**

AMERICAN CIVIL LIBERTIES UNION

FOUNDATION

March 3, 2008

Associate General Counsel (General Law)
U.S. Department of Homeland Security
Washington, DC 20528

**Re:     FOIA Appeal of 07-FOIA-52835**

To Whom It May Concern:

I write to appeal the final response that I received from U.S. Immigration and Customs Enforcement (ICE) to FOIA Case Number 07-FOIA-52835. The FOIA request pertained to the issue of deaths of persons in ICE custody. The request was filed on June 27, 2007, and the response was dated January 4, 2008. The request challenges the thoroughness of the search, as well as the decision to withhold, in part and in full, various records.

In the six months while the request was pending, the significance of this issue grew in importance. On October 4, 2007, the House Immigration Subcommittee held a hearing on "Detention and Removal: Immigration Detainee Medical Care." At that hearing, Gary Mead, ICE's Assistant Director for Detention and Removal revealed for the first time that 66 people had died since 2004. Two of the other witnesses who spoke before Congress were relatives of detainees who died in ICE custody during the period covered in this FOIA request, and a third witness was a former detainee who received grossly inadequate care in immigration custody; he has since died as a result of that poor care. Bob Egelko, <u>Cancer Patient Dies – Had Sued U.S., State</u>, S.F. CHRONICLE, Feb. 22, 2008. Major newspapers have continued to report on in-custody deaths and have questioned whether ICE, the Office of the Inspector General, and other branches of the Department of Homeland Security will conduct investigations into these deaths. <u>See, e.g.,</u> Robert MacMillan, <u>U.S. Care for HIV Detainees Falls Short—Report</u>, REUTERS, Dec. 7, 2007; Darryl Fears, <u>3 Jailed Immigrants Die in a Month; Medical Mistreatment Alleged; Federal Agency Denies Claims</u>, WASHINGTON POST, Aug. 15, 2007; Greg Krikorian, <u>Dead Detainee's Family Alleges Medical Mistreatment</u>, L.A. TIMES, Aug. 11, 2007. The editorial boards of the Miami Herald, New York Times, and Washington Post have all expressed concern about this issue, and some have called on Congress to investigate poor medical care and in-custody deaths. Editorial, <u>An Immigration Basic</u>, WASHINGTON POST, July 6, 2007; Editorial, <u>Immigration Lockup a Serious Health Risk</u>, MIAMI HERALD, July 3, 2007; Editorial, <u>Gitmos Across America</u>, N.Y. TIMES, June 27, 2007.

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

ELIZABETH ALEXANDER
DIRECTOR
ATTORNEY AT LAW

NATIONAL OFFICE
125 BROAD STREET, 18TH FL.
NEW YORK, NY 10004-2400
T/212.549.2500

OFFICERS AND DIRECTORS
NADINE STROSSEN
PRESIDENT

ANTHONY D. ROMERO
EXECUTIVE DIRECTOR

RICHARD ZACKS
TREASURER

**Thoroughness of Search**

1. ICE's FOIA response includes a chart containing information pertaining to the deaths of 66 detainees. In addition to the chart, ICE provided additional documents for 63 of these deaths, including (1) Detainee Treatment, Authorization & Consultation forms, (2) Detainee Medical Records, and (3) Significant Event Notification reports. However, for three detainees—Cezar Rioz-Martinez, Samou Fankeu, and Ignacio Sarabia-Vallasenor[1]—ICE provided no information at all aside from the information contained in the chart of detainee deaths. If neither DRO, nor DIHS, possess any records of these three individuals, it is unclear how ICE even learned the information contained in the chart of detainee deaths (e.g., the detainee's date of birth, date of death, the location of the detainee's last detention, the location of death, and the cause of death). This information did not appear out of thin air, and must therefore have been conveyed to ICE or DIHS in some manner. The lack of responsive records is particularly troubling in connection with the death of Ignacio Sarabia-Vallasenor, who died at the Otay Detention Facility/CCA San Diego, CA, where DIHS directly provides medical care to detainees. In response to item 6 of the request, ICE produced a Public Affairs Guidance to respond to the ACLU's allegations regarding detainee medical care. On page 8 of that Guidance, ICE makes specific factual allegations pertaining to this death. A copy of that Guidance is enclosed. It is inconceivable that ICE, DRO, and DIHS possess no medical records, significant event notifications, or other records pertaining to Mr. Sarabia-Vallasenor.

2. The FOIA request sought various types of records—Treatment Authorization Requests, requests for medical help, diagnoses of terminal illnesses, documentation of transfers to outside hospital, etc.—that were satisfied through the production of medical records. However, ICE produced medical records for only a handful of the detainees who died in custody. Moreover, ICE's decision to selectively produce medical records does not appear to follow a consistent pattern. For instance, although medical records were produced for some detainees who were housed at facilities where DIHS directly provides medical care (e.g., Otay Detention Facility, CCA San Diego, CA; San Pedro Service Processing Center; Northwest Detention Center), medical records were not produced for other detainees who passed away after being housed at these facilities. For instance, no medical records were produced for Victor (a.k.a. Victoria) Arellano, who passed away on July 20, 2007 after being detained at the San Pedro Service Processing Center. No medical records were produced for Rosa Isela Contreras-Dominguez, who passed away on August 7, 2007, after being detained at the El Paso Service Processing Center, where DIHS provides direct patient care. All medical records pertaining to

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[1] According to the ACLU's own records, this detainee's last name is spelled "Sarabia-Villasenor," rather than "Sarabia-Vallasenor."

detainees who have died in ICE custody since January 1, 2004, in the possession of ICE, DRO, or DIHS should be produced. But at the very least, ICE cannot arbitrarily produce medical records for some detainees held in facilities where DIHS provides direct patient care, while refusing to produce—or even acknowledge the existence of—medical records for other detainees housed at such facilities.

3. The FOIA request sought also sought all records for each in-custody death "[p]ertaining to requests for medical help by anyone, including the deceased, his/her family members, and fellow detainees." The records produced contain no such requests. Even in the cases where medical records were produced, no sick call requests were produced. It is entirely implausible that detainees—many of whom were detained for lengthy periods of time and were suffering from serious medical conditions—submitted no sick call requests during their detention. In many of these circumstances, other detainees have affirmatively stated that they filed sick call requests on behalf of the detainee who ultimately passed away. For instance, news reports regarding the deaths of Young Sook Kim in New Mexico and Victor (a.k.a. Victoria) Arellano in California indicate that fellow detainees repeatedly sought medical care for Ms. Kim and Ms. Arellano prior to their deaths. See Sandra Hernandez, Denied Medication, AIDS Patient Dies in Custody; DAILY JOURNAL, Aug. 9, 2007; Barbara Ferry, Crackdown's Fallout, THE NEW MEXICAN, May 20, 2007.

4. The FOIA request also sought all records for each in-custody death "[p]ertaining to reports of investigations into the circumstances surrounding the death, including all after-action reports and critical incident reports." However, the records produced contain no investigative reports at all.

5. The FOIA request also sought all records for each in-custody death "[p]ertaining to whether and how ICE notified families of the deaths of detained family members." The ICE Detention Standard on "Terminal Illness, Advance Directives, and Death" states that "[a]s soon as practicable, the ADD/DRO shall prepare a condolence letter (for DD signature) to the next of kin." The records produced contain no condolence letters.

6. The FOIA request also sought all records for each in-custody death "[p]ertaining to whether and how ICE notified consular officials of the deaths of detained persons." The ICE Detention Standard on "Terminal Illness, Advance Directives, and Death" states that after notifying the consulate by telephone, "[a]n official follow-up letter shall be prepared, explaining the circumstances of the death, and sent to the consulate." The records produced contain no official follow-up letters.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

7. Item 6 of the request sought "[a]ll records, including written and electronic correspondence, generated in response to requests for information from the Washington Post and The New York Times about immigrant detainee medical care and deaths, and in reaction to those articles." The request pertained specifically to two newspaper articles. ICE produced various documents that were presumably released to the press in response to the ACLU's allegations regarding detainee medical care. ICE partially withheld information pertaining to detainees who were not dead at the time the FOIA request was reviewed, and entirely withheld only ten responsive pages containing medical records of a detainee who had not passed away at the time the request was reviewed. However, it is entirely implausible that ICE generated no other written or electronic correspondence—such as e-mails—in preparation for or in response to these two newspaper articles. Please review your records again for all responsive documents.

**Withholding Decisions**

1. ICE also decided to withhold entirely 18 pages of documents. Of the 18 pages withheld in their entirety, eight pages are in the possession of DIHS, are responsive to item 5 of the request, and are being withheld pursuant to Exemption 2 of FOIA. According to Catrina M. Pavlik-Keenan, the ICE FOIA Officer in charge of this request, "[t]he 8 pages consist of a Standard Operating Procedure that [is] used by DIHS." A copy of Ms. Pavlik-Keenan's email, dated February 15, 2008, is enclosed. But on August 7, 2007, in response to the very same FOIA request, the Department of Health and Human Services produced eight pages of DIHS Standard Operating Procedures. Those pages are attached to this appeal. It is safe to assume that the eight pages of DIHS Standard Operating Procedures withheld by ICE are identical to the eight pages of DIHS Standard Operating Procedures produced by HHS. In light of the inconsistent treatment that these eight pages received, it would be prudent for all other withholding decisions—both decisions to withhold in part and in full—to be reviewed on appeal.

2. ICE also decided to withhold ten pages of records that are in the possession of the ICE FOIA Office and the Office Public Affairs and are responsive to item 6 of the request. According to Ms. Pavlik-Keenan's February 15, 2008, e-mail, these ten pages "are specific to one individual's medical care, which you do not have consent to have." Although it is impossible to tell which individual Ms. Pavlik-Keenan is referring to, it is likely that this individual is Francisco Castaneda. Mr. Castaneda's story was featured in the Washington Post article referred to in item 6. Mr. Castaneda passed away on February 16, 2008. Bob Egelko, Cancer Patient Dies – Had Sued U.S., State, S.F. CHRONICLE, Feb. 22, 2008. If the withheld records pertained to medical care received by Mr. Castaneda,

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

4

please produce the records just as you produced the medical records of some—though not all—other detainees who have died in custody since January 1, 2004.

3. ICE also decided to withhold portions of 816 pages pursuant to various FOIA exemptions. Some of those partial withholdings pertain to Francisco Castaneda. For instance, in response to item 6 of the request, ICE produced various documents responding to ACLU allegations pertaining to detainee medical care. ICE produced unredacted copies of information pertaining to deceased detainees, but withheld information pertaining to detainees who were still alive at the time the response was generated. As stated above, Mr. Castaneda has since passed away. Please produce unredacted copies of all documents containing information pertaining to Mr. Castaneda that has been withheld to date.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Thank you very much for your attention to this appeal. I look forward to receiving your response.

Sincerely,

Tom Jawetz
Immigration Detention Staff Attorney
ACLU National Prison Project
915 15th Street, NW
7th Floor
Washington, DC 20005
Tel: (202) 548-6610
Fax: (202) 393-4931

Encls.



U.S. Department of Homeland Security
425 I Street, NW
Washington, DC 20536

**U.S. Immigration
and Customs
Enforcement**

January 4, 2008

Mr. Tom Jawetz
American Civil Liberties Union
National Prison Project
915 15th Street NW, 7th Floor
Washington, DC 20005

Re: **FOIA Case Number 07-FOIA-52835**

Dear Mr. Jawetz:

This is the final response to your Freedom of Information Act (FOIA) request to Immigration and Customs Enforcement (ICE), dated June 27, 2007, and received by this office on July 24, 2007. You have requested the following:

1. A complete list of individuals who have died while detained in ICE custody since January 1, 2004. for each death listed, please include:
   a. Complete Name;
   b. Alien Number;
   c. Date on which detention began;
   d. Date of death;
   e. List of facilities where the detainee was housed along with dates of detention; and
   f. Location at time of death.
2. For each individual whose death is included in (1), all records:
   a. Pertaining to the cause of death;
   b. Pertaining to requests for medical help by anyone, including the deceased, his/her family members, and fellow detainees;
   c. Pertaining to Treatment Authorization Requests (TARs) submitted to the Division of Immigration Heath Services (DIHS), including any DIHS responses to those TARs;
   d. Pertaining to reports of investigations into the circumstances surrounding the death, including all after-action reports and critical incident reports;
   e. Pertaining to whether any of the detainees who died were diagnosed with terminal illnesses while in immigration detention or beforehand;
   f. Pertaining to whether any of the detainees who died were taken to outside hospitals for treatment, and if so, the names of those hospitals and the dates of treatment;
   g. Pertaining to whether and how ICE notified families of the deaths of detained family members;
   h. Pertaining to whether and how ICE notified consular officials of the deaths of detained persons;
   i. Pertaining to whether and how state, county, local officials and review boards were notified of the deaths.
3. All records, including written and electronic correspondence, pertaining to deaths in ICE custody.

4.  All records, including policies, procedures, or guidelines provided to or maintained by Contract Detention Facilities, Service Processing Centers, and Intergovernmental Service Agreement facilities relating to deaths in detention, including memoranda and training materials.

5.  All records identifying the manner by which your agency or any of its components track deaths in detention.

6.  All records, including written and electronic correspondence, generated in response to requests for information from the Washington Post and The New York Times about immigrant detainee medical care and deaths, and in reaction to those articles. This request pertains specifically to records generated in preparation for and in response to two articles: (a) Darryl Fears, Illegal Immigrants Received Poor Care in Jail, Lawyers Say, Washington Post, June 13, 2007; and (b) Nina Bernstein, New Scrutiny as Immigrants Die in Custody, N.Y. Times, June 26, 2007.

Your request has been processed under the FOIA, 5 U.S.C. § 552.

A search for records responsive to item 1 of your request produced a total of 4 pages. The documents have been reviewed and are being released to you in their entirety.

With regard to item 2 of your request, a search of the Office of Detention and Removal Operations (DRO) and the Division of Immigration Health Services (DIHS) produced a total of 789 pages. The documents have been reviewed and portions are being withheld pursuant to Exemptions 6 and 7(C) of the FOIA.

These records consist of the following three types of documents: (1) Detainee Treatment, Authorization & Consultation forms, (2) Detainee Medical records, and (3) Significant Event Notification reports. Although a thorough and comprehensive search of files in DRO and DIHS was conducted, records for the following individuals could not be located:

Cezar Rioz-Martinez
Samou Fankeu
Ignacio Sarabia-Vallasenor

For your convenience, I have included a list that details what responsive records were located for each individual.

With regard to item 3 of your request, a search of the Office of Detention and Removal Operations and the Office of the Executive Secretariat produced a total of 45 pages. The documents have been reviewed and 20 pages are being released to you in their entirety. Portions of 25 pages are being withheld pursuant to Exemptions 2 and 6 of the FOIA.

With regard to item 4 of your request, a search of the Office of Detention and Removal Operations was conducted. Records responsive to this portion of your request can be found in the ICE Detention Operations Manual located at the following address:

http://www.ice.gov/partners/dro/opsmanual/index.htm

With regard to item 5 of your request, a search of the Division of Immigration Health Services produced a total of 8 pages. The documents have been reviewed and are being withheld in their entirety pursuant to Exemption 2 of the FOIA.

With regard to item 6 of your request, a search of the ICE FOIA Office and the Office of Public Affairs produced a total of 35 pages. The documents have been reviewed and 13 pages are being released to you

in their entirety. Portions of 2 pages are being withheld pursuant to Exemptions 6 and 7(C) of the FOIA. Finally, 10 pages are being withheld in their entirety pursuant to Exemptions 2 and 5 of the FOIA.

Portions of 816 pages have been withheld as described below.

**FOIA Exemption 2(high)** protects information applicable to internal administrative and personnel matters, such as operating rules, guidelines, and manual of procedures of examiners or adjudicators, to the extent that disclosure would risk circumvention of an agency regulation or statute, impede the effectiveness of an agency's activities, or reveal sensitive information that may put the security and safety of an agency activity or employee at risk. Whether there is any public interest in disclosure is legally irrelevant. Rather, the concern under high 2 is that a FOIA disclosure should not benefit those attempting to violate the law and avoid detection.

**FOIA Exemption 2(low)** protects information applicable to internal administrative personnel matters to the extent that the information is of a relatively trivial nature and there is no public interest in the document.

**FOIA Exemption 6** exempts from disclosure personnel or medical files and similar files the release of which would cause a clearly unwarranted invasion of personal privacy. This requires a balancing of the public's right to disclosure against the individual's right privacy. The types of documents and/or information that we have withheld may consist of social security numbers, home addresses, dates of birth, or various other documents and/or information belonging to a third party that are considered personal. The privacy interests of the individuals in the records you have requested outweigh any minimal public interest in disclosure of the information. Any private interest you may have in that information does not factor into the aforementioned balancing test.

**FOIA Exemption 7(C)** protects records or information compiled for law enforcement purposes that could reasonably be expected to constitute an unwarranted invasion of personal privacy. This exemption takes particular note of the strong interests of individuals, whether they are suspects, witnesses, or investigators, in not being unwarrantably associated with alleged criminal activity. That interest extends to persons who are not only the subjects of the investigation, but those who may have their privacy invaded by having their identities and information about them revealed in connection with an investigation. Based upon the traditional recognition of strong privacy interest in law enforcement records, categorical withholding of information that identifies third parties in law enforcement records is ordinarily appropriate. As such, I have determined that the privacy interest in the identities of individuals in the records you have requested clearly outweigh any minimal public interest in disclosure of the information. Please note that any private interest you may have in that information does not factor into this determination.

Eighteen pages have been withheld as described below.

**FOIA Exemption 2(high)** protects information applicable to internal administrative and personnel matters, such as operating rules, guidelines, and manual of procedures of examiners or adjudicators, to the extent that disclosure would risk circumvention of an agency regulation or statute, impede the effectiveness of an agency's activities, or reveal sensitive information that may put the security and safety of an agency activity or employee at risk. Whether there is any public interest in disclosure is legally irrelevant. Rather, the concern under high 2 is that a FOIA disclosure should not benefit those attempting to violate the law and avoid detection.

**FOIA Exemption 2(low)** protects information applicable to internal administrative personnel matters to the extent that the information is of a relatively trivial nature and there is no public interest in the document.

**FOIA Exemption 5** protects from disclosure those inter- or intra-agency documents that are normally privileged in the civil discovery context. The three most frequently invoked privileges are the deliberative process privilege, the attorney work-product privilege, and the attorney-client privilege. After carefully reviewing the responsive documents, I have determined that the responsive documents qualify for protection under the deliberative process privilege. The deliberative process privilege protects the integrity of the deliberative or decision-making processes within the agency by exempting from mandatory disclosure opinions, conclusions, and recommendations included within inter-agency or intra-agency memoranda or letters. The release of this internal information would discourage the expression of candid opinions and inhibit the free and frank exchange of information among agency personnel.

You have a right to appeal the above withholding determination. Should you wish to do so, you must send your appeal and a copy of this letter, within 60 days of the date of this letter, to: Associate General Counsel (General Law), U.S. Department of Homeland Security, Washington, D.C. 20528, following the procedures outlined in the DHS regulations at 6 C.F.R. § 5.9. Your envelope and letter should be marked "FOIA Appeal." Copies of the FOIA and DHS regulations are available at www.dhs.gov/foia.

Provisions of the FOIA and Privacy Act allow us to recover part of the cost of complying with your request. In this instance, because the cost is below the $14 minimum, there is no charge.[1]

If you need to contact our office about this matter, please refer to case number **07-FOIA-52835**. This office can be reached at (202) 732-0300 or (866) 633-1182.

Sincerely,

Catrina M. Pavlik-Keenan
FOIA Officer

---

[1] 6 CFR § 5.11(d)(4).



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

**Office of Communications**
**Health Resources and**
**    Services Administration**
5600 Fishers Lane, Rm. 14-15
Rockville MD 20857

August 7, 2007

Mr. Tom Jawetz
Immigration Detention Staff Attorney
American Civil Liberties Union Foundation
National Prison Project
915 15th Street, N.W., 7th Floor
Washington, DC 20005

RE: Freedom of Information Act Case Number HRSA 07-149

Dear Mr. Jawetz:

This is in response to your request for various documents pertaining to the deaths of
individuals detained by U.S. Immigration and Customs Enforcement, which you
requested under the FOIA.

Our Bureau of Primary Health Care, Division of Immigration Health Services has
advised me that other than the enclosed policy and procedures, HRSA has no
additional documents.   The Department of Homeland Security, Bureau of
Immigration and Customs Enforcement have sole ownership of detainee medical
records.

The Department of Health and Human Services' policy calls for the fullest
responsible disclosure consistent with the requirements of administrative necessity
and confidentiality which are recognized by the FOIA, 5 U.S.C. 552, and the
Department's implementing Public Information Regulations, 45 CFR Part 5.

In accordance with the FOIA, Section 5.42(2), the Department of Health and Human
Services has established a policy that FOIA fees of $25 or less will be waived.  As a
result, the fee associated with this FOIA response has been waived.

If I can assist you further, please call this office at (301) 443-2865.

Sincerely,

Hazel Hargrove
Freedom of Information Specialist

Enclosures

**Division of Immigration Health Services**
**National Policy**
**Chapter 3 – Administrative Management**

**3.10.2 Deaths.** In the event of a detainee death the Associate Director for Field Operations and the Medical Director are to be notified immediately by phone. If neither can be reached, the Deputy Director or Director is to be notified. All medical records should be secured and the HSA is to Fedex the original and fax a copy to Headquarters immediately (see SOP 3.10.2, Mortality Notification).

> **3.10.2.1. Mortality Review.** A review will be conducted after any detainee death while in ICE custody, to include those in SPCs, contract detention facilities, inter-governmental service agreement facilities (see SOP 3.10.2.1).
>
> **3.10.2.2. Mortality Database.** A database will be maintained on all deaths while in ICE custody, to include those in SPCs, contract detention facilities, and inter-governmental service agreement facilities (see SOP 3.10.2.2).

# STANDARD OPERATING PROCEDURE
## Mortality Notification
SOP 3.10.2

Rev. 8/28/06

**PURPOSE: TO ESTABLISH AND MAINTAIN A DATABASE OF ALL DEATHS AMONG ICE-DETENTION AND REMOVAL OPERATIONS (DRO) DETAINEES, TO ASSIGN RESPONSIBILITIES AND TIME PARAMETERS FOR MORTALITY REPORTS AND REVIEWS REFLECTING ICE DETENTION STANDARDS, AND TO REVIEW CASES TO INSURE THE PROVISION OF HIGH QUALITY MEDICAL SERVICES.**

I.    **Notification of Mortality.**

    A.  **Immediate notification is required as follows:**
       1.  Service Processing Center (SPC)
         a.  Officer in charge (OIC) $\rightarrow$ Field Office Director (FOD) $\rightarrow$ Immigrations and Customs Enforcement (ICE), Detention and Removal (DRO) Headquarters (HQ).
         b.  Clinical Director (CD) and Health Services Administrator (HSA) $\rightarrow$ Associate Directors, Operations Branch and Medical Services Branch $\rightarrow$ Director, Division of Immigration Health Services (DIHS).

       2.  Contract Detention Facility (CDF)
         a.  Public Health Services (PHS) staffed CDF, as above.
         b.  Non-PHS staffed CDF.
           i) OIC $\rightarrow$ FOD $\rightarrow$ ICE DRO HQ
           ii) ICE DRO HQ $\rightarrow$ DIHS HQ
       3.  Inter-Governmental Service Agreement (IGSA) facilities follow process for non-PHS staffed CDF above.

    B.  **Reference ICE Detention Standard, "Terminal Illness, Advanced Directives, and Death"**
       1.  Section III, E, 6a2, Medical Reports, "Within 48 hours, the Assistant District Director (ADD)/DRO shall send all available medical reports to the local representative of the U.S. Public Health Service (USPHS)".
       2.  For SPCs and PHS-staffed contract detention centers, the local USPHS

representative shall be the HSA on-site, who shall forward via FedEx all reports listed in section-C below to the DIHS Medical Director.

3. For non-PHS staffed CDFs and IGSA facilities, the ADD/DRO shall forward all medical reports via FedEx to the DIHS Medical Director. Medical Services Branch a the following address:

1220 L Street, NW
Suite 500
Washington, DC 20005
Phone: 202-514-3339

## C. Documents required to be submitted to DIHS HQ
1. Mortality Review
    a.  For SPC and PHS-staffed CDF, use QMD 006 form
    b.  For non-PHS staffed CDF and IGSA facilities:
        i)  The local health authority on-site shall prepare a summary of the case, to include the detainee's name, alien number, date of birth, place of death, brief clinical synopsis of events leading to death (including staff response), and past medical history.
        ii) If the death occurred in the community hospital, length of hospitalization or emergency care provided shall be included.
2. Death Certificate (copy)
3. Autopsy Report, when available
4. Original Medical Record

# STANDARD OPERATING PROCEDURE
## Mortality Review
SOP 3.10.2.1

New SOP

8/28/06

## PURPOSE:  TO ESTABLISH A PROCEDURE FOR ENSURING MORTALITY REVIEW OF ALL DETAINEE DEATHS THAT OCCUR IN ICE CUSTODY.

**I.    Mortality Review**

A.  A mortality review shall be conducted on each detainee death by DIHS or the relevant health authority to (i) determine the appropriateness of clinical care, (ii) ascertain if corrective action in a system's policies, procedures, and/or practices is warranted, and (iii) identify trends that require further study and analysis.

B.  For SPCs and PHS-staffed CDFs:

1.  A mortality review must be conducted on a detainee's death within 30 days of the alien's passing.  Form QMD 006 will be utilized for this purpose.

2.  If an autopsy report or relevant report of investigation is pending, the mortality review will still meet the 30-day requirement, with an addendum to the report when the outstanding document is received.

3.  The on-site HSA will be responsible for collecting the following documents and forwarding them via Fed-Ex to the DIHS Medical Director: (i) mortality review, (ii) copy of death certificate, (iii) autopsy report, and (iv) original medical record.

C.  For non-PHS staffed CDFs, IGSAs, and BOP facilities:

1.  The local health authority shall perform a mortality review according to the policy of the contract or government agency.

2.  The local health authority shall provide to the DIHS Medical Director no later than 45 days from the date of the detainee's death a copy of its completed mortality review or a formal summary of the case, to include the detainee's name, alien number, date of birth, place of death, brief clinical synopsis of events leading to death (including staff response), and past medical information. If the

death occurred in the community hospital, length of hospitalization or emergency care provided shall also be included.

3. The DIHS National Information Systems Consultant will be responsible for collecting the following documents and forwarding them to the DIHS Medical Director: (i) mortality review or synopsis, (ii) copy of death certificate, (iii) autopsy report, and (iv) medical and/or hospitalization records.

4. The DIHS Medical Director or designee shall determine whether to perform any further review of the mortality. If a further mortality review is deemed necessary, then a second reviewer will be identified by the DIHS Medical Director to perform the mortality review. If it is deemed that a further review is not necessary, then the mortality review will be considered complete.

## II.    Dissemination of Mortality Review Findings

A. To ICE:

1. For SPCs and PHS-staffed CDFs:

HQ DIHS will prepare a summary memorandum to the Deputy Assistant Director, Detention Management, no later than 45 days from the date of death, that outlines: (i) the deceased's medical history, (ii) cause of death, (iii) identified strengths, weaknesses, and/or errors in DIHS and/or ICE policies and procedures, and (iv) medical recommendations for corrective action. A copy of the autopsy report, if applicable, will be attached to the DIHS summary.

2. For non-PHS staffed CDFs, IGSAs, and BOP facilities:

Irregardless of whether DIHS or the local health authority finalizes the mortality review, HQ DIHS will provide a summary memorandum to the Deputy Assistant Director, Detention Management, no later than 60 days from the date of death, that outlines: (i) the deceased's medical history, (ii) cause of death, (iii) identified strengths, weaknesses, and/or errors in DIHS and/or ICE policies and procedures, and (iv) medical recommendations for corrective action. A copy of the autopsy report, if applicable, will be attached to the DIHS summary.

B. To Performance Improvement Personnel:

1. For SPCs and PHS-staffed CDFs:

The DIHS Medical Director, in conjunction with the DIHS Executive Council, will identify those detainee deaths where a medical quality concern, health standards violation, or sentinel event may have had a contributory or causal effect on a detainee's death and convene a mortality review committee meeting of

appropriate staff or refer the case to the **DIHS National Performance Improvement Consultant** for appropriate action.

2. For non-PHS staffed CDFs, IGSAs, and BOP facilities:

   The DIHS Medical Director, in conjunction with the DIHS Executive Council, will identify those detainee deaths where a medical quality concern, health standards violation, or sentinel event may have had a contributory or causal effect on a detainee's death and make recommendations to ICE Performance Improvement Personnel regarding the need for on-site special assessment or for changes in medically-based operational policies and procedures. Unless DIHS is requested to do so, it will be the responsibility of ICE to contact these non-DIHS staffed facilities regarding any recommended changes in policy or procedure.

# STANDARD OPERATING PROCEDURE
## Mortality Database
SOP 3.10.2.2

New SOP

Rev. 8/28/06

PURPOSE:  TO MAINTAIN A CURRENT ICE MORTALITY DATABASE AND ELECTRONIC MORTALITY FILES ON ICE DETAINEE DEATHS.

A. The DIHS National Information Systems Consultant will maintain and update a Microsoft Excel spreadsheet with information on all detainee deaths that occur in ICE custody, to include aliens held at SPCs, CDFs, IGSAs, and BOP facilities. The spreadsheet will be located on the DIHS Headquarters Share Drive at the following location S:\ICE Detainee Death Roster\detaineedeathsOCT2003-present.xls, and include all of the information listed in Sections (B) and (C) below.

B. At a minimum, preliminary information regarding each detainee death will be entered into the database immediately, or the next working day if event occurs during off-hours.  An electronic SEN notification will provide the official notification of death. The Office of the DIHS Director receives the electronic SEN notification concurrently with the Headquarters Office of Detention and Removals (HQDRO) and the ICE Joint Intake Center. The SEN will be distributed to the DIHS National Information Systems Consultant.

C. All data entered into the spreadsheet will be properly formatted, indexed, and/or coded to ensure that each field or column of information is available for sorting and immediate retrieval of information.

D. The DIHS National Information Systems Consultant will enter the following elements of information into the database for each detainee death unless a given piece of information is not relevant to a particular case:

1. Detainee's full name
2. Alien number
3. Date of birth
4. Country of birth
5. Date, time, location of death, type of facility, and field office
6. Cause of death, preliminary and/or confirmed

    7.  Office of Medical Examiner/Coroner

    8.  Autopsy information, if applicable, to include date performed and findings

    9.  SEN notification date and tracking number

   10. Mandatory notifications, to include dates of notification to DRO, ICE Office of Professional Responsibility (OPR), ICE Office of Inspector General (OIG), local police departments, consulates, and next of kin.

   11. Investigations, to include date and source of request, name of investigating agency or facility, and date of completion

   12. ICE-DIHS on-site special assessment, to include date initiated and date completed

   13. Mortality review, to include date initiated and date completed

   14. Comments

E.  The DIHS National Information Systems Consultant will attach the following reports and/or findings to the mortality database via e-link, unless a particular document does not apply to a given case:

    1.  Medical history and relevant information from detainee's medical record

    2.  Autopsy report

    3.  Death certificate

    4.  All reports of investigation

    5.  All special assessments and on-site reviews related to the death or medical standards violations

    6.  Mortality review

F.  Collection of Information for Database

    1.  For SPCs and PHS-staffed CDFs, all documentation listed in Section I(C) and (D) above shall be collected from the originating source (e.g., hospital, coroner's officer, mortuary) by the local HSA and forwarded to the DIHS National Information Systems Consultant as soon as the documents become available.

    2.  For non-PHS staffed CDFs, IGSAs, and BOP facilities, all documentation listed in Section I(C) and (D) above shall be collected by the DIHS National Information Systems Consultant and maintained for entry into the database as soon as the documents become available.

    3.  The HQ Detention Health Liaison Officer (DHLO) will assist DIHS staff in any situation where a facility administrator or medical authority refuses to release mortality-related documentation or reports to the DIHS staff without specific authorization from ICE.

*Office of Public Affairs*
**U.S. Department of Homeland Security**

# Public Affairs Guidance



**U.S. Immigration and Customs Enforcement**

**July 12, 2007**

Contact: ICE Public Affairs
202-514-2648

## Response to ACLU allegations on ICE Detainee Medical Care

### Allegations:

The American Civil Liberties Union filed a Freedom of Information Act (FOIA) request to obtain information about the nature of 62 deaths of people in immigration detention since 2004.

Immigration and Customs Enforcement (ICE) reported 62 detainee deaths since 2004, but ICE refused to provide any details about the nature or causes of the deaths.

The "high number" of deaths in detention raise concerns about the quality of care provided to ICE detainees. It is imperative that information about these deaths be revealed to the public.

The ACLU believes that deficient medical care for prisoners is a leading cause of death in immigration detention, based on complaints it has received from detainees and information about nearly 20 detainee deaths since 2004, including those featured in yesterday's *New York Times* story.

This month, the ACLU filed a lawsuit against the San Diego Correctional Facility (SDCF), an ICE facility run by Corrections Corporation of America (CCA), the largest for-profit correctional services provider.

In its lawsuit, the ACLU challenged flawed medical care policies and the denial of needed treatment by the U.S. Public Health Service and the Division of Immigration Health Services resulting in the unnecessary suffering and deaths of numerous detainees at SDCF.

People are suffering unnecessarily in ICE custody. Deficient medical care seems to be a systemic problem, which is why we are trying to obtain more information about these deaths.

ACLU wants to know whether ICE—or any independent monitoring agency—keeps track of the deaths of immigrant detainees, who are often housed in county jails around the country alongside criminal detainees, or in one of numerous crowded immigration detention facilities managed by private prison companies.

The ACLU applauds the news that the Department of Homeland Security Office of the Inspector General (OIG) will be conducting a "special review" of two in-custody deaths, and urges the OIG to publicly release the findings of those reviews and make recommendations to ensure that preventable deaths are reduced and that all deaths are properly investigated by an independent government body.

The OIG releases semiannual reports to Congress that contain sporadic and vague references to investigations into in-custody deaths. Such reports provide little useful information to assure the

Ver. 10.05

public that meaningful investigations are conducted into each death, and that steps are taken to guarantee that detainees receive necessary medical services before it is too late.

Absent transparency about these deaths in detention, we can assume that ICE has something to hide.

**Statement:**

- As the population ICE detains typically has little preventive or ongoing medical care, it's sadly not surprising that health issues are prevalent and some chronic conditions result in death.

- ICE is committed to providing all immigration detainees in our care with humane and safe detention environments and ensuring that adequate medical services are available. ICE spends more than $72 million annually on detainee medical issues and the medical staff who provide or arranges health care for detainees have the same medical certifications as those serving the U.S. Bureau of Prisons and most major medical institutions across the nation.

- Nearly one million individuals came through detention facilities in the same time period covered by the allegations you have cited. Each of them received taxpayer-funded medical treatment, including a comprehensive health screening, or care management provided not by ICE, but by the Division of Immigration Health Services of the Department of Health and Human Services' Health Resources and Services Administration (DIHS), for a total of $259 million.

- Each ICE detainee is medically screened after arriving in ICE custody. Last year, of the 115,088 screenings, 24% (27,525 individuals) were identified as having chronic conditions, mostly hyper tension or diabetes. Many of these detainees would not have identified their medical ailment or received medical care and treatment were it not for the comprehensive screening process.

- Given that the population of aliens detained by ICE tripled between 2001 and 2006 (from approximately 95,000 to approximately 283,000), we are pleased that GAO reports show, in the vast majority of cases, that the agency is complying with the National Detention Standards governing alien detention facilities.

- On any given day, U.S. Immigration and Customs Enforcement (ICE) houses up to 27,500 immigration detainees in more than 325 facilities nationwide. ICE takes our charge to adhere to these standards seriously, conducting comprehensive annual audits of detention facilities using more than 300 officers specifically trained to perform these audits. This exceeds the American Correctional Association and other leading industry groups' recommendation of audits of correctional facilities every three years.

- We don't believe that only healthy individuals should be accountable for violating the law, while others should get a pass. When we do detain those with illnesses, ICE has a moral obligation to care for them, which we uphold each and every day in a manner of which the American people can be proud.

## Detention/Medical Standards

**Talking Points**

- On any given day, U.S. Immigration and Customs Enforcement (ICE) houses up to 27,500 immigration detainees in more than 325 facilities nationwide. ICE takes our charge to adhere to these standards seriously, conducting comprehensive annual audits of detention facilities using more than 300 officers specifically trained to perform these audits. This exceeds the American Correctional Association and other leading industry groups' recommendation of audits of correctional facilities every three years.

- Whenever ICE identifies potential challenges regarding standards at a detention facility, the facility is required to develop a plan to address the situation. ICE follows up with a comprehensive review within 90 days.

- It is also important to note that the length of stay in an ICE detention facility is considerably shorter than that of a correctional facility. In 2006, the average stay was 33 nights.

- ICE is committed to maintaining safe, secure and humane detention conditions and invests heavily in the welfare of the detained alien population.

- In FY 2006, ICE spent approximately $98 million dollars providing medical care to detainees and $335,000 for detainee legal materials.

- Nearly one million individuals came through detention facilities in the same time period covered by the stories. Each of them received taxpayer-funded medical treatment, including a comprehensive health screening, or care management provided not by ICE, but by the Division of Immigration Health Services of the Department of Health and Human Services' Health Resources and Services Administration (DIHS), for a total of $259 million.

- Last year alone, DIHS identified chronic conditions in 24% of detainees that they screened. In each case of a death, the local medical examiner is notified and makes a determination whether an autopsy or further investigation is warranted.

### Statistics, if asked

Percentages of detention facilities (2-19-07)

65% Intergovernmental Agreements with state and local jails/prisons
19% Contract Detention Facilities (Commercial)
14% Service Processing Centers (ICE owned)
2%  Bureau of Prisons

FY04: 233,000 aliens detained, 29 died
FY05: 237,000 detained, 15 died
FY06: 284,000 detained, 17 died
FY07 (through May): 245,000 detained, 2 died

## Detailed Case by Case response (DRO):

**Alleged medical malpractice (current situation unknown) CANNOT RELEASE INFO PER OPLA SUSAN MATHIS WITHOUT WAIVER BASED ON DHS PRIVACY OFFICE POLICY**



b6
b7c

**CANNOT RELEASE INFO PER OPLA SUSAN MATHIS WITHOUT WAIVER BASED ON DHS PRIVACY OFFICE POLICY**

**Allegation:**

[redacted]

***DIHS Response:***

[redacted]

[redacted] NOT DIHS

**CANNOT RELEASE INFO PER OPLA SUSAN MATHIS WITHOUT WAIVER BASED ON DHS PRIVACY OFFICE POLICY**

**Allegation:**

[redacted]

***DIHS Response:***

[redacted]

[redacted] NOT DIHS

**CANNOT RELEASE INFO PER OPLA SUSAN MATHIS WITHOUT WAIVER BASED ON DHS PRIVACY OFFICE POLICY**

**Allegation:**

[redacted]

b6
b7c

Alleged DECEASED due to medical malpractice or while in ICE custody. This material is releasable.

Sandra Kenley, Barbados:

### NOT DIHS

**Allegation:** Who allegedly did not get medicine for a large uterine fibroid before she died in December at the Hampton Roads Regional Jail in Portsmouth, Va.

***DIHS Response:*** There are no medicines prescribed to treat a uterine fibroid other than perhaps aspirin or other mild pain medicine to deal with any discomfort. Furthermore, the autopsy proved that the cause of death was totally unrelated to a uterine fibroid. On December 18, 2005, the detainee fell out her bed striking her head on a bin used for storage. She was discovered at 3:31 PM, EMS was called at 3:33 PM and an ambulance responded at 3:44PM. She was found to be in cardiac arrest at the local emergency room, and was pronounced dead at 4:32 PM. An autopsy was performed, and revealed that "death must be attributed to acute coronary insufficiency, or cardiac arrhythmia, brought on by a chronically enlarged heart, due to long-standing hypertension." Death was not due to head injury or a uterine fibroid.

**Abdoulai Sall, Sierra Leone: NOT DIHS**

**Allegation:** Who allegedly did not get treatment for a kidney ailment before he died in December at the Piedmont Regional Jail in Va.

***DIHS Response:*** On December 2, 2006, the detainee was seen by other detainees to fall to the floor from a standing position. Correctional officers responded to a disturbance report issued at the location, found the detainee on the floor, and called a medical emergency over the radio. The officers initiated life support, and continued life support until an ambulance responded. The detainee was transported to the emergency room (ER), arriving at 2:55 AM hours. The ER staff continued to perform life support until 3:06 AM hours, when the detainee was pronounced dead. An autopsy is being performed, and the results are pending.

**Nery Romero, El Salvador: NOT DIHS**

**Allegation:** Who allegedly did not have access to pain medicine he had been taking after a motorcycle injury before he was found hanging in his cell in February at the Bergen County jail in N.J.

***DIHS Response:*** On February 12, 2007 at 11:10 PM hours, the detainee was found hanging in his cell with a sheet tied around his neck. Life support was initiated until an ambulance arrived. The detainee was taken to an emergency room, where he was pronounced dead at 2349 hours. The detainee arrived to the jail on February 9, 2007. He was specifically asked about mental health conditions including suicidal thoughts, attempts, and other signs and symptoms suggesting a risk for self harm. The detainee denied these signs, symptoms, or history relating to suicide. An autopsy has been ordered, and is pending.

**Young Sook Kim: NOT DIHS**

**Allegation:** Who died at the New Mexico Regional Jail in Albuquerque in September 2006.

***DIHS Response:*** The detainee arrived to the detention facility in late August 2006, and was under care for diabetes. On September 4, 2006, she complained of nausea and abdominal pain, and was referred to the local emergency room for evaluation and treatment. She was admitted to the hospital. Subsequent evaluation revealed advanced cancer of the pancreas. She remained in the hospital until her death on September 11, 2006.

**Richard Rust, died at Oakdale Center, LA NOT DIHS**

**Allegation:** At the Oakdale Center in Louisiana (5/2004)

***DIHS Response:*** On May 29, 2004 at 1820 hours, a correctional officer called for medical assistance after finding the detainee unconscious in the barber shop. Witnesses report that the detainee had just finished playing basketball, entered the barber shop, and passed out. Life support was administered by the correctional officer and a staff nurse who responded. An ambulance arrived and transported the detainee to a local hospital, and was pronounced dead at 1924 hours. An autopsy was done, and reports the cause of death as, "cardiac arrhythmia, due to acute exacerbation of heart failure, due to massive dilated and hypertrophic cardiomyopathy, due to interstitial fibrosis of heart."

**Nelson Enriquez, Etowah Center, AL** NOT DIHS

**Allegation:** At the Etowah Center in Alabama (8/2004)

***DIHS Response:*** On August 11, 2004, the detainee was found lying in a fetal position on the floor of his cell. He had apparently been sitting on the toilet when he blacked out, striking his head on the floor or the wall. When he was found, he had a pulse and was breathing. Medical assistance was called. The detainee stopped breathing in the presence of Gadsden Fire Emergency Medical Service personnel, who began life support. The detainee was transported to a local hospital, where he was pronounced dead at 4:05AM hours. An autopsy was performed, and lists the cause of death as "thrombus occluding one of the coronary arteries" and "arteriosclerotic cardiovascular disease."

**Rev. Joseph Dantica, Krome, FL** DIHS

**Allegation:** Krome Center in Miami (11/2004)

***DIHS Response:*** The detainee arrived to the detention facility on October 30, 2004, reported a history of hypertension and was taking medication "for the prostate." He had medication with him that he brought from Haiti in unmarked containers, including a medication in an envelope with the word "diazepam" written in pencil on the envelope. The medical staff evaluated him, and prescribed medication for his hypertension. On November 2, 2004 at approximately 9:00 AM, during a legal visit, the detainee vomited and complained of abdominal pain. The facility medical staff responded, transported him to the medical clinic for observation, and shortly thereafter sent him to the emergency room via ambulance. He was admitted to the local hospital in the afternoon of the same day. On November 3, 2004 at 10:00PM, ICE was notified by the hospital that the detainee was pronounced dead at 8:46 PM that day. An autopsy was done, and lists the cause of death as acute and chronic pancreatitis.

**Heq Sung Soo, Passaic County** NOT DIHS

**Allegation:** Passaic County Jail in N.J (2/2005)

***DIHS Response:*** On January 20, 2005, the detainee attempted to hang himself in his cell. He was not seriously injured. He was taken to a local hospital and admitted. On January 22, 2005, he was transferred from the local hospital to an inpatient psychiatric hospital for treatment, and stayed at the hospital until February 11, 2005. According to the Discharge Summary from the psychiatric hospital, "It is the general consensus of the ITU treatment team that this patient has reached maximum benefit from this course of hospitalization, has not demonstrated any self-destructive behavior at this facility and shall now be returned to the custody of the INS." He was placed in the receiving area of the jail for observation.

On February 15, 2005, the detainee was placed into the Segregation-Disciplinary Unit (SDU) of the jail for observation and due to behavioral problems. The SDU cell was monitored by a camera, which has a live feed to the Control Unit.

On February 16, 2005, at approximately 8:45AM, the detainee committed suicide by hanging in his cell using a string from a blanket. He was transported to a local hospital immediately following the incident, and was pronounced dead at 9:45AM hours.

### Maria Filomena Merchan, ramsey County Jail, NOT DIHS

**Allegation:** Ramsey County Jail in St. Paul (4/2006)

***DIHS Response****:* At approximately 8:40AM on April 3, 2006, the detainee fell out of her bunk and was transported to the local hospital for evaluation. She was admitted to the hospital and diagnosed with a serious, chronic infection of the brain with parasites which caused bleeding in the brain. She was eventually removed from life support on April 13, 2006, and died shortly thereafter.

### Ingacio Sarabia-Villasenor, CCA San Diego DIHS

**Allegation:** CCA in San Diego (1/2005)

***DIHS Response****:* On January 4, 2005, witnesses report that the detainee fell to the floor while in the shower and stopped breathing. The witnesses notified correctional officers, who alerted Emergency Medical Services and began life support. The facility medical staff also provided life support until an ambulance arrived. The detainee was taken to a local emergency room, where life support was continued until 7:42 PM, when he was pronounced dead. An autopsy determined the cause of death as "sudden cardiac arrest due to ischemic heart disease due to coronary atherosclerosis."

### General ICE Detainee Medical Care Talking points:

### Background

- Today, ICE spends more than $72 million annually on detainee medical issues and more than 260,000 detainees come through the system each year. ICE is committed to providing all immigration detainees in our care with humane and safe detention environments and ensuring that adequate medical services are available.

- The Division of Immigration Health Services (DIHS), a component of the Department of Health and Human Services' Health Resources and Services Administration, provides or arranges for health care services for illegal aliens detained by ICE. This relationship dates back to 1891 when the Immigration Act authorized the Public Health Service to examine and quarantine aliens at Ellis Island.

### Medical Screenings and Care

- DIHS completes on-site physicals, intake screenings and identifies potential chronic care issues for detainees in ICE custody.

- The detainee population at ICE is normally composed of a relatively young and healthy population. The average length of stay is about 30 days, but could be longer as determined by ICE. Many are identified with preexisting medical ailments and other chronic conditions, such as hypertension or diabetes.

- The most common chronic conditions seen at DIHS medical facilities are diabetes and hypertension. According to the Center for Disease Control and Prevention, 7% of Americans have diabetes and 28% have hypertension.

- In Fiscal Year 2006, DIHS staffed facilities provided the following:

  o 4,311 chronic disease visits for hypertension representing 41% of the total chronic visits

- o  2,497 chronic disease visits for diabetes representing 24% of the total chronic visits
- o  942 referrals made to medical specialist
- o  16,312 on-site dental visits

- Each detainee that is identified with a chronic care issue is treated and educated on self-care needs, and appropriate treatment and follow-up are coordinated. Any case that is identified by the Case Management Branch, from a jail, is also monitored and provided the necessary and appropriate care needed at that time. DIHS medical staff and the Epidemiology branch also monitor TB cases to assure continuity of care even when the detainee is to be released from custody or returned to their country of origin.

- In ICE-owned service processing centers and certain designated contract detention facilities, detainee **health services are provided _on-site_** by U.S. Public Health Service commissioned officers (e.g., physicians, dentists, pharmacists, psychologists, nurses) that are assigned to the DIHS.

- At most other contract detention facilities and local jails, **_on-site_ medical care is provided** to detainees through commercial contracts or intergovernmental service agreements (IGSAs).

- Whoever the service provider, ICE detainees receive appropriate and cost effective health services consistent with community standards and the ICE mission.

- At non-ICE detention facilities, immigration detainees receive the same medical care as U.S. citizen detainees of the facility.

## Terminal Illness, Advance Directives and Death

- The current ICE policy is that when detainees die in our care or when allegations of medical impropriety arise, ICE refers the case to the Office of Professional Responsibility for investigation.

- All ICE-owned or contracted facilities have policies addressing the care of terminally- ill patients in our custody.

- When a detainee is hospitalized, even though ICE retains the authority to make administrative decisions affecting the detainee, like visitation, the hospital assumes medical decision-making authority consistent with the contract, including the patients drug regimen, lab tests, x-rays and treatments.

- If a detainee dies while in ICE custody, it is our policy to notify the next of kin and to include an account of the medical details.

# ICE #

*U.S. Immigration and Customs Enforcement (ICE) was established in March 2003 as the largest investigative arm of the Department of Homeland Security. ICE is comprised of five integrated divisions that form a 21st century law enforcement agency with broad responsibilities for a number of key homeland security priorities.*

## Jawetz, Tom

| | |
|---|---|
| **From:** | Pavlik-Keenan, Catrina M [catrina.m.pavlik-keenan@dhs.gov] on behalf of ICE-FOIA [ice-foia@dhs.gov] |
| **Sent:** | Friday, February 15, 2008 4:26 PM |
| **To:** | Jawetz, Tom |
| **Cc:** | Plofker, Howard TSA OCC |
| **Subject:** | RE: 07-FOIA-52835 |

Mr. Jawetz: We do not do Vaughn Indexes for FOIA requests that are not in litigation. What I can tell you is that 10 pages are specific to one individual's medical care, which you do not have consent to have. The 8 pages consist of a Standard Operating Procedure that used by DIHS. In the bottom of your response letter it indicated how to appeal.

Regard, Ms. Pavlik-Keenan, ICE FOIA Officer

---

**From:** Jawetz, Tom [mailto:tjawetz@npp-aclu.org]
**Sent:** Friday, February 15, 2008 10:18 AM
**To:** ICE-FOIA
**Subject:** 07-FOIA-52835

To Whom It May Concern:

On January 4, 2008, Immigration and Customs Enforcement produced over 800 pages of documents in response to FOIA request 07-FOIA-52835. ICE also withheld in full eighteen (18) pages of responsive documents. Eight (8) pages of records that responded to Item 5 of the request and ten (10) pages of records that responded to Item 6 of the request were withheld in full. Any appeal of the decision to withhold records is due March 4, 2008.

Earlier today I telephoned your office to request that the eighteen (18) pages that were withheld in their entirety be further defined in a Vaughn index. Such an index would identify each document separately, rather than as a group of eight (8) or ten (10) pages, and would explain the dates of those pages, the authors and recipients, and other non-exempt information that would contextualize the withholding decision. Vaughn indexes are often extremely useful in helping requestors decide whether or not to appeal the withholding decision, and can therefore save the agency the time that would be required to adjudicate any such appeal. I spoke with Ryan Law, who instructed me to put my request in writing.

Please let me know whether this request will be accommodated. Given the pending deadline for my appeal—March 4, 2008—I would appreciate a response as promptly as possible.

Thanks very much,

Tom Jawetz
Immigration Detention Staff Attorney
ACLU National Prison Project
915 15th Street NW
7th Floor
Washington, DC 20005
(202) 393-4930 (tel)
(202) 393-4931 (fax)
(202) 548-6610 (direct)

# EXHIBIT 23

U.S. Department of Homeland Security
Office of General Counsel
Washington, DC 20528



# Homeland Security

March 5, 2008

Tom Jawetz
ACLU National Prison Project
915 15th St., 7th Floor
Washington, DC 20005

Dear Sir or Madam:

The Department of Homeland Security has received your letter appealing the March 3, 2008, adverse determination of your Freedom of Information Act/Privacy Act (FOIA/PA) request by U.S. Immigration & Customs Enforcement, concerning deaths of persons in ICE custody. On behalf of the Deputy Associate General Counsel for General Law, we acknowledge your appeal request and are assigning it number DHS08-087 for tracking purposes. Please reference this number in any future communications about your appeal.

A high number of FOIA/PA requests have been received by the Department. Accordingly, we have adopted the court-sanctioned practice of generally handling backlogged appeals on a first-in, first-out basis.[1] While we will make every effort to process your appeal on a timely basis, there may be some delay in resolving this matter. Should you have any questions concerning the processing of your appeal, please contact Howard Plofker at (571) 227-2726, or howard.plofker@dhs.gov.

Sincerely,

Victoria Newhouse
Attorney-Advisor

---

[1] Appeals of expedited treatment denials will be handled on an expedited basis.

# EXHIBIT 24

## Jawetz, Tom

| | |
|---|---|
| **From:** | Gramian, Nikki [nikki.gramian@dhs.gov] |
| **Sent:** | Friday, December 07, 2007 8:27 AM |
| **To:** | Jawetz, Tom; Gramian, Nikki |
| **Subject:** | RE: OIG-2007-246 |

Dear Mr. Jawetz, by letter dated July 18, 2007, this office denied
your request for expedited processing. In that letter, you were
advised that you had 60 days to submit an administrative appeal to
the Associate General Counsel (General Law), Department of Homeland
Security, Washington, DC, 20528. Your letter of November 5, 2007
appears to be an appeal and should have been directed to that office.
(However, I note that your November 5, 2007 was submitted beyond the
scope of the 60 days, but that is a matter for the Associate General
Counsel to consider when reviewing your appeal.)

-----Original Message-----
**From:** Jawetz, Tom [mailto:tjawetz@npp-aclu.org]
**Sent:** Monday, December 03, 2007 3:28 PM
**To:** Gramian, Nikki
**Cc:** Gallo, Katherine
**Subject:** RE: OIG-2007-246

Dear Ms. Gramian,

Thank you for acknowledging receipt of my email and for asking for clarification. Unfortunately, I am
unable to entirely respond to your first paragraph. It is certainly my hope that by providing you with
additional information such as names, dates, and locations, I have made it easier for you to identify any
responsive documents in the possession of the OIG pertaining to *those* detainee deaths. However, it is
simply not possible for me to provide you with any additional information at this time regarding other in-
custody deaths, because I simply do not have such information. ICE has stated publicly that 66 individuals
have died in their custody since 2004. Despite my best efforts, I have been unable to collect the names of
all of the detainees who have passed away during this period--if I had them, I would gladly provide them to
you to assist you in your search. As you know, I also have a FOIA request pending with ICE, and if I obtain
responsive documents from ICE I should be able to provide you with them to assist you further. However,
as things stand, the Department of Homeland Security possesses all of this information, and the public
possesses very little of it. If you require additional information to comply with your statutory duty to conduct
a comprehensive search in response to my FOIA request, you will have to look elsewhere for assistance--
at least until ICE provides me with more information to work with. It looks like maybe we are both in a
difficult situation at this point.

With respect to the remainder of your email, I apologize if I misunderstood your position on the telephone.
I was obviously under the impression that you believed a search for Reports of Investigation would be done
in an expedited manner, but that a more comprehensive search would take longer. I appreciate you
clarifying that for me.

Just so that I am clear, however, the main purpose of my November 5, 2007 letter was to ask the OIG to
reconsider its decision to deny my request for expedited processing; I believe my request clearly satisfies
the agency's statutory and regulatory requirements for such processing. In fact, on the same day I sent
you a request for reconsideration, I sent a similar letter to Ms. Catrina M. Pavlik-Keenan, the FOIA officer
who is handling my identical FOIA request for U.S. Immigration and Customs Enforcement. On
reconsideration, Ms. Pavlik-Keenan recognized that the FOIA request satisfied the legal requirements for
expedited processing, and agreed to my request. I have attached both my letter to Ms. Pavlik-Keenan

encouraging reconsideration and her response granting me expedited processing. Please inform me whether the OIG also recognizes that this request meets the requirements and qualifies for expedited processing.

Thanks very much for working with me on processing this important request.

Tom

---

**From:** Gramian, Nikki [mailto:nikki.gramian@dhs.gov]
**Sent:** Wednesday, November 28, 2007 5:21 PM
**To:** Jawetz, Tom
**Cc:** Gallo, Katherine
**Subject:** RE: OIG-2007-246

Dear Mr. Jawetz:

Thank you for the list of names you provided in the attached email. This will greatly help our office in conducting our search for records.

Regarding your request, I have an additional clarifying question. In your email below, you indicated that "while this chart would help to provide you with some names for your search, I am absolutely not abandoning my request for **all** records pertaining to the deaths of ICE detainees." As indicated to you on the phone, without a name or other search terms, OIG is unable to conduct a search to see which one of the "66" incidents (that you referenced in your FOIA request as reported by ICE), were investigated by OIG. Therefore, my interpretation of your email is you are asking OIG to search its offices for records pertaining to the ICE detainees **listed** on the attached form you produced and that you want all records for these incidents. If this interpretation is incorrect, please clarify it for me.

Also, in your email below, you stated: "[Y]ou explained that if I only want the Report of Investigation you will be able to process that in a fast-track basis. I assume this means that in response to my Nov. 5, 2007 letter you have now concluded that my request warrants expedited treatment." You also stated, "I am willing to accept expedited production of Reports of Investigation, although I would ask that you continue to search for all exhibits to the ROI, including any and all Memorandums of Activity". Please understand that the purpose of my call to you on November 14th was to seek information from you regarding the scope of your request and to request information from you regarding search terms. In no way did I mean to indicate or imply that your request will be processed in an expedited manner.

Finally, regarding the queue in which your request will be placed, your email below states that although you will accept OIG Reports of Investigations, you are still requesting "all records" as well. Once OIG conducts its search for the names you specified below, and once OIG evaluates the number of responsive records, the status of the investigations (i.e., whether open or closed), etc., OIG will be in a better position to assess the complexity of the requested records and notify you of the queue where your request is placed.

I appreciate your assistance and further clarification of your request.

-----Original Message-----
**From:** Jawetz, Tom [mailto:tjawetz@npp-aclu.org]
**Sent:** Wednesday, November 21, 2007 10:38 AM
**To:** Gramian, Nikki
**Cc:** OIG, FOIA
**Subject:** FW: OIG-2007-246
**Importance:** High

Ms. Gramian,

I am attempting to send this email to you a third time.  My previous two attempts have both bounced back because your mailbox is too full.  The FOIA.OIG@dhs.gov mailbox also rejected the email.

In an effort to reduce the size of this email, I am no longer attaching a .pdf of the OIG's Semiannual Report to Congress from April 1, 2006-September 30, 2006.  Please ignore the suggestion in the message below that this file is attached.  Because this is a public document available on your website, I am sure you will be able to locate the relevant pages without much difficulty.

Please confirm receipt of this email.  I look forward to your prompt reply.
Tom

_____

**From:**  Jawetz, Tom
**Sent:**  Wednesday, November 21, 2007 10:24 AM
**To:**  'Nikki.Gramian@dhs.gov'
**Cc:**  'foia.oig@dhs.gov'
**Subject:**  FW: OIG-2007-246

Ms. Gramian,

I am resending this email because it bounced back when I sent it on Friday.  It does not appear that I mistyped your address, so I do not know why it bounced back.  In accordance with your suggestion, I am also copying the OIG FOIA email address.

Thank you in advance for responding promptly to this request.
Tom

_____

**From:**  Jawetz, Tom
**Sent:**  Friday, November 16, 2007 2:53 PM
**To:**  'Nikki.Gramian@dhs.gov'
**Subject:**  OIG-2007-246

Ms. Gramian,

Thank you for calling me on Wednesday, November 14, to discuss my outstanding FOIA request.  You explained on the phone that this request is complex because the topic is so broad.  You stated that when you conducted a search using obvious search terms such as "alien", "death", and "detainee" you got 3000 hits, many of which were unrelated to the request.

You indicated that it would be extremely helpful if I could provide you names or other information to assist you in your search.  I indicated that I can provide the names of about two dozen detainees and could direct you to some references to OIG investigations from the OIG's Semi-Annual Reports to Congress.

Finally, you explained that if I only want the Reports of Investigation you will be able to process that in a fast-track basis.  I assume this means that in response to my November 5, 2007 letter, you have now concluded that my request warrants expedited treatment.  Please let me know if this is incorrect.  Unfortunately, you stated that if I wanted the exhibits for all of the Reports of Investigation that would delay the response.

In this email, I am including some material to assist you in your search.

First, I am including a chart containing the names or other identifying information for 24 detainees who have died since 2004. Although I expect that this will be of significant help to you, I think it is critical to point out that according to ICE, 66 detainees have died during this period. Therefore, while this chart should help to provide you with some names for your search, I am absolutely not abandoning my request for all records pertaining to the deaths of ICE detainees.

<<Chart of Known Deaths in ICE Custody 8.17.07.doc>>

Second, #s 14 and 15 from the above chart were definitely investigated by the OIG, because those investigations were documented in the OIG's Semiannual Report to Congress from April 1, 2006–September 30, 2006 (attached). Page 26 refers to an ICE investigation into a suicide at a county contract facility. Page 27 refers to the death of a Cuban detainee at a contract facility operated by Corrections Corporation of America, Inc.

Third, #10 (the death of Mr. Sung Soo at Passaic County Jail on February 16, 2005) was also investigated by the OIG, according to the OIG's December 2006 Audit Report on Treatment of Immigration Detainees. On page 29 of that Audit Report, the OIG wrote that the OIG Office of Investigations was "reviewing the case to determine whether there was any impropriety by PCJ officials."

Fourth, I am personally aware that the OIG has received written requests to investigate several of the deaths on the chart, including, but not limited to, Reverend Joseph Dantica (#7); Sandra Kenley (#13); Maria Filomena Inamagua Merchan (#16); Abdoullai Sall (#20); and Victor(ia) Arellano (#22).

I hope that this information will assist you in responding to this FOIA request in an expeditious manner. I appreciate your offer to produce—in a fast-track manner—any Reports of Investigations pertaining to detainees who died while in ICE custody. As I explained over the phone, I am willing to accept expedited production of Reports of Investigation, although I would ask that you continue to search for all exhibits to the Reports of Investigation, including any and all Memorandums of Activity. Similarly, I continue to request "All records, including written and electronic correspondence, pertaining to deaths in ICE custody." Hopefully the names that I provided to you will assist you in conducting that search, but I do not want this email to be mistaken as limiting my FOIA request only to Reports of Investigations.

Thank you very much. Please feel free to give me a call if you would like to discuss this further.

Tom


Tom Jawetz
Immigration Detention Staff Attorney
ACLU National Prison Project
915 15th Street NW
7th Floor
Washington, DC 20005
(202) 393-4930 (tel)
(202) 393-4931 (fax)
(202) 548-6610 (direct)

# EXHIBIT 25

**U.S. Department of Homeland Security**
425 I Street. NW
Washington, DC  20536



**U.S. Immigration
and Customs
Enforcement**

November 16, 2007

Ms. Nina Bernstein
The New York Times
620 Eighth Avenue
New York, NY  10018

Re:  **FOIA Case Number 07-FOIA-52521**

Dear Ms. Bernstein:

This is the final response to your Freedom of Information Act (FOIA) request to Immigration and Customs Enforcement (ICE), dated June 21, 2007, and received by this office on June 22, 2007. You have requested documents listing the deaths of 62 detainees who died in the custody of ICE during 2004, 2005, 2006 and 2007, including any and all of the following information: name and age, date of death, location of last detention, location of death, and cause and circumstances of death.

A search of the ICE Office of Detention and Removal Operations for documents responsive to your request produced a total of 4 pages.  I am granting your request under the FOIA, 5 U.S.C. § 552, and DHS' implementing regulations, 6 C.F.R. Chapter I and Part 5.  After carefully reviewing the responsive documents, I have determined that they are appropriate for public release.  They are enclosed in their entirety; no deletions or exemptions have been claimed.

Provisions of the FOIA and Privacy Act allow us to recover part of the cost of complying with your request.  In this instance, because the cost is below the $14 minimum, there is no charge.[1]

If you need to contact our office about this matter, please refer to case number **07-FOIA-52521**. This office can be reached at (202) 732-0300 or (866) 633-1182.

Sincerely,

Catrina M. Pavlik-Keenan
FOIA Officer

---

[1] 6 CFR § 5.11(d)(4).

Detainee Deaths 2004 - November 2007

| | ALIEN NAME | DOB | DOD | LOCATION OF LAST DETENTION | LOCATION OF DEATH | Cause of Death |
|---|---|---|---|---|---|---|
| 1 | GUTIERREZ, Ramiro | 19660228 | 20040118 | Sacremento County Jail, CA | San Joaquin General Hospital, French Camp, CA | Cirrhosis |
| 2 | POPOOLA, Adetunji | 19550810 | 20040201 | Dallas County Jail, TX | Parkland Memorial Hospital, Dallas, TX | AIDS |
| 3 | RIOZ-MARTINEZ, Cezar | 19780909 | 20040216 | Frio County Jail | Frio County Jail, Pearsall, TX | Suicide by Hanging (Asphyxia) |
| 4 | MOSLEY, Hector | 19470225 | 20040227 | NY State Custody @ Time of Death | Columbia Care Center, Columbia, SC | AIDS |
| 5 | RODRIGUEZ, Jose Rangel | 19711108 | 20040303 | Kern Co. Jail | Kern Medical Center, Bakersfield, CA | AIDS |
| 6 | SOLIS-PEREZ, Maria | 19591020 | 20040306 | CCA Houston | Ben Taub Hospital, Houston, TX | Brain Aneurysm |
| 7 | HERNANDEZ, Wilfredo | 19390120 | 20040303 | Calcasieu Parish Prison | Richland Memorial Hospital, Olney, IL | Coronary Artery Disease |
| 8 | PEREZ-AYALA, Manuel | 19491224 | 20040312 | FCI Florence Colorado (BOP) | St. Thomas More Hospital, Canon City, CO | Cardiac Arrest, Hypertentive Disease |
| 9 | MENDEZ-BACCA, Carlos | 19740904 | 20040319 | Guadalupe County Jail, TX | Methodist Hospital, San Antonio, TX | HIV, Toxoplasmosis |
| 10 | SATKUNES-WARAN, Kandiah | 19640506 | 20040418 | Middlesex County Jail, NJ | Robert Wood Johnson University Hospital, New Brunswick, NJ | Renal Failure (CF: AIDS) |
| 11 | FANKEU, Samou | 19660616 | 20040511 | Chicago Hold, Chicago, IL | Lourdes Hospital, Padukah, KY | AIDS |
| 12 | RUST, Richard | 19700405 | 20040529 | BOP Oakdale LA | (BOP) Oakdale Community Hospital, Oakdale, LA | Cardiac Arrest |
| 13 | FIGUEREDO-LOPEZ, Juan | 19580608 | 20040529 | Federal Medical Center Sprinfiled MO (BOP) | (BOP) Springfield Federal Medical Center, Springfield, MO | Internal Injuries (Self-inflicted) |
| 14 | MENDEZ, Enrique | 19330823 | 20040614 | El Centro SPC | El Centro Regional Hospital, El Centro, CA | Prostate Cancer |
| 15 | HERRERA-TERAN, Jose | 19330412 | 20040615 | Pike County Jail | Pike County Jail, Milford, PA | Cardiac Arrest |
| 16 | MARTINEZ, Jose Alberto | 19570124 | 20040728 | Hampton Roads Regional Jail | Maryview Hospital, Portsmouth, VA | Pacreatitis, Sepsis |
| 17 | ALONSO, Juan | 19300914 | 20040801 | Columbia Care Center, S.C. | Columbia Care Center, Columbia, SC | Renal Failure (CF: Diabetes, HBP) |

Detainee Deaths 2004 - November 2007

| | ALIEN NAME | DOB | DOD | LOCATION OF LAST DETENTION | LOCATION OF DEATH | Cause of Death |
|---|---|---|---|---|---|---|
| 18 | ENRIQUEZ-BETANCOURT, N | 19490521 | 20040811 | Etowah County Detention Center | Etowah County Detention Center, Gadsden, AL | Cardiac Arrest (Thrombus Occluding Coronary Artery) |
| 19 | MEJIA VICENTES, Sebastian | 19770225 | 20040822 | Hampton Roads Regional Jail | Hampton Roads Regional Jail, Portsmouth, VA | Suicide |
| 20 | SOCA-ROS, Otalio | 19381203 | 20040823 | Krome Service Processing Center | Krome Service Processing Center, Miami, FL | Hypertensive, Atherosclerosis |
| 21 | SINGH, Bhupinder | 19560103 | 20040921 | | Columbia Care Center, Columbia, SC | Renal Failure |
| 22 | RUIZ-TABARES, Ervin | 19800325 | 20040925 | Guaynabo Metropolitan Detention Center | (BOP) Guaynabo Metropolitan Detention Center, San Juan, PR | Suicide by Hanging |
| 23 | REYES-ALTIMIRANO, Simon | 19790324 | 20041012 | El Centro SPC | Mesa Hills Specialty Hospital, El Paso, TX | Inoperable Brain Tumor (CF: HIV) |
| 24 | LOPEZ-LARA, Jose | 19481020 | 20041024 | Eloy Detention Center | Maricopa Medical Center, Phoenix, AZ | Cerebral Vascular Accident (Stroke) |
| 25 | ZAROU, Jose | 19481018 | 20041101 | Wicomico Co. Detention Center | Wicomico Co. Detention Center, Salisbury, MD | Cardiac Tamponade (Aortic Rupture) |
| 26 | DANTICA, Joseph | 19230207 | 20041103 | Krome SPC | Jackson Memorial Hospital, Miami, FL | Pancreatitis (Acute and Chronic) |
| 27 | FILS-AIME, Yvel | 19560103 | 20041122 | Hampton Roads Regional Jail | Hampton Roads Regional Jail, Portsmouth, VA | Pulmonary Embolism (CF: HIV) |
| 28 | ANACHE-CAMPOS, Luis | 19570106 | 20041130 | Fort Devens Medical Center MA (BOP) | (BOP) Devens FMC, Ayer, MA | Congestive Heart Failure |
| 29 | HERRERA-LIMAS, Pedro | 19421129 | 20041215 | York County Jail, York PA | Shepherd's Choice Nursing and Rehab, Gettysburg, PA | Brain Metastasis |
| 30 | SARABIA-VALLASENOR, Ignacio | 19720731 | 20050104 | Otay Detention Facility | Otay Detention Facility/CCA, San Diego, CA | Sudden Cardiac Arrest |
| 31 | NAND, Maya (aka NARID, Maya) | 19480224 | 20050205 | Eloy Detention Center | Eloy - St Mary's Hospital, Tuscon, AZ | Cardiac Arrest |
| 32 | HEO, Sung Soo | 19540213 | 20050216 | Passaic County Jail | Passaic County Jail | Suicide by Hanging |
| 33 | BELBACHIR, Hassiba | 19770824 | 20050317 | McHenry County Jail | McHenry County Jail, Woodstock, IL | Suicide |
| 34 | VARGAS, Nhung | 19680923 | 20050608 | Harris County Jail, GA | Columbus Regional Hospital, Columbus, GA | Renal Failure |

Detainee Deaths 2004 - November 2007

| | ALIEN NAME | DOB | DOD | LOCATION OF LAST DETENTION | LOCATION OF DEATH | Cause of Death |
|---|---|---|---|---|---|---|
| 35 | TUNON-ABEAL, Jose | 19520407 | 20050522 | Tensas Parish Detention Center, LA | E.A. Conway Hospital, Monroe, LA | Cirrhosis of the Liver |
| 36 | CRUZ GARCIA, Rene | 19520312 | 20050611 | Butner Medical Center, NC (BOP) | (BOP) Butner Medical Center Butner, NC | Lung Cancer |
| 37 | ALVAREZ-ESQUIVEL, Walter | 19581004 | 20050630 | CCA Laredo | Laredo Medical Center, Laredo TX | Massive Intraventricular Cerebral Hemorrhage |
| 38 | DELAPAZ, Eduardo | 19351013 | 20050927 | Columbia Care Center, S.C. | Richland Memorial Hospital Columbia, SC | Respiratory Failure |
| 39 | PRADO-ARENCILIA, Reinaldo | 19671110 | 20051003 | CCA Houston | Houston - Northeast Medical Center Hospital | Unwitnessed arrest, epilepsy |
| 40 | SANCHEZ-RODRIGUEZ, Sergio | 19510909 | 20051030 | Butner Medical Center, NC (BOP) | (BOP) Butner Medical Center - Butner, NC | Metastic Lung Cancer |
| 41 | MARRERO-ABREO, Domingo | 19430222 | 20051115 | San Pedro SPC | Little Company of Mary Hospital – San Pedro | Acute Myocardial Infarction |
| 42 | LEDESMAN-GUERREO, Roberto | 19331010 | 20051202 | Otay Detention Facility | Otay Detention Facility - Sharps Chula Vista Hospital | Complications of cardiac bypass surgery, 6 vessel CAD, diabetes, hypertension |
| 43 | SALAZAR-GOMEZ, Juan | 19760624 | 20051214 | Eloy Detention Center | Eloy - Tuscon, AZ | Suicide |
| 44 | KENLEY, Sandra Marina | 19530503 | 20051218 | Hampton Roads Regional Jail | Hampton Roads Regional Jail, Portsmouth, VA | C-spine Fx, Fall |
| 45 | MURPHY, Vincent | 19460605 | 20060204 | Suffolk County Jail, MA | Suffolk Co., Boston, MA | Cardiovascular |
| 46 | GARCIA-SANCHEZ, Felipe | 19841119 | 20060210 | BOP Oakdale LA | (BOP) Oakdale, Oakdale, LA | Suicide Hanging |
| 47 | GARCIA-MEJIA, Geovanny | 19790318 | 20060318 | Newton Co. Correctional Center | Newton Co. Correctional Center Newton, TX | Suicide Hanging |
| 48 | INAMAGUA-MERCHA, Maria | 19751119 | 20060404 | Ramsey County Jail | Ramsey County, St. Paul MN | Brain Hemmorrhage |
| 49 | RODRIGUEZ CASTRO, Walter | 19770621 | 20060423 | Kern Co. Jail | Kern Co. Jail  Bakerfield, CA | Unresponsive |
| 50 | RODRIGUEZ-GONZALEZ, Miguel | 19630119 | 20060521 | San Pedro Service Processing Center | San Pedro SPC - San Pedro Peninsula Hospital | Removed from Life Support/Multi System Failure/End Stage Renal Disease |
| 51 | OSMAN, Yusif | 19720107 | 20060627 | San Diego Service Processing Center | San Diego SPC - Otay Mesa, CA | Sudden Cardiac Event |

Detainee Deaths 2004 - November 2007

| | ALIEN NAME | DOB | DOD | LOCATION OF LAST DETENTION | LOCATION OF DEATH | Cause of Death |
|---|---|---|---|---|---|---|
| 52 | CASTRO-JIMENEZ, Rene | 19390826 | 20060815 | Fort Devens Medical Center MA (BOP) | BOP Fort Devens, Devens MA | Respiratory Failure |
| 53 | KIM, Young Sook | 19481105 | 20060911 | Regional Correctional Center NM | Albuquerque, New Mexico | Pancreatic Cancer |
| 54 | SINGH, Jamer | 19651108 | 20060920 | Lerdo Pretrail Facility | Lerdo Pretrail Facility, Bakersfield CA | Cardiovascular Disease |
| 55 | LOPEZ-GREGORIO, Jose | 19740101 | 20060929 | Eloy CCA Facility | Eloy CCA Facility, Eloy AZ | Suicide by Hanging |
| 56 | CARLOS-CORTEZ, Raudel | 19840917 | 20061003 | Mira Loma Detention Center | Mira Loma Detention Ctr., Lancaster CA | Suicide by Hanging |
| 57 | MARTINEZ-RIVAS, Antonio | 19611119 | 20061004 | Houston Contract Detention Facility | Houston, Texas CDF | Suicide by Hanging |
| 58 | CERVANTES-CORONA, Jesus | 19640716 | 20061118 | Northwest Detention Center | Northwest Detention Ctr. Tacoma, WA | Coronary Artery Disease |
| 59 | ABDEULAYE, Sall | 19560427 | 20061202 | Piedmont Regional Jail | Piedmont Regional Jail, Farmville Virginia | Undetermined |
| 60 | CHAVEZ-TORRES, Mario Francisco | 19791110 | 20061213 | Eloy Detention Center | Eloy Detention Ctr., Eloy AZ | Brain Aneurysm |
| 61 | ROMERO, Nery | 19840409 | 20070212 | Bergen County Jail | Bergen County Jail, NJ | Suicide by Hanging |
| 62 | BAH, Boubacar | 19550101 | 20070530 | Elizabeth Detention Center | University of Medicine, NJ | Brain Hemorrhage, Fractured Skull |
| 63 | ARELLANO, Victor | 19831010 | 20070720 | San Pedro SPC | Little Company of Mary Hospital – San Pedro; previously AKA San Pedro Peninsula Hospital | Complications of HIV |
| 64 | DE ARAUJO, Edimar | 19721009 | 20070807 | | Rhode Island Hospital Providence RI | Complications of DM |
| 65 | CONTRERAS-DOMINGUEZ, Rosa Isela | 19710917 | 20070807 | El Paso SPC | Del Sol Medical Center (El Paso) | Pulmonary Embolism (Pregnant) |
| 66 | GUEVARA-LAZARO, Alejandro | 19860304 | 20070813 | Otero County Detention Center TX | Thomason Hospital | Brain Dead due to anuerism |

# EXHIBIT 26

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT

**ACLU**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

December 7, 2007

Associate General Counsel (General Law)
Department of Homeland Security
Washington, DC 20528

**Re:    Freedom of Information Act/Privacy Act Appeal of OIG-2007-246**

To Whom It May Concern:

I write to appeal a decision by the Department of Homeland Security (DHS) Office of Inspector General (OIG) denying my request for expedited processing. On June 27, 2007, the ACLU National Prison Project filed a Freedom of Information Act (FOIA) request with the DHS Privacy Office. See Exh. 1. That request was forwarded to the OIG, which responded to me in a letter dated July 18, 2007. See Exh. 2. The OIG determined that the ACLU National Prison Project failed to demonstrate that its FOIA request merited expedited treatment. On November 5, 2007, I requested that the OIG reconsider its determination in light of both the ACLU's historic role as an organization that collects and disseminates information publicly, and the public's urgent need for the requested information. See Exh. 3. On December 7, 2007, FOIA/PA Analyst Nikki Gramian notified me that she would not reconsider the decision to deny expedited processing, and she encouraged me to direct my request to your office in the form of an appeal. See Exh. 4. Although this appeal is being submitted more than 60 days after expedited processing was initially denied, the appeal is based on facts that have only been developed in recent months. <u>It is important to note that on November 15, 2007, the ICE FOIA Office decided to **grant** my request for expedited processing of this very same FOIA request because the subject of the request—**deaths in U.S. Immigration and Customs Enforcement custody**—has generated "substantial news coverage."</u> See Exh. 5.

My request for expedited processing was denied on two grounds. First, the OIG concluded that the ACLU failed to demonstrate that our main professional activity is information dissemination, even if that is not our sole occupation. As I explained in my initial request, gathering information and disseminating it to the public is at the absolute <u>core</u> of what the ACLU is all about. As the largest civil liberties organization in the country, with offices in 50 states and over 500,000 members, the ACLU is in a unique position to collect and disseminate information that is of critical importance to the public. One of the principal means by which information is then disseminated to the public by the ACLU is through newsletters, news briefings, and right-to-know handbooks. The ACLU's website is heavily trafficked and our electronic newsletters are available by subscription. The ACLU disseminates information via dozens of podcasts, <u>see</u>

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

ELIZABETH ALEXANDER
DIRECTOR
ATTORNEY AT LAW

NATIONAL OFFICE
125 BROAD STREET, 18TH FL.
NEW YORK, NY 10004-2400
T/212.549.2500

OFFICERS AND DIRECTORS
NADINE STROSSEN
PRESIDENT

ANTHONY D. ROMERO
EXECUTIVE DIRECTOR

RICHARD ZACKS
TREASURER

http://www.aclu.org/multimedia/podcasts/index.html, and endeavors through all of our work to advance public access to information.

Most relevant to this request, the ACLU frequently utilizes FOIA requests to obtain documents of vital importance to the public, and the ACLU then disseminates information obtained through these FOIA requests to the public. For instance, the ACLU filed a FOIA request on October 7, 2003, demanding the release of information about detainees held overseas by the United States. Over 100,000 pages of documents ultimately obtained by the ACLU pursuant to a court order are now available directly to the public on the ACLU website. See http://www.aclu.org/safefree/torture/torturefoia.html. Similarly, in August 2002, the ACLU filed a FOIA request to find out how the Federal Bureau of Investigation was using its surveillance powers. In response, the government conceded that expedited processing of that request was warranted, and documents ultimately produced pursuant to court order are now available directly to the public on the ACLU website. Id. Moreover, the ACLU's commitment to information dissemination was never questioned by the ICE FOIA Office in connection with this FOIA request, and in fact ICE has granted expedited processing of **this** request.

The second basis for the denial of expedited processing was that the ACLU failed to demonstrate a particular urgency to inform the public about the documents requested. This FOIA request involves the circumstances surrounding the deaths of people held in ICE custody and the government's apparent failure to adequately prevent, investigate, or track such deaths. The FOIA request was filed on June 26, 2007, just one day after the New York Times revealed in a front page story that 62 people had died in U.S. Immigration and Customs Enforcement (ICE) custody since 2004. Nina Bernstein, New Scrutiny as Immigrants Die in Custody, N.Y. TIMES, June 26, 2007. According to the article, "[n]o government body is charged with accounting for deaths in immigration detention" and ICE "declined to release information about the 62 detention deaths since 2004." Id.

The significance of this issue has only grown in importance since this FOIA request was filed. Major newspapers have continued to report on in-custody deaths and have questioned whether the ICE, the Office of the Inspector General, and other branches of the Department of Homeland Security will conduct investigations into these deaths. See, e.g., Robert MacMillan, U.S. Care for HIV Detainees Falls Short—Report, REUTERS, Dec. 7, 2007; Darryl Fears, 3 Jailed Immigrants Die in a Month; Medical Mistreatment Alleged; Federal Agency Denies Claims, WASHINGTON POST, Aug. 15, 2007; Greg Krikorian, Dead Detainee's Family Alleges Medical Mistreatment, L.A. TIMES, Aug. 11, 2007. The editorial boards of the Miami Herald, New York Times, and Washington Post have all expressed concern about this issue, and some have called on Congress to investigate poor medical care and in-custody deaths.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

2

In fact, on October 4, 2007, the House Immigration Subcommittee held a hearing on "Detention and Removal: Immigration Detainee Medical Care." At that hearing, Gary Mead, ICE's Assistant Director for Detention and Removal revealed for the first time that 66 people had died since 2004—presumably four people had died in the three and a half months following the release of the New York Times article. Two of the other witnesses who spoke before Congress were relatives of detainees who died in ICE custody during the period covered in this FOIA request. The ACLU also presented testimony at that hearing. In connection with her nomination hearing, Assistant Secretary Julie Myers has also been asked numerous questions about deaths in detention and the government's efforts to investigate in-custody deaths.

Not only is this request timely, it is literally about life and death issues—issues that are of utmost importance to the public. Although this appeal is submitted beyond the 60 day window, it is based largely upon the public's increasing interest in the subject matter of the request. As stated earlier, the ICE FOIA Office recently reconsidered its own decision to deny expedited processing and agreed that the subject of the ACLU's FOIA request is "a topic of substantial new coverage" that warrants expedited treatment. I urge you to reverse the decision of the OIG and grant this request for expedited treatment. I eagerly await your response.

Sincerely,

Tom Jawetz
Immigration Detention Staff Attorney
ACLU National Prison Project
915 15th Street, NW
7th Floor
Washington, DC 20005
Tel: (202) 548-6610
Fax: (202) 393-4931

Encls.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

# EXHIBIT 1

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



June 27, 2007

U.S. Department of Homeland Security
Privacy Office
Mail Stop 0550
245 Murray Lane, S.W.
Washington, DC 20528-0550

Health Resources and Services Administration
Office of Communications
FOIA Requester Service Center
5600 Fishers Ln., Room 14-18
Rockville, MD 20857

U.S. Public Health Service
Freedom of Information Office
5600 Fishers Ln., Room 17A-46
Rockville, MD 20857

**Re: FOIA Request Related to Deaths in Immigration Detention**

Dear Freedom of Information Officers:

This letter constitutes a request (Request) pursuant to the Freedom of Information
Act, 5 U.S.C. § 552 (FOIA). The Request is submitted on behalf of the National
Prison Project (NPP) of the American Civil Liberties Union (ACLU). NPP is also
requesting expedited processing for this request, pursuant to 5 U.S.C. §
552(a)(6)(E) and agency regulations, and a fee waiver, pursuant to 5 U.S.C. §
552(a)(4)(A)(iii). The request is simultaneously being filed with the U.S.
Department of Homeland Security, the Health Resources and Services
Administration, and the U.S. Public Health Service.

## **BACKGROUND**

Recent news reports indicate that individuals detained by U.S. Immigration and
Customs Enforcement (ICE) have died as a result of grossly inadequate medical
care. Until recently, it was unknown how many individuals had died in ICE
custody. Such deaths are not publicly reported and no government agency
appears to be charged with the task of tracking and investigating such deaths.
One attempt by the ACLU to account for in-custody deaths identified 20 deaths
since 2004; this list was generated through a review of publicly available
documents and correspondence with immigrants' rights advocates around the

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

ELIZABETH ALEXANDER
DIRECTOR
ATTORNEY AT LAW

NATIONAL OFFICE
125 BROAD STREET, 18TH FL.
NEW YORK, NY 10004-2400
T/212.549.2500

OFFICERS AND DIRECTORS
NADINE STROSSEN
PRESIDENT

ANTHONY D. ROMERO
EXECUTIVE DIRECTOR

RICHARD ZACKS
TREASURER

country.  However, according to a figure recently released by ICE to The New York Times, the number of immigrant detainee deaths since 2004 is actually 64.[1]

The circumstances surrounding many of these deaths are highly disturbing and demand further investigation and oversight.  In one account, a Korean woman detained at a privately-run facility in Albuquerque, New Mexico complained for weeks about her need for medical attention.[2]  Despite her deteriorating health, the woman received little attention until she was transferred to a local hospital where she died.[3]  In February 2007, a detainee held in Hackensack, New Jersey, was denied powerful prescription medication despite experiencing crippling pain; according to other detainees, the man's severe distress was common knowledge at the jail, and he committed suicide after five agonizing days.[4]

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Just yesterday, The New York Times published a front page story describing two other in-custody deaths.[5]  Sandra Kenley, a lawful permanent resident of more than 30 years, died in December 2005 after being detained in two Virginia regional jails for approximately seven weeks.  Prior to being taken into custody, Ms. Kenley notified airport immigration inspectors of her serious medical conditions, which included a scheduled surgery to treat her fibroid tumor and uterine bleeding.  She complained until her death of continued hemorrhaging and the jails' refusal to provide her with necessary prescription medications.

One year later, while detained in yet another Virginia regional jail, Abdoullai Sall died approximately ten weeks after entering immigration custody.  Throughout his detention, Sall complained to jail officials that he was not receiving the proper medication for his serious medical condition, and attempts by his immigration attorney to notify the jail of his client's worsening health were largely ignored.

Recent press attention to deaths in detention reveals just how little information is available about this problem.  According to the ICE Detention Standards, when an immigrant detainee dies in custody, the Assistant District Director for Detention and Removal Operations (DRO) is supposed to notify the District Director, the Assistant Regional Director for DRO, and the Director of Field Operations at ICE Headquarters.[6]  A local representative of the U.S. Public Health Service is to receive medical reports within 48 hours of the death, and both the family of the deceased and consular officials are to be notified about the death.[7]

The Department of Homeland Security's Office of Inspector General (OIG) publicly released a report in January 2007 detailing a series of problems with the

---

[1] Nina Bernstein, *New Scrutiny as Immigrants Die in Custody*, N.Y. Times, June 26, 2007.
[2] Barbara Ferry, *Crackdown's Fallout*, The New Mexican, May 20, 2007.
[3] *Id.*
[4] Nina Bernstein, *One Immigrant Family's Hopes Lead to a Jail Cell Suicide*, N.Y. Times, Feb. 23, 2007.
[5] Bernstein, *supra* note 1.
[6] INS Detention Standard, Terminal Illness, Advance Directives, and Death (Sept. 20, 2000), 6-7.
[7] *Id.*

2

treatment of immigrant detainees at five facilities.[8]  One problem highlighted by
the OIG was that four of the five facilities reviewed showed serious problems
with the delivery of adequate health services.  Although the report made a general
reference to one suicide death at the Passaic County Jail,[9] it made no mention of
at least three other deaths that occurred at the San Diego Correctional Facility.
The OIG also releases semiannual reports to Congress that contain sporadic and
vague references to investigations into in-custody deaths.  Such reports provide
little useful information to assure the public that meaningful investigations are
conducted into each death, and that steps are taken to guarantee that detainees
receive necessary medical services before it is too late.[10]

Over the last ten years, the United States has dramatically increased the use of
detention for individuals in civil immigration proceedings.  In 1997, the number
of immigrants detained in the custody of U.S. Immigration and Naturalization
Service on a given day was approximately 13,000.[11]  Just ten years later, ICE has
funding to detain 27,500 individuals at any given time.[12]  As the nation considers
comprehensive immigration reform legislation, it is likely that ICE will receive
funding to detain many thousands more.  This issue will only grow in importance
over the coming years, and it is essential that the federal government—which is
ultimately responsible for the health and welfare of individuals detained pursuant
to its authority—do more to ensure that immigrant detainees do not suffer and die
unnecessarily.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

## RECORDS REQUESTED

Please disclose:

1. A complete list of individuals who have died while detained in ICE
   custody since January 1, 2004.  For each death listed, please include:
      a. Complete name;
      b. Alien number;
      c. Date on which detention began;
      d. Date of death;
      e. List of all facilities where the detainee was housed along with
         dates of detention; and

---

[8] Department of Homeland Security, Office of Inspector General, *Treatment of Immigration
Detainees Housed at Immigration and Customs Enforcement Facilities*, OIG-07-07 (Dec. 2006).
[9] *Id.* at 29.
[10] The OIG recently began a "special review" of two in-custody deaths, and is considering the ICE
Detention Standards that pertain to in-custody deaths and medical care.  The ACLU hopes that the
results of the OIG review are made public, and that the OIG make recommendations to ensure that
preventable deaths are reduced and that all deaths are properly investigated by an independent
government body.
[11] U.S. Department of Justice, Office of the Federal Detention Trustee, *Detention Needs
Assessment and Baseline Report: A Compendium of Federal Detention Statistics*, *at*
http://www.usdoj.gov/ofdt/.
[12] U.S. Immigration and Customs Enforcement, *ICE Accomplishments in Fiscal Year 2006* (May
15, 2007), *at* http://www.ice.gov/pi/news/factsheets/2006accomplishments.htm.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

    f.  Location at time of death.

2.  For each individual whose death is included in (1), all records:

    a.  Pertaining to the cause of death;

    b.  Pertaining to requests for medical help by anyone, including the deceased, his/her family members, and fellow detainees;

    c.  Pertaining to Treatment Authorization Requests (TARs) submitted to the Division of Immigration Health Services (DIHS), including any DIHS responses to those TARs;

    d.  Pertaining to reports of investigations into the circumstances surrounding the death, including all after-action reports and critical incident reports;

    e.  Pertaining to whether any of the detainees who died were diagnosed with terminal illnesses while in immigration detention or beforehand;

    f.  Pertaining to whether any of the detainees who died were taken to outside hospitals for treatment, and if so, the names of those hospitals and the dates of treatment;

    g.  Pertaining to whether and how ICE notified families of the deaths of detained family members;

    h.  Pertaining to whether and how ICE notified consular officials of the deaths of detained persons;

    i.  Pertaining to whether and how state, county, local officials and review boards were notified of the deaths.

3.  All records, including written and electronic correspondence, pertaining to deaths in ICE custody.

4.  All records, including policies, procedures, or guidelines provided to or maintained by Contract Detention Facilities, Service Processing Centers, and Intergovernmental Service Agreement facilities relating to deaths in detention, including memoranda and training materials.

5.  All records identifying the manner by which your agency or any of its components track deaths in detention.

6.  All records, including written and electronic correspondence, generated in response to requests for information from the Washington Post and The New York Times about immigrant detainee medical care and deaths, and in reaction to those articles. This request pertains specifically to records generated in preparation for and in response to two articles: (a) Darryl Fears, *Illegal Immigrants Received Poor Care in Jail, Lawyers Say*, Washington Post, June 13, 2007; and (b) Nina Bernstein, *New Scrutiny as Immigrants Die in Custody*, N.Y. Times, June 26, 2007.

## THE REQUESTOR

The ACLU is a nationwide, nonprofit, nonpartisan organization dedicated to protecting human rights and civil rights in the U.S. It is the largest civil liberties organization in the country, with offices in 50 states and over 500,000 members. The ACLU is specifically dedicated to holding the U.S. government accountable

to universal human rights principles in addition to rights guaranteed by the U.S. Constitution.

Furthermore, the ACLU publishes newsletters, news briefings, right-to-know handbooks, and other materials that are disseminated to the public. These materials are widely available to everyone, including tax-exempt organizations, not-for-profit groups, law students and faculty, for no cost or for a nominal fee through its public education department. The ACLU also disseminates information through its heavily subscribed website, http://www.aclu.org. The website addresses civil liberties issues in depth, provides features on civil liberties issues in the news, and contains hundreds of documents that relate to the issues addressed by the ACLU. The website includes features on information obtained through the FOIA. *See, e.g.*, http://www.aclu.org/patriot_foia/index.html. The ACLU also publishes an electronic newsletter, which is distributed to subscribers by e-mail.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Accordingly, the ACLU is an organization whose "main professional activity or occupation is information dissemination." 6 C.F.R. § 5.5(d)(3). The ACLU is also a "representative of the news media" for purposes of 45 C.F.R. § 5.5. Finally, the ACLU meets the criterion laid out in *National Sec. Archive v. U.S. Dep't of Defense*, where a representative of the news media is defined as an entity that "gathers information of potential interest to a segment of the public" and "uses its editorial skills to turn raw materials into a distinct work, and distributes that work to an audience." *National Sec. Archive v. U.S. Dep't of Defense*, 880 F.2d 1381,1387 (D.C. Cir. 1989).

## EXPEDITED PROCESSING

We request Track 1 expedited treatment for this FOIA request. This request qualifies for expedited treatment pursuant 5 U.S.C. § 552(a)(6)(E) and applicable regulations.

As demonstrated above, there is a "compelling need" for expedited processing sought by the ACLU. 5 U.S.C. § 552(a)(6)(E)(i)(I). The lack of expedited disclosure of records related to these deaths in detention could "reasonably be expected to pose an imminent threat to the life or physical safety of an individual." 5 U.S.C. § 552(a)(6)(E)(v)(I); 6 C.F.R. § 5.5(d)(1)(i).

Moreover, there exists a clear "urgency to inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v)(II). *See also* 6 C.F.R. § 5.5(d)(1)(ii) (expedited processing is warranted where there is "[a]n urgency to inform the public about an actual or alleged federal government activity.").

The ACLU is therefore entitled to expedited processing of this request.

## FEE WAIVER

The ACLU requests a total waiver of fees on the grounds that disclosure of the requested records is in the public interest and because disclosure "is likely to contribute significantly to the public understanding of the activities or operations of the government and is not primarily in the commercial interest of the requester[s]." 5 U.S.C. § 552(a)(4)(A)(iii). *See also* 45 C.F.R. § 5.45. This Request aims at furthering public understanding of government conduct, and specifically to help the public determine whether civil detainees in the custody of Immigration and Customs Enforcement are treated in a manner that comports with our nation's values. On account of these factors, the ACLU has not been charged fees associated with responding to FOIA requests on numerous occasions.[13]

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

In any event, as discussed *supra*, the ACLU qualifies as a "representative of the news media" and the records are not sought for commercial use. Accordingly, should fees be assessed for the processing of this Request, such fees should be "limited to reasonable standard charges for document duplication." 5 U.S.C. § 552(a)(4)(A)(ii)(II).

The ACLU is therefore entitled to a total waiver of fees associated with this request and should, in no event, be required to pay more than reasonable standard charges for document duplication alone.

\* \* \*

Thank you for your consideration of this request. If this request is denied in whole or part, the ACLU asks that you justify all deletions by reference to specific exemptions of the FOIA. We expect you to release all segregable portions of otherwise exempt material. We reserve the right to appeal a decision to withhold any information, or to deny expedited processing or a waiver of fees. We look forward to your reply to the request for expedited processing within ten (10) business days, as required under 5 U.S.C. § 552(a)(6)(E)(ii)(I).

---

[13] The following are recent examples of requests for which agencies did not charge the ACLU fees associated with responding to a FOIA request: (1) The Department of State did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in April 2005; (2) The National Institute of Standards and Technology did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in April 2005; (3) The Office of Science and Technology Policy in the Executive Office of the President did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in August 2003; (4) The Federal Bureau of Investigation did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in August 2002; (5) The Office of Intelligence Policy and Review did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in August 2002; (6) and The Office of Information and Privacy in the Department of Justice did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in August 2002.

Notwithstanding your decision on the matter of expedited processing, we look forward to your reply to the records request within twenty (20) business days, as required under 5 U.S.C. § 552(a)(6)(A)(I).[14]

Please respond to Tom Jawetz, Immigration Detention Staff Attorney, ACLU National Prison Project, 915 15th St. NW, 7th Floor, Washington, DC 20005, telephone: (202) 548-6610, email: tjawetz@npp-aclu.org. Also, please notify us in advance if the costs for photocopying the documents exceed $100. We eagerly await your response, and thank you for your assistance.

*   *   *

Under penalty of perjury, I certify, to the best of my knowledge and belief, that the above information is true and correct.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Tom Jawetz
Immigration Detention Staff Attorney
ACLU National Prison Project
915 15th Street, NW
7th Floor
Washington, DC 20005
Tel: (202) 548-6610
Fax: (202) 393-4931

---

[14] Pursuant to the Department of Health and Human Services regulations, a reply by HRSA and PHS is due within ten working days after this request has been received. 45 C.F.R. § 5.35(b)(1).

# EXHIBIT 2



*Office of the Inspector General*
**U.S. Department of Homeland Security**
Washington, DC 20528

**JUL 18 2007**

Tom Jawetz
Immigration Detention Staff Attorney
ACLU National Prison Project
915 15ᵗʰ Street, N.W.
Washington, D.C. 20005

SUBJECT: Freedom of Information Act Request No. 2007-246

Dear Mr. Jawetz:

This letter acknowledges receipt of your Freedom of Information Act (FOIA) request dated June 27, 2007, to the Privacy Office for the Department of Homeland Security (DHS). You have requested expedited review and a fee waiver. The Privacy Office referred your request to the Office of Inspector General (OIG) on July 12, 2007. Your request was assigned the above-referenced FOIA tracking number.

As to your request for expedited review, 5 U.S.C. § 552(a)(6)(E)(i) states that "each agency shall promulgate regulations ... providing for expedited processing of requests for records." There are two categories of requests that merit expedited review under DHS FOIA regulations: (1) requests for which a "lack of expedited treatment could reasonably be expected to pose an imminent threat to the life or physical safety of an individual;" or (2) where there is "an urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information." 6 C.F.R. §§ 5.5(d)(1)(i), (ii).

It appears that you have requested expedited treatment on the basis of "an urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information." 6 C.F.R. § 5.5(d)(ii). Under DHS FOIA regulations, a requester seeking expedited treatment on this basis, "if not a full-time member of the news media, must establish that he or she is a person whose main professional activity or occupation is information dissemination, though it need not be his or her sole occupation." 6 C.F.R. § 5.5(d)(iii). Such requests must also "establish a particular urgency to inform the public about the government activity involved in the request, beyond the public's right to know about government activity generally." Id.

Based on my review of the information contained in your request, I am denying your request for expedited processing. You have not provided any evidence that information dissemination is your main professional activity, nor have you adequately demonstrated a particular urgency to inform the public regarding the subject matter of your request, beyond the public's general right to know about government activity.

**www.dhs.gov**

Since your request does not meet the criteria for expedited review, OIG will place your request in the queue for processing in the order in which it was received. Simple requests are answered more quickly and will be placed on the fast track of our multi-track processing system. More complex requests, including those calling for a particularly large volume of records, are segregated into a group designated as Project Requests. These requests require significantly more processing time and are processed separately in the order in which received. Unfortunately, we cannot predict exactly when your request will be processed, as we currently have a backlog of such requests. The OIG is devoting additional staff and resources to reducing this backlog and using its best efforts to process all requests with due diligence on a first-in, first-out basis.

Regarding your fee status request, I am denying your request for "representative of the news media" status. DHS FOIA regulations specifically define "representative of the news media" as "any person actively gathering news for an entity that is organized and operated to publish or broadcast news to the public." 6 C.F.R. §§ 5.11(b)(6). Based on the information contained in your letter, I am denying your request for this fee status because you have not presented a convincing argument that ACLU is an entity organized and operated to publish or broadcast news to the public. See id.

Although your request for "representative of the news media" status is denied, you are entitled to two hours of search time and 100 pages of releasable records free of any charges. 6 C.F.R. § 5.11(d)(3). Should search time exceed two hours and duplication costs exceed 100 pages, we will charge you in accordance with DHS FOIA regulations. In accordance with DHS regulations, this letter also confirms your agreement to incur all applicable fees involved in the processing of your request, up to the amount of $25.00. 6 C.F.R. § 5.11.

We are holding your request for a fee waiver in abeyance pending the review and quantification of responsive records.

You have the right to appeal my denial determination of your expedited review request. Your appeal must be in writing and **received** within 60 days of the date of this response. Please address any appeal to:

Associate General Counsel (General Law)
Department of Homeland Security
Washington, D.C. 20528.

Both the envelope and letter of appeal must be clearly marked, "Freedom of Information Act/Privacy Act Appeal." Your appeal letter must also clearly identify the OIG's response. Additional information on submitting an appeal is set forth in the Department of Homeland Security regulations at 6 C.F.R. § 5.9.

Please refer to the above-referenced tracking number if you contact us regarding your request. Our mailing address is DHS/Office of Inspector General/STOP 2600, 246 Murray Drive, Building 410, Washington, D.C. 20528. If we need additional information, we will contact you.

If you have questions, you may contact Ms. Nikki Gramian, FOIA/PA Analyst, at
(202) 254-4001.  Thank you.

Sincerely,

Katherine R. Gallo
Assistant Counsel to the Inspector General

# EXHIBIT 3

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



November 5, 2007

Nikki Gramian
FOIA/PA Analyst
DHS/Office of Inspector General
STOP 2600
246 Murray Drive, Building 410
Washington, DC 20528

**Re: FOIA Request Number 2007-246**

Dear Ms. Gramian:

I write in connection with your letter acknowledging receipt of my Freedom of Information Act (FOIA) request, dated June 27, 2007. In your response, dated July 18, 2007, you indicate that the Office of the Inspector General determined that the ACLU National Prison Project failed to demonstrate that this request merited expedited review. I write to ask that you reconsider this determination in light of both the ACLU's historic role as an organization that collects and disseminates information publicly, and the public's urgent need for the requested information.

Your denial was based on two grounds. First, you concluded that the ACLU failed to demonstrate that our main professional activity is information dissemination, even if that is not our sole occupation. As I explained in my initial request, gathering information and disseminating it to the public is at the absolute core of what the ACLU is all about. As the largest civil liberties organization in the country, with offices in 50 states and over 500,000 members, the ACLU is in a unique position to collect and disseminate information that is of critical importance to the public. One of the principal means by which information is then disseminated to the public by the ACLU is through newsletters, news briefings, and right-to-know handbooks. The ACLU's website is heavily trafficked and our electronic newsletters are available by subscription. The ACLU disseminates information via dozens of podcasts, *see* http://www.aclu.org/multimedia/podcasts/index.html, and endeavors through all of our work to advance public access to information.

Most relevant to this request, the ACLU frequently utilizes FOIA requests to obtain documents of vital importance to the public, and the ACLU then disseminates information obtained through these FOIA requests to the public. For instance, the ACLU filed a FOIA request on October 7, 2003, demanding the release of information about detainees held overseas by the United States. Over 100,000 pages of documents ultimately obtained by the ACLU pursuant to a court

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

ELIZABETH ALEXANDER
DIRECTOR
ATTORNEY AT LAW

NATIONAL OFFICE
125 BROAD STREET, 18TH FL.
NEW YORK, NY 10004-2400
T/212.549.2500

OFFICERS AND DIRECTORS
NADINE STROSSEN
PRESIDENT

ANTHONY D. ROMERO
EXECUTIVE DIRECTOR

RICHARD ZACKS
TREASURER

order are now <u>available directly to the public</u> on the ACLU website. <u>See</u>
http://www.aclu.org/safefree/torture/torturefoia.html. Similarly, in August 2002,
the ACLU filed a FOIA request to find out how the Federal Bureau of
Investigation was using its surveillance powers. In response, <u>the government
conceded that expedited processing of that request was warranted</u>, and documents
ultimately produced pursuant to court order are <u>now available directly to the
public</u> on the ACLU website. <u>Id.</u>

The second basis for your denial of expedited processing was that the ACLU
failed to demonstrate a particular urgency to inform the public about the
documents requested. As you are no doubt aware, this FOIA request involves the
circumstances surrounding the deaths of people held in ICE custody and the
government's apparent failure to adequately prevent, investigate, or track such
deaths. The FOIA request was filed on June 26, 2007, just <u>one day</u> after the New
York Times revealed in a front page story that 62 people had died in U.S.
Immigration and Customs Enforcement (ICE) custody since 2004. Nina
Bernstein, <u>New Scrutiny as Immigrants Die in Custody</u>, N.Y. TIMES, June 26,
2007. According to the article, "[n]o government body is charged with
accounting for deaths in immigration detention" and ICE "declined to release
information about the 62 detention deaths since 2004." <u>Id.</u>

The significance of this issue has only grown in importance since this FOIA
request was filed. Major newspapers have continued to report on in-custody
deaths and have questioned whether the ICE, the Office of the Inspector General,
and other branches of the Department of Homeland Security will conduct
investigations into these deaths. <u>See, e.g.</u>, Darryl Fears, <u>3 Jailed Immigrants Die
in a Month; Medical Mistreatment Alleged; Federal Agency Denies Claims</u>,
WASHINGTON POST, Aug. 15, 2007; Greg Krikorian, <u>Dead Detainee's Family
Alleges Medical Mistreatment</u>, L.A. TIMES, Aug. 11, 2007. The editorial boards
of the Miami Herald, New York Times, and Washington Post have all expressed
concern about this issue, and some have called on Congress to investigate poor
medical care and in-custody deaths.

In fact, on October 4, 2007, the House Immigration Subcommittee held a hearing
on "Detention and Removal: Immigration Detainee Medical Care." At that
hearing, Gary Mead, ICE's Assistant Director for Detention and Removal
revealed for the first time that 66 people had died since 2004—presumably four
people had died in the three and a half months following the release of the New
York Times article. Two of the other witnesses who spoke before Congress were
relatives of detainees who died in ICE custody during the period covered in this
FOIA request. In connection with her nomination hearing, Assistant Secretary
Julie Myers has also been asked numerous questions about deaths in detention and
the government's efforts to investigate in-custody deaths.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Not only is this request timely, it is literally about life and death issues—issues that are of utmost importance to the public. Please reconsider your decision to deny this request for expedited treatment. I eagerly await your response.

Sincerely,

Tom Jawetz
Immigration Detention Staff Attorney
ACLU National Prison Project
915 15th Street, NW
7th Floor
Washington, DC 20005
Tel: (202) 548-6610
Fax: (202) 393-4931

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Encls.

3

# EXHIBIT 4

## Jawetz, Tom

**From:**    Gramian, Nikki [nikki.gramian@dhs.gov]
**Sent:**    Friday, December 07, 2007 8:27 AM
**To:**      Jawetz, Tom; Gramian, Nikki
**Subject:** RE: OIG-2007-246

Dear Mr. Jawetz, by letter dated July 18, 2007, this office denied
your request for expedited processing. In that letter, you were
advised that you had 60 days to submit an administrative appeal to
the Associate General Counsel (General Law), Department of Homeland
Security, Washington, DC, 20528. Your letter of November 5, 2007
appears to be an appeal and should have been directed to that office.
(However, I note that your November 5, 2007 was submitted beyond the
scope of the 60 days, but that is a matter for the Associate General
Counsel to consider when reviewing your appeal.)

> -----Original Message-----
> **From:** Jawetz, Tom [mailto:tjawetz@npp-aclu.org]
> **Sent:** Monday, December 03, 2007 3:28 PM
> **To:** Gramian, Nikki
> **Cc:** Gallo, Katherine
> **Subject:** RE: OIG-2007-246
>
> Dear Ms. Gramian,
>
> Thank you for acknowledging receipt of my email and for asking for clarification. Unfortunately, I am
> unable to entirely respond to your first paragraph. It is certainly my hope that by providing you with
> additional information such as names, dates, and locations, I have made it easier for you to identify any
> responsive documents in the possession of the OIG pertaining to *those* detainee deaths. However, it is
> simply not possible for me to provide you with any additional information at this time regarding other in-
> custody deaths, because I simply do not have such information. ICE has stated publicly that 66 individuals
> have died in their custody since 2004. Despite my best efforts, I have been unable to collect the names of
> all of the detainees who have passed away during this period--if I had them, I would gladly provide them to
> you to assist you in your search. As you know, I also have a FOIA request pending with ICE, and if I obtain
> responsive documents from ICE I should be able to provide you with them to assist you further. However,
> as things stand, the Department of Homeland Security possesses all of this information, and the public
> possesses very little of it. If you require additional information to comply with your statutory duty to conduct
> a comprehensive search in response to my FOIA request, you will have to look elsewhere for assistance--
> at least until ICE provides me with more information to work with. It looks like maybe we are both in a
> difficult situation at this point.
>
> With respect to the remainder of your email, I apologize if I misunderstood your position on the telephone.
> I was obviously under the impression that you believed a search for Reports of Investigation would be done
> in an expedited manner, but that a more comprehensive search would take longer. I appreciate you
> clarifying that for me.
>
> Just so that I am clear, however, the main purpose of my November 5, 2007 letter was to ask the OIG to
> reconsider its decision to deny my request for expedited processing; I believe my request clearly satisfies
> the agency's statutory and regulatory requirements for such processing. In fact, on the same day I sent
> you a request for reconsideration, I sent a similar letter to Ms. Catrina M. Pavlik-Keenan, the FOIA officer
> who is handling my identical FOIA request for U.S. Immigration and Customs Enforcement. On
> reconsideration, Ms. Pavlik-Keenan recognized that the FOIA request satisfied the legal requirements for
> expedited processing, and agreed to my request. I have attached both my letter to Ms. Pavlik-Keenan

encouraging reconsideration and her response granting me expedited processing.  Please inform me whether the OIG also recognizes that this request meets the requirements and qualifies for expedited processing.

Thanks very much for working with me on processing this important request.

Tom

**From:** Gramian, Nikki [mailto:nikki.gramian@dhs.gov]
**Sent:** Wednesday, November 28, 2007 5:21 PM
**To:** Jawetz, Tom
**Cc:** Gallo, Katherine
**Subject:** RE: OIG-2007-246

Dear Mr. Jawetz:

Thank you for the list of names you provided in the attached email. This will greatly help our office in conducting our search for records.

Regarding your request, I have an additional clarifying question. In your email below, you indicated that "while this chart would help to provide you with some names for your search, I am absolutely not abandoning my request for **all** records pertaining to the deaths of ICE detainees." As indicated to you on the phone, without a name or other search terms, OIG is unable to conduct a search to see which one of the "66" incidents (that you referenced in your FOIA request as reported by ICE), were investigated by OIG. Therefore, my interpretation of your email is you are asking OIG to search its offices for records pertaining to the ICE detainees **listed** on the attached form you produced and that you want all records for these incidents. If this interpretation is incorrect, please clarify it for me.

Also, in your email below, you stated: "[Y]ou explained that if I only want the Report of Investigation you will be able to process that in a fast-track basis. I assume this means that in response to my Nov. 5, 2007 letter you have now concluded that my request warrants expedited treatment." You also stated, "I am willing to accept expedited production of Reports of Investigation, although I would ask that you continue to search for all exhibits to the ROI, including any and all Memorandums of Activity". Please understand that the purpose of my call to you on November 14th was to seek information from you regarding the scope of your request and to request information from you regarding search terms. In no way did I mean to indicate or imply that your request will be processed in an expedited manner.

Finally, regarding the queue in which your request will be placed, your email below states that although you will accept OIG Reports of Investigations, you are still requesting "all records" as well. Once OIG conducts its search for the names you specified below, and once OIG evaluates the number of responsive records, the status of the investigations (i.e., whether open or closed), etc., OIG will be in a better position to assess the complexity of the requested records and notify you of the queue where your request is placed.

I appreciate your assistance and further clarification of your request.

-----Original Message-----
**From:** Jawetz, Tom [mailto:tjawetz@npp-aclu.org]
**Sent:** Wednesday, November 21, 2007 10:38 AM
**To:** Gramian, Nikki
**Cc:** OIG, FOIA
**Subject:** FW: OIG-2007-246
**Importance:** High

Ms. Gramian,

I am attempting to send this email to you a third time. My previous two attempts have both bounced back because your mailbox is too full. The FOIA.OIG@dhs.gov mailbox also rejected the email.

In an effort to reduce the size of this email, I am no longer attaching a .pdf of the OIG's Semiannual Report to Congress from April 1, 2006-September 30, 2006. Please ignore the suggestion in the message below that this file is attached. Because this is a public document available on your website, I am sure you will be able to locate the relevant pages without much difficulty.

Please confirm receipt of this email. I look forward to your prompt reply.
Tom

---

**From:**  Jawetz, Tom
**Sent:**  Wednesday, November 21, 2007 10:24 AM
**To:**  'Nikki.Gramian@dhs.gov'
**Cc:**  'foia.oig@dhs.gov'
**Subject:**  FW: OIG-2007-246

Ms. Gramian,

I am resending this email because it bounced back when I sent it on Friday. It does not appear that I mistyped your address, so I do not know why it bounced back. In accordance with your suggestion, I am also copying the OIG FOIA email address.

Thank you in advance for responding promptly to this request.
Tom

---

**From:**  Jawetz, Tom
**Sent:**  Friday, November 16, 2007 2:53 PM
**To:**  'Nikki.Gramian@dhs.gov'
**Subject:**  OIG-2007-246

Ms. Gramian,

Thank you for calling me on Wednesday, November 14, to discuss my outstanding FOIA request. You explained on the phone that this request is complex because the topic is so broad. You stated that when you conducted a search using obvious search terms such as "alien", "death", and "detainee" you got 3000 hits, many of which were unrelated to the request.

You indicated that it would be extremely helpful if I could provide you names or other information to assist you in your search. I indicated that I can provide the names of about two dozen detainees and could direct you to some references to OIG investigations from the OIG's Semi-Annual Reports to Congress.

Finally, you explained that if I only want the Reports of Investigation you will be able to process that in a fast-track basis. I assume this means that in response to my November 5, 2007 letter, you have now concluded that my request warrants expedited treatment. Please let me know if this is incorrect. Unfortunately, you stated that if I wanted the exhibits for all of the Reports of Investigation that would delay the response.

In this email, I am including some material to assist you in your search.

FW: OIG-2007-246

First, I am including a chart containing the names or other identifying information for 24 detainees who have died since 2004. Although I expect that this will be of significant help to you, I think it is critical to point out that according to ICE, 66 detainees have died during this period. Therefore, while this chart should help to provide you with some names for your search, I am absolutely not abandoning my request for all records pertaining to the deaths of ICE detainees.

<<Chart of Known Deaths in ICE Custody 8.17.07.doc>>

Second, #s 14 and 15 from the above chart were definitely investigated by the OIG, because those investigations were documented in the OIG's Semiannual Report to Congress from April 1, 2006-- September 30, 2006 (attached). Page 26 refers to an ICE investigation into a suicide at a county contract facility. Page 27 refers to the death of a Cuban detainee at a contract facility operated by Corrections Corporation of America, Inc.

Third, #10 (the death of Mr. Sung Soo at Passaic County Jail on February 16, 2005) was also investigated by the OIG, according to the OIG's December 2006 Audit Report on Treatment of Immigration Detainees. On page 29 of that Audit Report, the OIG wrote that the OIG Office of Investigations was "reviewing the case to determine whether there was any impropriety by PCJ officials."

Fourth, I am personally aware that the OIG has received written requests to investigate several of the deaths on the chart, including, but not limited to, Reverend Joseph Dantica (#7); Sandra Kenley (#13); Maria Filomena Inamagua Merchan (#16); Abdoullai Sall (#20); and Victor(ia) Arellano (#22).

I hope that this information will assist you in responding to this FOIA request in an expeditious manner. I appreciate your offer to produce--in a fast-track manner--any Reports of Investigations pertaining to detainees who died in ICE custody. As I explained over the phone, I am willing to accept expedited production of Reports of Investigation, although I would ask that you continue to search for all exhibits to the Reports of Investigation, including any and all Memorandums of Activity. Similarly, I continue to request "All records, including written and electronic correspondence, pertaining to deaths in ICE custody." Hopefully the names that I provided to you will assist you in conducting that search, but I do not want this email to be mistaken as limiting my FOIA request only to Reports of Investigations.

Thank you very much. Please feel free to give me a call if you would like to discuss this further.


Tom




Tom Jawetz
Immigration Detention Staff Attorney
ACLU National Prison Project
915 15th Street NW
7th Floor
Washington, DC 20005
(202) 393-4930 (tel)
(202) 393-4931 (fax)
(202) 548-6610 (direct)

# EXHIBIT 5



U.S. Department of Homeland Security

425 I Street, NW
Washington. DC 20536

**U.S. Immigration
and Customs
Enforcement**

November 15, 2007

Mr. Tom Jawetz
Immigration Detention Staff Attorney
ACLU National Prison Project
915 15th Street, NW, 7th Floor
Washington, DC 20005

Re: **07-FOIA-52835**

Dear Mr. Jawetz:

This letter responds to your November 5, 2007 letter which requested that our office reconsider your request for expedited processing for your Freedom of Information Act (FOIA) request 07-FOIA-52835.

*Under the DHS FOIA regulation, expedited processing of a FOIA request is warranted if the request involves "circumstances in which the lack of expedited treatment could reasonably be expected to pose an imminent threat to the life or physical safety of an individual," 6 C.F.R. § 5.5(d)(1)(i), or "an urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information," 6 C.F.R. § 5.5(d)(l)(ii). Requesters that seek expedited processing must submit a statement explaining in detail the basis for the request, and that statement must be certified by the requester to be true and correct. 6 C.F.R. § 5.5(d)(3).*

I have reconsidered your request for expedited treatment and I have decided that you have demonstrated that the subject of your FOIA request would exceed the public's right to know about government activity generally. A good gauge of public interest is news coverage, and a preliminary search of the internet and other sources does reveal that the subject of deaths in the custody of Immigration and Customs Enforcement (ICE) is a topic of substantial news coverage.

If you need to contact us about this request, please refer to **07-FOIA-52835.** You may contact this office at (202) 732-0300.

Sincerely,

Catrina M. Pavlik-Keenan
FOIA Officer

www.ice.gov

EXHIBIT 27

U.S. Department of Homeland Security
Office of General Counsel
Washington, DC 20528

 **Homeland Security**

Tom Jawetz                                                              **JAN  4 2008**
ACLU National Prison Project
915 15th St., NW, 7th Floor
Washington, DC 20005-2112

RE: DHS08-052

Dear Mr. Jawetz:

This is in response to your letter dated December 7, 2007, appealing 2007-246, the July 18, 2007 adverse
determination concerning your Freedom of Information Act (FOIA request by Office of the Inspector General
(OIG). Your initial request asked for records about immigration detainee medical care.

The FOIA requires agencies to promulgate regulations providing for the expedited processing of requests if
the requester demonstrates a "compelling need." 5 U.S.C. § 552(a)(6)(E). DHS regulations governing
expedited processing of requests are located at 6 CFR § 5.5(d). OIG denied your request for expedited
processing because you failed to (1) provide evidence of your main professional activity, and (2) adequately
demonstrate a particular urgency to inform the public regarding the subject matter of your request. OIG also
informed you that any appeal of its initial determination must be received within 60 days of the date of the
July 18, 2007 response.

Pursuant to 6 C.F.R. § 5.9(a), appeals must be received within 60 days of the date of the letter denying your
request. Because your appeal is well past the 60 day filing requirement, you are hereby barred from filing a
FOIA appeal.

This decision is the final action of the Department of Homeland Security concerning your FOIA request.
Inasmuch as you consider this to be a denial of your appeal, you may obtain judicial review of this decision
pursuant to the provisions of 5 U.S.C. § 552(a)(4)(B) in the United States District Court in the district in
which you reside, or in which the agency records are situated, or in the District of Columbia.

Sincerely,

Victoria Newhouse
Attorney-Advisor

# EXHIBIT 28

**Jawetz, Tom**

| | |
|---|---|
| **From:** | Gramian, Nikki [nikki.gramian@dhs.gov] |
| **Sent:** | Monday, May 12, 2008 10:54 AM |
| **To:** | Kuehn, Stephanie; Jawetz, Tom |
| **Cc:** | Gallo, Katherine |
| **Subject:** | RE: OIG-2007-246 |

WELL DONE!  Thank you so much.

-----Original Message-----
From: Kuehn, Stephanie
Sent: Monday, May 12, 2008 10:35 AM
To: Jawetz, Tom
Cc: Gramian, Nikki; Gallo, Katherine
Subject: RE: OIG-2007-246

Good morning Mr. Jawetz,

I do understand that this issue has received quite a bit of media attention of late;
however, once a decision is made on expedited processing, it can't be reversed unless an
appeal is made to the Office of General Counsel (OGC), following the instructions outlined
in our response to your request for expedition. That appeal must be made within 60 days of
the receipt of our expedition response letter, and OGC must then decide whether expedition
is warranted.

In the meantime, your request is up in our queue and I've begun processing the records. As
I've explained before this is a very complex request, with a lot of records to review so I
can't estimate how long it will take to complete processing. Once I'm finished my initial
processing, the response package must also undergo another level of review before anything
can be released. We are working very hard to complete this as quickly as possible.

Thank you so much for your continued patience, Stephanie


-----Original Message-----
From: Jawetz, Tom [mailto:tjawetz@npp-aclu.org]
Sent: Monday, May 05, 2008 10:33 AM
To: Kuehn, Stephanie
Cc: Gallo, Katherine; Gramian, Nikki
Subject: RE: OIG-2007-246
Importance: High

Stephanie,

This morning, the New York Times printed an above-the-fold story that highlights the
problem of deaths in ICE custody.  As you know, I initially requested expedited processing
of my FOIA request and this request was denied.  I later filed a request for
reconsideration when additional information came out that heightened the importance of
expedited processing.  This request was denied, as was my appeal of that denial.

I am now asking that the OIG consider yet again the need for expedited processing of this
request.  That expedited processing is warranted cannot seriously be challenged--as I
mentioned months ago, ICE granted expedited processing of this very same request and
produced hundreds of pages of responsive documents.  The New York Times story today again
demonstrates that the government's efforts to investigate deaths in custody are of special
importance to the public.  Indeed, the government's investigation into the death of
Boubacar Bah is featured throughout the story and the New York Times reports that after
being told that an investigation was underway, subsequent requests for updated information
were ignored.

Rather than continuing to process this request in the ordinary queue, I would ask that you
recognize this request easily meets the statutory and regulatory requirements for
expedited processing and should be placed on the fast track.  If you are unable to revisit

1

this issue, please direct me to the person who is able to make that decision. The New York Times article is posted below. The New York Times website now has additional information, including a video of Boubacar Bah's family in Guinea, interviews with his relatives in the U.S., and additional stories.

Thanks very much,
Tom


May 5, 2008

Few Details on Immigrants Who Died in U.S. Custody

By NINA BERNSTEIN
<https://mail.dcaclu.org/exchweb/bin/redir.asp?URL=http://topics.nytimes
.com/top/reference/timestopics/people/b/nina_bernstein/index.html?inline
=nyt-per>

Word spread quickly inside the windowless walls of the Elizabeth Detention Center, an immigration jail in New Jersey: A detainee had fallen, injured his head and become incoherent. Guards had put him in solitary confinement, and late that night, an ambulance had taken him away more dead than alive.

But outside, for five days, no official notified the family of the detainee, Boubacar Bah, a 52-year-old tailor from Guinea who had overstayed a tourist visa. When frantic relatives located him at University Hospital in Newark on Feb. 5, 2007, he was in a coma after emergency surgery for a skull fracture and multiple brain hemorrhages.
He died there four months later without ever waking up, leaving family members on two continents trying to find out why.

Mr. Bah's name is one of 66 on a government list of deaths that occurred in immigration custody from January 2004 to November 2007, when nearly a million people passed through.

The list, compiled by Immigration and Customs Enforcement after Congress demanded the information, and obtained by The New York Times under the Freedom of Information Act, is the fullest accounting to date of deaths in immigration detention, a patchwork of federal centers, county jails and privately run prisons that has become the nation's fastest-growing form of incarceration.

The list has few details, and they are often unreliable, but it serves as a rough road map to previously unreported cases like Mr. Bah's. And it reflects a reality that haunts grieving families like his: the difficulty of getting information about the fate of people taken into immigration custody, even when they die.

Mr. Bah's relatives never saw the internal records labeled "proprietary information - not for distribution" by the Corrections Corporation of America, which runs the New Jersey detention center for the federal government. The documents detail how he was treated by guards and government employees: shackled and pinned to the floor of the medical unit as he moaned and vomited, then left in a disciplinary cell for more than 13 hours, despite repeated notations that he was unresponsive and intermittently foaming at the mouth.

Mr. Bah had lived in New York for a decade, surrounded by a large circle of friends and relatives. The extravagant gowns he sewed to support his wife and children in West Africa were on display in a Manhattan boutique.

But he died in a sequestered system where questions about what had happened to him, or even his whereabouts, were met with silence.

As the country debates stricter enforcement of immigration laws, thousands of people who are not American citizens are being locked up for days, months or years while the government decides whether to deport them. Some have no valid visa; some are legal residents, but have past criminal convictions; others are seeking asylum from persecution.

Death is a reality in any jail, and the medical neglect of inmates is a perennial issue. But far more than in the criminal justice system, immigration detainees and their families lack basic ways to get answers when things go wrong.

No government body is required to keep track of deaths and publicly report them. No independent inquiry is mandated. And often relatives who try to investigate the treatment of those who died say they are stymied by fear of immigration authorities, lack of access to lawyers, or sheer distance.

Federal officials say deaths are reviewed internally by Immigration and Customs Enforcement, which reports them to its inspector general and decides which ones warrant investigation. Officials say they notify the detainee's next of kin or consulate, and report the deaths to local medical authorities, who may conduct autopsies. In Mr. Bah's case, a review before his death found no evidence of foul play, an immigration spokesman said, though after later inquiries from The Times, he said a full review of the death was under way.

But critics, including many in Congress, say this piecemeal process leaves too much to the agency's discretion, allowing some deaths to be swept under the rug while potential witnesses are transferred or deported. They say it also obscures underlying complaints about medical care, abusive conditions or inadequate suicide prevention.

In January, the House passed a bill that would require states that receive certain federal money to report deaths in custody to their attorneys general. But the bill is stalled in the Senate, and it does not cover federal facilities.

The only tangible result of Congressional concern has been the list of 66 deaths, which names Mr. Bah and many other detainees for the first time, but raises as many questions as it answers.

For Mr. Bah's survivors, the mystery of his death is hard to bear. In Guinea, his first wife, Dalanda, wept as she spoke about the contradictory accounts that had reached her and her two teenage sons through other detainees, including some who speculated that Mr. Bah had been beaten.

In New York, a cousin who is an American citizen, Khadidiatou Bah, 38, said she was unable to bring a lawsuit, in part because other relatives were afraid of antagonizing the authorities.

"They don't want to push the case, or maybe they will be sent home," she said. "This guy was killed, and we don't know what happened."

Lingering Questions

The list of deaths where Mr. Bah's name surfaced is often cryptic. Along with 13 deaths cited as suicides and 14 as the result of cardiac ailments, it offers such causes as "undetermined" and "unwitnessed arrest, epilepsy." No one's nationality is given, some places of detention are omitted, and some names and birth dates seem garbled. As a result, many families could not be tracked down for this article.

But when they could be, they posed more disturbing questions.

In California, relatives of Walter Rodriguez-Castro, 28, said they were rebuffed when they tried to find out why his calls had stopped coming from the Kern County Jail in Bakersfield in April 2006. Then in June, his wife went to his scheduled hearing in San Francisco's immigration court and learned that he had been dead for many weeks, his body unclaimed in the county morgue.

The coroner found that Mr. Rodriguez-Castro, a mover from El Salvador in the country illegally, had died of undiagnosed meningitis and H.I.V., after days complaining of fever, stiff neck and vomiting. The cause of death on the government's list: "unresponsive."

Immigration authorities said on Friday that the case was now under review, but would not answer questions about it or other deaths on the list. Sgt. Ed Komin, a spokesman for the jail, said the death had been promptly reported to immigration officials, who were responsible for notifying families.

Four sons in another family, in Sacramento, described trying for days to get medical care for their father, Maya Nand, a 56-year-old legal immigrant from Fiji, at a detention center run by the Corrections Corporation in Eloy, Ariz. Mr. Nand, an architectural draftsman, had been ailing when he was taken into custody on Jan. 13, 2005, apparently

because his application for citizenship had been rejected, based on an earlier conviction for misdemeanor domestic violence. In collect calls, the sons said, he told them that despite his chest pains and breathing problems, doctors at the detention center did not take his condition seriously.

The Corrections Corporation said he had been seen and treated "multiple times." But a letter to the family from an immigration official said his treatment was for a respiratory infection. The letter said that Mr. Nand was taken to an emergency room on Jan. 25, where congestive heart failure was diagnosed, and that he "suffered an apparent heart attack while at the hospital." He died on Feb. 2, 2005, shackled to a hospital bed in Tucson.

Boubacar Bah had more going for him than many detainees. He had a lawyer and many friends and relatives in the United States, and his detention center in New Jersey was one of the few frequented by immigrant advocates.

But three days after he suffered a head injury in detention last year, no one in his New York circle knew that he was lying comatose in a Newark hospital, where he had already been identified as a possible organ donor.

"Thank you for the referral," an organ-sharing network wrote on Feb. 3, 2007, according to hospital records. "This patient is a potential candidate for organ donation once brain death criteria is met."

Four days after the fall, tipped off by a detainee who called Mr. Bah's roommate in Brooklyn, relatives rushed to the detention center to ask Corrections Corporation employees where he was.

"They wouldn't give us any information," said Lamine Dieng, an American citizen who teaches physics at Bronx Community College and is married to Mr. Bah's cousin Khadidiatou.

On the fifth day, they said, a detention official called them with the name of the hospital. There they found Mr. Bah on life support, still in custody, with a detention guard around the clock.

"There was one guard who knew Boubacar," Ms. Bah said. "He told me on the down-low: 'This guy, you have to fight for him. This guy was neglected.' "

Within the week, word of the case reached a reporter at The Times, through an immigration lawyer who had received separate calls from two detainees; they were upset about a badly injured man - named "something like Aboubakar" - left in an isolation cell and later found near death.

But advocacy groups said they were unaware of the case. And Michael Gilhooly, the spokesman for Immigration and Customs Enforcement, said that without the man's full name and eight-digit alien registration number, he could not check the information.

For those who knew Mr. Bah, it was hard to understand how such a man could lie dying without explanations.

"Everybody liked Boubacar," said Sadio Diallo, 48, who has a tailor shop in Flatbush, Brooklyn, where he and Mr. Bah had shared an apartment with fellow immigrants since arriving in 1998. "He's a very, very, very good man."

For six years, Mr. Bah had worked for L'Impasse, a clothing store in the West Village, sewing dresses that sold for up to $2,000 with what a former manager, Abdul Sall, called his "magic hands." Mr. Bah often spent Sundays at the Bronx townhouse his cousins had inherited from the family's first American citizen, a seaman who arrived in 1943.

In Africa, Mr. Bah's earnings not only supported his first wife, sons and ailing mother, but in Guinean tradition, allowed him to wed a second wife, long distance. It was his longing to see them all again after eight years that landed him in detention. When he returned from a three-month visit to Guinea in May 2006, immigration authorities at Kennedy Airport told him that his green card application had been denied while he was away, automatically revoking his permission to re-enter the United States. An immigration lawyer hired by his friends was unable to reopen the application while Mr. Bah waited for nine months in detention, records showed.

Mr. Bah died on May 30, 2007, after four months in a coma. His lawyer, Theodore Vialet, requested detention reports and hospital records under the Freedom of Information Act. But by the time the records arrived last autumn, the idea of a lawsuit had been dropped.

So Mr. Vialet just filed the records away - until a reporter's call about a name on the list of dead detainees prompted him to dig them out.

After the Fall

There are 57 pages of documents, some neatly typed by medics, some scrawled by guards. Some quote detainees who said Mr. Bah was ailing for two days before his fall on Feb. 1, and asked in vain to see a doctor.

The records leave unclear exactly when or how Mr. Bah was injured in detention. But they leave no doubt that guards, supervisors, government medical employees and federal immigration officers played a role in leaving him untreated, hour after hour, as he lapsed into a stupor.

It began about 8 a.m., according to the earliest report. Guards called a medical emergency after a detainee saw Mr. Bah collapse near a toilet, hitting the back of his head on the floor.

When he regained consciousness, Mr. Bah was taken to the medical unit, which is run by the federal Public Health Service. He became incoherent and agitated, reports said, pulling away from the doctor and grabbing at the unit staff. Physicians consulted later by The Times called this a textbook symptom of intracranial bleeding, but apparently no one recognized that at the time.

He was handcuffed and placed in leg restraints on the floor with medical approval, "to prevent injury," a guard reported. "While on the floor the detainee began to yell in a foreign language and turn from side to side," the guard wrote, and the medical staff deemed that "the screaming and resisting is behavior problems."

Mr. Bah was ordered to calm down. Instead, he kept crying out, then "began to regurgitate on the floor of medical," the report said. So Mr. Bah was written up for disobeying orders. And with the approval of a physician assistant, Michael Chuley, who wrote that Mr. Bah's fall was unwitnessed and "questionable," the tailor was taken in shackles to a solitary confinement cell with instructions that he be monitored.

Under detention protocols, an officer videotaped Mr. Bah as he lay vomiting in the medical unit, but the camera's battery failed, guards wrote, when they tried to tape his trip to cell No. 7.

Inside the cell, a supervisor removed Mr. Bah's restraints. He was unresponsive to questions asked by the Public Health Service officer on duty, a report said, adding: "The detainee set up in his bed and moan and he fell to his left side and hit his head on the bed rail."

About 9 a.m., with the approval of the health officer and a federal immigration agent, the cell was locked.

The watching began. As guards checked hourly, Mr. Bah appeared to be asleep on the concrete floor, snoring. But he could not be roused to eat lunch or dinner, and at 7:10 p.m., "he began to breathe heavily and started foaming slightly at the mouth," a guard wrote. "I notified medical at this time."

However, the nurse on duty rejected the guard's request to come check, according to reports. And at 8 p.m., when the warden went to the medical unit to describe Mr. Bah's condition, the nurse, Raymund Dela Pena, was not alarmed. "Detainee is likely exhibiting the same behavior as earlier in the day," he wrote, adding that Mr. Bah would get a mental health exam in the morning.

About 10:30 p.m., more than 14 hours after Mr. Bah's fall, the same nurse, on rounds, recognized the gravity of his condition: "unresponsive on the floor incontinent with foamy brown vomitus noted around mouth."
Smelling salts were tried. Mr. Bah was carried back to the medical unit on a stretcher.

Just before 11, someone at the jail called 911.

When an ambulance left Mr. Bah at the hospital, brain scans showed he had a fractured skull and hemorrhages at all sides of his swelling brain. He was rushed to surgery, and the detention center was informed of the findings.

But in a report to their supervisors the next day, immigration officials at the center described Mr. Bah's ailment as "brain aneurysms" - a diagnosis they corrected a week later to "hemorrhages," without mentioning the skull fracture. After Mr. Bah's death, they wrote that his hospitalization was "subsequent to a fall in the shower."

The nurse, Mr. Dela Pena, and the physician assistant, Mr. Chuley, said that only their superiors could discuss the case. The Public Health Service did not respond to questions, and the Corrections Corporation said medical decisions were the responsibility of the Public Health Service.

Mr. Bah's cousins demanded an autopsy, but the Union County medical examiner's confidential report was not completed until Dec. 6. It was sent to the county prosecutor's office only as a matter of routine, because the matter had been classified as an "unattended accident resulting in death."

Prosecutors said they did not investigate. "According to the report, Bah suffered a fall in the shower," Eileen Walsh, a spokeswoman for the prosecutors, said in an e-mail message. "We are not privy to any other bits of information."

In the home movies Mr. Bah made of his last journey home, he is only a fleeting presence: a slim man with a shy smile. But without his support, relatives in Africa say they have little money for food and none for his sons' schooling.

His body went back to Guinea in a sealed coffin.

"I stayed here seven years, waiting for him," his second wife, Mariama, said in French, recalling their long separation and the brief reunion that led to the birth of their son, now a toddler, while Mr. Bah was in detention.

"I wanted them to open the casket," she added, "to know if it was him inside. Until today, I cry for him."

---

From: Kuehn, Stephanie [mailto:Stephanie.Kuehn@dhs.gov]
Sent: Fri 4/25/2008 12:28 PM
To: Jawetz, Tom
Cc: Gallo, Katherine; Gramian, Nikki
Subject: RE: OIG-2007-246


Good afternoon Mr. Jawetz,

Thank you so much for your continued patience. Since we last spoke our office has been diligently working on our backlog of FOIA requests.
Unfortunately, I am unable to estimate when documents responsive to your request will be available for production as there are still several requests ahead of yours in the queue. We will begin reviewing the documents associated with your case once the requests ahead of yours have been satisfied.

As it pertains to Ahmed Tender, because our search is complete for your request #2007-246, you will need to submit a separate FOIA request for that information.

Thanks,
Stephanie


-----Original Message-----

From: Jawetz, Tom [mailto:tjawetz@npp-aclu.org]
Sent: Thursday, April 24, 2008 9:55 AM
To: Kuehn, Stephanie
Cc: Gallo, Katherine; Gramian, Nikki
Subject: RE: OIG-2007-246

Stephanie,

I hope you are doing well.  It has been one month since we last exchanged emails, and
would like to request an update on the status of OIG-2007-246.  As you probably know, the
DHS OIG appears to be nearing the completion of a special review into two detainee deaths,
which suggests that this issue will become increasingly important to the public in the
upcoming weeks and months.  It would be very helpful to know whether you have an estimate
of when the responsive documents will be ready for production.

I also wanted to request that the Office of Investigations run a quick search to find out
whether there are any documents pertaining to a man named "Ahmed Tender".  I was recently
informed that Mr. Ahmed Tender (no A# known) died on or about September 9, 2005 at the
Monmouth County Jail in New Jersey.  This death was not included in the list of deaths
produced to me by ICE in response to my FOIA request, so I was not able to provide the
name to you at an earlier date.  However, based upon the information that I have received,
Mr. Tender was a detainee in ICE custody and he did pass away while in ICE custody during
the relevant time frame, so documents pertaining to his death should be included in the
documents produced.

Thanks very much.  I look forward to hearing from you.

Tom

Tom Jawetz
Immigration Detention Staff Attorney
ACLU National Prison Project
915 15th St. NW, 7th Floor
Washington, DC 20005
(202) 393-4930 (tel)
(202) 393-4931 (fax)
(202) 548-6610 (direct)

-----Original Message-----
From: Kuehn, Stephanie [mailto:Stephanie.Kuehn@dhs.gov]
Sent: Wednesday, March 26, 2008 11:22 AM
To: Jawetz, Tom
Subject: RE: OIG-2007-246

We will certainly work on getting everything to you as quickly as possible. I will likely
be processing this; however, if you want you could direct any further inquiries to both of
us to be sure all bases are covered.

-----Original Message-----
From: Jawetz, Tom [mailto:tjawetz@npp-aclu.org]
Sent: Wednesday, March 26, 2008 11:01 AM
To: Kuehn, Stephanie
Subject: RE: OIG-2007-246

Thanks, Stephanie.  With that understanding, I would like to keep the request as is.  I
appreciate your efforts to explain the process to me, and look forward to receiving the
responsive records as quickly as possible.

If I would like to receive occasional updates on how the request is proceeding, should I
direct those questions to you or to Ms. Gramian?

Tom

-----Original Message-----
From: Kuehn, Stephanie [mailto:Stephanie.Kuehn@dhs.gov]

7

Sent: Wednesday, March 26, 2008 10:58 AM
To: Jawetz, Tom
Subject: RE: OIG-2007-246


Correct...If you told me today that you wanted the ROIs processed with the attachments it would return to the queue as a June 2007 FOIA; however, if you submitted a separate request for the attachments, that request would be processed as a March 2008 request.


Stephanie


-----Original Message-----
From: Jawetz, Tom [mailto:tjawetz@npp-aclu.org]
Sent: Wednesday, March 26, 2008 10:51 AM
To: Kuehn, Stephanie
Subject: RE: OIG-2007-246

Thanks Stephanie.  One final question, then.  If I were to file a separate request for the attachments, I assume I would be placed in the queue with a priority date of March 2008, rather than June 2007, right?
If I were to say today that I wanted the pending FOIA to proceed as written (the ROIs plus attachments) and it were put in the queue, would it be processed as a June 2007 FOIA or as a March 2008 FOIA?

Tom

-----Original Message-----
From: Kuehn, Stephanie [mailto:Stephanie.Kuehn@dhs.gov]
Sent: Wednesday, March 26, 2008 10:47 AM
To: Jawetz, Tom
Subject: RE: OIG-2007-246

Unfortunately we can't split up a request into different processing tracks. If you want us to process the ROI's without the attachments we can do so; however, you would then have to file a separate request for the attachments.

Stephanie

-----Original Message-----
From: Jawetz, Tom [mailto:tjawetz@npp-aclu.org]
Sent: Monday, March 24, 2008 11:05 AM
To: Kuehn, Stephanie
Cc: Gramian, Nikki; Gallo, Katherine
Subject: RE: OIG-2007-246

Thank you Stephanie,

I have one last question.  Would it be at all possible to have the ROIs processed without the attachments on a fast-track basis, while putting the remainder of the request (the attachments) in the queue to await processing?  If that is possible, that would be the best option given the circumstances.

Best,
Tom
-----Original Message-----
From: Kuehn, Stephanie [mailto:Stephanie.Kuehn@dhs.gov]
Sent: Wednesday, March 19, 2008 11:37 AM
To: Jawetz, Tom
Cc: Gramian, Nikki; Gallo, Katherine
Subject: RE: OIG-2007-246

Unfortunately, if the request is placed back in line for processing I can't estimate how long it will take to get to. Once it does come up in line I can say that processing just one complete ROI (with attachments) typically takes a lot of coordination with other entities and undergoes many levels of review which takes some time in itself. Since this request has at least 10 ROI's plus complaints and referrals, it could take quite a while

to process.


-----Original Message-----
From: Jawetz, Tom [mailto:tjawetz@npp-aclu.org]
Sent: Wednesday, March 19, 2008 11:23 AM
To: Kuehn, Stephanie
Cc: Gramian, Nikki
Subject: RE: OIG-2007-246

Thank you for your response, Ms. Kuehn.  I will definitely consider the options.  Can you provide me with any estimate for the amount of time it will take to review the records if I do not agree to narrow the scope of the request?

Thanks very much,

Tom


Tom Jawetz
Immigration Detention Staff Attorney
ACLU National Prison Project
915 15th St. NW, 7th Floor
Washington, DC 20005
(202) 393-4930 (tel)
(202) 393-4931 (fax)
(202) 548-6610 (direct)


-----Original Message-----
From: Kuehn, Stephanie [mailto:Stephanie.Kuehn@dhs.gov]
Sent: Wednesday, March 19, 2008 11:22 AM
To: Jawetz, Tom
Cc: Gramian, Nikki
Subject: RE: OIG-2007-246

Mr. Jawetz,


We have completed our search for records responsive to your request (which includes Mr. Alvarez, named in your below email) and determined that OIG has approximately 500 pages of documents responsive to your request as it is written. Of the names you identified, OIG has investigated at least 10. Other names were associated with complaints that were not investigated by OIG and were referred elsewhere.

Because of the volume and complexity of many of the documents that must be reviewed to respond to your request, and because of our limited staff at this time, we must place your request back in the queue to await processing; however, should you wish to narrow the scope of your request to only include the Reports of Investigation (ROI) OIG created for the named individuals (excluding any attachments), we should be able to process your request in a more timely matter. Please feel free to contact me or Ms. Gramian should you have any questions.


Thank you,

Stephanie L. Kuehn
Office of Counsel
Office of Inspector General
Department of Homeland Security


-----Original Message-----
From: Jawetz, Tom <tjawetz@npp-aclu.org>
To: Gramian, Nikki <nikki.gramian@dhs.gov>
Sent: Tue Mar 18 09:20:19 2008
Subject: RE: OIG-2007-246


Ms. Gramian,

I am writing to check in on the status of the Office of Investigations search.  Also, I recently learned of a detainee death at the Middlesex County Jail in New Jersey. According to the enclosed newspaper article, the detainee was held under the name Arturo Alvarez and he passed away on March 2, 2008 at St. Peter's University Hospital in New Brunswick, NJ.  When he was in the Department of Corrections custody, he was held under the name Arturo Suarez-Almenares.  As you can see from the article, Mark Vogler, Assistant Field Office Director for ICE's DRO office in Newark, NJ stated that the death was referred to ICE's internal affairs office--I do not know whrhter this means the death was referred to the OIG, OPR, OCRCL, or some other office.

Please add this man to the query that the Office of Investigations is currently running.

Thanks very much.  I look forward to talking to you.

Tom

_____

From: Gramian, Nikki [mailto:nikki.gramian@dhs.gov]
Sent: Friday, February 15, 2008 9:51 AM
To: Jawetz, Tom
Subject: RE: OIG-2007-246

Good Morning Mr. Jawetz:  I have asked the Office of Investigations to conduct a search for the names you produced.  I have received some interim search responses, but it is not completely done.  I will contact you as soon as it is completely done.  Thanks so much.

_____

From: Jawetz, Tom [mailto:tjawetz@npp-aclu.org]
Sent: Friday, February 15, 2008 9:43 AM
To: Gramian, Nikki
Subject: RE: OIG-2007-246

Ms. Gramian,

I hope you are doing well.  I am writing to follow-up on our previous conversations, and to see whether you have any more information about when I can expect a response to my pending FOIA request.  Please let me know if the responsive records search has been conducted using the names and A#s that I provided and, if so, how extensive the production will be.

Best,

Tom

_____

From: Gramian, Nikki [mailto:nikki.gramian@dhs.gov]
Sent: Friday, January 25, 2008 9:20 AM
To: Jawetz, Tom
Subject: RE: OIG-2007-246

Thank you Mr. Jawetz for the attached list.  I will use it to request a search of responsive records.  I will be in touch when I have a better idea of the volume of records.

-----Original Message-----
From: Jawetz, Tom [mailto:tjawetz@npp-aclu.org]
Sent: Friday, January 25, 2008 9:14 AM
To: Gramian, Nikki
Subject: OIG-2007-246

Dear Ms. Gramian,


Thank you very much for speaking with me this morning about the status of my pending request. As you mentioned, the request is still in the queue and is being treated as a complex request. Pursuant to our previous conversations, I am now providing you with a list of names for all detainees who have died in ICE custody since 2004-this information was recently provided to me by ICE pursuant to an identical FOIA request.


The list is attached as a .pdf document and contains 66 names and A numbers. In addition to these names, I am providing you with the name of a 67th detainee death: Cesar Gonzales-Baeza, who died on December 5, 2007 at the Mira Loma Detention Center.


As we discussed, with this list of names you will be able to run a search to find out how many responsive documents come up. If the request still involves an enormous number of records, you will contact me by telephone and we will discuss whether the request should be narrowed to include only ROIs. If the search shows that the production would not be too onerous, you should be able to process it more quickly than previously thought.


Thank you again. I look forward to hearing from you.


Tom


Tom Jawetz

Immigration Detention Staff Attorney

ACLU National Prison Project

915 15th Street NW

7th Floor

Washington, DC 20005

(202) 393-4930 (tel)

(202) 393-4931 (fax)

(202) 548-6610 (direct)

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| American Civil Liberties Union | United States Department of Homeland Security; United States Immigration and Customs Enforcement; Department of Homeland Security Office of Inspector General |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____88888_____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____11001_____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Margaret K. Pfeiffer (D.C. Bar No. 358723)
Lee Ann McCall (D.C. Bar No. 445740)
1701 Pennsylvania Avenue, N.W.
Washington, D.C.  20006-5805

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

● 2 U.S. Government Defendant

○ 3 Federal Question
(U.S. Government Not a Party)

○ 4 Diversity
(Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**○ A. Antitrust**

☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**○ E. General Civil (Other)**   OR   **○ F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☒ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

5 U.S.C. § 552, Freedom of Information Act claims principally seeking a reasonable search for, and expedited production of, agency records

**VII. REQUESTED IN COMPLAINT**    ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    **DEMAND $** _____    Check YES only if demanded in complaint    **JURY DEMAND:** YES ☐ NO ☒

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐ NO ☒    If yes, please complete related case form.

DATE June 25, 2008    SIGNATURE OF ATTORNEY OF RECORD *(signature)*

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.      COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.      CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.      CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.      CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.      RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.