UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

AMERICAN CIVIL LIBERTIES UNION, )
                                 )
              Plaintiff,         )
                                 )
         v.                      )    Civil Action No. 08-1100
                                 )              (RBW)
UNITED STATES DEPARTMENT OF      )
HOMELAND SECURITY, <u>et</u> <u>al</u>.,       )
                                 )
              Defendants.        )
                                 )
_____)

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S
   CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN REPLY TO
<u>PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

<u>PRELIMINARY STATEMENT</u>

In this action commenced by plaintiff American Civil
Liberties Union ("ACLU") under the Freedom of Information Act
("FOIA"), 5 U.S.C. § 552, plaintiff challenges the search and
processing of its access request with respect to three components
of the Department of Homeland Security ("DHS").  In particular,
plaintiff argues that the Office of Inspector General ("OIG") and
Immigration and Customs Enforcement ("ICE") have failed to
perform an adequate search for responsive records.  Plaintiff
further argues that OIG, ICE, and the Office for Civil Rights and
Civil Liberties ("CRCL") have improperly asserted certain FOIA
exemptions with respect to the responsive material located.
Plaintiff's arguments, however, are often based on mere
speculation and frequently ignore entirely defendants'

declarations and defendants' memorandum in support of their

motion for summary judgment ("Defendants' Mem.").

Accordingly, for the reasons set forth below, and those set

forth in defendants' prior memorandum, and based on all of the

declarations and <u>Vaughn</u> indices filed in this case, defendants

submit that they are entitled to judgment as a matter of law, and

plaintiff's cross-motion for partial summary judgment should be

denied.

ARGUMENT

I.   Defendants OIG and ICE Have Performed an
     <u>Adequate Search for Responsive Documents.</u>

A.   <u>Search by OIG</u>

Plaintiff argues that OIG "has failed to search for records

to (sic) all known deaths in custody."  Memorandum of Law in

Partial Opposition to Defendants' Motion for Summary Judgment and

in Support of Plaintiff's Cross-Motion for Partial Summary

Judgment ("Plaintiff's Mem.'), at 12.   Plaintiff's primary

arguments appear to be:

> (1) that OIG was deficient in its search because it
> limited its search for records using lists of "known
> deaths" that plaintiff produced; and
>
> (2) that OIG failed to make reasonable efforts in order
> to investigate and create a list of the names of
> detainees who died in DHS custody and then search for
> related records.

<u>See</u> Plaintiff's Statement of Material Facts as to Which There is

no Genuine Issue ("Plaintiff's Facts"), ¶¶ 4, 11, 14, 15, 16, 18,

-2-

19, 22, 36, and 47; Plaintiff's Mem. at 8-9.  Plaintiff is wrong on both points.

When OIG received plaintiff's request, OIG determined that plaintiff was primarily seeking records under ICE's purview, given that the request sought access to records on detainees who died while in the custody of ICE.  Declaration of Katherine Gallo ("Gallo Dec."), filed at Docket No. 27, ¶ 5 & Ex. 1.  OIG knew that plaintiff's request had been referred to ICE, and that ICE was the most likely DHS component to have records responsive to such a request.  Third Declaration of Katherine Gallo ("3rd Gallo Dec."), filed at Docket No. 27, ¶ 17.

OIG, therefore, called plaintiff on November 14, 2007, to discuss its FOIA request.  Id. at ¶¶ 12-13.  OIG informed plaintiff that the request appeared to seek information maintained by ICE.  During the conversation, plaintiff pointed out that item number 2(d) of plaintiff's request specifically asked for "reports of investigations into the circumstances surrounding the death[s of detainees], including all after-action reports and critical incident reports," and that plaintiff was aware that OIG investigated or issued reports on these deaths. See Gallo Dec., ¶ 18.

During this telephone call, and in a subsequent e-mail communication with plaintiff, OIG also informed plaintiff that OIG was having difficulty with the terms it was using to search

OIG's Investigative Data Management System for responsive

records.  See Gallo Dec., ¶¶ 19-21.  OIG asked plaintiff to

produce either the list of 20 detainees referenced in its FOIA

request or provide other search terms to assist OIG to conduct a

more thorough search.  See Gallo Dec., Exh. 6.  OIG also offered

to produce a redacted narrative of the results of its searches of

the Investigative indices so plaintiff could review the narrative

listing and determine what information plaintiff was seeking from

OIG's Investigative indices.[1]  See 3rd Gallo Dec., ¶ 13 & Exh. D.

Plaintiff refused this proposal.  Id.

Instead, on November 16, 2007, plaintiff e-mailed to OIG a

list of 24 names, stating:

> First I am including a chart containing the names or
> other identifying information for 24 detainees who have
> died since 2004.  Although I expect that this will be
> of significant help to you, I think it is critical to
> point out that according to ICE, 66 detainees have died
> during this period.  Therefore while this chart should
> help to provide you with some names for your search, I
> am absolutely not abandoning my request for all records
> pertaining to the deaths of ICE detainees.

See Gallo Dec., Exh. 6.  OIG interpreted this statement as a

request that OIG continue to search for the "66" deaths to which

plaintiff had referred.  Subsequent e-mail communications between

OIG and plaintiff confirmed for OIG that this interpretation was

accurate.  See Gallo Dec., Exhs. 6, 16, and 18.  All of these

---

[1] OIG would have first redacted identifying information on
third parties before providing such narrative listings to
plaintiff.

exhibits show that OIG was trying to obtain the names of "66" deceased detainees, and that plaintiff knew this.

On January 25, 2008, plaintiff produced to OIG a list of these 66 names.  Gallo Dec., Exh. 17.  Although plaintiff contends that it did not agree that OIG could limit its search to the names on this list, Plaintiff's Facts, ¶ 11, plaintiff did **not**, as it contends "expressly decline[] to agree that OIG could limit its search to those 66 deaths . . . ."  Plaintiff's Mem. at 12.  The exhibit in question on which plaintiff relies, Exhibit 17 to the Gallo Declaration, in fact states that plaintiff was providing OIG with a list of 66 detainee names, and the name of an additional 67th detainee who had died, and "<u>with this list</u> you will be able to run a search to find out how many responsive documents come up."  <u>Id</u>. (emphasis added).  Nowhere did plaintiff state, either expressly or impliedly, that OIG should conduct a search beyond the names provided by plaintiff.  <u>Id</u>.

In fact, on January 25, 2008, after receiving plaintiff's list, OIG e-mailed plaintiff and stated: "Thank you Mr. Jawetz for the attached list.  I will use it to request a search of responsive records."  Gallo Dec., Exh. 18 at p. 10.  Instead of writing back immediately to inform OIG that it was improperly narrowing its search, plaintiff waited until February 15, 2008, to communicate with OIG and then simply asked how the search was progressing.  <u>Id</u>.  Plaintiff was informed that OIG's Office of

Investigations had been asked "to conduct a search for the names you produced." Id.

Again, plaintiff raised no objection, waited approximately one month, and contacted OIG to ask about the status of the search. Id. at p. 9. In that e-mail, dated March 18, 2008, plaintiff informed OIG that it had recently learned the name of another detainee who had died, and plaintiff stated: "Please add this man to the query the Office of Investigations is currently running." Id. at p. 9.

As the foregoing shows, plaintiff was informed on more than one occasion that OIG's search was limited to the names he had provided to OIG, and it never objected or informed OIG that its search was too narrow. To the contrary, plaintiff's e-mail communications with OIG indicated that it believed that OIG's search was proceeding as plaintiff intended. Thus, there is no evidence that OIG improperly narrowed its search for responsive records by using the names of detainees provided by plaintiff as the basis of its search.

In interpreting plaintiff's FOIA request and in formulating its search based on that interpretation, OIG followed DHS's FOIA regulation at 6 C.F.R. § 5.3(b), which requires requesters to describe the records sought[2], and also requires OIG, as the

---

[2] "You must describe the records that you seek in enough detail to enable Department personnel to locate them with a reasonable amount of effort."  6 C.F.R. § 5.3(b).

recipient of the request, to discuss the request with the requester to resolve any questions regarding the scope or specificity of the records sought.[3]  As evidenced by Ms. Gallo's declarations and associated exhibits, OIG made telephone calls and corresponded extensively via e-mail with plaintiff in an attempt to obtain either **search terms or names** from plaintiff, because OIG's term searches had not been productive.  See Gallo Dec., ¶ 19, and 3rd Gallo Dec., ¶ 12.  None of the e-mail communications after plaintiff provided OIG with specific names to search indicated that plaintiff expected OIG to search beyond the names provided; those communications, as shown above, plainly indicate that OIG was proceeding with a name-based search, and that plaintiff knew this fact and tacitly approved of it. Plaintiff has produced no evidence to the contrary.

Plaintiff also claims that OIG was deficient in its search because on May 7, 2009, plaintiff sent correspondence to OIG that included a new list, produced by the New York Times, of detainees' deaths.  Plaintiff claims that OIG's prior searches were inadequate because they did not include searches for names on this May 2009 list.  Plaintiff's Mem. at 13-14.  Plaintiff's

---

[3]  "If a component determines that your request does not reasonably describe records, it shall tell you either what additional information is needed or why your request is otherwise insufficient. The component also shall give you an opportunity to discuss your request so that you may modify it to meet the requirements of this section."  6 C.F.R. § 5.3(b).

contention, however, conflicts with both DHS regulations and FOIA mandates.

DHS regulations provide for a "cut-off" date for search requests; otherwise, the temporal scope of a request would never end.  Therefore, "[i]n determining which records are responsive to a request, a component ordinarily will include only records in its possession as of the date the component begins its search for them.  If any other date is used, the component shall inform the requester of that date."  6 C.F.R. § 5.4(a).

OIG initiated its search for plaintiff's records using the first 24 names, and completed its search for plaintiff's records on March 19, 2008.  3rd Gallo Dec., ¶ 18.  Although OIG could have set the cut-off date earlier, _i.e._, the date that OIG began its search, OIG actually was more inclusive and used as its cut-off date the date the search ended.  _Id_.

Based on this March 19, 2008 cut-off date, any searches OIG conducted after March 19th were to double-check that all responsive records had been found in the initial searches up to March 19, 2008, and/or to include a search for records on any detainee not previously identified but who was discovered to have a date of death prior to OIG's completion of its search and the beginning of its processing of responsive records, which began on May 12, 2008.  _See_ Gallo Dec., Exh. 9, p. 1.  Therefore, although OIG had no obligation to conduct a new search in May of 2009 in

-8-

response to the new list provided by plaintiff, it did so for six of the names only because these detainee deaths had occurred <u>prior</u> to OIG's March 19, 2008 search cut-off date and OIG's May 12, 2008 processing date.[4] <u>See</u> 3rd Gallo Dec., ¶¶ 19-20. Contrary to plaintiff's claim, there is nothing "unreasonable" about OIG's decision to limit its search in this fashion in connection with the May 7, 2009 list provided by plaintiff. <u>See</u> Plaintiff's Mem. at 14. On the contrary, it shows the extra effort OIG was willing to go to in order to ensure that it performed a thorough search for responsive records while placing a reasonable limitation on the contours of that search consistent with DHS's regulation on a search cut-off date.

The Court of Appeals for this Circuit has upheld the imposition of a temporal deadline for a search for documents responsive to a FOIA request. For example, in <u>McGehee</u> v. <u>CIA</u>, 697 F.2d 1095 (D.C. Cir. 1983), <u>vacated on other grounds on panel reh'g & reh'g en banc denied</u>, 711 F.2d 1076 (D.C. Cir. 1983), a case on which plaintiff relies, <u>see</u> Plaintiff's Mem. at 14-15, the Court of Appeals indicated its approval of a "date-of-search"

---

[4] It should be noted that the second list plaintiff produced contained three names of deceased detainees who died in 2003. Records on these individuals were clearly outside the scope of plaintiff's FOIA request, which sought records on detainees who had died while in ICE custody since January 1, 2004. Nonetheless, OIG, while searching for records on the other detainees who had died prior to the March 19, 2008 cut-off date, included these three names in its search.

cut-off date because it would result in a broader search than a "date-of-request" cut-off date.  Id. at 1101; cf. Bonner v. U.S. Department of State, 928 F.2d 1148, 1152 (D.C. Cir. 1991( ("To require an agency to adjust or modify its FOIA responses based on post-response occurrences could create an endless cycle of judicially mandated reprocessing."); Afshar v. U.S. Department of State, 702 F.2d 1125, 1137 n.18 (D.C. Cir. 1983) (although the government declassified the requested documents after the cut-off date, remanding the case to take this change into account would conflict with FOIA's goal of speedy and final resolution of FOIA requests).  See, e.g., Edmonds Inst. V. U.S. Department of Justice, 383 F. Supp.2d 105, 111 (D.D.C. 2005) (rejecting date-of-release cut-off date in favor of date-of-search cut-off); Defenders of Wildlife v. U.S. Department of the Interior, 314 F. Supp.2d 1, 12 n.10 (D.D.C. 2004) (holding that agency's FOIA regulation establishing a date-of-search cut-off date meant that records created after that date were not covered by the FOIA request).

OIG expressly notified plaintiff of the cut-off date via e-mail, in response to plaintiff's request that OIG conduct additional searches for records pertaining to Mr. Tanveer:  "As it pertains to Ahmed [Tanveer], because our search is complete for your request #2007-246, you will need to submit a [new] FOIA request for that information."  See Gallo Dec., Exh. 19.

Plaintiff never objected to this cut-off date, nor did plaintiff assert in response that OIG was deficient in its search because it should have identified Mr. Tanveer as one of the deceased detainees.  It was clearly understood between OIG and plaintiff that the names of 69 deceased detainees provided by plaintiff were the foundation for OIG's search for records.

Finally, relying on <u>Defenders of Wildlife</u> v. <u>U.S. Border Patrol</u>, 2009 WL 1620790 at *7-8 (D.D.C. 2009), plaintiff argues that OIG's search was deficient because DHS did not use information in its possession to direct OIG to conduct an adequate search for responsive records.  Plaintiff's Mem. at 13. This claim is without merit.

First, upon receipt of plaintiff's FOIA request, DHS referred the request to the DHS components that it believed would have responsive records.   Second, the Court's concerns as expressed in <u>Defenders of Wildlife</u> v. <u>U.S. Border Patrol</u> were focused on the confusion that arose at the time DHS was created in 2003.  The case involved records that had been held by one former component of the U.S. Department of the Treasury, Customs Border and Protection, and two former Immigration and Naturalization Service ("INS") divisions, U.S. Border Patrol and Citizenship and Immigration Services, both under the purview of the Department of Justice, from which multiple DHS components were created.  The Court focused on DHS declarations expressing

confusion regarding the processing of FOIA requests and records held by these newly-created agencies.

By contrast, this case did not involve ambiguities regarding who had custody or control of records that were responsive to plaintiff's FOIA requests.  DHS determined immediately that OIG and ICE were likely to have responsive records and promptly referred plaintiff's request to those components.  Thus, the Court's findings in <u>Defenders of Wildlife</u> v. <u>U.S. Border Patrol</u> have no application to this case.

Moreover, when plaintiff submitted its FOIA request, there was no DHS requirement that all deaths of detainees be reported to OIG.  As Ms. Gallo explained:

> OIG does not track the names of all detainees who die in detention centers because it is not OIG's mission or function to detain illegal aliens or to document every detainee death. In fact, at the time Plaintiff submitted its FOIA request, there was no ICE policy or requirement in place requiring that detainees' deaths be reported to OIG.  Thus, if a death occurred while a detainee was confined in an ICE detention facility, OIG would not know of the death unless information was sent to OIG or a complaint filed with OIG to investigate the circumstances of the detainee's death.

3rd Gallo Dec., ¶ 15.  Although this policy subsequently changed, 3rd Gallo Dec., ¶¶ 15-16, citing Exh. E, the records sought by plaintiff pre-dated this change.  Therefore, because there was no such reporting requirement with respect to the records sought by plaintiff, it thus "becomes obvious why the 37 names, as well as the other four names that OIG searched for based on Plaintiff's

new list submitted on May 7, 2009, resulted in a `no records'
response [from OIG]."  3rd Gallo Dec., ¶ 20.  The response was
"no records" because OIG had not received notification of these
deaths, and thus had no corresponding records.

In sum, plaintiff provided the names of 69 detainees who
died, and OIG used those names to search for responsive records.
OIG also explained to plaintiff the problems that arose when OIG
attempted to identify responsive records by using terms other
than the names of detainees to search OIG's Investigative
database.  OIG then offered to provide plaintiff with OIG
investigative case narratives so plaintiff could review these
narratives and identify the specific records plaintiff sought.
Plaintiff rejected this proposal, leaving OIG with no choice but
to rely on the names provided by plaintiff.

Thus, OIG made a good faith and reasonable effort to search
for records responsive to plaintiff's FOIA request, and summary
judgment for defendants is warranted with respect to OIG's search
efforts.

B.   <u>Search by ICE</u>

Plaintiff acknowledges that ICE has performed multiple
searches for responsive records, which has resulted in several
significant releases of responsive information to plaintiff.
Plaintiff's Mem. at 9-10.  Plaintiff argues, however, that, like
OIG, ICE improperly failed to search for records concerning the

names of detainees included on the New York Times' list.  $\underline{Id}$. at
10.

The New York Times' list, which plaintiff calls the "Second
Death List," Plaintiff's Mem. at 10, includes deaths occurring in
ICE custody beginning October 2003 through February 7, 2009. 3rd
Gallo Dec., Ex. B.  Plaintiff's FOIA request, however, as
previously indicated. sought: "A complete list of individuals who
have died while in ICE **custody beginning January 1, 2004**."
Declaration of Catrina Pavlik-Keenan ("Pavlik-Keenan Dec."),
filed at Docket No. 27, Exh 1 (emphasis added).  The cut-off date
used by ICE was the beginning of ICE's search for responsive
records, which began on July 30, 2007.  Supplemental Declaration
of Catrina Pavlik-Keenan ("Supp. Pavlik-Keenan Dec."), filed at
Docket No. 27, ¶ 18.  To the extent that a death during the
relevant time period (January 1, 2004 through July 30, 2007) was
not searched for by ICE during its initial search, because ICE
did not have a record of that death in the tool created to
identify deaths in ICE custody, ICE has supplemented its search
to provide those records to plaintiff.  See Supp. Pavlik-Keenan
Dec., ¶ 104.  Plaintiff identifies no names on the New York
Times' list that fall within its FOIA request, and ICE's cut-off
date, that ICE failed to include in its search for responsive
records.

On August 10, 2009, ICE produced to plaintiff records

-14-

concerning Felix Rodriguez-Torres, a detainee who had died in the
custody of ICE whose name had not been uncovered during previous
searches.  Third Supplemental Declaration of Catrina Pavlik-
Keenan ("3rd Supp. Pavlik-Keenan Dec."), ¶¶ 2-5. 2-5.  Mr.
Rodriguez-Torres' name had not been included on ICE's first list
of detainee deaths because of "record keeping errors by ICE in
either the early development of the detainee death list and//or
updating that list after its creation." Loiselle Dec., ¶ 22.
Additionally, ICE searched for medical records of Mr. Rodriguez-
Torrez during its search for his records, but they were not in
ICE's custody. See 3rd Supp. Pavlik-Keenan Dec., ¶¶ 28-30.
Moreover, Mr. Rodriguez-Torres did not receive medical care in a
DIHS staffed facility.  3rd Supp. Pavlik-Keenan, ¶ 3.  ICE
requested medical records to update its records related to
detainee Rodriguez-Torres from the contract facility, which owned
those records after ICE completed its initial search for records
for Mr. Rodriguez-Torres and, therefore, produced medical records
for Mr. Rodrigues-Torres to plaintiff on September 4, 2009. See
Loiselle Dec., ¶ 114; 4th Supp. Pavlik-Keenan Dec., ¶ 10.

Plaintiff argues that, although certain medical records
pertaining to Mr. Rodriguez-Torres were produced to plaintiff,
ICE should be required to conduct a further search because
plaintiff has evidence that additional responsive medical records
exist that were not produced.  Plaintiff's Mem. at 15.

-15-

Plaintiff's request, however, is now moot.

Following ICE's search for records on Mr. Rodriguez-Torres, ICE made a request to the Contract Facility for medical records on him.  They were received and provided to plaintiff. Declaration of Mary Loiselle ("Loiselle Dec."), ¶ 114. As explained in the Fourth Supplemental Declaration of Catrina Pavlik-Keenan:

> Additionally, I want to clarify a statement concerning the search for medical records in my prior Declarations. DIHS and DRO did search for medical records for detainee Rodriguez-Torres and for all the other detainees who died in ICE custody.  At the time of the search concerning detainee Rodriguez-Torres, ICE did not have those medical records in its possession. In fact, the records were searched for in the DIHS Case Trakker, which is the only other place DIHS would have maintained these records, given this detainee's information was not in the detainee death database.    In August, after processing the records related to detainee Rodriguez-Torres, DRO requested medical records from the outside facility who owned those records. That facility provided those records to ICE.  Those medical records were provided to my staff and processed for release to plaintiff.

Id. at ¶ 10.

ICE did not have an obligation under the FOIA to request records which it did not have in its custody and control. However, since ICE received these records while this case was pending, ICE provided them to plaintiff.

Plaintiff further argues that since Mr. Rodriguez-Torres' name was not on ICE's list of detainee deaths because at the time of his death DIHS did not provide medical services at the

facility where he was detained, it is likely that there are more detainees in a similar situation whom ICE has failed to identify and include in its search.  Plaintiff's Mem. at 11.

On the contrary, ICE searched for responsive records in places likely to have such records, including searching for records of any previously unidentified deaths.  See Loiselle Dec., ¶¶ 13-23; 26-34; 35-140.  Moreover, ICE previously reasonably relied on its detainee death roster to locate records concerning detainee deaths.  This was created in order to identify persons who died in ICE custody.  Id., ¶ 24.  As Ms. Loiselle explains:

> Although this process uncovered that the DIHS detainee death roster did contain errors, ICE's reliance on this tool was reasonable.  This tool was created and designed for the very purpose of tracking detainee deaths in ICE custody in order to respond to government oversight groups and other requesters. ICE relied on this tool in good faith in responding to this FOIA request, even though it has now discovered through extensive additional searches and cross comparisons of various systems of records, resulting in the creation of new documents that would be used to conduct a new search, that the database contained errors.

Id.  See also Loiselle dec., ¶¶ 5-11.

Moreover, ICE has met its legal obligation in conducting a search that is reasonably calculated to uncover responsive documents.  ICE searched its headquarters and 24 field offices twice, searching for records related to detainees who died in ICE custody.  ICE's inability to locate every single record does not undermine its otherwise reasonable search.  E.g., Iturralde v.

<u>Comptroller of the Currency</u>, 315 F. 3d 311, 315 (D.C. Cir. 2003).  Moreover, when information came to light about a detainee death that ICE had not previously identified, ICE supplemented its search to locate any responsive records.  Loiselle Dec., ¶¶ 13-23; 26-34; 35-140.

Searching for records in ICE about a detainee death is best accomplished by using the detainee's name.  <u>See</u> 3rd Supp. Pavlik-Keenan Dec., ¶ 4. "This is because most records relating to detainees in ICE custody are located by using the individuals name and alien registration number or both.  Although other searches for records were conducted using search terms such as 'death' and 'dying' during the various offices in ICE that conducted searches, those terms are generally not the best terms to locate all records related to detainee's death."  <u>Id</u>.

Consequently, plaintiff's speculation that there could be other detainees such as Mr. Rodriguez-Torres does not undermine the demonstration by ICE that its multiple searches for responsive records have provided plaintiff with an adequate search under the FOIA.

Plaintiff also argues that ICE should be required to conduct a further search for e-mails maintained by DIHS.  Plaintiff's Mem. at 15-16.  Plaintiff claims that ICE's refusal to do so on the grounds of undue burden is without basis, because ICE could conduct such a search using the deceased detainees' names and

alien registration numbers, "once ICE has identified all
detainees who died during the relevant time period," instead of
using search terms such as "death" or "deceased", which ICE
argued were too broad.  Plaintiff's Mem. at 16.

ICE, in fact, has conducted such a supplemental search.  As
the accompanying Declaration of Capt. Marsha Davenport explains:

> In order to come up with an alternative method to
> locate and produce releasable portions of responsive
> emails relating to detainee deaths, DIHS identified the
> Directors and Medical Directors serving at the time
> period the deaths occurred. Due to there [sic] position
> and responsibilities, these persons were believed the
> most likely to have email traffic concerning the
> detainee deaths.

Id. at ¶ 24.  The e-mail archives of the these types of
individuals were searched by using the alien number or the names
of each of the 76 detainees on the listed appendix.  Id. at
¶¶ 25-26, Appendix A & B.  DIHS also searched its CaseTrakker
database and the Hospitalizations Database for responsive
records.  Id. at ¶¶ 29-31.  No responsive records were located in
these databases.  Id. at ¶ 31.

The Davenport Declaration explains in detail that any
further search by DIHS would be unduly burdensome.  Id. at ¶¶ 4-
23.  DIHS stores its e-mails in a system called "MIMOSA" and in
one called "PST".  Id.  As Ms. Davenport explains:

> Therefore the total cost for searching MIMOSA data base
> and all PST files on DIHS servers scattered on the DIHS
> network  is between $553,500 ($152,000 low estimate for
> MIMOSA  + $401,500 low end for PST Search),  and
> $633,900 ($228,000 high end for MIMOSA  + $405,900 high

end for PST search).  This effort will take an
estimated total of 5, 535 hours to 6, 339 man hours to
perform.

Id. at ¶ 22.

Consequently, DIHS has now conducted a reasonable electronic
search for responsive records.  Plaintiff's request for any
further search should be denied.

The foregoing demonstrates that ICE has performed adequate
searches for records responsive to plaintiff's FOIA request.
Accordingly, as with OIG, summary judgment on ICE's search
efforts is warranted.

II.  ICE Correctly Invoked Exemption 2 to
     Withheld Information Related to Detention
     Facility Procedures.

ICE invoked Exemption "high 2" to withhold certain
information the disclosure of which would risk circumvention of a
legal requirement.  See Crooker v. ATF, 670 F.2d 1051, 1074 (D.C.
Cir. 1981) (en banc).  In particular, ICE asserted Exemption 2 to
withhold information pertaining to detention facility procedures
that include intake procedures, security procedures, medical
procedures and suicide prevention at detention centers, detention
center staffing schedules and shift reports, and e-mails related
to detainee deaths.  Pavlik-Keenan Dec., ¶¶ 54, 62-66; 2d Supp.
Pavlik-Keenan Dec., ¶¶ 5, 13-14.

Plaintiff has challenged the withholdings in three
documents: "(I) a 25-page document containing 'intake procedures

-20-

and suicide prevention' procedures; (ii) a 16-page document containing 'security post procedures and general orders memorandum'; and (iii) a 43-page compilation of 'shift schedules and reports'." <u>See</u> Plaintiff's Mem. at 23-24 & Plaintiff's Facts, ¶¶ 43-44.  Although plaintiff concedes that "some information contained in these documents might jeopardize security and rightfully could be withheld under Exemption 2," plaintiff argues that "it is virtually certain that each of them contain responsive, disclosable and reasonably segregable material."  Plaintiff's Mem. at 24.

ICE reviewed the three documents at issue to determine whether any segregable information could be released to plaintiff.  As a result of this review, ICE reprocessed the 25-page document containing intake and suicide prevention procedures and released the majority of the document to plaintiff.  4th Pavlik-Keenan Supp. Dec., ¶ 11.  ICE believes that this reprocessing addresses plaintiff's concerns with respect to this document.

ICE has also reviewed the second document, the 16-page document concerning security post procedures and general orders.  ICE has concluded that this document can be released in full to plaintiff, and has done so.  <u>See</u> Fifth Supplemental Declaration of Catrina Pavlik-Keenan, attached.

As to the third document, the 43-page compilation of shift

schedules and reports, Ms. Pavlik-Keenan states:

> my office conducted another review of 3056-3098 to
> determine if any information could be segregated for
> release. As a result, we have determined the post
> locations listed on the document may be disclosed. The
> agency must still withhold the details of how each post
> was staffed. Therefore, ICE continues to withhold
> portions of this document pursuant to Exemption (b)(2)
> high, including: the identities, gender, number of
> guards at each post location, overall staffing level,
> as well as the time of the shift. ICE also continues
> to withhold the identities of law enforcement personnel
> pursuant to exemptions (b)(6) and (7)(C) -- it is
> important to note, however, that plaintiff has not
> challenged this assertion.

4th Pavlik-Keenan Supp. Dec., ¶ 14. Plaintiff offers no argument
that the categories of information ICE continues to withhold in
this document warrant release. See Plaintiff's Mem. at 23-25.

Accordingly, ICE is entitled to summary judgment on its
Exemption 2 claim. See Pavlik-Keenan Dec., ¶¶ 63-65.

III. OIG and CRCL Properly Withheld Certain
Information Protected by the Deliberative Process
Privilege and/or the Attorney Client Privilege.

A. Deliberative Process Privilege

1. OIG Documents

Plaintiff also challenges OIG's reliance on Exemption 5 for
a limited number of OIG records created by OIG's Inspection
review that resulted in the report titled, "ICE Policies Related
to Detainee Deaths and the Oversight of Immigration Detention
Facilities", OIG-08-52. See Plaintiff's Mem. at 18-21;
Plaintiff's Facts at ¶¶ 48, 49, 50. Specifically, plaintiff
challenges only OIG's processing of 55 Memoranda of Records

-22-

("MORs") included in OIG's work-papers in this inspection review, as well as the processing of an e-mail dated August 14, 2007.[5]

In response, OIG re-examined its withholdings of the 55 MORs (Document Nos. 129 and 137) and the referenced e-mail dated August 14, 2007 (Document No. 105), in order to comply with the Attorney General's new 2009 FOIA Guidelines that were issued after OIG had processed these MORs in 2008.  See 3rd Gallo Dec. at ¶¶ 21-24.  OIG invoked both Exemptions 5 and 6 to withhold information it excised from these records.  Exemption 6 was invoked to protect the names and identifying information of third parties (including statements made by interviewees that might identify the interviewees) referenced in these records. Plaintiff has not challenged the assertion of Exemption 6 in these documents.[6]  See Plaintiff's Mem. at 25-28.  OIG also invoked Exemption 5's deliberative process privilege to protect pre-decisional and deliberative information within such records.

OIG conducts independent investigations, audits, inspections, and special reviews of DHS personnel, programs, and operations to detect and deter waste, fraud, and abuse, and to

---

[5] The August 14, 2007 e-mail is OIG Vaughn document number 105; plaintiff's statement of material facts mistakenly refers to the e-mail as document number 104.  See Plaintiff's Facts, ¶ 50.

[6] Given that plaintiff has not challenged the Exemption 6 withholdings, plaintiff's objection as to how OIG marked these documents with respect to the Exemption 6 withholdings is unavailing.  See Plaintiff's Mem. at 19, n.2.

promote integrity, economy, and efficiency within the Department.
5 U.S.C. App. 3, §§ 4(a)(1), 6(a)(2).  OIG cannot fulfill these
duties if communications with third parties are chilled by third
parties' fears that their comments will be made public.
In the instant case, the OIG's work papers in an inspection are
at issue.  An inspection is defined as:

> a process that evaluates, reviews, studies, and/or
> analyzes the programs and activities of a
> Department/Agency for the purposes of providing
> information to managers for decision making; making
> recommendations for improvements to programs, policies,
> or procedures; and identifying where administrative
> action may be necessary.  Inspections may be used to
> provide factual and analytical information; monitor
> compliance; measure performance; assess the efficiency
> and effectiveness of programs and operations; share
> best practices; and inquire into allegations of fraud,
> waste, abuse, and mismanagement.

See *Quality Standards for Inspections* (January 2005) available
at: http://ignet.gov/pande/standards/oeistds.pdf.  *The Quality
Standards for Inspections* require an inspection to be documented
through work papers.

     OIG has submitted detailed declarations from Ms. Gallo that
explain the OIG audit/inspection process and the role that OIG
work papers play in documenting the mental impressions, advice,
opinions, and recommendations of the inspectors and supervisors
at the lower levels of the decisional process.  The First and
Third Gallo Declarations also clearly demonstrate the significant
role these staff level work papers play in OIG's deliberative
processes which, ultimately, lead to production of a final OIG

inspection report.  Ms. Gallo explained the steps involved in an audit and inspection and how the generated work papers document the **entire** body of collaborative work that is performed by the audit/inspection teams.  She explained how these memoranda summarize the inspectors' impressions of the information they obtain through site visits, interviews, meetings, and/or telephone conversations.  She also explained how these documents form the foundation for drafting the final inspection report. See First Gallo Decl. ¶¶ 35-50; see also Third Gallo Decl. ¶¶ 38-47.

Plaintiff disputes **none** of this.  Indeed, plaintiff does not even acknowledge the Gallo Declarations' discussion of the applicability of Exemption 5"s deliberative process privilege to these records.  See Plaintiff's Mem. at 18-20.  Accordingly, the representations made in the Gallo declarations stand unrefuted by plaintiff.

Releasing the deliberative opinions and impressions expressed by OIG inspectors, DHS employees, and other interviewees who provide their personal opinions, analyses, and criticisms to OIG, would significantly chill OIG's ability to obtain such information in future inspections and audits.  Such a release would discourage the candid exchange of ideas, analyses, and perspectives that are required in order for OIG to conduct a thorough, comprehensive, and independent inspection or audit –- a

consideration clearly recognized in the Inspector General Act's

confidentiality provision for certain information provided to the

OIG.  See 5 U.S.C. App. 3, § 7(b) (providing for confidentiality

of employee disclosures to the Inspector General).  See also 3rd

Gallo Dec., ¶ 41.

Ms. Gallo emphasized the significance of this process for

OIG's Audit and Inspection units:

> Discussions between interviewees and OIG
> auditors/inspectors reflect the give and take of agency
> deliberations.  If such discussions, or email
> communications were released to the public, **OIG would
> be hard-pressed to find cooperative individuals to
> provide information for an audit or inspection.**  Also,
> interviewees would filter information provided in such
> interviews because of their concerns on how the
> information would be perceived by the public, the
> media, and co-workers/supervisors.  Thus, other
> government employees and private citizens would be much
> more cautious and less transparent in their stated
> opinions and discussions on issues.  This would
> certainly hinder OIG in its inspection and auditing
> missions, by chilling full and frank discussions
> between agency personnel and devastating OIG's ability
> to foster forthright, internal discussions, both within
> OIG and also with other DHS employees – discussions
> required for OIG to properly conduct its investigative,
> audit, and inspection missions.

Gallo Dec., ¶ 48 (emphasis added).

Ms. Gallo further explained that most of these work papers

are a combination of facts intertwined with subjective opinions

offered by the interviewees, documents obtained from components,

and telephone conversations, and e-mail communications, and the

like.  Relying on their own experience and judgment, inspectors

sift through all materials, analyzing relevant facts in order to

formulate a conclusion regarding a specific review. The selection
and sifting of factual materials (as is the case here) is itself
the product of a government agency's deliberative process and,
therefore, entitled to the privilege.  See Moye, O'Brien,
O'Rourke, Hogan, & Pickert v. Nat'l Railroad Passenger Corp., 376
F.3d 1270, 1281 (11th Cir. 2004); Lead Industries Association,
Inc. v. OSHA, 610 F.2d 70, 85 (2d Cir. 1979); Montrose Chemical
Corp. v. EPA, 491 F.2d 63, 68 (D.C. Cir. 1974).  Ultimately, the
OIG work papers are summaries of the analytical processes used by
auditors/inspectors to formulate final conclusions.  They are
"building blocks" used by auditors/inspectors to form their
preliminary conclusions and findings -- findings that may or may
not ultimately be included in the final report.  See Gallo Dec.,
¶ 44.

Plaintiff argues that OIG inconsistently redacted quotes or
paraphrases of factual information and, therefore, "arbitrarily"
disclosed some factual information in the MORs while withholding
other factual information.  Plaintiff's Mem. at 19; Plaintiff's
Facts, ¶ 49.  Plaintiff's argument demonstrates exactly why the
MORs were withheld in full at the start -- attempting to
segregate factual information from the MORs is extremely
difficult.

Nonetheless, in light of the Attorney General's new
memorandum on FOIA processing, OIG reviewed the MORs and

attempted to release all segregable information while still withholding any identifying information or deliberative information.  Thus, if any factual information was redacted, it was because that information would either identify the interviewee or it was considered deliberative because it was selectively chosen.  Redacting the MORs was difficult because the facts are so intertwined with the deliberative information.  OIG should not be faulted for making additional releases to comply with the Attorney General's new FOIA guidelines.

Plaintiff also contests OIG's continued withholding of portions of an August 14, 2007 e-mail, consisting of the summary of an interview with a source who is identified in the e-mail, but asked for confidentiality and thus is referred to in the e-mail as an anonymous source.  This e-mail was drafted by the third party, and consists of information being sent to the Lead Inspector as a follow-up to a prior e-mail.  See OIG Vaughn Doc. 104.  Plaintiff argues that OIG has withheld facts that should be segregated and released.  Plaintiff's Mem. at 20.

OIG invoked Exemption 6 to redact the name of the person who wrote the e-mail, as well as information that would identify third parties referenced in the email; plaintiff does not contest this withholding.  OIG also invoked Exemption 5's deliberative process privilege to protect pre-decisional and deliberative information within this record.  See Gallo Dec., Exh. 35 at

Vaughn number 105.

Regarding the applicability of Exemption 5's deliberative process to the factual information in this document, OIG's compilation of information is not just limited to information from DHS components; rather, in an effort to obtain as much information as possible, OIG inspectors contact outside consultants, subject matter experts, and/or other third parties who possess special knowledge on a particular subject OIG inspectors are examining.  OIG inspectors concluded the individual in this e-mail possessed expertise or knowledge of a subject matter the inspectors believed might be useful to their review.  As such, this email constitutes a "work paper" that was formulated through online communications.  See 3rd Gallo Dec., ¶ 45.  The release of such preliminary and deliberative opinions and impressions of both third parties and the responding/reacting OIG inspector would chill individuals from expressing their candid opinions to OIG inspectors in future OIG inspections, thus precluding OIG from accessing a vital source of information in conducting an inspection/audit.  Id. at ¶¶ 46-48.

In addition, release of candid statements and opinions by persons OIG interviews would cause public confusion and bring into question why particular information provided by the third parties was not further reviewed or used in the OIG's final decision.  See id. at ¶ 50.  Therefore, protecting such

deliberative segments from disclosure protects against the public confusion that would result from disclosure of preliminary, examination, analysis, evaluation of a particular information OIG inspectors were exploring in their particular review, that do not, in fact, reflect the final topics, views, or policies of OIG as reflected in OIG's final report.  See, e.g., Russell v. Department of the Air Force, 682 F.2d 1045, 1048 (D.C. Cir. 1982).

The deliberative process privilege is designed to protect not only documents and information, but also the integrity of the deliberative process itself where the exposure of the process would result in harm.  E.g., Department of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8, (2001); NLRB v. Sears Roebuck & Co., 421 U.S. 132, 149 (1975).  OIG's work papers, therefore, meet the three policy purposes that have been held to constitute a basis for the deliberative process privilege:  to protect the open, frank discussions on matters of policy between subordinates and superiors; to protect against premature disclosure of proposed policies before they are finally adopted; and to protect against public confusion that might result from disclosure of reasons and rationales that were not in fact ultimately the grounds for an agency's action.  Id.; Coastal States Gas Corp. v. Department of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980).  The information withheld by OIG meets these three

objectives.  <u>See</u> 3rd Gallo Dec., ¶ 48-50.

Accordingly, OIG is entitled to summary judgment on its
invocation of Exemption 5 for the documents challenged by
plaintiff.

### 2.  <u>CRCL documents</u>

Plaintiff argues that CRCL improperly withheld several
documents in full under the deliberative process privilege and
that it is "unimaginable that they do not contain significant
segregable factual information."  Plaintiff's Mem. at 20-21.  In
particular, plaintiff challenges the withholding in full of: "(I)
CRCL's 'Case Opening Memorandum,' (ii) notes of interviews of
third parties, (iii) a 'close letter to complainant's counsel,'
(iv) final 'talking points' for use in response to media
inquiries; (v) a 'final report of CRCL's investigation', and (vi)
an 'expert report from OIG, with attachments, prepared by CRCL
experts examining a detainee death and medical standards in
detention facilities.'" Plaintiff's Mem. at 20; Plaintiff's
Facts, ¶ 53.

The rationale for withholding all of these documents was
specifically addressed in the Supplemental McNeely Declaration.
<u>Id</u>. at ¶¶ 9-11.  Plaintiff, however, does not even acknowledge
the existence of this declaration let alone make any attempt to
demonstrate how the reasons set forth in this declaration for
withholding these particular documents should be rejected.

For example, with respect to the only document that plaintiff discusses beyond including it in a list, plaintiff claims that any "conclusions" in CRCL's "final report" must be released.  Plaintiff's Mem. at 21.  Yet plaintiff offers **no** response to the explanation in the Supplemental McNeely declaration as to why this report is considered deliberative in nature.  <u>Compare</u> Supp. McNeely Dec., ¶3-9 <u>with</u> Plaintiff's Mem. at 20-21.

As Mr. McNeely explains, although the conclusions offered in the final report constitutes CRCL's final conclusions, they are, in fact, only recommendations as to conclusions within DHS.  The Secretary of DHS is free to reject both CRCL's factual findings as well as any advice given, and thus the report, and the conclusions reached, are predecisional and deliberative in nature.  McNeely Dec. ¶ 35; Supp. McNeely Dec., ¶¶ 5-7.  Release of this information not only would harm DHS's decision-making process, as outlined by Mr. McNeely, <u>see</u> Supp. McNeely Dec., ¶ 7, but it would also cause public confusion should DHS reject CRCL's factual findings and conclusions.  <u>Russell</u> v. <u>Department of the Air Force</u>, 682 F.2d at 1048.

CRCL's "talking points" are another clear example of deliberative material.  As Mr. McNeeley explains,

> At the time of these communications, no decision was made on how to respond, and a final agency action would consist of a press release or a discussion in a press conference.  Until that point, no decision has been

made on what DHS will actually say about a topic, and
release of these pre-decisional materials would hinder
the ability of DHS employees to have a candid exchange
of views regarding how to respond to such inquiries.
Therefore Exemption 5(Deliberative Process Privilege)
is asserted here.  Any factual matter withheld here is
inextricably intertwined with deliberative material.

Id. at ¶ 11.

As defendants stated in their prior memorandum, and
plaintiff does not dispute, Exemption 5 was enacted to prevent
the kind of harm that would flow to DHS's decision-making process
if deliberative materials such as those withheld by CRCL are
released.  See Defendant's Mem. at 10-12; Plaintiff's Mem. at 20-
21.  Therefore, CRCL's invocation of Exemption 5's deliberative
process privilege with respect to the documents identified by
plaintiff should be upheld.

B.  CRCL Properly Asserted the Attorney-Client Privilege

In this case, plaintiff objects to CRCL's assertion of the
attorney-client privilege with respect to certain information in
four of the six categories of CRCL documents listed above.  See
supra at 31 (categories (I), (ii), (iv) and (v)).  CRCL, however,
did not assert the attorney-client privilege with respect to
(iv), the "talking points."  See Supp. McNeely Dec., ¶ 11.

The information withheld in the other documents listed,
pursuant to the attorney-client privilege, was also withheld
pursuant to the deliberative process privilege.  Supp. McNeely
Dec., ¶¶ 8-9.  Accordingly, the Court need not reach the issue of

the application of the attorney-client privilege to these documents unless the Court concludes that the information withheld in them is not protected by the deliberative process privilege.

Plaintiff concedes that the documents at issue "likely contain information protected by the attorney-client privilege" but argues that "it is virtually certain that (I) the withheld interview notes and final CRCL investigative report contain disclosable factual information conveyed to third parties. . . ." Plaintiff's Mem. at 22.  Once again, plaintiff rests its entire argument on its mere speculation and does not even bother to respond to defendant's argument or the McNeely declarations addressing the invocation of this privilege.

Plaintiff's argument rests upon a faulty premise – _i.e._, any disclosure outside of CRCL waives the attorney-client privilege. This completely ignores Mr. McNeely's explanation of the role of counsel at CRCL and DHS.

The withheld information consists of legal discussions between DHS personnel and DHS attorneys relating to the conduct of the investigation, policy formulation and final recommendations, as well as discussions of ongoing litigation and legal aspects of DHS business processes.  McNeely Dec., ¶ 38; Supp. McNeely Dec., ¶¶ 8,-9, 16.  Mr. McNeely made clear that legal advice provided by DHS attorneys to DHS clients, and

communications by DHS clients seeking legal advice from DHS

attorneys, were not shared with third parties outside of DHS.

McNeely Dec., ¶ 38.  Plaintiff points to no evidence that

undermines this showing.

> Mr. McNeely explains that:
>
> The relationship between DHS attorneys and the DHS
> clients is at times complex.  DHS attorneys embedded
> with CRCL have a dual role in CRCL investigations, as
> do the DHS attorneys who support components under
> investigation by CRCL.  When CRCL conducts an
> investigation or offers advice to a component, a CRCL
> attorney advises CRCL on how to conduct its
> investigation, while also providing specialized legal
> advice to component legal counsel, on an as-needed
> basis, on civil rights and civil liberties laws that
> may apply to the investigation and final
> recommendations.  At the same time, component legal
> counsel advises its component clients on how to assist
> the CRCL investigation in a manner consistent with
> applicable laws, while also advising CRCL investigators
> and policy advisors, on an as-needed basis, on
> component-specific legal issues.  Because the DHS
> Office of General Counsel functions like a law firm for
> the Department, the corporate attorney-client
> relationship extends between any DHS employees, acting
> in their official capacity, seeking legal counsel from
> any member of the Office of General Counsel.

Id. at ¶ 39.

CRCL has asserted the attorney client privilege with respect

to the final report from CRCL to ICE, as that report was prepared

under the supervision of counsel assigned to CRCL, and it

contains legal analysis relating to the underlying allegations,

and mixed legal and policy advice offered to ICE.  Id. at ¶ 40.

"Breaching the attorney-client privilege in this context would

discourage components from seeking advice from the Office's legal

-35-

advisors and thwart the Office in its statutory duty to provide advice on civil rights and civil liberties issues, a role that necessarily entails providing legal advice." Supp. McNeely Dec., ¶ 7.

Thus, plainly, the disclosure of such information would strip away the very underpinnings of the attorney-client privilege generally, as clients would be less likely to candidly raise potential issues with counsel if they anticipated public disclosure of such matters, and the system as a whole would suffer. See Upjohn Co. v. United States, 449 U.S. 383, 392-97 (1981).

Because the communications withheld are properly exempt from mandatory disclosure as attorney-client privileged communications pursuant to Exemption 5, the determinations of CRCL should be sustained.

IV. OIG, CRCL and ICE Properly Applied
Exemptions 6 and/or 7(C) to the Withheld
Information Challenged by Plaintiff

A. OIG Properly Withheld Handwritten
Witness Statements

OIG withheld in full handwritten witness statements pursuant to Exemption 7(C), on the grounds that the handwriting could identify the witnesses, and plaintiff has not objected to the identities of these witnesses being withheld in other documents.[7]

---

[7] OIG also invoked Exemption 6 to withhold this information. 3rd Gallo Dec., ¶¶ 25-30. The Court, however, need not reach the

3rd Gallo Dec., ¶¶ 25-30.  Plaintiff contests only the withholding of two handwritten witness statements related to Victor Allerano's death.  See Plaintiff's Mem. at 27-28. Plaintiff asserts that it is not plausible that the handwriting could identify the writer because this would require possession of other writing samples of the writer and the employment of a handwriting expert to compare the samples with the released document.  Id., at 27.

On the contrary, handwriting can be identifying, especially where it is available to a limited group of persons, as anyone who works in an office environment is aware.  In this case, the handwritten statements at issue are known to have been created by witnesses at the specific location that housed Victor Allerano. Revealing those handwritten statements to the public, and thus to all persons who have worked in that facility, would render the writer of the statement subject to identification; no handwriting expert would be required.

Plaintiff argues that even if an invasion of privacy were plausible from disclosure of the handwritten statements, there is a significant public interest in knowing the facts contained in these statements.  Plaintiff's Mem. at 28.  Plaintiff also suggests that OIG "is hiding important information" by

---

issue of this higher standard, given the applicability of Exemption 7(C).

withholding these statements.  Id.  Not only is this charge baseless, but in making it plaintiff has failed to acknowledge that the facts contained in these statements have already been released to plaintiff in another format.

OIG has produced "typed" versions of information contained in both of these contested handwritten statements.  See 3rd Gallo Dec. ¶¶ 25-28, Exhibits H and I.  OIG released a "typed" paraphrased translation of the first handwritten statement.  With regard to the second handwritten statement, OIG released its Memoranda of Activity (MOA) which memorialized an OIG investigator's interview with the witness and contained paraphrased information from an interviewee's handwritten statement.  See id. & Exh. I; Gallo Dec., Exh. 10.  In fact, the MOA actually contained a more detailed account of the interview which was not contained in the handwritten statement.  3rd Gallo Dec., ¶¶ 25-28 & Exh. I.

As stated in Ms. Gallo's Third Declaration regarding the Spanish handwritten statement:

> OIG did not see any reason to have this statement translated again because the OIG investigator had already attached a "paraphrased" English translation. OIG can request to have the statement translated by a private translation company, should Plaintiff agree to pay the cost of doing so.  If so, OIG reserves the right to redact the name and identifying information of the witnesses from the translated statement, prior to any release.

3rd Gallo Dec., ¶ 28, n.6.  The same offer was made with respect

to the interviewee's handwritten statement that was written in English.  3rd Gallo Dec., ¶ 28, n.7.  Such an approach was upheld in <u>Church of Scientology of Texas</u> v. <u>IRS</u>, 816 F. Supp. 1138, 1160 (W.D. TX 1993).

Therefore, plaintiff's claim that the withholding of these handwritten witness statements has somehow deprived plaintiff of the facts contained in these statements is clearly without merit. Given that plaintiff has already been given the facts in these statements, OIG correctly concluded that release of the handwritten statements would shed no further light on the operations or activities of OIG, or, for that matter, the government.  Plaintiff offers no argument as to why the typed versions of these statements, with the facts contained therein, do not provide the factual information to which plaintiff claims an entitlement under the "public interest" standard of the FOIA. <u>Department of Justice</u> v. <u>Reporters Committee for Freedom of the Press</u>, 489 U.S. 749, 774 (1989); <u>Nat'l Archives & Records Admin.</u> v. <u>Favish</u>, 541 U.S. 157, 172 (2004).

       B.    CRCL Properly Withheld Documents
            <u>Pertaining to Maria Inamaqua-Merchan</u>

Plaintiff contends that CRCL improperly withheld in full documents pertaining to its investigation into the death of Maria Inamagua-Merchan.  Plaintiff's Mem. at 28-30. By letter dated May 7, 2009, plaintiff identified the specific documents subject to its challenge to the invocation of Exemption 6, which are CR

-39-

7246-660 - CR7246-716 and CR 7246-718.  Exh. A, filed at Docket

No. 28.  Plaintiff argues that CRCL failed to adequately describe

these documents in its <u>Vaughn</u> index and improperly withheld these

documents "solely on the grounds that the record includes some

information that identifies a person."  Plaintiff's Mem. at 29 &

n.6.

First, plaintiff is wrong with respect to its claim about

CRCL's <u>Vaughn</u> index.  The Supplemental McNeely Declaration, which

plaintiff ignores, provided additional information about the

records at issue.  <u>Id</u>. at ¶¶ 12-13.

The Supplemental McNeely Declaration explains that the

documents at CR 7246-660-CR 7246-716 consists of correspondence

with counsel for the estate or relatives of Ms. Inamagua-Merchan,

which had medical records attached.  Supp. McNeely Dec., ¶¶ 12-

13.  CRCL withheld this information under Exemption 6 of the FOIA

not because it identified Ms. Inamagua-Merchan but because

release of the substance of this communication would cause a

clearly unwarranted invasion of the personal privacy of "decedent

**and her survivors** and estate as they seek redress against the

Government."  Supp. McNeely Dec., ¶ 13 (emphasis added).  Thus,

the privacy interests of individuals who are alive are also at

issue, a point plaintiff seems to ignore entirely.  Courts have

recognized that survivors have cognizable privacy interests in

information pertaining to a decedent. <u>E.g.</u>, <u>NARA</u> v. <u>Favish</u>, 541

U.S. 157, 173-74 (2004).

Moreover, as Mr. McNeely explained, "the invasion of privacy would be significant enough to discourage current complainants and future complainants from reporting complaints to the Office and assisting in investigations." Id. at ¶ 12.  Plaintiff offers no response to this.

Plaintiff argues that both OIG and ICE have produced substantial information concerning deceased detainees, including medical records.  Plaintiff's Mem. at 30.  Plaintiff, however, does not claim that such released records were produced to the government by an attorney for the deceased detainees' relatives or estate beneficiaries.  Id.  Consequently, plaintiff's attempted analogy must fail because there are factual differences associated with CRCL's decision to withhold certain records pertaining to Ms. Inamagua-Merchan.

> C.   ICE Properly Withheld a Portion of a
>      Document Containing "Talking Points"

Plaintiff argues that ICE improperly applied Exemptions 6 and 7(C) to withhold a portion of a June 2007 ICE Office of Public Affairs document that included "talking points" concerning the deaths of detainees.  Plaintiff's Mem. at 30.  Plaintiff concedes that the information at issue pertains to detainees who were alive at the time the document was created, but then speculates that the information withheld relates to Francisco Castaneda, who died on February 16, 2008.  Plaintiff argues that

-41-

if the information pertains to now-deceased detainee Castaneda,
it must be released because the treatment of Mr. Castaneda "has
been a matter of particular public interest."  Id. at 31.

> The Fourth Pavlik-Keenan Declaration explains:
>
> Initially, ICE withheld the challenged portions of the
> record to protect the privacy interest of individuals
> whom ICE believed were not deceased and were the
> subject of ICE law enforcement actions.  As a result of
> this second review, ICE determined that one detainee is
> deceased, although his death did not occur while in
> ICE's custody.  ICE is now releasing to plaintiff the
> previously redacted paragraph relating to this
> individual. The other portions of the record withheld
> on pages 935-936 do not relate to detainee deaths.
> These sections relate to medical treatment of three
> detainees.  ICE has checked its known information
> concerning these detainees, all of whom are no longer
> in ICE custody, and has no information to conclude that
> these individuals have died.

Id. at ¶ 12.  Thus, even though the detainee at issue did not die
in ICE custody, and therefore information concerning this
individual was **not** responsive to plaintiff's FOIA request, ICE
has released information pertaining to the only known now-
deceased detainee mentioned in this document.  This appears to
resolve entirely plaintiff's argument concerning this document.

The foregoing demonstrates that OIG, CRCL and ICE are
entitled to summary judgment on plaintiff's Exemption 6 and 7(C)
claims.

## CONCLUSION

WHEREFORE, for all of the reasons set forth above, and in
defendants' prior memorandum, and in all defendants' declarations

and <u>Vaughn</u> indices, defendants respectfully submit that they are entitled to summary judgment, and plaintiff's cross-motion for summary judgment should be denied.

                    Respectfully submitted,


                    ___/s/_____
                    CHANNING D. PHILLIPS, D.C. BAR # 415793
                    Acting United States Attorney


                    ___/s/_____
                    RUDOLPH CONTRERAS, D.C. BAR #434122
                    Assistant United States Attorney


                    ___/s/_____
                    MARINA UTGOFF BRASWELL, D.C. BAR #416587
                    Assistant United States Attorney
                    U.S. Attorney's Office for the
                      District of Columbia
                    555 4th Street, N.W. – Civil Division
                    Washington, D.C. 20530
                    (202) 514-7226

-43-

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
AMERICAN CIVIL LIBERTIES UNION, )
                                )
              Plaintiff,        )
                                )
              v.                )    Civil Action No. 08-1100
                                )              (RBW)
UNITED STATES DEPARTMENT OF      )
HOMELAND SECURITY, et al.,       )
                                )
              Defendants.        )
                                )
_____)

ORDER

Upon consideration of Defendants' Motion For Summary
Judgment, Plaintiff's Cross-Motion for Partial Summary Judgment,
of all the papers filed in support of and in opposition to these
motions, and the entire record herein, and it appearing that the
grant of defendants' motion and the denial of plaintiff's motion
would be just and proper, it is by the Court this _____ day of __
_____, 2009,

ORDERED that Defendants' Motion For Summary Judgment be, and
it is, granted, and it is further

ORDERED that Plaintiff's Cross-Motion for Partial Summary
Judgment be, and it is, denied; and it is further

ORDERED that this case be, and it is, dismissed with
prejudice.

_____
UNITED STATES DISTRICT JUDGE