## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **AMERICAN CIVIL LIBERTIES UNION** | : | |
| | : | **Civil Action No. 08-1100** |
| | : | **(RBW)** |
| **Plaintiff :** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **UNITED STATES DEPARTMENT OF** | : | |
| **HOMELAND SECURITY, et al.** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

### DECLARATION OF MARY F. LOISELLE
Mary F. Loiselle, pursuant to 28 U.S.C. § 1746, declares as follows:

1.      I am the Deputy Director (DD) of the Office of Detention and Removal

Operations (DRO), within U.S. Immigration and Customs Enforcement (ICE), and have

held this position since October of 2008. In this capacity, I am responsible for employing

DRO resources to detain certain aliens while their cases are being processed and to

remove them from the United States when so ordered.  I have direct operational oversight

of five major program divisions and 24 field offices, accountability for the execution of a

$2.46 billion dollar budget and the management of approximately 7,000 staff.

Additionally I have responsibility for all detention programs managed by Federal, state

and local law enforcement agencies and private contractors in support of the ICE mission.

2.      Prior to occupying this position, I served as DRO's Assistant Director for

Management from February to October 2008.  In this capacity, I oversaw the Detention

Management, Removal Management, and Mission Support Divisions. Combined, these three divisions are responsible for developing and implementing strategies that support the detention and removal of removable aliens in the administrative custody of ICE. At any given time, there are approximately 32,000 detainees in over 300 Federal, state, and local facilities in ICE custody. Prior to holding these positions I served in the field including as the Field Office Director (FOD) in the Washington Field Office, as well as other various positions at both ICE, and its predecessor agency the Immigration and Naturalization Service (INS) since 1978.

3.     The statements contained in this declaration are based upon my personal knowledge and experience, and information conveyed to me by DRO employees in the the course of my official duties, including the individuals who personally searched for records in the DRO offices relevant to Plaintiffs' requests for information under the Freedom of Information Act (FOIA).

4.     The purpose of this declaration is to set forth the facts that led my office to locate records relating to nine persons who were not identified in ICE's consolidated lists of detainee deaths or the detainee death roster maintained by the Division of Immigration Health Services (DIHS), and provide the details of how DRO conducted a search for records related to those detainees deaths in response to plaintiff's FOIA request. Furthermore, this declaration sets forth the steps DRO has taken to review its records in order to identify any other deaths omitted from the detainee death roster from October 2003 until the present and or the consolidated detainee death list. After completion of this review, no other detainee deaths have been identified.

Background on the Initial Compilation of detainee death data

5.      Prior to December of 2004, neither ICE nor its predecessor INS maintained statistics or consolidated data regarding detainees who died in ICE custody. Prior to December 2004, the data about a detainee death was maintained in the regular course of business in the detainee's alien file.  ICE did not have an automated way to pull information from its databases regarding deaths that occurred while a detainee was in ICE custody.  The system used during this time period to record information concerning the case management of individual detainees' immigration proceedings was the Deportable Alien Control System (DACS) database.  The data fields in DACS did not include a field to enter data specifically for detainee deaths in custody.  As this was designed as a docket control system for immigration cases, DACS did have a code for "died" as reason for case closure.  However, this code did not correlate to deaths in detention—rather it included persons whose immigration case was closed due to death and was inclusive of both detained and non-detained aliens.  To determine if the person died in custody, multiple queries would have to be run.  Each returned record would have to be individually reviewed to determine if it related to a death in custody, to ensure the data entered accurately reflected that the returned record related to death and that such death occurred in custody.

6.      In early December of 2004, DRO management directed their staff to create a list of detainees who died in ICE custody.  This was done by requesting the FODs to provide information on all deaths in their area of operations beginning October 1, 2003. FODs were required to report information on any detainee deaths in their area of

3

operations to ICE Headquarters (HQ). It was believed the FODs would be the best sources for this information because there was no specific repository for the information and since the FODs had access to all local records and databases concerning the deaths in their area of operation, they would be in the best position to gather information available in the field regarding any such deaths that had occurred.

7.     The data provide from the field was then placed in a Microsoft (MS) Excel spreadsheet.

8.     Early in 2005, the spreadsheet was provided to DIHS, then a component of the Public Health Service within the Department of Health and Human Services. DIHS was, and is, the health authority for ICE. ICE asked DIHS to develop a database to collect all records into one place that related to detainee deaths, including medical records, autopsies and other reports, death certificates, and any other medical information relating to the detainees deaths.

9.     Soon thereafter, in order to assist DIHS in receiving timely information concerning detainee deaths, DRO added employees of the Office of the DIHS Director to the distribution list for Significant Event Notifications (SEN) when such reports related to detainee deaths. Moreover in mid-2005 DRO Detention Management Division (DMD) staff began working with DIHS staff in order to assist DIHS in its development of procedures to maintain a comprehensive database of information regarding detainee deaths in ICE custody.

10.     Once the detainee death spreadsheet was developed and turned over to DIHS, ICE relied on information contained in their detainee death database to identify persons who died in ICE custody. DIHS updated the database whenever it was notified of

a new death. Part of the process of updating the database was to request medical records concerning an identified death. This would include medical records, death certificates, autopsy reports and other investigatory reports. These documents would be requested from the institutions who owned these records. Medical records relating to health care provided by DIHS employees or contractors were easily obtained because these records were owned by DIHS. However, since a number of the detainees died while receiving medical care from outside entities, much of the documentation relating to many of these deaths, was not in the possession of DIHS or ICE and had to be collected from the outside entities who were the owners of the records. Some of these outside entities did not respond to agency requests to provide these records.

11.     From the DIHS database compiled during this time period, DIHS provided the original list (ICE 858- 861) of detainees who died in ICE custody in response to this FOIA. See Exhibit 1. This was produced by DIHS by pulling data from its database for the relevant period of time and placing the data in an excel spreadsheet. The FOIA requested information regarding detainees who died in ICE custody as of January 1, 2004. It took a number of months to create this document in the current format. As a result, DIHS included all deaths as of the last day that DIHS completed the spreadsheet. Additionally, this same database was the source of the consolidated detainee list of detainee deaths that was compiled and that ICE recently provided to Congress in June 2009[1] . Based on the best efforts of those who created the database and spreadsheets, ICE believed that this was a comprehensive list.

---

[1] The list provided to Congress was for a different time period that plaintiff's request. The list provided for Congress was inclusive of deaths between October 2003 and the information available as of June of 2009 when the list was updated by DIHS. See Supplemental Declaration of Catrina Pavlik-Keenan ¶ 18 footnote 2.

12.     On July 23, 2009, members of the DROHQ staff were notified that during this litigation OPR staff had located a record relating to a detainee who had died in ICE custody but whose name did not appear on the ICE consolidated list. This was the second detainee ICE learned had not been accounted for on this list since providing it to Congress. The other detainee had been identified in the spring of 2009 based on records located as a result of a search for records in the New York Field Office. [2]

### Comprehensive Review of ICE Data

13.     After learning that a second detainee who had died in ICE custody had not been included on the list, I and other members of ICE Management grew concerned that the detainee death list that ICE had been relying on to identify detainee deaths in ICE custody might still be incomplete. As a result, I tasked my staff to come up with a strategy to identify if any other detainees who had died in ICE custody were not included on the list.

14.     My staff undertook this review by the following methodology. First my staff undertook to collect the known sources of information concerning detainee deaths. At this phase of the review a group of individuals who had not participated in the collection of this data undertook a review of data to identify gaps in the reporting and to validate known deaths. This staff reviewed the following information: the comprehensive list (hereinafter "Congressional list") of detainee deaths in ICE custody that was provided to Congress on or about June 2009; a list of detainee deaths that OPR had received from DIHS (herein after DIHS list); and raw data from the ENFORCE alien removal database that is described more fully below. The congressional list was then compared against the DIHS and raw data from the ENFORCE Alien Removal Module

---

[2] See paragraph 103 of the Supplemental Declaration of Catrina Pavlik-Keenan.

(EARM) database consisting of detainees whose reason for release from detention was due to death.

15.    Each list was reviewed for any names that were not on every list and then compared to the most recent corrected queried list to ensure any mistakes on the original list provided to Congress were corrected.   Each detainee name on these lists was then researched in the EARM database for case history and case comments.   EARM is a portion of the ENFORCE database, which is the update to DACS.   Like DACS, EARM is a case management tool for immigration proceedings—and is not limited to aliens in detention but is inclusive of all aliens who are or have been in immigration proceedings. In addition, like DACS, it does not include a single field that accounts for detainee deaths that occur in ICE custody.   The tool was designed to track the management of immigration proceedings and although there are fields for adding notations- the data collected was meant to be focused on the case docket.

16.    In addition to researching case histories in EARM, my staff contacted appropriate field offices when necessary to verify the final disposition of the individuals who appeared on the respective lists.

17.    My staff then created another list by conducting further queries of the EARM database.   Ultimately, my staff had to run multiple queries in order to identify and verify detainee deaths in ICE custody.

18.    Specifically, EARM was queried for cases using two specific data fields identified within the EARM database as "Booked Out" and "Case Closure" between the dates of October 2003 and August 19, 2009.   The code "7" is used to close a case due to

the death of an alien any time prior to or after completion of immigration proceedings.[3] A query of that case closed field alone would identify records of all such persons and would not be limited to those who died while within ICE custody. For example, during the time period for this request, approximately 3000 persons died before or after final order in the immigration proceeding had issued. Only a small fraction of these persons were in ICE custody at the time of their death. Nonetheless, all of these persons would be identified as a result of a search based on use of this case closure code. In order to narrow the search to the relevant population of detainees who were actually in ICE custody when they died, an additional field was queried—that field was the "Booked-Out" field of "died." Simply put, this field indicates that a person was no longer in custody of ICE because they died. Through the use of these combined queries and by reviewing each name identified individually in EARM we were able to identify errors within the database that required correction.

19.     As an example, a detainee was booked out as "Died" but the case closure screen indicated the final case closure as "Removed". Utilizing this combination could have previously resulted in errors when requesting a specific query as identified above. Both fields needed to be queried to identify the persons who were in custody when they died—rather than persons whose immigration proceeding caused their immigration case to close, but did not die in custody.

20.     Upon identification of errors, the field offices were contacted to verify and to correct any and all database errors or conflicts in the data. Once all conflicts were reconciled a final query in EARM was conducted. To ensure the quality of that data each

---

[3] In some instances when a person is not in custody, there may be a gap in time between final order of removal and that person's removal. If an individual died prior to his or her removal, this would cause the update to the case closure field after the completion of the immigration proceeding.

identity was then verified as being a death in detention by researching via available database and making inquires to the relevant field offices.

21.    Research on the Congressional list determined that some of the data in the EARM database was miscoded such that detainees who died in ICE custody were not on the Congressional list. Errors were corrected to ensure data integrity. As described above the final list of detainees identified as having died in custody through the final EARM list was vetted, to ensure that the identities that were returned from the queries coded as having died in ICE custody—actually did die in custody. Any miscoded records identified through the Congressional list or the EARM research process that were returned in error were corrected. After this entire vetting process was completed, a final list was queried and vetted a last time to ensure accuracy. During the period of 2004 through 2006 nine persons were inadvertently left off the comprehensive list of detainee deaths prepared for Congress and from the smaller sub-list that had been prepared in response to this FOIA for request.

22.    Eight of the nine names who had not been included on the prior lists were detainees who were being housed in BOP facilities. BOP facilities are not under the direction and control of ICE. The omissions appear to be the result of poor record keeping errors by ICE in either the early development of the detainee death list and/or updating that list after its creation. Although all were closed out in DACS, using the correct codes, they were not reported to the list.

23.    The final results of this research were provided to ICE senior management, to include the FOIA office. This entire comprehensive review and correction of ICE EARM data and vetting that led to the identification of 9 deaths of ICE

9

detainees that had previously not been identified and the creation of a new list took extensive resources and man-hours to complete. Specifically, it took, four HQ staff officers, GS-1801-14, approximately 120 hours to complete this task.

24.     Although this process uncovered that the DIHS detainee death roster did contain errors, ICE's reliance on this tool was reasonable. This tool was created and designed for the very purpose of tracking detainee deaths in ICE custody in order to respond to government oversight groups and other requesters. ICE relied on this tool in good faith in responding to this FOIA request, even though it has now discovered through extensive additional searches and cross comparisons of various systems of records, resulting in the creation of new documents that would be used to conduct a new search, that the database contained errors.

25.     On the same day that my staff verified that nine new detainees were located and notification was made to the relevant ICE management, the ICE FOIA staff sent a tasking to my office to search for all records related to these nine detainees' deaths in related to this litigation. My staff in DRO HQ tasked the request to all relevant offices in HQ and the field. On or about the same time, the Assistant Secretary directed a thorough review of any and all records and databases to correctly identify any detainee who has died in immigration custody since the beginning of FY 04 (October 1, 2003) to the present. I therefore requested that all FODs conduct a review all records and data to identify any other omissions from the list.

### Searches in DRO HQ

26.     DRO HQ also conducted a search to locate records related to the nine additional persons who died in ICE custody. Specifically DRO HQ staff searched the

DRO HQ internal file share drive for all folders and sub-folders relevant to the nine designated detainee deaths referenced in this FOIA request. The DRO HQ share drive was searched because DRO staff used the share drive to maintain documents created relating to DRO HQ activities and would be the likely place to look for any HQ documents created relating to detainee deaths.

27.     During this search, to ensure that all responsive records maintained by its DMD were located, each of the nine detainee death cases occurring in the time period, FY04-FY06, was searched using queries, such as first and last name, first name, last name, respective alien number using various formatting i.e., with and without prefix "A" and zero and prefix "A" with zero. The outcome of these searches was the recovery of one SEN record from the DRO share drive SEN folder, which was related to the death of one detainee. Finally, one death certificate of the nine detainee deaths was located in the DMD S drive sub-folders entitled "Deaths Certificates & Autopsies."   In all, two responsive records were located during this search of the DRO HQ share drive.

28.     The automated DRO HQ share drive search was conducted using the Microsoft search tool. As noted previously, this search was conducted by using the "containing text field" and entering in each deceased detainee's alien registration number (various formats) to yield results. This field was used again to enter the detainees first and last names (various formats described above). This was done for each of the designated nine detainees who died in custody.

29.     In addition to the automated search described above which included all folders and subfolders of DMD, DRO conducted a manual review of the entire DMD electronic share drive folders, including the following DMD subfolders: Detainee deaths;

Deaths; SEN; DMCP; DHCU; DSCU; FOIA; Archive; Archive FY05; DFIG; Special

Assessments 2003; Special Assessments 2004; Special Assessments 2005; Special

Assessments 2006; Special Assessments 2007; Cuba; Site Assessments 2005; Site

Assessments 2006; Site Assessments 2007; Det Reviews 2003; Det Reviews 2004; Det

Reviews 2005; Det Reviews 2006; Det Reviews 2007; Det Reviews 2008; Deaths

Certificates & Autopsies; AS Notes & Taskings and FOIA 07-52835. This was

accomplished by reviewing all records in these sub-folders for responsive records. No

other records were located during this manual search.

30.    The SEN database was also queried and two responsive records relating to

the nine detainees were located there as well. Of the two records that were located in the

SEN database, one was identical to the SEN located in the SEN share drive folder.

31.    The EARM database was also queried to locate responsive records by

using the alien file number for each of the nine detainee deaths. It was used as a tool to

help locate records/data that may have been annotated in the case comments fields. The

result showed that in each of the BOP detainee death cases, the case category close out

was designated as "7-died". These records, along with the SEN records and the birth

certificate described above, were provided to the DRO HQ FOIA point of contact.

32.    Additionally, the DRO HQ staff searched in Office of Executive

Secretariat Information Management System (OESIMS)[4] for records related to these

same nine individuals. The search was conducted by Alien registration number both with

and without the letter A, and by last name of each individual.   No responsive records

were located.

---

[4] See paragraph 31 of the February 6, 2009 declaration of Catrina Pavlik-Keenan explaining the nature of
this database.

33.     Out of an abundance of caution, I tasked the following other offices to search for responsive records: The HQ Criminal Alien Program and the Operations Coordination Unit.  Although neither of these offices would be expected to have any relevant records related to detainee deaths in ICE custody, they were tasked to search their office electronic data storage and or paper files for any responsive records. No other records were located.

34.     No other locations within the DRO HQ Office would be expected to have information on the requested records.

### Field Office Searches

### Atlanta Field Office

35.     The Atlanta Field Office conducted a comprehensive search to locate records for the nine detainees who were newly identified as dying in ICE custody, two of whom were in the BOP Federal Correctional Institute (FCI) Butner medical facility in Butner, NC at the time of their death.  Specifically, the Atlanta Field Office instructed all employees to search their email records, to include personal archive folders, using the nine names and alien registration numbers provided. This included staff in all three states of the Atlanta Field Office Area Of Responsibility (AOR).  No records were located through these computer records searches.

36.     The office also conducted a search of its electronic shared files using the Microsoft search for files and folders function on the Microsoft start menu.  All subfolders were searched on the S:\ Share drive using the names and alien registration numbers of all nine aliens listed.  It was determined that these searches would most likely result in any responsive records to this request because it is the Atlanta Filed Office's

practice to maintain records concerning detainees by their name or alien registration number.

37.     Additionally the office searched its paper files.  These files were searched using the names and alien registration numbers of the detainees.  No paper records were located during this manual paper search.  Finally, the following employees checked folders and drives on their individual work station computers and their email files for responsive records:  The FOD, Deputy Field Office Director (DFOD) and Assistant Field Office Directors (AFODs).  These individuals, based on their position and responsibilities are the persons expected to most likely have responsive records of this nature in this office's AOR.  The searches conducted by these individuals included the detainees' names and alien registration numbers.  No responsive records were located. No other locations within the Atlanta Field Office would likely maintain records responsive to these nine detainees.  While the search was being conducted, however, for administrative purposes unrelated to this litigation, the Atlanta Field Office requested the FCI Butner medical facility to provide the Atlanta Field Office with medical records concerning the two ICE detainees who died in their facility.  These records were provided to the DRO HQ FOIA point of contact. Based on its distribution of work and record keeping practices, the Atlanta Field Office determined that no other location for which it had oversight would be expected to maintain records relating to these detainees' deaths.

38.     Additionally, in order to ensure the integrity of ICE record keeping on detainee deaths, the Atlanta Field Office also conducted a comprehensive search of all of its e-mail records and archives utilizing the terms "death" and "detainee death" to assist in identifying any previously unidentified deaths in the Atlanta AOR.  The results did not

reveal any previously unidentified alien deaths.

39.     Finally, the Atlanta Field Office has contacted both FCI Butner medical

facility and the Columbia Care Center (CCC), where alien deaths have occurred in the

past, and inquired if they are aware of any alien deaths not previously identified by ICE.

FCI Butner reported their databases are not designed to search the cross-referenced

criteria of inmate death and ICE detainer, but they are not aware of any deaths other than

the two already identified.  CCC was unable to provide any information indicating any

other detainee deaths other than those previously identified.

Baltimore Field Office

40.     The Baltimore Field Office conducted a comprehensive search to locate

records related to the nine detainees who were newly identified as dying in ICE custody.

Specifically, the office conducted a search of its electronic shared files using the

Microsoft search find function.  All subfolders were searched in this drive using the name

and alien registration number of those who died in ICE custody within Baltimore's AOR.

All employees also searched their emails using the name and alien numbers for these nine

detainees.  The Baltimore Field Office determined that these searches would most likely

result in any responsive records to plaintiff's request because it is the Baltimore Field

Office's practice to maintain records concerning a detainee by his/her name and alien

registration number. Records checks of the nine individuals listed rendered a negative

response, indicating that the nine individuals were never detained within the Baltimore

Field Office AOR.  Based on its distribution of work and record keeping practices, the

Baltimore Field Office determined that no other location for which it had oversight would

be expected to maintain records relating to these detainees' deaths.

41.    Furthermore, the Baltimore Field Office contacted all ICE detention
facilities within its AOR in order to ensure that all detainee deaths from October 1, 2003
to the present had been accounted for. This was accomplished by contacting all the
facilities that housed ICE detainees and asking each facility review a list of the detainees
who ICE's records indicated had died in their facility for this time period. Each facility
then reviewed its records to determine if the list left out any persons.   No responsive
records were located as a result of this process.

Boston Field Office

42.    The Boston Field Office conducted a comprehensive search to locate
records related to the nine detainees' who were newly identified as dying in ICE custody.
None of these nine detainees died in the Boston AOR.   Nonetheless, the following
individuals checked the computer drives on their individual work station computers and
their email files for responsive records: The FOD, the DFOD and four AFODs.   It is the
Field Office practice to keep any records of the type requested in the computer hard drive
and/or email archives to save space using paperless methods of records keeping.   These
six persons based on their position and responsibilities are the persons expected to most
likely have responsive records of this nature in this office's area of responsibility (AOR).
These individuals conducted their searches by using the detainees' names and alien
registration numbers, and the terms "detainee death" "suicide" and "detainee dying."
These terms were searched on their individual work station computer hard drive and
other drives by using the Microsoft search function located on the start menu of each
searching employee's computer. Each of these six employees also searched their
Microsoft Outlook Email including all folders and achieved folders for any responsive

records using the search terms listed above.   No records were located as a result of these searches.

      43.     The office conducted a search of its electronic shared files using the Microsoft search find function. All subfolders were searched in this drive using the names and alien registration numbers of these nine detainees.   These terms were queried both separately and together.  The Boston Field Office determined that using this search criterion would most likely result in the location of any records responsive to plaintiff's request because it is the Boston Filed Office's practice to maintain records relating to detainees by their name or Alien Registration Number.  Furthermore, the Boston Field Office also searched using the term "detainee death" to locate any other records on this topic.  No records were located as a result of these searches.  It is not the practice of the Field Office to save electronic records of the type requested in a "share" drive.  Most records are instead maintained in the individual computer hard drives and email archives of the employees who are working on these types of matters.

      44.     Additionally the office searched its paper files.  The paper files, if any, are maintained by individual employees, who may choose to print records for easier personal access to these records while working on a particular matter.  Each of the searching employees checked any paper files they individually maintained within the office for any records related the death of these nine detainees.  These files were searched using the name of the detainees as this would be the way to locate any record relating to any particular detainee.  No paper records were located during this manual paper search. Very few records within the Field Office are kept in paper form.  Those that are kept in paper form primarily relate to budget and employee issues.  No other places in the Boston

Field Office would be expected to have any relevant documents.

45.     Additionally, the Boston Field Office also conducted a comprehensive search of all of its records and databases to assist in identifying any previously unidentified deaths in ICE custody to ensure the integrity of ICE record keeping on detainee death. The terms "detainee death" "suicide" and "detainee dying" were used. No previously unreported deaths were found as a result of these searches. Based on its distribution of work and record keeping practices, the Boston Field Office determined that no other location for which it had oversight would be expected to maintain records relating to these detainees' deaths.

### Buffalo Field Office

46.     The Buffalo Field Office conducted a comprehensive search to locate records related to the nine detainees' who were newly identified as dying in ICE custody. Specifically, the office conducted a search of its electronic shared files using the Microsoft search for files and folders function on the Microsoft start menu.   All subfolders were searched on the Buffalo DRO network; drives using the names and alien registration numbers of the nine detainees who died, the office also searched using the words "death" and "died". These terms were queried both separately and together.

47.     Searches of EARM and the National File Tracking System (NFTS) were conducted for each of the nine detainees to research if they had ever been in ICE custody in the Buffalo AOR.  Although all nine persons were found in these systems, none of the nine had ever been in the Buffalo AOR.   Based on its distribution of work and record keeping practices, the Buffalo Field Office determined that no other location for which it had oversight would be expected to maintain records relating to these detainees' deaths.

48.     The Buffalo's electronic search of its shared files and folders was designed to identify any previously unidentified deaths in ICE custody to ensure the integrity of ICE record keeping on detainee death.  No previously unreported deaths were found as a result of these searches.  Moreover, there have been no deaths in the Buffalo AOR between 2003 and the present.

### Chicago Field Office

49.     The Chicago Field Office conducted a comprehensive search to locate records related to the nine detainees who were newly identified as dying in ICE custody. Of the nine detainees who died in ICE custody, four detainees died while detained at the Medical Center for Federal Prisoners in Springfield, Missouri, which is within the Chicago Field Office's AOR.   Specifically, seventeen members of the Chicago Field Office staff searched the following locations for any information relating to the deaths of these nine detainees: EARM; the SEN system; the Central Index System; the Chicago office S:\Share drive; individual work station computer files; email folders in Outlook; and office paper files.  The members of the Chicago Field Office staff who conducted these searches included a DFOD, three AFODs, four SDDOs, one Supervisory Detention and Removal Assistant (SDRA), and eight Detention and Removal Assistants (DRA). The duty stations for these staff members are located in the Chicago, Kansas City, and Springfield, Missouri, offices within the Chicago Field Office's AOR.

50.     EARM was searched by using each detainee's alien registration number as this was the most efficient way to locate each record within this system.  Responsive records were located for each detainee.  The contents of each record were printed and provided to the DRO HQ point of contact for review of the documents to determine if any

relevant portions of these records related to these detainees' deaths.

51.     The SEN database was searched by each detainee's name and alien registration number.  One responsive record was located by this search that related to a detainee who had died in the Medical Center for Federal Prisoners in Springfield, Missouri.  A copy of the document was provided to the DRO HQ point of contact.

52.     The Central Index System was searched by each detainee's alien registration number and responsive records were found within the Chicago Field Office's AOR for four of the detainees.  This search resulted in the location of these detainee's Alien Files.  The detainees' agency A-files were copied and provided to the DRO HQ point of contact for review of the documents to determine if any relevant portions of these records related to these detainees' deaths.

53.     The Chicago office conducted a search of its electronic shared files using the Microsoft search for files and folders function on the Microsoft start menu.  All subfolders were searched on the S:\ Share drive using the detainees' names and alien registration numbers.  These terms were queried both separately and together.  It was determined that these searches would most likely result in any responsive records to plaintiff's request because it is the Chicago Field Office's practice to maintain records concerning detainees by their name or alien registration number.  This Office also searched the share drive visually to locate any other responsive records.   No responsive records were located as a result of this search.

54.     Two AFODs and three SDDOs searched their individual work station computers and email files for responsive records.  These five persons, based on their positions and responsibilities, are the persons expected to most likely have responsive

records of this nature in this office's AOR. The searches conducted by these individuals included the detainees' names and alien registration numbers, and the terms "detainee death" and "detainee dying." Any responsive documents located were provided to the DRO HQ point of contact.

55.     The Kansas City and Springfield, Missouri, offices conducted a manual search of the office paper files. The search was conducted based on the detainees' names as the paper files are kept in alphabetical order and those identifiers would appear on any related paper documents. No responsive records were located by this search.

56.     Based on its distribution of work and record keeping practices, the Chicago Field Office determined that no other location for which it had oversight would be expected to maintain records relating to these detainees' deaths.

57.     The Chicago Field Office conducted a comprehensive search of its records and databases to assist in identifying any previously unidentified deaths in ICE custody to ensure the integrity of ICE record keeping on detainee deaths. This was accomplished by searching emails located on individual work station computers for the terms "detainee deaths". These checks resulted in no additional detainee deaths being identified.

58.     Furthermore, the Chicago Field Office contacted all IGSA and BOP facilities within its AOR in order to ensure that all detainee deaths from October 1, 2003 to the present had been accounted for. This was accomplished by contacting all facilities that housed ICE detainees and asking each facility to provide the Chicago Field Office with a list of detainees who died in their facility during this time period. Each facility then provided this information to the Chicago Field Office. The information from each facility was compared against ICE records.   No additional detainee deaths were

discovered during this review.

### Dallas Field Office

59.     The Dallas Field Office conducted a comprehensive record search to locate records related to the nine detainees' who were newly identified as dying in ICE custody.    Specifically the Dallas Field Office queried all nine detainees listed individuals through EARM to see if they had been in the Dallas AOR at any time during their removal proceedings or detention with the Immigration and Naturalization Service (INS) or Immigration and Customs Enforcement (ICE).   One case was found to have been in the custody of the BOP within the Dallas AOR.

60.     An AFOD searched the local network "share drive" for any records relating to the deceased person.  All subfolders were searched on the S:\ Share drive using the name and alien registration number of the detainee who died in ICE custody in Dallas' AOR.  These terms were queried both separately and together.  It was determined that these searches would most likely result in any records responsive to plaintiff's request because it is the Dallas Field Office's practice to maintain records concerning detainees by their name or alien registration number.  The AFOD also searched the share drive visually to locate any other responsive records.   There were no responsive records located on the share drive.

61.     An AFOD searched the office's paper files.  These files were searched using the name of the detainee as this would be the way to locate any record relating to any particular detainee.  No paper records were located during this manual paper search.

62.     The SEN database was queried for all SENs submitted by the Dallas Field Office from the month of the detainee's death to six months after the detainee's death.

The responses were then searched for the detainee's name and A-number. One SEN was located and was forwarded to the DRO HQ point of contact.

63.     An SDDO in Kansas City obtained and reviewed the Alien File for records relating to the detainee's death. Three documents were located—a death certificate and 2 letters concerning the detainee's death. All documents located were provided to the DRO HQ point of contact. Based on its distribution of work and record keeping practices, the Dallas Field Office determined that no other location for which it had oversight would be expected to maintain records relating to these detainees' deaths.

64.     Additionally, the Dallas Field Office conducted a comprehensive search of all of its records and databases to assist in identifying any previously unidentified deaths in ICE custody to ensure the integrity of ICE record keeping on detainee death. Specifically, the network share drive was searched using the term "death", and "died." No responsive records were found.  Managers who had worked for Dallas DRO since 2003 were asked for personal recollections, but none could remember any additional deaths. Finally, the Rolling Plains Regional Detention Center (RPRDC) was asked to search for any additional records. RPRDC located no additional records. RPRDC is the largest detention facility in the Dallas Area of Responsibility, and has been continually used for detention by Dallas DRO since the creation of ICE.

## Denver Field Office

65.     The Denver Field Office conducted a comprehensive search to locate records related to the nine detainees who were newly identified as dying in ICE custody. The Pueblo office within the Denver Field Office AOR is responsible for all ICE

detainees being detained in the BOP Complex located in Florence, Colorado. As such, the Denver Field Office leadership sent an e-mail to the Pueblo SDDO asking him to search the Pueblo records for any information relating to one detainee, who had previously been housed in a detention facility within the Denver Field Office AOR, but who had subsequently died while still in ICE custody after being transferred to the BOP facility in FCI Butner, North Carolina. No records regarding this detainee were located as a result of searching the Pueblo office records.

66.     To assist in locating any information in aid of this search, the Pueblo Office also conducted a search of the BOP database to use as a tool to locate any existing records regarding this individual that had not been located as a result of the Pueblo Office's other search efforts. The search of the BOP database revealed that this one individual had been detained at the FCI Florence, Colorado from February 1999 to February 2002. The Inmate History showed that the subject passed away in December 2004, at the Federal Medical Center, Butner, North Carolina due to Prostate Cancer -- over a year after he left the Denver AOR.

67.     Based on its distribution of work and record keeping practices, the Denver Field Office determined that no other location for which it had oversight would be expected to maintain records relating to the death of this detainee or any of the other detainees' deaths.

68.     The Denver Field Office also conducted a comprehensive search of all of its records and databases to assist in identifying any previously unidentified deaths in ICE custody to ensure the integrity of ICE record keeping on detainee deaths. Specifically, the Denver Field Office conducted a research of the common shared drive, the "S" drive

on the Denver Field Office server using the terms "Death" and "Died." Additionally, a

search was conducted Significant SEN database for all SENs from the Denver Field

Office between 2003, and the present. Each notification was then reviewed to determine

if any of the notifications concerned a death not previously identified. No records of

previously unidentified deaths in ICE custody were located.

Detroit Field Office

69.     The Detroit Field Office conducted a comprehensive search to locate

records related to the nine detainees' who were newly identified as dying in ICE custody.

None of these detainees died in the Detroit Field Office AOR. Specifically, the Detroit

Field Office leadership sent an e-mail to key Detroit AOR employees asking that they

search any agency records they individually maintained for any information relating to

the any of the nine cases where detainees died in ICE custody. They were instructed to

do so by searching their individual work station computers and email records by using

these detainees' names and alien registration numbers as search terms. This included staff

in both states of the AOR. No records were located through these individual work station

computer records searches.

70.     The office also conducted a search of its electronic shared files using the

Microsoft search for files and folders function on the Microsoft start menu. All

subfolders were searched on the S:\ Share drive using the names and alien registration

numbers of the nine detainees who died in ICE custody. These terms were queried both

separately and together. This office also searched the share drive visually to locate any

other responsive records. No information concerning the detainee deaths were located

during these searches.

25

71.     Finally, the following individuals checked their individual work station computers and email files for responsive records: An AFOD, SDDOs, and Detained Docket Deportation Officers.  These persons, based on their position and responsibilities, were persons expected to most likely have responsive records of this nature in this office's AOR.  The searches conducted by these individuals were conducted by using the detainees' names and alien registration numbers, and the terms "detainee death" and "detainee dying."  Based on its distribution of work and record keeping practices, the Detroit Field Office determined that no other location for which it had oversight would be expected to maintain records relating to these detainees' deaths.

72.     The Detroit Field Office's searched using terms "detainee death" and "death" and the visual review of the Detroit Field Office shared drives were designed to locate identifying any previously unidentified deaths in ICE custody to ensure the integrity of ICE record keeping on detainee death.  No previously unreported deaths were found as a result of these searches.  Based on its distribution of work and record keeping practices, the Detroit Field Office determined that no other location for which it had oversight would be expected to maintain records relating to these detainees' deaths.

<u>El Paso Field Office</u>

73.     The El Paso Field Office conducted a comprehensive search to locate records related the nine detainees' who were newly identified as dying in ICE custody. None of the nine detainees died or were ever in custody in this AOR.

74.     Specifically, the El Paso Field Office leadership sent an e-mail to all El Paso AOR employees asking that they search any agency records they individually maintained for any information relating to these nine detainees. They were instructed to

do so by searching their individual work station computers and email records by these detainees' names and alien registration numbers. This included staff in the two states of the AOR. No records were located through these individual work station computer records searches and this information was provided to the DRO HQ Point of contact for this request.

75.     The office also conducted a search of its electronic shared files using the Microsoft search for files and folders function on the Microsoft start menu. All subfolders were searched on the share drives using the names and alien registration numbers of the nine detainees who died in ICE custody. These terms were queried both separately and together. It was determined that these searches would most likely result in any responsive records to plaintiff's request because it is the El Paso Field Office practice to maintain records concerning detainees by their name or alien registration number. This Office also searched the share drive visually to locate any other responsive records. No responsive records were located for this request.

76.     This office maintains some of its records in a paper system. It is the practice of this office to track its records using the El Paso Field Office's Uniform Service Filing System (USFS). This is a legacy tracking system from the INS that helps the office maintain its records. This system uses a MS Excel spreadsheet to track the location in the office paper filing system. The El Paso Field Office searched the USFS to locate any records responsive to this request. The El Paso Field Office searched the USFS using the following terms: "detainee deaths", detainee names, and detainee file number. No responsive documents were located. Finally, the following individuals checked their individual work station computer and email files for responsive records: The DFOD, and

six AFODs.  These seven persons based on their position and responsibilities are the
persons expected to most likely have responsive records of this nature in this office's
AOR.  The searches conducted by these individuals included the detainees' names and
alien registration numbers, and the term "detainee death".  No responsive documents
were located. Based on its distribution of work and record keeping practices, the El Paso
Field Office determined that no other location for which it had oversight would be
expected to maintain records relating to these detainees' deaths.

77.     The El Paso Field Office's searches using the terms "detainee death" were
designed to locate any previously unidentified deaths in ICE custody to ensure the
integrity of ICE record keeping on detainee death.  No previously unreported deaths were
found as a result of these searches.

Houston Field Office

78.     The Houston Field Office conducted a comprehensive search to locate
records related to the nine detainees' who were newly identified as dying in ICE custody.
Specifically, the office conducted a search of its electronic shared files using the
Microsoft search for files and folders find function. All subfolders were searched in this
drive using the first last names of the nine detainees who died in ICE custody who were
the subject of the request. These terms were queried separately to maximize search
results. The Houston Field Office determined that these searches would most likely result
in any responsive records to plaintiff's request because it is an ICE practice to include the
first last name, or control name, in all records and written correspondence. Any
responsive records located were copied and provided to the DRO HQ Point of contact for
this request. This Office also searched the share drive visually to locate any other

28

responsive records.

79.     Additionally the office searched its paper files. The paper files relating to

detainee deaths are maintained by the office's Contracting Officer Technical

Representative (COTR) staff by name and alien registration number in a central filing

area. These files were searched using the name of the detainees as this would be the way

to locate any record relating to any particular detainee. No responsive records were

located.

80.     Finally, the following individuals checked their individual work station

computer and email files for responsive records: The AFOD assigned to detention facility

compliance and the supervisor of the Field Office's COTR staff. In addition, the

supervisor of the Field Office's COTR staff checked agency files that he individually

maintained for responsive records. These two persons based on their position and

responsibilities are the persons expected to most likely have responsive records of this

nature in this office's AOR. The searches conducted by these individuals included the last

names. In addition, the Field Office's FOIA POC surveyed all staff for additional

responsive documents in electronic and paper form relating to these nine detainees. Any

responsive documents located were provided to the DRO HQ point of contact. Based on

its distribution of work and record keeping practices, the Houston Field Office

determined that no other location for which it had oversight would be expected to

maintain records relating to these detainees' deaths.

81.     Additionally, as quality assurance for this process to ensure all Houston

area of operation deaths of ICE detainees were accounted for, contact was made with all

of the detention facilities.  Specifically, the supervisor of the COTR staff contacted

management at the BOP facilities in the Houston AOR, specifically the Federal

Correctional Complex in Beaumont, Texas; the Federal Detention Center in Houston,

Texas; and the Federal Correctional Institution in Three Rivers, Texas requesting the

identities of any ICE detainees who died in their facility.   None of these facilities

reported any deaths that were not previously identified in the ICE lists.

Los Angeles Field Office

82.     The Los Angeles Field Office conducted a comprehensive search to locate

records related to the nine detainees' who were newly identified as dying in ICE custody.

Specifically, the Los Angeles Field Office leadership sent an e-mail to all Los Angeles

AOR employees asking that they search agency records they individually maintained for

any information relating to all these nine cases where detainees died in ICE custody. Of

these nine detainees, one detainee died in this office's AOR at the Federal Correctional

Institution, Victorville, California. Employees were instructed to search their individual

work station computers and email records by using these detainees' names and alien

registration numbers as search terms. This included staff in all seven counties of the

AOR.  No records were located through these individual work station computer records

searches.

83.     The office also conducted a search of its electronic shared files using the

Microsoft search for files and folders function on the Microsoft start menu.  All

subfolders were searched on the S:\ Share drive using the names and alien registration

numbers of all detainees who died in ICE custody in Los Angeles's AOR.  These terms

were queried both separately and together.  It was determined that these searches would

most likely result in any responsive records to plaintiff's request because it is the Los

30

Angeles Field Office's practice to maintain records concerning detainees by their name or alien registration number. The Los Angeles Field Office conducted all electronic searches in the shared drives and emails by utilizing the "Search" feature in Windows Explorer for all hard drives and share drives, "Look For" feature in Outlook the employees email folders including archives . The terms "death" and "detainee death", were used to search all shared office files and folders.

84.   Any responsive records located were copied and provided to the DRO HQ Point of contact for this request.

85.   Additionally, the offices were instructed to search any paper files, including A-files, temporary files, or work folders. These files were searched using the names of the detainees and A-numbers, as this would be the way to locate any record relating to any particular detainee. Manual searches at book shelves containing memorandums, and cabinets of administrative records were searched for any records relating to these detainees deaths.

86.   Finally, the following individuals checked their individual work station computer and email files for responsive records: The DFOD and four AFODs. These persons based on their position and responsibilities are the persons expected to most likely have responsive records of this nature in this office's AOR. The searches conducted by these individuals included the detainees' names and alien registration numbers. Any responsive documents located were provided to the DRO HQ point of contact. Based on its distribution of work and record keeping practices, the Los Angeles Field Office determined that no other location for which it had oversight would be expected to maintain records relating to these detainees' deaths.

87.     The Los Angeles Field Office search using the terms "detainee death" and
"death" was designed to locate identifying any previously unidentified deaths in ICE
custody to ensure the integrity of ICE record keeping on detainee death. No previously
unreported deaths were found as a result of these searches.

Miami Field Office

88.     The Miami Office conducted a comprehensive search to locate records
related to the nine detainees' who were newly identified as dying in ICE custody.  This
was accomplished by having appropriate personnel conduct a comprehensive search of
all nine detainees   Miami Field Office staff that were indentified and conducted this
search included: one DFOD, one Deportation Officer and one DIHS Records Technician.
These staff members were selected to search because of their familiarity with HQ
directives, knowledge and awareness of the Detention Management Division, supervisory
experience, and medical records knowledge.

89.     A search to locate records related to the nine individuals was conducted in
the Krome Service Processing Center (KRO) and the DIHS KRO detainee processing
area.  These two areas were selected to be searched because these are the locations of
shared drives as well as where paper records related to the nine detainees would be
expected to be located. An electronic review of share and individual work station drives
of the employees listed above as well as database systems was conducted as part of this
search.  Specifically, the electronic search included ENFORCE Alien Detention Module,
MS Outlook (email), and the "S:/drive" Share drive.   The following terms were used as
keywords in this electronic search: alien number (specific by detainee), full name, and
date of death.  These terms were queried both separately and together. A search of all

32

electronic shared files using the Microsoft search for files and folders function on the Microsoft start menu and a search of individual work station computers provided negative results. A research of EADM disclosed that these nine detainees were not detained in the Miami Field Office's AOR. However, a search of DIHS records at this location did not result in the location of any responsive records or information concerning these nine detainees. Based on its distribution of work and record keeping practices, the Miami Field Office determined that no other location for which it had oversight would be expected to maintain records relating to these detainees' deaths.

90.    A quality assurance review was also conducted to ensure that all deaths in the Miami Field Office's AOR were accounted for on the consolidated ICE list of detainee deaths. A search was conducted at KRO because this is the processing facility of detainees in this area of operation. Specifically, an electronic search was conducted that included EADM, Outlook (email), and the "S:/drive" Share drive. EADM was queried for any detainee that was processed out of custody as having died. This search of EADM did not result in the discovery of any previously unidentified deaths within the Miami Field Office. The following terms were used as keywords in the electronic search of Outlook and the "S:/drive" Share drive: death and suicide. These terms were queried both separately and together. A search of all electronic shared files using the Microsoft search for files and folders function on the Microsoft start menu and a search of individual work station computers provided negative results.

91.    A search was also conducted of all hard copy paper files maintained by the Miami Field Office. These paper files are maintained alphabetically in a central filing area. To ensure thoroughness, all working folders maintained by individual employees

were also checked.   This search resulted in no records found relating to any of the nine

individuals or any previously unidentified deaths within the Miami Field Office area of

operations.  No other places in the Miami office would be expected to have any relevant

documents.  This search resulted in no records found relating to any unidentified deaths

in ICE custody within the Miami Field Office.

### New Orleans Field Office

92.     The New Orleans Field Office conducted a comprehensive search to locate

records related to the nine detainees' who were newly identified as dying in ICE custody.

Specifically, the New Orleans Field Office leadership sent an e-mail directing staff to

search agency records they individually maintained for any information relating to these

nine individuals.   They were instructed to do so by searching their individual work

station computers and email records by these detainees' names and alien registration

numbers. No records were located through these individual work station computer

records searches.  The office also conducted a search of its electronic shared files using

the Microsoft search for files and folders function on the Microsoft start menu.  All

subfolders were searched on the S:\ Share drive using the names and alien registration

numbers of these nine individuals.   These terms were queried both separately and

together.  It was determined that these searches would most likely result in any

responsive records to plaintiff's request because it is the New Orleans Field Office's

practice to maintain records concerning detainees by their name or alien registration

number.  This Office also searched the share drive visually to locate any other responsive

records.  No responsive records were located.

93.     Additionally, the following individuals checked their individual work

station and shared drives and email files for responsive records: The Acting FOD, Acting

DFOD and three AFODs.   These five persons based on their position and responsibilities

are the persons expected to most likely have responsive records of this nature in this

office's AOR.  The searches conducted by these individuals included the detainees'

names and alien registration numbers, and the terms "detainee death" and "detainee

dying."  No responsive documents were located.  Based on its distribution of work and

record keeping practices, the New Orleans Field Office determined that no other location

for which it had oversight would be expected to maintain records relating to these

detainees' deaths.

94.     In order to certify that there have been no unreported deaths in custody,

the New Orleans Office conducted a search of electronic records using the terms

"detainee death" and "dying." These terms were designed to locate or identify any

previously unidentified deaths in ICE custody to ensure the integrity of ICE record

keeping on detainee death.   No previously unreported deaths were found as a result of

these searches.

New York Field Office

95.     The New York Field Office conducted a comprehensive search to locate

records related to the nine detainees' who were newly identified as dying in ICE custody.

Specifically, the New York Field Office leadership sent an e-mail to employees asking

that they search agency records they individually maintained for any information relating

to the nine deceased detainees listed in the tasking who died in ICE custody.  These

employees were instructed to do so by searching their individual work station computers

and email records by the detainees' names and alien registration numbers. No records

35

were located through these individual work station computer records searches.  Of the

nine, one detainee was in detained in the New York Field Office AOR from June 27,

1990 to July 24, 1990, almost 14 years prior to his death on May 7, 2004.  And another

detainee was detained in the New York Field Office area of operations from March 26,

1986 to  January 21, 1987, 19 years prior to his death on March 30, 2006.

96.      The office also conducted a search of its electronic shared files using the

Microsoft search for files and folders function on the Microsoft start menu.  All

subfolders were searched on the Share drive using the alien registration numbers of the

nine deceased detainees listed in the tasking who died in ICE custody.  It was determined

that these searches would most likely result in any responsive records to plaintiff's

request because it is the New York Filed Office practice to maintain records concerning

detainees by their name or alien registration number.  This Office also searched the share

drive visually to locate any other responsive records. New York Field Office does not

generally maintain paper records due to space limitations.  No other places in the New

York Field Office would be expected to be where the requested records would be located.

No records were located.   Based on its distribution of work and record keeping practices,

the New York Field Office determined that no other location for which it had oversight

would be expected to maintain records relating to these detainees' deaths.

97.      Additionally, New York Field Office conducted a comprehensive search of

all of its records and databases to assist in identifying any previously unidentified deaths

in ICE custody to ensure the integrity of ICE record keeping on detainee death.  Upper

management to include SDDOs and AFODs conducted a search of their hard drives,

individual drives on their work station computers and share drives using the search

criteria "death, dead, died, and suicide" Moreover, employees to include upper

management, or employees who worked in the New York AOR during the timeframe of

October 2003 to the present were asked if they had any personal recollections of any

detainee deaths in this AOR other than those previously reported and accounted for.

None of these employees had such recollections.

### Newark Field Office

98.     The Newark Field Office conducted a comprehensive search to locate

records related to the nine detainees' who were newly identified as having died in ICE

custody.   Specifically, each unit within the DRO Newark Field Office conducted a

search of their electronic records and manual records for any information relating to these

nine individuals.  Each AFOD and SDDO from each unit completed a search of his or her

individual work station computers and email/Outlook records by using the detainees'

names and alien registration numbers as search terms.  Email searches were conducting

accomplished by using the Microsoft Outlook Email including all folders and archived

folders for any responsive records using the search terms listed above.  In addition, these

terms were searched on the hard drives and individually maintained local drives of

individual work station computer by using the Microsoft search function located on the

start menu of each searching employee's computer. Employees also searched folders and

subfolders on electronic media such as thumb drives using the complete last name of the

names provided as well as each last name separately.  No responsive records were

located.  Of note, none of the nine detainees who were the subject of this search died in

the Newark AOR.

99.     The Newark Field Office also conducted a search of its electronic shared

files using the Microsoft search for files and folders function on the Microsoft start menu. All subfolders were searched on the Share drive using the nine individual's names and alien registration numbers. No records were located through these searches.

100. Additionally, the AFOD for Administration/Congressional Relations and Media Affairs conducted a manual search of paper records. The Newark Field Office generally maintains paper files other than the alien files with the AFOD for Administration/ Congressional Relations and Media Affairs and such paper files are maintained in the administrative inquiry unit safe. Paper records are maintained by name and /or management referral/fact finder number. The manual search was conducted and no responsive records were located. The Newark Field Office determined based on its distribution of work and record keeping practices that no other location within the area it oversees would be expected to maintain records responsive to this request related to these nine detainees.

101. Additionally, the Newark Field Office conducted a comprehensive search of all of its records and databases to assist in identifying any previously unidentified deaths in ICE custody to ensure the integrity of ICE record keeping on detainee death. All shared drives and paper files were manually searched and searched using the terms "detainee death" or "ICE death in Custody." Additionally, the SDDO and AFOD for the detained unit checked their individual work station drives and/or external media and/or drives. There are no other locations in the Newark Field Office that would be expected to maintain the requested records. No previously unreported deaths were found as a result of these searches.

<u>Philadelphia Field Office</u>

38

102.    The Philadelphia Field Office conducted a comprehensive search to locate records related to this request.  Specifically, the Philadelphia Field Office leadership sent an e-mail to an AFOD and Deportation Officer requesting they search electronic databases and agency records they individually maintained for any information relating to the one detainee's death who was housed in the Philadelphia AOR prior to his death at a BOP facility.  They were instructed to conduct searches to include a search of computer databases to identify information by searching Outlook, shared drives, EARM and NFTS records by utilizing the detainees' names and alien registration numbers as search terms.

103.    All searches conducted in MS Outlook and of the network drives failed to reveal any responsive records.  Searches were conducted on electronic shared files using the Microsoft search for files and folders function on the Microsoft start menu.  All subfolders were searched on individual work station computers and shared drives using the name and alien registration number for the detainee who was thought to have died in the Philadelphia AOR.   MS Outlook advanced searches were also conducted utilizing the name and alien registration number for the subject.

104.    To aid in discovering where records may be located, the Philadelphia Field Office conducted research concerning this detainee in the BOP database. As a result of this research, Philadelphia Field Office staff learned the subject was in detention at Allenwood Federal Prison known as the Allenwood Low Security Correctional Federal Institute from November 3, 2003, through January 13, 2004, when he was transferred to FCI Butner in North Carolina.  The subject subsequently passed away in FCI Butner on March 10, 2004. As described above, the Philadelphia office reviewed its records to locate any information concerning this detainee's death including records related to

notification of this Field Office of detainee's move from the Allenwood to FCI Butner
and or his death. No records were located.

105.    While the search was being conducted, however, for administrative
purposes unrelated to this litigation, the Philadelphia Field Office coordinated with the
Atlanta Field Office to request medical records from FCI Butner concerning this
detainee.

106.    Based on its distribution of work and record keeping practices, the
Philadelphia Field Office determined that no other location for which it had oversight
would be expected to maintain records relating to this detainee's death or any of the other
detainees' deaths.

107.    Additionally, Philadelphia Field Office conducted a comprehensive search
of all of its records and databases to assist in identifying any previously unidentified
deaths in ICE custody to ensure the integrity of ICE record keeping on detainee death.
Philadelphia management consisting of AFODs and SDDOs were requested to conduct a
comprehensive review of ICE detainee deaths that occurred since 2003. Database checks
were conducted in MS Outlook, EARM, share drives and detention records in addition to
inquiries made with detention facility operators. As a result of the review, all detainee
deaths in the Philadelphia AOR were previously accounted for and no additional detainee
deaths were identified.

### Phoenix Field Office Search

108.    The Phoenix Field Office conducted a comprehensive search to locate
records related to the death of one of the nine detainees' who were newly identified as
dying in ICE custody. The death occurred at the Eloy Detention Center.

109.    The Phoenix Field Office searched for responsive records relating to the
detainee that died in its AOR while in ICE custody. The ICE staff at Eloy Detention
Center conducted a search of its electronic shared files using Microsoft search for files
and folders function. All files and subfolders were searched using name and alien
registration number of the detainee who died in ICE custody at the Eloy Detention
Center. These terms were queried both separately and together. It was determined that
this type of search would most likely result in any records responsive to the plaintiff's
request because it is the practice of the Eloy Detention Center to maintain records
concerning detainees by their names and alien numbers. Furthermore, the Eloy Detention
Center expanded its search by using the term "detainee death" to locate any other records
on this topic.

110.    The Eloy Detention Center conducted a search of the SEN database using
the alien number, name, dates the death occurred, and office location. It was determined
that these types of searches would most likely result in any requested records that was in
this particular database. Furthermore, the Eloy Detention Center expanded its search to
include the days before and following the dates of the detainee's death to locate any
additional records on this topic.

111.    The Eloy Detention Center also conducted a search of the ENFORCE
database using the alien numbers to determine if any of those records were responsive to
plaintiff's request. No records responsive records were located.

112.    An additional search was conducted of the Eloy facility's records.
Although this facility is not owned by ICE, the facility is operated by ICE employees.
Therefore ICE conducted a comprehensive search of all its records at the Eloy facility to

include electronic records, shared drives, and all paper records. The search was

conducted using the name and alien registration numbers of the detainee who died in the

Phoenix AOR to search all electronic shared files using the Microsoft search for files and

folders and function located in the Microsoft start menu. Additionally, the facility

searched its paper files.  These files were searched using the name of the detainee and

alien registration number as this would be the best way to locate any record relating to

any particular detainee

     113.   Finally, as noted above, the following individuals checked their individual

work station computers and email files for responsive records in the Eloy Detention

Center: all the SDDOs at the facility and all the Deportation Officers assigned to the

facility when the detainee's death occurred.  The searches conducted by these individuals

included the detainee's names, alien registration numbers and the term "detainee death."

They searched these terms in their hard and individual work station drives using the

Microsoft search for files and folders function. They additionally searched their email

folders and subfolders, including archives, using these same terms.  The email searches

were accomplished by using the "Look For" and "Find Now" functions available in

Microsoft Outlook.  The Eloy Detention Center has completed a comprehensive search of

every possible electronic database as well as a manual paper file search was conducted.

Any responsive documents located were provided to the DRO HQ point of contact.

Additionally, the FOD and DFOD conducted searches of e-mail folders and sub-folders

including archived folders using the Microsoft Outlook search function. Additionally, the

FOD and DFOD searched their individual work station computers and hard drive folder s

and subfolders using the Microsoft search for files and folders function.  All of these

searched were conducted by using name of the detainee who died in ICE custody. Furthermore, the FOD and DFOD expanded their searches by using the term "death" to locate any other records on this topic. Additionally, the FOD and DFOD conducted a search of e-mail folders containing SENs as well as searching the detainees' name and office locations where they died. Any records located during the Phoenix Field Office search were provided to the DRO HQ points of contact. Based on its distribution of work and record keeping practices, the Phoenix Field Office determined that no other location for which it had oversight would be expected to maintain records relating to these detainees' deaths.

114.    While the search was being conducted, however, for administrative purposes unrelated to this litigation, the Phoenix Field Office requested Corrections Corporation of America (CCA) Eloy, Arizona provide the medical records of Felix RODRIGUEZ-Torres and one of the nine ICE detainees identified and who died while detained at the Eloy Detention Center. The records were provided and sent to the DRO HQ point of contact.

115.    The Phoenix Field Office's search using terms "detainee death" and "death" were designed to locate identifying any previously unidentified deaths in ICE custody to ensure the integrity of ICE record keeping on detainee death. No previously unreported deaths were found as a result of these searches.

### Salt Lake City Field Office

116.    The Salt Lake City Field Office conducted a comprehensive search to locate records to the nine detainees' who were newly identified as dying in ICE custody. Specifically, the Salt Lake City Field Office leadership telephonically contacted each

office manager within the Salt Lake City AOR asking that they search their office and

agency records they individually maintained for any information relating these deaths of

detainees while in ICE custody within our AOR. They were instructed to do so by

searching all individual work station drives, emails, and shared drives in reference to the

nine names and alien registration numbers of these individuals. They were also

instructed to search their offices manually for any paper or other records to search for any

information found related to any other deaths of ICE detainees while in ICE custody

within our AOR. This included all offices within the four states of the AOR. No records

were located through these computer record searches nor did any manager recall a death

of an ICE detainee while in our AOR's custody that had not been previously reported.

There have been no deaths of detainees ICE custody in the Salt Lake City AOR during

this period, 2003 till present. Based on its distribution of work and record keeping

practices, the Salt Lake City Field Office determined that no other location for which it

had oversight would be expected to maintain records relating to these detainees' deaths.

### San Antonio Field Office

117.    ICE DRO staff from the San Antonio Field Office conducted a

comprehensive search to locate records associated with plaintiff's request related to the

nine detainees who were newly identified as dying in ICE custody.   No records were

located for the additional nine who died in custody.   Specifically, the San Antonio Field

Office sent an email to all the facility AFODs asking they search agency records they

individually maintained for any information relating to detainee deaths. The searches

conducted included the detainees' names and alien registration numbers, and the terms

"detainee death" and "death". The searches of individual work station and hard drives

were accomplished by using the Microsoft Search for files and folders search function. Email searches were conducted using the Microsoft Outlook "Look For" and "Find Now" search function for all email folders and subfolders, including archived folders. Based on its distribution of work and record keeping practices, the San Antonio Field Office determined that no other location for which it had oversight would be expected to maintain records relating to these detainees' deaths.

118. The San Antonio Field Office's search using terms sing the terms "detainee death" and "death" were also designed to locate identifying any previously unidentified deaths in ICE custody to ensure the integrity of ICE record keeping on detainee death. No previously unreported deaths were found as a result of these searches.

119. Officers contacted the dedicated ICE facilities within the San Antonio Field Office AOR requesting whether they had any record of any ICE detainees who had died in custody. Officers also contacted the two BOP facilities within the San Antonio Field Office AOR -- the Bastrop FCI and the Three Rivers FCI -- requesting whether BOP had record of any "INS" or "ICE" detainee who had died in custody in immigration custody since the beginning of FY 04 (October 1, 2003) to the present. No additional records were found.

<u>San Diego Field Office</u>

120. The San Diego Field Office conducted a comprehensive search to locate records related to the nine detainees' who were newly identified as dying in ICE custody. None of these nine detainees were ever in the San Diego Field Office AOR, defined as San Diego and Imperial Counties, California.

121.    The Otay Detention Facility, El Centro Service Processing Center, and San Diego Staging Facility are all under the jurisdiction of the San Diego Field Office and detain aliens awaiting removal from the United States.

122.    On August 24, 2009, A Deportation Officer at the Otay Detention Facility conducted a comprehensive EADM and his computer and email search to locate records related to the detainees' deaths. This search included a search of the employee's individual work station computer and email records by using these detainees' names and alien registration numbers as search terms. No records were located through these computer records searches. A search was also conducted of the ICE Otay office's electronic shared files using the Microsoft search for files and folders function on the Microsoft start menu. All subfolders were searched on the S:\ Share drive using the names and alien registration numbers of the nine detainees who died in ICE custody. Finally, a search was conducted of the S:\ drive and ENFORCE to ascertain if the nine detainees in question were ever housed in the San Diego AOR. All searches came back negative.

123.    Additionally, an SDDO at the El Centro Service Processing Center, CA., located within the San Diego field office, conducted a comprehensive EADM and computer and email search to locate records related these nine individuals for ICE records in that facility.    This search included a search of the employee's email records and other agency records they individually maintained by these detainees' names and alien registration numbers. No records were located through these computer records searches. A search was also conducted of the El Centro shared folders. This was conducted by searching these electronic shared files using the Microsoft search for files

46

and folders function on the Microsoft start menu.  All subfolders were searched on the S:\
Share drive using the names and alien registration numbers of the nine detainees who
died in ICE custody.

124.    A Supervisory Immigration Enforcement Agent at the San Diego Staging
Facility, located within the Field Office also conducted a search for ICE records in this
facility related to these nine individuals.  This was done by searching the employee's
computer and email records by these detainees' names and alien registration numbers.
No records were located through these computer records searches.

A search was also conducted of the Staging Facility office's shared folders.  This was
accomplished by searching its electronic shared files using the Microsoft search function
for files and folders function on the Microsoft start menu.  All subfolders were searched
on the S:\ Share drive using the names and alien registration numbers of the nine
detainees who died in ICE custody.  The searches did not result in the location of any
responsive records.  Based on its distribution of work and record keeping practices, the
San Diego Field Office determined that no other location for which it had oversight
would be expected to maintain records relating to these detainees' deaths.

125.    Additionally, the San Diego Field Office conducted a comprehensive
search of all of its records and databases to assist in identifying any previously
unidentified deaths in ICE custody to ensure the integrity of ICE record keeping on
detainee death.  The search was conducted by the FOD, DFODs, AFODs and SDDOs.
These persons based on their positions and responsibilities are the persons expected to
most likely have responsive records of this nature in their work.   The searches conducted
by these individuals included their individual work station computers and email records.

The following keywords were used in the search; "death," "deceased," and "died."

126.    The office also conducted a search of its electronic shared files using the

Microsoft search for files and folders function on the Microsoft start menu.  All

subfolders were searched on the S:\ Share drive using the following keywords; "death,"

"deceased," and "died."  No records of unidentified deaths in ICE custody were located.

No records of unidentified deaths in ICE custody in the San Diego AOR were located.

No other places in the San Diego Field Office would be expected to have any relevant

documents.

<u>Seattle Field Office</u>

127.    The Seattle Field Office conducted a comprehensive search to locate

records related to the nine detainees' who were newly identified as dying in ICE custody.

Specifically, Seattle researched each of the nine detainees in EARM to determine if any

of the nine individuals indentified had at any time been detained in the Seattle AOR.

This search proved negative, indicating that the nine individuals had never been detained

within the Seattle AOR.

128.    The DFOD and the FOD then conducted a complete search of their

individual work station electronic files.  These searches were conducted using the nine

names provided by the HQ tasking.  The search of our electronic files also provided a

negative result.  The Seattle Field Office determined based on its distribution of work and

record keeping practices that no other location within the area it oversees would be

expected to maintain records responsive to this request related to these nine detainees.

129.    Additionally, the Seattle Field Office also conducted a comprehensive

search of all of its records and databases to assist in identifying any previously

unidentified deaths in ICE custody to ensure the integrity of ICE record keeping on

detainee death. This included a search of EARM, a file search of all agency files being

individually maintained by the DFOD and FOD. These searches were conducted by the

terms, "detainee deaths" and "death." In addition, the FOD and the DFOD also reviewed

their personal recollections and could not recall any other deaths in this area of operations

that remained unreported between October 2003 and the present. No previously

unreported deaths were found as a result of these searches.

San Francisco Field Office

130.    The San Francisco Field Office conducted a comprehensive search to

locate records related to the nine detainees' who were newly identified as dying in ICE

custody. This was accomplished by having the appropriate personnel search their

individual work station computers and email records by these detainees' names and alien

registration numbers. Given that none of these nine detainees died in the San Francisco

AOR, the following individuals checked their individual work station computer and email

files for responsive records: The FOD, DFODs, AFODs and SDDOs. These persons

based on their positions and responsibilities would be most likely to receive or maintain

records of this nature in the course of their work. These individuals conducted their

searches by using the detainees' names and alien registration numbers as search terms.

No records were located through these individual work station computer records

searches.

131.    The office also conducted a search of its electronic shared files using the

Microsoft search for files and folders function on the Microsoft start menu. All

subfolders were searched on the S:\ Share drive using the names and alien registration

49

numbers of the nine detainees.  These terms were queried both separately and together.  It was determined that these searches would most likely result in any responsive records to plaintiff's request because it is the San Francisco Field Office practice to maintain records concerning detainees by their name or alien registration number.  No paper files were searched as the only paper files maintained in the San Francisco Field Office are the alien immigration files (A-files).  The San Francisco Field Office did not locate any alien files related to these nine detainees. Based on its distribution of work and record keeping practices, the San Francisco Field Office determined that no other location for which it had oversight would be expected to maintain records relating to these detainees' deaths.

132.    Additionally, the San Francisco Field Office conducted a comprehensive search of all of its records and databases to assist in identifying any previously unidentified deaths in ICE custody to ensure the integrity of ICE record keeping on detainee death.  The search was conducted by the FOD, DFODs, AFODs and SDDOs.  These persons based on their positions and responsibilities are the persons expected to most likely have responsive records of this nature in their work.   The searches conducted by these individuals included their individual work station computers and email records.  The following keywords were used in the search; "death," "deceased," and "died."  No records of unidentified deaths in ICE custody were located.

133.    The office also conducted a search of its electronic shared files using the Microsoft search for files and folders function on the Microsoft start menu.  All subfolders were searched on the S:\ Share drive using the following keywords; death, deceased, died.  No records of unidentified deaths in ICE custody were located.

### St. Paul Field Office

134.    The St. Paul Field Office conducted a comprehensive search to locate records related to the nine detainees who were newly identified as dying in ICE custody. Specifically, the office conducted a search of its electronic shared files using the Microsoft search function located on the start menu. All subfolders were searched in this drive using the last names and alien registration numbers of these nine individuals. It was determined that these searches would most likely result in any responsive records that were located on the St. Paul Field Office's electronic share drive. This office also searched the share drive visually to locate any other responsive records. This office also researched the following databases to determine if these persons had any connection to the St. Paul area of operations: the EARM, the CIS, the NFTS, and the SEN database. No leads or responsive records associated with the St. Paul Field Office were located.

135.    A search of the NFTS database revealed that none of the alien files associated with these nine individuals have ever been through the St. Paul Field Office. As a result, this office would not have any paper, video, audio, or microfiche files. Finally, an AFOD who has worked in the St. Paul Field Office for both ICE and INS since 1997 conducted an email search using the same search terms, but by utilizing the "Look For" and "Find now" Microsoft Outlook search functions to search all email folders and sub-folders, including archived email records. This search resulted in no responses related to these nine individuals. Based on its distribution of work and record keeping practices, the St. Paul Field Office determined that no other location for which it had oversight would be expected to maintain records relating to these detainees' deaths.

136.    Additionally, the St. Paul Field Office conducted a comprehensive search of all its records and databases to assist in identifying any previously unidentified deaths

in ICE custody to ensure the integrity of ICE record keeping on detainee deaths. Specifically, each Significant Incident Report (SIR) submitted by the St. Paul Field Office within the SEN database was reviewed to determine if any related to the death of a detainee. The search terms "death", "detainee death", "died", and "passed away" were searched through both the electronic shared files and through the Outlook email database of an AFOD. This AFOD has been employed at the St. Paul Field Office since 1997 and would most likely have email information related to the death of an ICE detainee within the St. Paul AOR. In addition, this office contacted every BOP detention facility in the St. Paul Field Office's jurisdiction. Each BOP facility was asked to run a report for any ICE detainees that may have died while detained with them between 2003 and the present. These searches resulted in no previously unreported deaths within the St. Paul Field Office.

Washington Field Office

137.    The Washington Field Office conducted a comprehensive search to locate records related to the nine detainees' who were newly identified as dying in ICE custody. Specifically, the Field Office leadership sent an e-mail to all Washington AOR employees asking that they search agency records they were individually maintaining for any information relating to these detainees who  in ICE custody. They were instructed to do so by searching their individual work station computers and drives and email records by these detainees' names and alien registration numbers including all email archives and individual work station drives. This included staff within the sub-offices of the AOR. One record was located through these individual work station computer records searches.

138.    The office also conducted a search of its electronic shared files using the

52

Microsoft search for files and folders function on the Microsoft start menu searching

using the names and alien registration numbers. These names were queried both

separately and together with negative results. No records were found. In addition, all

database systems that were checked are ENFORCE, TECS, CIS to determine if these

detainees died or were detained in the Washington Field Office AOR. None of the nine

detainees were in this AOR or died in the AOR.

139. Additionally the office searched its paper files. These files were searched

using the names of the detainees as this would be the way to locate any record relating to

any particular detainee. No paper records were located during this manual paper search.

In addition to the individual work station computer searches described above, the

following individuals checked their individual work station computers and the office

shared drives and email files for responsive records: the DFOD and four AFODs. These

five persons based on their position and responsibilities are the persons who would most

likely have received or maintained records of this nature within this office's AOR. These

individuals conducted their searches by using the detainees' names and alien registration

numbers, and the terms "detainee death" and "detainee dying." No records were located.

The Acting FOD and an AFOD also reviewed the office's SEN log book that is

maintained in the senior management suite. The log book is a depository of printed

records, reports and memorandums of any notification from the Washington Field Office

to HQ-DRO regarding significant events or incidents that occur, to include detainee

deaths. The log book has records dating back to February 2005. No responsive log

entries were located. Based on its distribution of work and record keeping practices, the

Washington Field Office determined that no other location for which it had oversight

would be expected to maintain records relating to these detainees' deaths.

140.    The Washington Field Office's search using the terms "detainee death" and "detainee dying" and a manual review of the SEN log book were also designed to locate identifying any previously unidentified deaths in ICE custody to ensure the integrity of ICE record keeping on detainee death. No previously unreported deaths were found as a result of these searches.

Conclusion

141.    DRO HQ mission support staff was the HQ point of contact for all responsive record located during the above described searches.  They provided all records located by the searching offices to the ICE FOIA Office for final review and processing. Based upon the record keeping practices and systems of records for DRO, I believe DRO has conducted a search in all locations reasonably expected to have responsive records.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on this _____ day of _____ 2009.

                                    Mary F. Loiselle
                                    Deputy Director
                                    Office of Detention and Removal
                                    Operations (DRO),
                                    US ICE