## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **AMERICAN CIVIL LIBERTIES UNION** | : : : | **Civil Action No. 08-1100** |
| **Plaintiff,** | : : : | **(RBW)** |
| **v.** | : : | |
| **UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al.** | : : : | |
| **Defendants.** | : : : | |

### DECLARATION OF CAPT Marsha Davenport, M.D.

1.      I, CAPT Marsha Davenport, M.D., pursuant to 28 U.S.C. § 1746, declare as follows:

2.      I am the Acting Director of the Division of Immigration Health Services (DIHS) and have held this position since June 2009.  Prior to becoming the Acting Director of DIHS, I was hired as the DIHS Deputy Director of Clinical Services.  I have held that position since January 2009 until present.

3.      As the Acting Director of DIHS, my official duties and responsibilities include ensuring the efficient operation of a comprehensive health care delivery system incorporating medical, dental, mental health and environmental health services, oversight of all DIHS operations to include the Information Technology (IT) infrastructure currently utilized by the Division. The statements contained in this declaration are based upon my personal knowledge and experience, and information conveyed to me by DIHS

staff in the course of my official duties, including the individuals who personally

searched for records in DIHS offices and or knowledgeable IT program mangers relevant

to Plaintiffs' requests for information under the Freedom of Information Act (FOIA).

4.     The purpose of this declaration is to provide the Court and the Plaintiffs a

more detailed explanation as to why an email search of DIHS would be unduly

burdensome and provide details of an alternative search that we recently conducted, as

well as explain other aspects of a search for records conducted by DIHS relating to nine

detainees who were recently identified as dying in ICE custody.

5.     On October 1, 2007, a Memorandum of Understanding between HHS and

the Department of Homeland Security (DHS) took effect pursuant to which the U.S.

Public Health Service Commissioned Corps Officers of DIHS were detailed from HHS to

DHS/ICE to provide public health expertise necessary for the DHS mission as it related

to detainees in the custody of Immigration and Customs Enforcement (ICE).  As detailed

to ICE, DIHS operates as a division of the Office Detention and Removal Operations.

6.     The time period covered by Plaintiff request for information under the

Freedom of Information Act (FOIA), January 1, 2004 through July 30, 2007 predates

DIHS's detail to ICE.  Likewise, DIHS staff employed during the time period covered by

this request have for the most part left DIHS employment.  Since many of the staff are no

longer employed by DIHS the email search would have to be conducted at an IT level

instead of an individual user level.

7.     Prior to being detailed to ICE, DIHS maintained records relating to

detainee deaths either in an ICE Detainee Death Database, the CaseTrakker database, and

the Hospitalization Database on the DIHS Headquarters shared network drive or the

records were maintained by the individual employees in their personal computers. CaseTrakker and the Hospitalization database information would be copied into the Detainee Death Database to maintain all information about detainee deaths in one location. Additionally, DIHS had its own server for its employee emails. However, this server did not contain an application for maintaining employee emails other than on a temporary basis.

8.      Following the detail of DIHS to ICE, in June of 2008 DIHS deployed an email solution to allow for the storage of emails organizationally as opposed to by individual employee. The product DIHS deployed was called MIMOSA systems. This solution by MIMOSA Systems allowed DIHS to centralize and automate email archiving. MIMOSA archived all email messages that were present on the Exchange server at the time it was deployed. It continues to archive email messages as they are processed in the current MS Exchange server.

9.      Prior to the deployment of MIMOSA, it was up to the individual employees to decide the content, frequency and method for archiving their emails. Due to space limitations on the central exchange server, employees had limited space in which to store emails in their active email folders (inbox, sent items, drafts, and deleted items) before they exceeded their storage limit. As a result, users would be required to either delete old email messages or archive them to Personal Storage Tables (PST) files. PST files allow individual users to move email messages from the central exchange email server, which has limited capacity, to an off-line file for archiving and retention. These files can be stored on shared network drives, on individual workstation or on removable storage such as CD or DVD. Any messages deleted or archived to a PST file prior to the

implementation of MIMOSA in June of 2008, were not captured in the MIMOSA email
archive solution at the time MIMOSA was deployed.  DIHS is still in the process of
collecting any emails that were saved to local shared network files to store in the
MIMOSA email archives, however, since the process of identifying, collecting and
importing all the PST files into the MIMOSA database is very time and resource
intensive, it is taking a long time to complete.

      10.     Conducting a comprehensive search in the  MIMOSA database for email
messages referencing specific detainees requires execution of several searches to address
the different common forms used for Alien number and/or names. For example, an Alien
number may be recorded as Axxxxxxxxx,  Axxx xxx xxx or  Axxx-xxx-xxx,  and all
three combinations should be searched in order to obtain results of all methods of
recording the alien number. The same is true for different combinations used for
detainees' names.  Overall, a search for an individual detainee could require six or more
individual searches in order to retrieve any or all records relating to that detainee in the
archived email system.  Since the search engine compares text strings, it is very likely
that it will identify many items that are not relevant, but may contain a similar text string
somewhere in the message or an attachment. For example, searching for ICE CREAM
will return any message that contain the two words or either word. When searching for
common names in these records, the emails returned may contain that name, but may not
relate to the particular detainee we were searching for.

      11.     In addition, DIHS employees move frequently between sites.  Generally
employees serve on two-year details to DIHS.  Hard drives and local personal drives of
computers are generally erased when employees leave a location or the agency to allow

for a new employee to use the computer equipment.   Accordingly, as explained above

the searches for email would need to be conducted on the entire MIMOSA email archive,

which is approximately 300 Gigabytes.

12.    Searching all mailboxes in MIMOSA for a single detainee by one search

term could take between eight to twelve hours depending on utilization of resources at the

time of the search.   Generally speaking, at least two searches would be conducted at

minimum: one to locate records searching by the  detainees name, and then another to

utilizing the detainee's alien number.   Detainee Rodriguez-Torres search took 8 hours to

conduct for each search of these referenced searches.  Additionally, DIHS IT program

managers have conducted email searches of this type in other instances unrelated to this

FOIA request and based on these experiences similar searches using one term can take

over 12 hours to complete. Specifically, since the same server resources that are used for

on-going operations are also used for the searches, on-going activity can slow down the

search considerably.   This is why the search time can range from 8 to 12 hours.  At the

same time, the searches can affect response time to operational activity, diminishing the

ability of DIHS to effectively respond and carry out its core duties to provide medical

attention to ICE detainees. Since DIHS operates around the clock (24 X 7), searches

would necessarily have to run concurrent with on-going operations.

13.    Additionally, because these records are on a main server, once the search

identifies records that may be responsive they need to be extracted from the database and

placed on another medium. This took approximately 5 hours in the case of records

retuned from the search conducted for detainee Rodriguez-Torres.  However, the

extraction time will be lesser or greater depending on the volume of records returned for

each search. Therefore DIHS estimates extraction for each group of returned records would be between 4 to 6 hours.

14.    Extrapolating from the individual estimates of the search conducted regarding detainee Rodriquez-Torres and other experiences from our IT program managers, searching for email messages at an organizational level  the remaining  76 detainees would take between 1216 (8 hours per search * 2 searches * 76 detainees)  to 1824 hours  (12 hours per search * 2 searches  * 76 detainees). The additional time required to save the result to removable storage would take between 304 hours (4 hours * 76 detainees) to 456 hours (6 hours * 76 detainees). The total time estimated is between 1520 hours (1216 + 304) to 2280 hours (1824 + 456).  The current rates for IT professionals working at DIHS range from $78.43/hr to $169.62/hr. Based on the most likely combination of resources that will have to perform this searches, and for ease of calculation, an average rate of $100/hr will be used to estimate costs for this effort. Using an average cost of $100/hr for technical resources to conduct this search, the cost to search the MIMOSA archives would be between $152,000 to $228,000.  This does not include any time to review the records to ensure the returned results are actually responsive to the FOIA request.

15.    Since MIMOSA was implemented in the summer of 2008, it contains limited number of email messages from the 2004-2007 time period covered by the FOIA request. Users that did archive their emails prior to the deployment of MIMOSA did so by moving the email messages from the Exchange server to individual PST files stored either on their personal workstations, on shared network drives or on removable storage media.  It is important to note that outside of Headquarters in Washington, DC and the

main datacenter in Houston, Texas, DIHS maintains servers with shared network drives at 22 additional field sites.

16.     Searching for email messages that were archived to PST files and stored on local shared drives prior to the implementation of MIMOSA requires searching over a Terabyte of data on network servers for PST files. It is estimated that there are several hundred PST files totaling over 100 Gigabytes of data.[1]

17.     Before DIHS is able to search, all PST files from the different servers on the DIHS network, the files will have to be identified, indexed, cataloged, and copied to a central location for searching.  Assuming an average of 4 to 6 hours to find and copy PST files from each of the 22 sites, the estimated effort to complete these pre-search steps is between 88 (4 hours * 22 sites) to 132 (6 hours * 22 sites) hours with an estimated cost of $8,800 to $13,200 (using an average rate of $100/hr). The copying of 100 Gigabytes of data over the network over a two to three week period will also severely affect ongoing operations at DIHS due to the increased utilization of available bandwidth.  These limitations of bandwidth and server capacity also limit the number of concurrent searches that can be performed.  Current limitations will only allow for two concurrent searches..

18.     After each PST file was located and copied as described above, since each PST is a stand-alone file,  each PST file will have to be opened and searched individually multiple times for each detainee using the outlook client to allow extraction of identified messages. Searches will have to be performed for different possible variations of the A#, (such as Axxxxxxxxx, A#xxx-xxx-xxx or Axxx xxx xxx), and different combinations of the detainee names. Due to the nature of PSTs, these searches can only be done

---

[1] Since the number of PST files are currently unknow, the estimates are based on the 100 Gigabytes of data that will be searched.  To reach this estimate we conducted a survey of a local server and used the average size of PST files and then estimated this size for the remaining DIHS servers to reach this estimation.

sequentially one search at a time.

19.     On average, it takes approximately five minutes to execute a single search through a one Gigabyte PST. Searching through all 100 Gigabytes of PSTs will take approximately 8.5 hours per search (5 minutes per 1 Gb * 100 GB = 500 minutes). Assuming an average of six searches per detainee (see paragraph XX above) the estimated time to search for email messages per detainee is 50 hours .  Repeating the process for 77 detainees is estimated at 3,850 hours, or a cost $385,000 using an average rate of $100/hr[2].

20.     The cost of extracting the results from each search and storing on transferable media such as DVD will depend on the outcome of the search, including results that are not related to plaintiff's request. Using a very conservative estimate of ten minutes per search to copy the results of each search to a new PST files and transferring to removable media, such as a CD or DVD, based on the need to run an average of 6 different searches for each detainee, to total estimate for extracting the identified messages from the PST is 60 minutes per detainee (10 minutes per search * 6 searches). For all 77 detainees on the request, the total time estimate to extract the messages from the original PST is 77 hours/$7,700 (using an average rate of $100/hr) to extract and store the data on DVD.

21.     The total process to identify, collect and search the PST files is estimated to take between 4,015 hours (88 hours to Identify & Collect + 3,850 search + 77 extract & transfer)  to 4,059 (132  hours to Identify & Collect + 3,850 search + 77 extract & transfer), Using an average cost of $100/hr, the cost for this effort is between $401,500 and $405,900.

---

[2] No PST file searches have been conducted for any of the 77 detainees as described above.

22.     Therefore the total cost for searching MIMOSA data base and all PST files on DIHS servers scattered on the DIHS network  is between $553,500 ($152,000 low estimate for MIMOSA  + $401,500 low end for PST Search),  and $633,900 ($228,000 high end for MIMOSA  + $405,900 high end for PST search).  This effort will take an estimated total of 5, 535 hours to 6, 339 man hours to perform.

23.     The description above does not take into account the time and cost of the subsequent retrieval and review of the emails to determine which, if any, are responsive to the Plaintiffs' requests.

24. In order to come up with an alternative method to locate and produce releasable portions of responsive  emails  relating to detainee deaths, DIHS identified the Directors and Medical Directors serving at the time period the deaths occurred. Due to there position and responsibilities, these persons were believed the most likely to have email traffic concerning the detainee deaths. The following mailboxes for the persons listed in the following positions were searched in MIMOSA for email messages received between January 1, 2004 and August 30, 2008[3]:

- 2 – Medical Director
- 2 – Medical Director/Acting DIHS Director
- 2 – Acting DIHS Director
- 1 – DIHS Director

25.     The email archives of the above mentioned individuals were searched for messages containing the Alien Number or the names of each of the 76 detainees listed on the request. First a search for email messages relating to nine (9) detainees was

---

[3] Although the cut-off date for the detainee deaths was the date ICE began its search on July 30, 2007, it took several months to complete the detainee death list that was created to assist in location of requested records.  As a result deaths occurring during the month of August 2007 were identified. Out an abundance of caution, email searches described above were conducted for email messages received up to a year later, i.e August 2008 to locate records that may have been responsive to plaintiff's request.

performed (See Appendix A) between 8/19/09 and 8/21/09 resulting in 585 email messages being returned from the automated search.   A second search for email messages searching for emails relating to additional 67 detainees listed in Appendix B was conducted between 8/25/09 and 8/28/09 and resulted in 4,826 email messages being returned from the automated search. Since Alien Numbers can appear in multiple formats, the three most common formats were searched for. For example, the search for A number 12345678 included the following searches:

- 12345678

- 12-345-678

- 12 345 678


26.     Similarly, a search by name was performed for detainee's first and last name. Two searches were conducted: one for first and last names, and a second search for last and first names.

27.     The messages returned from these searches were exported from MIMOSA into a PST file. The file was compressed and placed on a DVD and provided to the DRO FOIA point of contact for review and processing.

28.     Executing both the initial search for the first group of nine (9) detainees and the subsequent search for the other 67 (Rodriguez-Torres was not included in this search, since all of the Archives in MIMOSA were searched previously by his name and alien number).  The search for these records took close to 50 hours to complete, with a cost estimate of  $5000.

29.     In addition to the searches for email described above concerning the nine

detainees listed in Appendix A, because none of these individuals nor there records were maintained in the detainee death database, my staff conducted a search for each detainee's records relating to plaintiff's FOIA request in the CaseTrakker database and the Hospitalizations Database.

30.    The CaseTrakker database is used for managed care administrative processes which include Treatment Authorization Requests (TARs). CaseTrakker was searched for all TARs relating to these nine detainee using a "quick print" function in that system.  That function searches all TARs for the system and creates a readable and printable report if a record is located.  In this instance, CaseTrakker was searched using each detainee's alien registration number.  CaseTrakker is also the location where DIHS would maintain medical records for detainees, such who receive medical care at facilities that are not staffed by DIHS, including BOP facilities should those facilities provide such records to DIHS.  In this case responsive records located in this database were provided to the DRO FOIA point of contact for review and processing.

31.    Additionally DIHS searched the Hospitalization database.  This database is comprised of information that is used to track all detainees in ICE custody who have been hospitalized.  It is used to track the case management of the detainees care and allows for DIHS Managed Care Coordinators to annotate notes in the database to provide updates on the detainees condition during hospitalizations.  Each detainee's records were searched using the detainee's alien registration number in this database.  Because these detainees had been omitted from the Detainee Death Roster where DIHS in the normal course of business would maintain this information, this database search was conducted. No records were located in conducting these searches.

Appendix A – List of Detainees searched 8/19/09 – 8/21/09

| ALIEN NAME |
| --- |
| LEYVA-ARJONA,ARGELIO |
| ALVAREZ ARIAS,JOSE DE LA CONCEPCION |
| AYALA-GARCIA,ANTONIO |
| LOPEZ RUELAS,ELIAS |
| ROSELL SIERRA,JOSE |
| CORREOSO-JAY,CONRADO |
| LAZO REINOSO,SILVIO |
| POLANCO-MOLINA,ANGEL |
| LAZANO-BLANCO,JORGE |

Appendix B – List of Detainees searched 8/25/09 – 8/28/09

| ALIEN NAME |
| --- |
| GUTIERREZ, Ramiro |
| POPOOLA, Adetunji |
| RIOZ-MARTINEZ, Cezar |
| MOSLEY, Hector |
| RODRIGUEZ, Jose Rangel |
| SOLIS-PEREZ, Maria |
| HERNANDEZ, Wilfredo |
| PEREZ-AYALA, Manuel |
| MENDEZ-BACCA, Carlos |
| SATKUNES-WARAN, Kandiah |
| FANKEU, Samou |
| RUST, Richard |
| FIGUEREDO-LOPEZ, Juan |
| MENDEZ, Enrique |
| HERRERA-TERAN, Jose |
| MARTINEZ, Jose Alberto |
| ALONSO, Juan |
| ENRIQUEZ-BETANCOURT, N |
| MEJIA VICENTES, Sebastian |
| SOCA-ROS, Otalio |
| SINGH, Bhupinder |
| RUIZ-TABARES, Ervin |
| REYES-ALTIMIRANO, Simon |
| LOPEZ-LARA, Jose |
| ZAROU, Jose |
| DANTICA, Joseph |
| FILS-AIME, Yvel |
| ANACHE-CAMPOS, Luis |
| HERRERA-LIMAS, Pedro |

| |
|---|
| SARABIA-VALLASENOR, Ignacio |
| NAND, Maya (aka NARID, Maya) |
| HEO, Sung Soo |
| BELBACHIR, Hassiba |
| TUNON-ABEAL, Jose |
| VARGAS, Nhung |
| CRUZ GARCIA, Rene |
| ALVAREZ-ESQUIVEL,  Walter |
| Ahmad, Tanveer |
| DELAPAZ, Eduardo |
| PRADO-ARENCILIA, Reinaldo |
| SANCHEZ-RODRIGUEZ, Sergio |
| MARRERO-ABREO, Domingo |
| LEDESMAN-GUERREO, Roberto |
| SALAZAR-GOMEZ, Juan |
| KENLEY, Sandra Marina |
| MURPHY, Vincent |
| GARCIA-SANCHEZ, Felipe |
| GARCIA-MEJIA, Geovanny |
| INAMAGUA-MERCHA, Maria |
| RODRIGUEZ CASTRO, Walter |
| RODRIGUEZ-GONZALEZ, Miguel |
| OSMAN, Yusif |
| CASTRO-JIMENEZ, Rene |
| KIM, Young Sook |
| SINGH, Jamer |
| LOPEZ-GREGORIO, Jose |
| CARLOS-CORTEZ, Raudel |
| MARTINEZ-RIVAS, Antonio |
| CERVANTES-CORONA, Jesus |
| ABDEULAYE, Sall |
| CHAVEZ-TORRES, Mario Francisco |
| ROMERO, Nery |
| BAH, Boubacar |
| ARELLANO, Victor |
| CONTRERAS-DOMINGUEZ, Rosa Isela |
| DE ARAUJO, Edimar |
| GUEVARA-LAZARO, Alejandro |

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is  true and correct.

Executed on this ____4th____ day of ___September___, 2009.


Marsha Davenport
Acting Director
Division of Immigration Health Services