IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION : <br> : <br> Plaintiff : <br> : <br> v. : <br> : <br> UNITED STATES DEPARTMENT OF : <br> HOMELAND SECURITY, et al. : <br> : <br> Defendants. : <br> : | Civil Action No. 08-1100 <br> (RBW) |

**THIRD SUPPLEMENTAL DECLARATION OF CATRINA PAVLIK-KEENAN**

Catrina Pavlik-Keenan, pursuant to 28 U.S.C. § 1746, declares as follows:

1. I am the Director of the Freedom of Information Act (FOIA)/Privacy Act Office at U.S. Immigration and Customs Enforcement ("ICE") within the Department of Homeland Security ("DHS") (the "ICE FOIA office"). The statements contained in this declaration are based upon my personal knowledge and experience, review of documents kept in the normal course of business, and information conveyed to me by other ICE employees in the course of my official duties, including the individuals who personally searched for records in the ICE offices relevant to Plaintiffs' FOIA requests.

2. On July 23, 2009, Assistant United States Attorney Marina Braswell provided ICE correspondence from Plaintiff's counsel, which indicated that ICE had provided documents to Plaintiff on June 26, 2009 relating to the death of Mr. Felix Franklin Rodriguez-Torres. The letter further noted that, although this detainee died on January

18, 2007, his name did not appear on ICE's list of detainees who died in ICE custody for the relevant time period that was provided to plaintiff. Plaintiff also notes, this name was also absent from an updated list ICE provided to the New York Times in a separate FOIA request, that according to plaintiff was published by the New York Times on April 3, 2009.[1] On July 23, 2009, my staff confirmed that this identity was not on either list of detainee deaths.

3. My office contacted the Office of Detention and Removal Operations (DRO) to notify the office that this individual was absent from the list of the detainee deaths that was complied from the Detainee Death Roster ( also referred to as Detainee Death Database) maintained by the Division of Immigration Health Services ("DIHS") which is a database of information compiled concerning detainees who died in ICE custody. DIHS confirmed that they did not have any information concerning this detainee's death in this database. At the time of this detainee's death, DIHS did not provide on site medical services at this facility where Mr. Rodriguez-Torres was detained.

4. As a result of the information being omitted from the Detainee Death Roster which is where ICE maintains the identities of detainees who died in ICE custody, ICE did not identify records relating to this detainees death in its other searches for records relating to Plaintiff's request. This is because most records relating to detainees in ICE custody are located by using the individuals name and alien registration number or both. Although other searches for records were conducted using search terms such as "death" and "dying" during the various offices in ICE that conducted searches, those terms are

---

[1] This FOIA request from the New York Times was not filed at the same time as Plaintiff's request, and although the subject matter of the request may be similar, the relevant temporal cut –off date for responsive records was not the same as Plaintiffs. See Supplemental Declaration of Catrina Pavlik-Keenan dated May 5, 2009 ¶18.

generally not the best terms to locate all records related to detainee's death.

5. The records that were located and provided to plaintiff on June 26, 2009 were located in ICE's Office of Professional Responsibilities (OPR) Joint Intake Center, in paper files maintained by the JIC. These files were searched manually for any documents related to detainee deaths reported to the JIC concerning Plaintiff's FOIA request. The JIC is an Intake Center that maintains paper copies of material faxed, emailed, or mailed concerning complaints or referrals it receives and keeps them in files maintained for two years. These paper files were searched by using the JIC's log to locate any potential paper files relating to detainee deaths. Paper files kept by the JIC are maintained using the OPR case file number. The log was used to identify all detainee deaths. These entries were then used to locate the OPR file number to then search the JIC's paper records to determine if they maintained paper records concerning any of the reported detainee deaths. The JIC produced these records having appropriately identified that they were responsive to the Plaintiff's FOIA request.

6. At the time my office processed these records located by the OPR JIC staff relating to detainee Rodriguez-Torres, my office did not compare these records to other records previously provided to plaintiff, including the list of detainees who died in ICE custody.

7. Upon learning of ICE's omission to search for detainee death records relating to the identity of detainee Rodriguez-Torres and his alien registration number to locate any other records related to plaintiff's request, my Office tasked DROHQ and Phoenix Field Office, DIHS, Executive Secretariat, and OPR.

8. OPR conducted a search by querying Rodriguez-Torres name in the JICMS

system. This query resulted in locating records in JICMS pertaining to the OPR case file relating to Mr. Rodriguez –Torres death in ICE custody. As a result, no further quires were conducted in JICMS. The records were reviewed to determine if any other locations in OPR would reasonably be expected to have records related to this matter. As this particular matter was referred to the Office of Detention and Removal Operations for a management referral rather than accepted as an OPR investigation, OPR determined that it would not maintain records related to this matter besides the records located in JICMS related to this search, and the paper records located at the JIC previously produced on June 26, 2009. Management referrals are matters referred to the appropriate ICE office from OPR that do not require a response to OPR. The records located in JICMS were provided to the FOIA office for processing.

9. DROHQ also conducted a search of its records to locate records related to the death of Mr. Rodriguez-Torres in ICE custody. This search included a search of the Significant Event Database or "SEN" database. This was conducted by using both the detainee's name and alien registration number to conduct this search. This resulted in locating one report contained in this database relating to this detainee's death.

10. Additionally, DRO HQ searched records maintained by its Detention Management Division (DMD) electronic files and folders. DRO HQ also searched the electronic files and folders of its Detention Standards Compliance Unit records (DSCU) to search for responsive records. The DSCU is charged with ensuring compliance with the ICE's National Detention Standards. This Unit is a subunit of DMD and may maintain records relating to compliance issues relating to detainee deaths. As result DRO HQ searched the DRO HQ internal file share drive for folders relevant to these offices

that would be reasonably likely to maintain responsive records. The share drive is the place in which DRO places folders for shared use by the DRO headquarters staff. A manual search of known locations of information was conducted, as well as a search utilizing a standard search tool residing on the Microsoft start button that allows files and folders to be searched for specific content.

11. Specifically, DRO conducted a visual review of the following sub-folder of the Detention Management Division folder: Detainee Deaths. Additionally, a second folder, the Detention Compliance Unit (DMCP) folder, was reviewed. Within the DMCP folder, the following sub-folder was searched manually by reviewing the contents of each folder visually in order to locate responsive records: Special Assessments 2007. Additionally, in case any records had been misfiled, a visual review of the subfolders entitled Special Assessments 2006 and Special Assessments 2008 was also conducted.

12. As noted above, an automated DRO share drive search using the Microsoft search tool was also conducted. This search was conducted by using the "containing text field" and entering in detainee Rodriguez-Torres' alien registration number to yield results. This field was used again entering the detainees first and last name and other name variants using his full name.

13. One of the folders located during the most recent search had been created, and information compiled into it, after DRO completed its initial search in late 2007. This subfolder named "Detainee Deaths" folder contained detainee death certificates. This folder was created in June of 2008, with the majority of the information being entered during that time frame. This file did not contain a death certificate for Mr. Torres-Rodriguez.

14. Additionally, DROHQ and the Office of the Executive Secretariat both searched Office of Executive Secretariat Information Management System (OESIMS) central repository for all incoming requests for information received by ICE and any outgoing responses or internal memoranda for any records related to the death of Mr. Rodriguez-Torres in ICE custody. This search was conducted by using the detainees' names, and alien registration number. No responsive records were located searching this database.

15. DRO also conducted research in its ENFORCE Alien Booking Module (EABM) database to confirm what other DRO offices might reasonably be expected to have records related to plaintiff's FOIA request. This database contains information concerning what facilities detainees are booked into. As a result, DRO confirmed that the Phoenix Office should be tasked to search as Mr. Rodriguez-Torres was detained in the Eloy facility which was in the Phoenix Field Office's area of responsibility. This record also noted that the detainee died, and therefore, along with the SIR from the SEN database was provided to the ICE FOIA office for processing.

16. As a result, DRO tasked the Phoenix Field Office to conduct a search for records related to this detainee's death. The Phoenix Field Office conducted a comprehensive search to locate records related to the plaintiff's request.

17. Mr. Rodriguez-Torres was detained in the Eloy Detention Center. Therefore ICE conducted a comprehensive search of all its records in the Eloy facility to include electronic records, shared drives, and all paper records.

18. ICE staff at Eloy Detention Center conducted a search of its electronic shared files using Microsoft search for files and folders function. All files and subfolders were searched using the name and alien registration number of Mr. Rodriguez-Torres. These

6

terms were queried both separately and together. It was determined that this type of search would most likely locate any records responsive to the plaintiff's request because it is the practice of the Eloy Detention Center to maintain records concerning detainees by their names and alien numbers. Furthermore, the Eloy Detention Center expanded its search by using the term "detainee death" to locate any other records on this topic.

19. The ICE staff at Eloy Detention Center also conducted a search of the Significant Event Notification (SEN) system also using the alien number, name, dates the death occurred, and office location. It was determined that these types of searches would most likely result in any requested records that was in this particular database. Furthermore, the Eloy Detention Center expanded its search to include the days before and following the dates of the detainee's death to locate any additional records on this topic.

20. ICE staff at the Eloy Detention Center also conducted a search of the ENFORCE database using the alien numbers to determine if any of those records were responsive to plaintiff's request.

21. An additional search of the records maintained by the ICE staff at the Eloy facility was conducted of its paper records. These files were searched using the name of the detainee and alien registration number as this would be the best way to locate any record relating to any particular detainee. No paper files were located during this search by ICE staff at the Eloy facility.

22. Finally, the following individuals checked their personal computer and email files for responsive records in the Eloy Detention Center: five Supervisory Detention and Deportation Officers at the facility; and all the Deportation Officers that were assigned to the facility when the detainee's death occurred. These individuals conducted the searches

by using the detainees' names, alien registration numbers, and the term "detainee death". They searched these terms in their hard and individually maintained local drives using the Microsoft search for files and folders function. They additionally searched their email folders and subfolders, including archives, using these same terms. The email searches were accomplished by using the "Look For" and "Find Now" functions available in Microsoft Outlook. The Eloy Detention Center searched every electronic database and paper file that would likely have any records responsive to plaintiff's request. Any responsive documents located as a result of this search were provided to the DRO Headquarters point of contact.

23. Additionally, searches were conducted of records maintained in the Phoenix Field Office. A search was conducted of the email of the Field Office Director (FOD) a Deputy Field Office Director (DFOD) and two Assistant Field Office Director's (AFODs) of all their email folders and sub-folders including archived folders using the Microsoft Outlook search function. The FOD, DFOD, and AFOD's computers were likewise searched in individually maintained local and hard drive folders and subfolders using the Microsoft search for files and folders function. All of these searched were conducted by using name and alien registration numbers of Mr. Rodriguez-Torres. Finally, the Phoenix Field Office paper files and any paper files maintained by the FOD, DFOD, and AFOD's were manually searched using the detainee's name and registration number. Only one paper record was located during this manual search in a file concerning an OPR Management Referral.

24. Any records located during the Phoenix Field Office search were provided to the DRO Headquarters points of contact. The Phoenix Field Office determined based on its

distribution of work and record keeping practices that no other location within the area it oversees would be expected to maintain records responsive to this request.

25. All records located by DROHQ and the Phoenix Field Office were provided to my office for review and processing. All releasable portions of the records were prepared for release to plaintiff by my staff.

26. DIHS also conducted an email search for any records related to detainee Rodriguez-Torres. In order to do so, DIHS Information Technology (IT) program searched its emails at an organizational level by using the detainees name and alien registration number separately. This search is time consuming because the system searches archived emails in a system that contains over 300 gigabytes (GB) of data. As a result, the processing time of each search for records by these terms took approximately 8 hours—for a total of 16 hours of search time for the two searches. The search resulted in 33 emails comprised of 65 pages were located as a response to the search using detainee's name. No records were identified using the search term of the alien registration number.

27. These email records were saved and forwarded to the DRO point of contact to provide to my staff for review and processing. My staff reviewed these records and found of the 33 emails initially located from the automated search run by the DIHS IT program, 12 emails totaling 27 pages and the releasable portions are being produced as responsive. Of the original 33 emails located, 13 emails are exact duplicate copies of the 12 emails being released in part. The remaining 8 emails are non responsive. For example, some of the records returned in the automated search concerned detainees who had similar names and the content related to their medical treatment rather than that of

the detainee whose records were the subject of this search. The 12 responsive emails were then processed by my office for all releasable material to be provided to plaintiff.

28. Because this detainee was not included in the detainee death roster, DIHS also searched for records related to this detainee's death in the following other locations: the Case Trakker database and the Hospitalizations Database.

29. The Case Trakker database is used for managed care administrative processes which include Treatment Authorization Requests (TARs). Case Trackker was searched for all TARs relating to this detainee using a "quick print" function in that system. That function searches all TARs for the system and creates a readable and printable report. In this instance, Case Trakker was searched using detainee Rodriguez-Torres' alien registration number. Case Trakker is also the location where DIHS would maintain medical records for detainees, such as Mr. Rodriguez-Torres, who receive medical care at facilities that are not staffed by DIHS, should those facilities provide such records to DIHS. In this case no medical records or other records besides the TARs related to detainee Rodriguez-Torres death were maintained in this database. All TARs related to this detainee were provided to the DRO FOIA Point of Contact.

30. Additionally DIHS searched the Hospitalization database. This database is comprised of information that is used to track all detainees in ICE custody who have been hospitalized. It is used to track the case management of the detainees care and allows for DIHS Managed Care Coordinators to annotate notes in the database to provide updates on the detainees condition during hospitalizations. Responsive information concerning this detainee was located by a search using the detainee's alien registration number. Because this detainee had been omitted from the Detainee Death Roster where DIHS

maintains information concerning detainee deaths, these are the only other places where records relating to this detainee would be maintained. These records were provided to the DRO FOIA Point of Contact. These records were then provided to my office for processing and to provide all releasable portions to plaintiff.

## JUSTIFICATION FOR NON-DISCLOSURE UNDER THE FOIA

31.    The rationale of the ICE FOIA office for withholding each particular category of information under the specific Exemption is specified below, and is also described in detail in the attached Vaughn Index.

### FOIA Exemption (b)(2)(high)

32. FOIA Exemption (b)(2)(high), 5 U.S.C. 552(b), permits the withholding of internal matters of a far more substantial nature, the disclosure of which would risk the circumvention of a statue or agency regulation.

33. ICE applied FOIA Exemption (b)(2)(high) to the following types of information: agency case file and record numbers and Uniform Resource Locator (URL) for agency Intranet sights.

34. Internal agency case files numbers were withheld pursuant to Exemption (b)(2)(high). These included a number of different types of case files, including case files assigned by the Office of Professional Responsibility. These file numbers are significant because they could assist persons in possession of a file number to locate and potentially alter the particular file upon access to the agency system. In addition, the agency assigned file numbers may be based on a number of factors including date of the agency's initiation of investigative interest and scope of the investigation. The date of

the initiation of the investigation is significant because that in itself may provide information as to the particular activity being investigated.

35. For example, with respect to the OPR case file numbers, the subject of an investigation having access to the date an investigation was initiated may be able to identify the particular misconduct that is the focus of the investigation. Likewise, the subject of one investigation trying to ascertain the case file number relating to OPR's investigation into his or her own misconduct would be greatly assisted by having access to the file numbers of cases opened during the same timeframe because these case numbers would allow the subject to pinpoint the range of case numbers that could relate to his or her own file. This information could assist the subject in inappropriately accessing his or her own investigative file in the agency's system, which could lead to the alteration of information contained in the file. Such alteration would allow a subject to circumvent the agency's law enforcement efforts.

36. Moreover, where the case file number assignment is based on other factors in addition to the date on which the investigation was initiated, the broad disclosure of the case file numbers could enable some members of the public to decipher the elements of the case numbering system and thereby identify the scope and focus of agency interest in individuals in all cases in which the code become publicly known.

37. Finally, while the case file number may have significance internally, it does not provide any insight as to how the agency carries out its statutory obligations.

38. ICE also withheld an internal Uniform Resource Locator (URL). This is an Intranet code located at the bottom of some agency documents. It shows the location within the agency Intranet where the particular information being displayed may be

found. This site is internal to the agency and is for the purpose of providing agency employees access to certain information that is relevant to their performance of their official duties. Members of the public are not granted access to this site. Some of the information on this site is considered law enforcement sensitive or is otherwise privileged information. The disclosure of this URL could enable members of the public to gain unauthorized access to an agency Intranet site and view law enforcement sensitive information. Such unauthorized access to this information could enable these persons to circumvent or interrupt law enforcement efforts.

39. Finally ICE applied exemption (b)(2)(high) to the deceased detainees alien registration and social security numbers. If disclosed, persons could attempt to use these numbers in combination with the name and other personally identifying information of the person to which it was lawfully issued, which could afford the criminal element an opportunity to obtain a fraudulent social security or alien registration card for the purpose of assuming this individual's identity or otherwise use to obtain fraudulent identification.

### FOIA Exemption (6)

40. FOIA Exemption (b)(6), 5 U.S.C. (b)(6), permits the withholding of personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. When applying this exemption, the agency must balance the individual's personal privacy interest against the public need for the information for purposes of shedding light on the agency's performance of its statutory duties.

41. ICE applied Exemption (b)(6) to the identities of government personnel and medical personnel and their direct telephone numbers that would lead to their

13

identification; information in the records that would identify third parties, including the names, and addresses of deceased detainees' relatives.

42. The names of medical personnel were withheld because their involvement in matters relating to the detainees' deaths would constitute a clearly unwarranted invasion of personal privacy. Persons seeking to second guess medical determinations by medical personnel who were involved in the treatment of the detainee at the detention facility or at hospitals will likely make attempts to contact these persons and expose them to unwanted attention or otherwise intrude on their privacy. While a number of these medical personnel are employed by the Division of Immigration Health Services (DIHS), others are private medical providers. Disclosure of their specific identities will not shed greater light on the agency's carrying out of its statutory responsibilities. Therefore the public interest in having their personal information disclosed does not outweigh their personal privacy interests

43. Likewise, the names and identifying information relating to third parties, including detainee's relatives, would not shed any light on how the agency carried out its statutory responsibilities. Moreover, with respect to the relatives of deceased detainees, the disclosure of these persons' names or identifying information including their home address could result in their being contacted by the media or others seeking information on the deaths of their loved ones – a matter which is highly private. This type of intrusion into their personal lives, even if well intended, would constitute a clearly unwarranted invasion of personal privacy. The public need for this information does not outweigh the personal privacy interests of these individuals.

44. Exemption (b)(6) was also applied in connection with the identities and email address, their direct telephone number, cell phone number of law enforcement and government personnel. While many of these persons are employed by ICE, given the very sensitive nature of detainee deaths, and the likelihood of being contacted directly by family members of deceased detainees and other members of the public, they have a strong interest in the protection of their privacy. Disclosure of their specific identities will not shed greater light on the agency's carrying out of its statutory responsibilities. Therefore the public interest in having their personal information disclosed does not outweigh their personal privacy interests.

45. Finally, Exemption (b)(6) was applied to the alien registration numbers and other private information relating to the deceased detainees. With respect to this information, while the subject to whom the alien number was assigned is deceased, release of this identification number in combination with the name and other personally identifying information belonging to the person to whom it was lawfully issued could afford the criminal element an opportunity to obtain a fraudulent alien registration card for the purpose of assuming this individual's identity. This would negatively affect the privacy of any of the decedent's survivors.

### FOIA Exemption (b)(7)(C)

46. FOIA Exemption (b)(7)(C), 5 U.S.C. 552(b)(7)(C), permits the agency to withhold records or information compiled for law enforcement purposes to the extent that the production of such law enforcement records or information could reasonably be expected to constitute an unwarranted invasion of personal privacy. As with FOIA Exemption (b)(6), when applying Exemption (b)(7)(C), the agency must balance the

individual's personal privacy interest against the public need for the information for purposes of shedding light on the agency's performance of its statutory duties.

47. As a threshold matter, all of the records the agency located that were responsive to Plaintiffs' request were compiled by the agency in the context of its detention of persons suspected of being present illegally in the United States, which is a law enforcement function, or were compiled by the agency's Office of Professional Responsibility and or the Office of Detention and Removal Operations in their performance of investigative and or enforcement responsibilities. Accordingly, these records all meet the threshold issue being law enforcement records.

48. ICE applied Exemption (b)(7)(C) to the identities of Law Enforcement officers, their direct telephone number, cell phone number, home and email address. Finally, ICE applied this exemption to information that would identify medical personnel/professionals in the documents related to agency investigations.

49. The names of law enforcement personnel were withheld pursuant to Exemption (b)(7)(C) because disclosure of their identities could be expected to constitute an unwarranted invasion of their personal privacy. As agency employees carrying out actions that at times may be unpopular with certain sectors of the public, these officers could be subject to harassment and attempts by members of the public who disagree with agency actions to interfere with the performance of official duties. Likewise, the officers' family members and private lives may also be affected by such actions by the public. The privacy interests of these officers are therefore substantial. Specific knowledge of the identities of these officers would not provide additional insight as to

how the agency has carried out its statutory mandates. Accordingly, the privacy interests of the officers outweigh the public interest in having this information disclosed.

## SEGREGABILITY

50. Under the FOIA, "any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). My office has reviewed each record responsive to Plaintiff's FOIA requests to identify information exempt from disclosure or for which a discretionary waiver of exemption could be applied and to determine which category of record each document should be placed into in the accompanying Vaughan index.

51. With respect to the records that were released in part, all information not exempted from disclosure pursuant to the FOIA exemptions specified above was correctly segregated and non-exempt portions were released. As indicated in the attached Vaughn Index, information withheld was individually determined to be exempt from release. Regarding the records withheld in their entirety, because the exempt information is so inextricably intertwined with the non-exempt information, I determined that no portions of those records can be reasonably segregated and disclosed. The few non-exempt words and phrases that are dispersed throughout the withheld information, if disclosed, would be meaningless and would not serve the purpose of FOIA--to open agency action to the light of public scrutiny. Further, the non-exempt information constitutes an extremely small proportion of the information contained in those records.

## **CONCLUSION**

52. The ICE FOIA office's processing of Plaintiff's request is consistent with DHS regulations governing the FOIA and PA, which were adopted to insure an equitable response to all persons seeking access to records under the FOIA/PA.

53. The Vaughn Index attached to this declaration, ICE FOIA Exhibit 1, describes with particularity each document and all meaningful information contained therein. Each information in each page was evaluated for segregability initially, and again during the preparation of the attached Index. See Exhibit 1.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 7th day of August, 2009.

Catrina M. Pavlik-Keenan
FOIA Officer
Department of Homeland Security