**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————
                                                                )
AMERICAN CIVIL LIBERTIES UNION,        )
                                                                )
                    Plaintiff,                              )
                                                                )
            v.                                               )        Civil Action No. 08-1100 (RBW)
                                                                )
UNITED STATES DEPARTMENT OF           )
HOMELAND SECURITY, <u>et al.</u>,                  )
                                                                )
                    Defendants.                          )
———————————————————————)

<u>**MEMORANDUM OPINION**</u>

The plaintiff, the American Civil Liberties Union ("ACLU"), brings this action against

the Department of Homeland Security (the "Department") and several of its component divisions

– the Office for Civil Rights and Civil Liberties ("Civil Rights Office"), the Office of Inspector

General ("OIG"), and Immigration and Customs Enforcement ("ICE") – pursuant to the Freedom

of Information Act, 5 U.S.C. § 552 (2006) ("FOIA"), challenging the adequacy of the defendants'

search for records responsive to its FOIA request and seeking to compel the release of several

documents the defendants withheld in full or released only in part.  Complaint ("Compl.") ¶ 1.

This matter comes before the Court on the parties' cross-motions for summary judgment pursuant

to Federal Rule of Civil Procedure 56.  <u>See</u> Defendants' Motion for Summary Judgment ("Defs.'

Mot."); Plaintiff's Cross-Motion for Partial Summary Judgment ("Pl.'s Mot.").  For the reasons

set forth below, the Court must grant in part and deny in part the parties' cross-motions.

**I.  BACKGROUND**

The plaintiff represents that it "is a nationwide, non-profit and non-partisan organization

with over 500,000 members," with its "primary functions includ[ing to] educat[e] the public on a

broad array of issues affecting [the] protections and guarantees extended by the United States Constitution and engaging in various advocacy efforts related to the promotion of individual rights." Compl. ¶ 9.  Through its National Prison Project, the plaintiff aims to "ensure constitutional conditions of confinement and strengthen prisoners' and detainees' rights through class action litigation, advocacy, and public education," and in furtherance of these efforts it has in the past acquired information concerning detainee confinement from the Department under the FOIA.  Id. ¶ 10.

On June 27, 2007, the plaintiff submitted a FOIA request for the production of documents to the Department.  Id. ¶ 2, which sought six categories of information regarding the deaths of individuals in the custody of ICE dating back to January 23, 2004.  See Defendants' Statement of Material Facts as to Which There is No Genuine Issue ("Defs.' Stmt.") ¶ 1; Plaintiff's Opposition to Defendants' Statement of Material Facts as to Which There is No Genuine Dispute ("Pl.'s Opp'n to Defs.' Stmt.") ¶ 1.  The first two categories of records sought by the plaintiff were those containing information about individuals who died while in ICE custody.  See Defs.' Stmt. ¶ 1. The next three categories sought records relating to the defendants' recordkeeping when individuals died in the defendants' custody.  Id.  The last category pertained to records "generated in response to requests for information from the Washington Post and the New York Times about immigrant detainee medical care and deaths, and in reaction to those articles."  Id.

Although the Department denied the plaintiff expedited processing of its request, the Department and its components undertook multiple searches for records in response to the request.  Id. ¶ 22.  As a result of its efforts, the Department made several disclosures to the plaintiff, producing redacted and unredacted records, Defs.' Stmt. ¶¶ 2-10, 14-17, 23-25, 27-28; Pl.'s Opp'n to Defs.' Stmt. ¶¶ 2-10, 14-17, 23-25, 27-28, and detailing the documents withheld in

full in several <u>Vaughn</u> indices.  <u>See</u> Defendants' Memorandum of Points and Authorities In

Support of Defendants' Motion for Summary Judgment ("Defs.' Mem."), Declaration of

Katherine Gallo ("Gallo Decl.") at Ex. 35 (indexing the OIG's assertions of exemptions); <u>id.</u>,

Second Declaration of Katherine R. Gallo ("2d Gallo Decl.") at Exs. D, E (same); <u>id.</u>, Third

Declaration of Katherine R. Gallo ("3d Gallo Decl.") at Ex. K (same); <u>id.</u>, Declaration of Catrina

Pavlik-Keenan ("Pavlik-Keenan Decl.") at Exs. 17-19 (indexing ICE's assertions of exemptions

from various components of the Department, including its Citizenship and Immigration Services

and Customs and Border Protection components, and documents referred to ICE by the OIG);

<u>id.</u>, Pavlik-Keenan Decl. at Four Unnumbered Exs. (same); <u>id.</u>, Supplemental Declaration of

Catrina Pavlik-Keenan ("Supp. Pavlik-Keenan Decl.") at Exs. 1-6; (same) <u>id.</u>, Second

Supplemental Declaration of Catrina Pavlik-Keenan ("2d Supp. Pavlik-Keenan Decl.") at Ex. 1

(same); Defendants' Memorandum in Opposition to Plaintiffs' Cross-Motion for Partial Summary

Judgment ("Defs.' Opp'n"), Third Supplemental Declaration of Catrina Pavlik-Keenan ("3d

Supp. Pavlik-Keenan Decl.") at Ex. 1 (same); <u>id.</u>, Fourth Supplemental Declaration of Catrina

Pavlik-Keenan ("4th Supp. Pavlik-Keenan Decl.") at Ex. 1 (same); Defs.' Mem., Declaration of

James W. McNeely ("McNeely Decl.") at Ex. 1 (indexing the Civil Rights Office's assertions of

exemptions); <u>id.</u>, Supplemental Declaration of James W. McNeely in Response to Plaintiff's

Letter of May 7, 2009 ("Supp. McNeely Decl."), Ex. (same).  In particular, both the OIG and

ICE made at least three separate releases of records to the plaintiff.  Defs.' Mem., Gallo Decl. ¶

13; <u>see also</u> Defs.' Stmt. ¶¶ 9-10, 24-25, 28; Defs' Mem., Pavlik-Keenan Decl. ¶ 12; <u>id.</u>, Supp.

Pavlik-Keenan Decl. ¶¶ 5-6, 9-106; <u>id.</u>, 2d Supp. Pavlik-Keenan Decl. ¶¶ 4-37; Defs.' Opp'n, 3d

Supp. Pavlik-Keenan Decl. ¶¶ 3-30; <u>id.</u>, 4th Supp. Pavlik-Keenan Decl. ¶¶ 3-8; Defs.' Mem.,

Declaration of Timothy Moynihan ("Moynihan Decl."); <u>id.</u>, Declaration of Sean E. Quick

3

("Quick Decl."); Defs.' Opp'n, Declaration of Mary F. Loiselle ("Loiselle Decl.").  And the Civil

Rights Office made at least two disclosures as well.  <u>Defs.' Mem.</u>, McNeely Decl. ¶¶ 13-14, <u>see</u>

<u>also</u> Defs.' Stmt. ¶¶ 16-17.

      Unsatisfied with the defendants' search methods and unpersuaded by the defendants'

assertions of exemptions to disclosure of specific documents, the plaintiff brought this lawsuit to

compel the defendants to conduct more thorough searches of their records and make greater

disclosures with respect to responsive records that were either redacted and disclosure only in

part or totally withheld.  <u>See generally</u> Compl.  The defendants move for summary judgment on

the grounds that their searches were adequate and that their reliance on the several FOIA

exemptions was proper.  <u>See</u> Defs.' Mot. at 1.  The plaintiff cross-moved for partial summary

judgment on the grounds that the defendants' searches and disclosures were not in compliance

with the requirement of the FOIA.  Pl.'s Mot. at 1.

## II.  STANDARD OF REVIEW

      Under Rule 56, summary judgment is appropriate if "the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(c)(2).  When ruling on a Rule 56 motion, the Court must view the evidence in the light most

favorable to the non-moving party.  <u>Holcomb v. Powell</u>, 433 F.3d 889, 895 (D.C. Cir. 2006)

(citing <u>Reeves v. Sanderson Plumbing Prods.</u>, 530 U.S. 133, 150 (2000)).  The Court must

therefore draw "all justifiable inferences" in favor of the non-moving party and accept the non-

moving party's evidence as true.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).

The non-moving party cannot, however, rely on "mere allegations or denials," <u>Burke v. Gould</u>,

286 F.3d 513, 517 (D.C. Cir. 2002) (quoting <u>Anderson</u>, 477 U.S. at 248) (internal quotation

marks omitted), because "conclusory allegations unsupported by factual data will not create a triable issue of fact," Pub. Citizen Health Research Group v. FDA, 185 F.3d 898, 908 (D.C. Cir. 1999) (internal brackets and quotation marks omitted).  If the Court concludes that "the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof," then the moving party is entitled to summary judgment.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

The FOIA requires a federal agency to release all records responsive to a request for production, 5 U.S.C. § 552(a)(3)(A), unless such records falls within one of the well-defined exemptions listed in § 552(b), see 5. U.S.C. § 552(b).  The Court is authorized under the FOIA "to enjoin [a federal] agency from withholding agency records or to order the production of any agency records improperly withheld from the complainant."  § 552(a)(4)(B); see Kissinger v. Reporters Comm. for Freedom of the Press, 445 U.S. 136, 139 (1980).  When a FOIA requester files a civil action, the agency has the burden of proving that "each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the Act's inspection requirements."  Goland v. CIA, 607 F.2d 339, 352 (D.C. Cir. 1978), cert. denied, 445 U.S. 927 (1980) (internal citation and quotation marks omitted); see Maydak v. Dep't of Justice, 218 F.3d 760, 764 (D.C. Cir. 2000) (government has the burden of proving each claimed FOIA exemption).  So long as the agency's search for records comports with the FOIA, the Court may award summary judgment to an agency solely on the basis of information provided in affidavits or declarations when they sufficiently describe "the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith."  Military Audit Project v. Casey,

5

656 F.2d 724, 738 (D.C. Cir. 1981); <u>see also</u> <u>Vaughn v. Rosen</u>, 484 F.2d 820, 826 (D.C. Cir.

1973), <u>cert. denied</u>, 415 U.S. 977 (1974).

### III.  LEGAL ANALYSIS

**A.**      **Adequacy of the Defendants' Searches for Responsive Records**

An agency that is responding to a FOIA request must make "a good faith effort to

conduct a search for the requested records, using methods which can be reasonably expected to

produce the information requested."  <u>Baker & Hostetler LLP v. U.S. Dep't of Commerce</u>, 473

F.3d 312, 318 (D.C. Cir. 2006) (citation and internal quotation marks omitted); <u>see also</u>

<u>Steinberg v. U.S. Dep't of Justice</u>, 23 F.3d 548, 551 (D.C. Cir. 1994) (stating that "[an] agency

must demonstrate that it has conducted a search reasonably calculated to uncover all relevant

documents") (internal quotation marks omitted).  While "an agency cannot limit its search to

only one record system if there are others that are likely to turn up the information requested,"

<u>Campbell v. U.S. Dep't of Justice</u>, 164 F.3d 20, 28 (D.C. Cir. 1998) (internal quotation marks

omitted), the search "need not be perfect, only adequate, and adequacy is measured by the

reasonableness of the effort in light of the [plaintiff's] specific request," <u>Meeropol v. Meese</u>, 790

F.2d 942, 956 (D.C. Cir. 1986); <u>see also</u> <u>id.</u> at 953 (stating that "[i]t would be unreasonable to

expect even the most exhaustive search to uncover <u>every</u> responsive file").

Thus, "[t]here is no requirement that an agency search every record system" in which

responsive documents might conceivably be found.  <u>Oglesby v. U.S. Dep't of Army</u>, 920 F.2d

57, 68 (D.C. Cir. 1990).  Rather, an agency must demonstrate the adequacy of its search by

providing a "reasonably detailed affidavit, setting forth the search terms and type of search

performed, and averring that all files likely to contain responsive materials . . . were searched."

<u>Id.</u>  "Once the agency has shown that its search was reasonable, the burden shifts to [the

plaintiff] to rebut [the defendants'] evidence . . . either by contradicting the defendant's account

of the search procedure or by raising evidence of the defendant's bad faith." Moore v. Aspin,

916 F. Supp. 32, 35-36 (D.D.C. 1996) (citing Miller v. U.S. Dep't of State, 779 F.2d 1378, 1383-

84 (8th Cir. 1985)).  Moreover, "[a]gency affidavits are accorded a presumption of good faith,

which cannot be rebutted by purely speculative claims about the existence and discoverability of

other documents."  SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal

quotation marks omitted).

   The plaintiff challenges the adequacy of the OIG's and ICE's searches for responsive

records, alleging that the defendants did not expend reasonable efforts necessary to satisfy their

legal obligations to locate responsive records.  Pl.'s Mem. at 7-17.  The plaintiff argues that the

defendants' lack of reasonable efforts is evidenced by the fact that the defendants' search did not

produce known responsive records.  Id.  And because the defendants were more knowledgeable

about the identities of detainees who died in ICE's custody, the plaintiff maintains that the

defendants should have defined the scope of the plaintiff's request and narrowed the search

criteria required to "identify" records related to "all of the detainees who died in custody . . . ."

Id. at 8.  The plaintiff opines that the inadequacy of the defendants' search is exemplified by the

defendants' admission that the identities of additional detainees who purportedly died in the

defendants' custody came to light after the defendants represent that their searches for responsive

records concluded.  Id. at 9-10.  The plaintiff speculates that, with respect to ICE in particular,

"there are likely other detainee deaths that have yet to be identified by DHS or ICE [given that

the defendants' search initially only queried facilities that provided medical services] . . . and

that, as a result, ICE's searches were inadequate" because it should have searched all of its

facilities.  Id. at 11.  Moreover, the plaintiff maintains that ICE must conduct its search anew

with respect to one detainee, Mr. Rodriguez-Torres, id. at 15., because although records produced by ICE reveal that Mr. Rodriguez-Torres was medically evaluated on December 25, 2006, ICE did not produce records pertaining to such an evaluation. Id. Finally, the plaintiff contends that ICE must conduct a new search with respect to its e-mail records, which according to the plaintiff, are "an obvious source of important records." Id. at 16. The plaintiff posits that ICE's failure produce such records ignores the scope of the plaintiff's request because: (1) ICE demonstrated its ability to search its e-mail systems "at an organizational level" for information regarding a specific individual, and (2) such a search would not be overly burdensome if more narrow search terms were used. Id. at 16-17.

With respect to the OIG, the plaintiff agues that because the OIG was in a better position than the plaintiff to identify detainees who died while in the defendants' custody, it was unreasonable for the OIG to limit its search to only the detainees identified by the plaintiff. Id. at 13-14. The plaintiff additionally asserts that each time an additional search became necessary, the OIG was obligated to search its records through the date it conducted the supplementary search, not the date of the plaintiff's initial 2007 request. Id. at 14. Furthermore, the plaintiff maintains that it would be a "simple matter" for the OGI to conduct another search for documents concerning the detainees subsequently identified by the plaintiff. Id.

Conversely, in support of their motion for summary judgment, the defendants rely upon several declarations to support their contention that their searches for records complied with the FOIA, making any further searches unnecessary. With respect to ICE's search, the defendants rely on the declarations of Catrina Pavlik-Keenan, Sean E. Quick, Timothy Moynihan, Marsha Davenport, and Mary F. Loiselle. See Defs.' Mem., Pavlik-Keenan Decl.; id., Supp. Pavlik-Keenan Decl.; id., 2d Supp. Pavlik-Keenan Decl.; Defs.' Opp'n, 3d Supp. Pavlik-Keenan Decl.;

id., 4th Supp. Pavlik-Keenan Decl.; id., Defs.' Mem., Moynihan Decl.; id., Quick Decl.; Defs.'

Opp'n, Declaration of Mary F. Loiselle ("Loiselle Decl."); id., Declaration of CAPT Marsha

Davenport, M.D. ("Davenport Decl.").  The defendants argue, in contrast to the plaintiff's

assertion that ICE's search methods were inadequate, that ICE's multiple searches illustrate that

it was committed to conducting a thorough overall effort to satisfy its FOIA obligations.  Defs.'

Mem. at 8-9.  With respect to the OIG, the defendants rely on the declarations of Katherine R.

Gallo and contend that after the OIG received the plaintiff's FOIA request, its approach to the

search was enlightened and modified by subsequent communications with the plaintiff to clarify

the nature of the request and refine the search terms to be used.  Defs.' Opp'n at 3-4; Defs.' Mem.,

Gallo Decl. ¶ 12-13.  Ultimately, the defendants represent that the OIG agreed to search for

records pertaining to the death of 66 individuals whose names were provided by the plaintiff.

Defs.' Opp'n at 4-5.  The defendants maintain that regardless of the plaintiff's subjective beliefs,

i.e., whether it was limited to the names of those 66 individuals, the plaintiff never expressed any

objection when the OIG informed them that the OIG was conducting the search using only those

66 names as search terms.  Id.

　　　　Upon review of the defendants' numerous detailed declarations, the Court is satisfied that

they each undertook "a good faith effort to conduct a search for the requested records, using

methods which can be reasonably expected to produce the information requested."  Baker &

Hostetler, 473 F.3d at 318 (citation and internal quotation marks omitted).  Each defendant's

efforts are accounted for.  The declarations of Catrina Pavlik-Keenan and others personally

familiar with the searches for records responsive to the plaintiff's request set forth how ICE

complied with the plaintiff's FOIA request.  See generally Defs.' Mem., Pavlik-Keenan Decl.; id.,

Supp. Pavlik-Keenan Decl.; id., 2d Supp. Pavlik-Keenan Decl.; Defs.' Opp'n, 3d Supp. Pavlik-

Keenan Decl.; id., 4th Supp. Pavlik-Keenan Decl.; see also Defs.' Mem., Moynihan Decl.; Defs.'

Opp'n, Davenport Decl.; id., Loiselle Decl.  Similarly, the declarations of Katherine Gallo, who

was personally familiar with the OIG's search efforts, detail how the OIG searched for

responsive records.  See generally Defs.' Mem., Gallo Decl.; id., 2d Gallo Decl.; id., 3d Gallo

Decl..  These declarations explain the nature of the searches conducted for responsive records by

both ICE and the OIG, the procedures both divisions of the Department used, the manner in

which responsive records were processed and reviewed to assess whether information was

exempt from disclsoure, and the reasoning relied on for the exemptions claimed by ICE and the

OIG with respect to the redacted and withheld records. Id., Pavlik-Keenan Decl. ¶ 5; id., Gallo

Decl. ¶ 4.

    With respect to ICE, the declarations detail how it conducted multiple searches for

responsive records.  Defs.' Opp'n at 13.  The defendants maintain that it is Department policy to

only search for records as of the date of a request.  Id. at 14.  Therefore, with respect to the

plaintiff's requests, the defendants' state that ICE was only obligated to search for records

relating to detainee deaths occurring between January 1, 2004, the initial date specified in the

plaintiff's request, and July 30, 2007, the date when ICE first began its search.  Id.  Moreover, in

follow-up communications with the plaintiff, ICE and the plaintiff agreed to refine the search

based on a list of purported deceased detainees provided by the plaintiff.  Id.  The primary

dispute between the parties about the thoroughness of the search appears to have arisen over the

plaintiff's submission of a second list of purported deceased detainees on May 7, 2009.  Id. at 7-

8.  ICE determined that these names fell outside of the scope of the plaintiff's request because the

names provided were not of detainees who purportedly died in the defendants' custody between

January 1, 2004, and July 30, 2007, and therefore ICE did not conduct a further search based on these additional names.  Id. at 7-8, 14.

 With respect to records pertaining to Mr. Rodriguez-Torres, the defendants' declarations explain that all records relevant to Mr. Rodriguez-Torres that were located through ICE's search were produced.  To the extent that records were not produced, the defendants assert that the non-production resulted from the records not being in ICE's custody, likely because Mr. Rodriguez-Torres may have received medical care from a non-ICE operated facility.  Id. at 15-16.  Further, the defendants represent that conducting additional searches based on the plaintiff's mere speculations about the inadequacy of ICE's internal recordkeeping practices is not required.  Id. at 15.  In regards to the search of ICE's e-mail database, the defendants maintain that such a search is not appropriate given that ICE already conducted a limited search tailored to the information sought and a more extensive search would be overly burdensome to the defendants.  Id. at 18-19; Defs.' Opp'n, Davenport Decl. ¶¶ 4-31.

 Similarly, with respect to the OIG, the defendants argue that it conducted multiple searches to supplement its initial search because: (1) it subsequently learned of affiliated Department offices that potentially possessed responsive records, and (2) the plaintiff supplied the OIG with a list of specific detainee names which provided the OIG with more specific search terms for locating responsive records.  Def.'s Opp'n at 4.  Like ICE, the declarations submitted on behalf of the OIG detail how the OIG limited its search criteria to the first list of purported deceased detainees supplied by the plaintiff, but did not conduct additional searches based on the second later-submitted list of names because the OIG took the position that its initial searches were reasonable and sufficient given its view of the scope of the plaintiff's June 27, 2007 request.  Id. at 7-9.

Because the defendants and the plaintiff negotiated the search terms subsequent to the plaintiff's initial request, the plaintiff's allegations do not suggest to the Court that the defendants improperly limited the scope of their searches.[1]   The Department's policy of establishing a cut-off date for the scope of the search, which the defendants relied upon to limit the scope of their search and any necessary follow-up searches, see 6 C.F.R. § 5.4(a); Defs.' Opp'n at 8, does not appear under these circumstances to have been unreasonably utilized to improperly limit the scope of the plaintiff's request.  See, e.g., Defenders of Wildlife v. U.S. Dep't of the Interior, 314 F. Supp. 2d 1, 12 n.10 (D.D.C. 2004) (holding that the agency's FOIA regulation establishing a date-of-search cut-off date meant that records created after that date were not covered by the FOIA request); Cf. Bonner v. U.S. Dep't of State, 928 F.2d 1148, 1152 (D.C. Cir. 1991) ("To require an agency to adjust or modify its FOIA responses based on post-response occurrences could create an endless cycle of judicially mandated reprocessing.").

Moreover, given that at the time of the plaintiff's request the Department did not require its divisions to report the fact of a detainee death to the OIG, it cannot be, as the plaintiff posits, that the OIG was obligated to use its position within the Department to craft a more accurate list of search criteria, or detainee names, on the plaintiff's behalf.  Pl.'s Mem. at 12-13.  The FOIA "does not obligate agencies to create or retain documents; it only obligates them to provide access to those which it in fact has created or retained."  Reporters Comm. for Freedom of the

---

[1]      If there was any misunderstanding as to the scope of the OIG's search which arose from the parties' negotiations, the record in this case does not suggest that the plaintiff made any objection to the scope of the search to the defendants when the search was being conducted.  See Pl.'s Mem., Exs. 5-6, 9-12, 14, 24.  Based on the negotiations, the OIG's interpretation that the search was limited to the 66 individuals was accordingly reasonable, given that it was the plaintiff's obligations to describe the records sought with reasonable detail.  See 6 C.F.R. § 5.3(b); Kowalczyk v. Dep't of Justice, 73 F.3d 386, 388 (D.C. Cir. 1996)  (rejecting plaintiff's argument that "staff should have realized" that he wanted records from their New York office even though FOIA request did not so indicate); Hudgins v. IRS, 620 F. Supp. 19, 21 (D.D.C. 1985)  ("[A]n agency is not required to have 'clairvoyant capabilities' to discover the requester's need." (citation omitted)); cf. Thomas v. Office of the U.S. Attorney for E.D.N.Y., 171 F.R.D. 53, 55 (E.D.N.Y. 1997) (FOIA requester cannot add to or enlarge underlying FOIA request during pendency of request or litigation).

Press, 445 U.S. at 152 (emphasis added); see also Weisberg v. U.S. Dep't of Justice, 705 F.2d

1344, 1363 (D.C. Cir. 1983) (indicating that the information must be "within the agency's

possession at the time of the request").  Nor were the defendants compelled to conduct new

searches when it was discovered that the plaintiff's first list of detainee names was incomplete

and the plaintiff submitted a second expanded list almost two years after its initial request.

Accord Kowalczyk v. Dep't of Justice, 73 F.3d 386, 389 (D.C. Cir. 1996) (indicating that an

agency is "not obligated to look beyond the four corners of the request for leads to the location of

responsive documents," although the agency must pursue both clear and certain leads); Judicial

Watch, Inc. v. Export-Import Bank, 108 F. Supp. 2d 19, 27 (D.D.C. 2000) (quotation and citation

omitted) ("[I]t is the requester's responsibility to frame requests with sufficient particularity to

ensure that searches are not unreasonably burdensome . . . [because the] FOIA was not intended

to reduce government agencies to full-time investigators on behalf of requesters.").

It must be remembered that an agency's obligation is to make a good faith search using

methods reasonably anticipated to produce responsive information, Oglesby, 920 F.2d at 68, and

an agency need not establish that it has searched far and wide to produce "all responsive

records," Nation Magazine v. U.S. Customs Serv., 71 F.3d 885, 892 n. 7 (D.C. Cir. 1995)

(emphasis in original).  Therefore, the plaintiff's identification of any failures in the defendants'

search – i.e., responsive records that were not located and produced – does not undermine the

adequacy of the defendants' searches.  Id. (indicating that the "failure to turn up [a specified]

document does not alone render the search inadequate").  In other words, the law does not

require the defendants to demonstrate that their searches were perfect.  Id.  Indeed, any

inadequacy in the defendants' initial search efforts appears to have been cured to great extent by

the follow-up searches.  And contrary to the plaintiff's position that the subsequent searches

underscore the defendants' failures, the Court finds that these additional efforts actually bolster its confidence in the defendants' attempt to retrieve responsive records in good faith.  See Meeropol, 790 F.2d at 953 ("[T]he additional releases suggest a stronger, rather than a weaker, basis for accepting the integrity of the search.") (internal quotation omitted).

For these reasons, the Court rejects the plaintiff's argument that the defendants should not have relied on a cut-off date to limit the scope of their searches and therefore should be compelled to conduct additional searches based on the plaintiff's subsequent use of more accurate search terms, merely because the plaintiffs found that its initial list of detainee names was incomplete.  Again, while an agency cannot utilize its cut-off date policy in an unbridled manner to shield itself from performing justified additional or broadened searches, see, e.g., Public Citizen v. Dep't of State, 276 F.3d 634, 643 (D.C. Cir. 2002) (finding that given the "large 'backlog' of FOIA requests" pending before the agency and given that the request was "not limited to a 'central records system'" it was appropriate to require "a date-of-search cut-off [date]" instead of the date-of-request cut-off date relied on by the agency), a government agency may, as the defendants did, reasonably rely and apply a cut-off date policy, see Tuchinsky v. Selective Serv. Sys., 418 F.2d 155, 158 (7th Cir. 1969) (indicating that the agency was not required to "'run what might amount to a loose-leaf service'" by continually sending out current memoranda updating its response to the records request) (citation omitted); cf. McGehee v. CIA, 697 F.2d 1095, 1100, 1103-05 (D.C. Cir. 1983) (indicating that the agency may establish reasonable cut-off date for its FOIA search).

Also, the Court does not find that ICE's search is cast into doubt by the fact that ICE only searched some of its e-mail databases instead of its entire e-mail system.  The defendants represent that ICE searched the databases it deemed most likely to contain responsive

14

information and that searching the entire database would pose an unreasonable burden.  Defs.'

Opp'n at 19.  Searches "impos[ing] an unreasonable burden on [an] agency" need not be

compelled, <u>Nation Magazine</u>, 71 F.3d at 892, and the Court must accept the defendants'

representations that the databases searched were those most likely to contain relevant

information absent proof by the plaintiff that "either . . . contradict[s] the defendant's account of

the search procedure or [that] rais[es] evidence of the defendant's bad faith," <u>Moore</u>, 916 F.

Supp. at 35-36 (citation omitted).  Neither conflicting evidence nor bad faith can be found on the

record before the Court, and thus it must accord the defendants' representations the presumption

of good faith.  <u>See</u> <u>SafeCard Servs., Inc.</u>, 926 F.2d at 1200.  Accordingly, because the Court

finds that the defendants' searches conducted in response to the plaintiff's FOIA request, as

detailed in the defendants' declarations, satisfy the requirement of the FOIA, it must grant the

defendants' summary judgment motion and deny the plaintiff's cross-motion in regards to the

adequacy of the defendants' searches.

**B.**      **The Exemptions Relied Upon by the Defendants for Their Non-Production of Responsive Documents**

As indicated earlier, because the FOIA presumes that responsive records are to be

disclosed, a government agency relying on a statutory exemption to withhold certain records or

portions of records from a requester bears the burden of establishing that its reliance on those

exemptions is warranted.  <u>Goland</u>, 607 F.2d at 352 (D.C. Cir. 1978), <u>cert. denied</u>, 445 U.S. 927

(1980) (internal citation and quotation marks omitted); <u>accord</u> <u>Maydak</u>, 218 F.3d at 764.  Here,

the defendants rely upon Exemptions 2, 5, 6, 7(C) and 7(E).  Each exemption is addressed in

turn.

  1.  **Exemption 2**

  Exemption 2 of the FOIA shields from disclosure information that is "related solely to the internal personnel rules and practices of an agency."  5 U.S.C. § 552(b)(2).  It applies if the information in question meets two criteria: First, the information must be "used for predominantly internal purposes," Crooker v. Bureau of Alcohol, Tobacco and Firearms, 670 F.2d 1051, 1073 (D.C. Cir. 1981); see Nat'l Treasury Employees Union v. U.S. Customs Serv., 802 F.2d 525, 528 (D.C. Cir. 1986); and second, the agency must show either that "disclosure may risk circumvention of agency regulation," or that "the material relates to trivial administrative matters of no genuine public interest," Schwaner v. Dep't of the Air Force, 898 F.2d 793, 794 (D.C. Cir. 1990) (citations and internal quotation marks omitted).  "Predominantly internal documents the disclosure of which would risk circumvention of agency statutes and regulations are protected by the so-called 'high 2' exemption.  Predominantly internal documents dealing with trivial administrative matters fall under the 'low 2' exemption."  Schiller v. Nat'l Labor Relations Bd., 964 F.2d 1205, 1207 (D.C. Cir. 1992); see Founding Church of Scientology, Inc. v. Smith, 721 F.2d 828, 830-31 n. 4 (D.C. Cir. 1983) (finding that application of exemption 2 "to trivial administrative matters of no genuine public interest [is] . . . automatic").

  The plaintiff challenges ICE's reliance on Exemption 2.  Pl.'s Mem. at 23.  In justifying its reliance on Exemption 2, ICE offers several declarations in support of its claim that it properly invoked "Exemption 2 to withhold information that includes intake procedures, security procedures, medical procedures and suicide prevention at detention centers, detention center staffing schedules and shift reports, and e-mails related to detainee deaths."  Defs.' Mem. at 11 (citing id., Pavlik-Keenan Decl. ¶¶ 13-14; id., 2d Supp. Pavlik-Keenan Decl. ¶¶ 5, 13-14).

According to ICE, this withheld "information pertain[s] to security policies and procedures in order to prevent against circumvention of these policies and procedures."  Id. at 12; see id., Pavlik-Keenan Decl. ¶¶ 63-65.

On the contrary, the plaintiff contends that ICE "improperly relied on Exemption 2 to withhold, in full, documents relating to detention facility procedures and allegedly containing 'High 2' material."  Pl.'s Mem. at 23.  The plaintiff focuses its challenge in particular on ICE's complete withholding of the following documents listed on the defendants' Vaughn index: "(i) a 25-page document containing 'intake procedures and suicide prevention' procedures; (ii) a 16-page document containing 'security post procedures and general orders memorandum'; and (iii) a 43-page compilation of 'shift schedules and reports.'"  Id. at 23-24.  The plaintiff candidly acknowledges that "some information contained in these documents might jeopardize security and rightfully could be withheld under Exemption 2," but it contends that "given the substantial length of these documents, and the fact that they were contained in files relating to investigations of detainee deaths, it is virtually certain that each of them contain responsive, disclosable and reasonably segregable material."  Id. at 24.  And relying on the defendants' representations of what information has been withheld, the plaintiff also contends that because the records contain information that it can prove has been publically disclosed elsewhere, the defendants' reliance on Exemption 2 to fully withhold the records is not justified.  Id. at 24-25; Pl.'s Reply at 24.

Prior to these cross-motions becoming ripe, ICE made redacted disclosures of the records that are the subject of the plaintiff's Exemption 2 challenge.  Defs.' Opp'n at 21-22.  Given these subsequent disclosures and the defendants' representations that they have now thoroughly reviewed the challenged record and relied on Exemption 2 again as the basis for not disclosing the redacted information, the Court rejects the plaintiff's challenge.  The defendants' declarations

support their present contention that Exemption 2 has been narrowly and accurately applied.  To

the extent that the plaintiff's challenge remains, it is based on pure speculation regarding the

length of the records and the file location in which the records were stored, which are insufficient

to undermine the defendants' representations.  And while the defendants bear the burden to show

that their redactions were proper, they have met that burden.  The Court therefore finds the

defendants' representations are sufficient to establish that disclosure of the withheld information

would threaten the security of ICE policies and procedures set forth in the records, and on that

basis, the defendants' summary judgment motion must be granted and the plaintiff's cross-motion

denied as to Exemption 2.

**2.      Exemption 5**

Exemption 5 of the FOIA provides that the "inter-agency or intra-agency memorand[a] or

letters which would not be available by law to a party other than an agency in litigation with the

agency" are not subject to disclosure under the FOIA.  5 U.S.C. § 552(b)(5).  "To qualify [for

non-disclosure under Exemption 5], a document must thus satisfy two conditions: its source must

be a Government agency, and it must fall within the ambit of a privilege against discovery under

judicial standards that would govern litigation against the agency that holds it."  <u>U.S. Dep't of

Interior & Bureau of Indian Affairs v. Klamath Water Users Protective Ass'n</u>, 532 U.S. 1, 8

(2001).  The threshold issue that must therefore be addressed when Exemption 5 is asserted is

whether the records in question qualify as "inter-agency or intra-agency memorand[a]."  <u>Judicial

Watch, Inc. v. U.S. Dep't of Commerce</u>, 90 F. Supp. 2d 9, 13 (D.D.C. 2000).

"With respect to the secondary consideration under Exemption 5—whether such

materials would not be 'available by law in litigation with the agency,'" <u>id.</u>, "the parameters of

Exemption 5 are determined by reference to the protections available to litigants in civil

discovery . . . [,]" Burka v. U.S. Dep't of Health & Human Servs., 87 F.3d 508, 516 (D.C. Cir. 1996).  Thus, if a document requested pursuant to the FOIA would normally be subject to disclosure in the civil discovery context, it must also be disclosed under the FOIA.  Id. Conversely, information that is routinely not subject to disclosure in the civil discovery process is exempt from disclosure under Exemption 5.  Id.  Accordingly, "to justify non-disclosure under Exemption 5, an agency must show that the type of material it seeks to withhold is generally protected in civil discovery for reasons similar to those asserted by the agency in the FOIA context."  Id. at 517.  Thus, courts have incorporated three traditional civil discovery privileges into Exemption 5: (1) the deliberative process privilege; (2) the attorney-client privilege; and (3) the attorney work-product privilege.  NLRB v. Sears, Roebuck, & Co., 421 U.S. 132, 148-49 (1975); Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 862, 866 (D.C. Cir. 1980).

The defendants contend that their reliance on Exemption 5 is proper because the information withheld by the defendants consists of "[r]ecords created by [the defendants] and circulated within the agency, as well as to entities outside the agency to which the agency turned for advice," and thus falls within either the deliberative process privilege or the attorney-client privilege.  Defs.' Mem. at 13 & n. 5 (citing id. at Ex. Gallo Decl. ¶¶ 37-56; id., McNeely Decl. ¶¶ 33-40; id., 2d Supp. Pavlik-Keenan Decl. ¶¶ 125-27).  The plaintiff challenges both the defendants' reliance on the deliberative process privilege and the attorney-client privilege, seeking redacted disclosures of the records withheld in full and further disclosures of portions of some of the redacted records that have been produced.  Pl.s' Mem. at 17-23.

### a. Deliberative Process Privilege

The deliberative process privilege may be relied upon by an agency if the information withheld from disclosure contains predecisional information that was part of the deliberative

process, i.e., that there was a "'deliberative process . . . involved, and the role played by the documents at issue [was] in the course of that process,'" Heggestad v. Dep't of Justice, 182 F. Supp. 2d 1, 7 (D.D.C. 2000) (quoting Coastal States Gas Co., 617 F.2d at 868)), and the records contain "'recommendations or expresse[d] opinions on legal or policy matters,'" id. (quoting Vaughn, 523 F.2d at 1143-44).

The plaintiff contends that while the invocations of Exemption 5 by the OIG are not wholly improper, the OIG nonetheless improperly withheld "factual information received from third parties" under the deliberative process privilege, namely: "[s]ubstantial portions of 55 Memoranda of Record . . . containing factual information provided to [the] OIG during third-party interviews conducted in connection with a review of detainee deaths by the Office of Inspections in 2007 and 2008," and a substantial portion of a "two-page e-mail . . . related to the same . . . review." Plaintiff's Statement of Material Facts as to Which There is No Genuine Dispute ¶¶ 48-50. The plaintiff contends that its conclusion of improper withholding is clear upon review of the redacted records, which demonstrates that the defendants inconsistently redacted the memoranda. Pl.'s Mem. at 19. For instance, the plaintiff notes that the background sections of some of the memoranda are only slightly redacted, while others have been almost entirely withheld. Id. The plaintiff states that while it is not "seeking disclosure of predecisional opinions of OIG employees," the OIG is obligated to produce non-privileged material contained within the records and thus cannot arbitrarily disclose some factual information but withhold other such information. Id. The plaintiff also objects to the defendants' withholding of an e-mail virtually in its entirety on the basis that it appears that the e-mail recounts "a factual account of another interview," similar to those in the 55 Memoranda of Record, and the "OIG should be

20

required to release the reasonably segrebable portion that reflects the facts conveyed during the interview," id. at 18-19; id., Declaration of Benjamin R. Walker ("Walker Decl."), Ex. 18.

As to these challenges to the OIG's production, the defendants maintain that their reliance on Exemption 5 is proper.  The defendants contend that the redacted records challenged by the plaintiff "were all created during the course of [the] OIG's Inspection review which resulted in the OIG Inspection Report titled, 'ICE Policies Related to Detainee Deaths and the Oversight of Immigration Detention Facilities.'"  Defs.' Mem. at 15 (citing id., 3d Gallo Decl. 3d ¶ 31).  According to the defendants, these records constitute "work papers" and include the Memoranda of Record, which contains "information the inspector deemed important to document, including any impressions from a site visit, the demeanor of the witnesses interviewed, additional leads or information proposed by interviewees or the inspector, and preliminary findings and/or conclusions" – "working papers" that were later used to "prepare an initial draft report."  Id. at 16-17.  And, because the defendants maintain that "the facts contained in these work papers are intertwined with subjective opinions offered by the interviewees" in a manner that "it is not practicable to segregate one from the other in any meaningful way," their non-production is proper under Exemption 5.  Defs.' Mem. at 17-18 (citing id., Gallo Decl. ¶ 44).  The defendants also maintain that if the information in these records was disclosed, it would have a chilling impact on the inspectors who prepare the reports as well as the interviewees who provided source information for the records.  Defs.' Opp'n at 24-27.  The Court accepts the defendants' representations that "segregat[ing] factual information from the [Memoranda of Record] [was] extremely difficult," but its segregation decisions were carefully made as to each document, id. at 27, and therefore the Court finds that the defendants have met their burden to show that what seem to be apparent inconsistent disclosures in the Memoranda of Record do not amount to

21

inconsistent application of the deliberative process privilege by the OIG.  Rather, the record

demonstrates that the OIG was careful to withhold identifying information only where it would,

in context, identify the interviewee or reveal the mental processes of the OIG investigators

because the investigators chose to include those facts in the report.  Id. at 28.

Further, the defendants contend that their withholding of an August 14, 2007 e-mail in

full was proper because the e-mail was compiled by a third party and contained the identity of an

interviewee who provided the information on the condition of anonymity.  Id.  The defendants

maintain that the identity of its interviewee is protected from disclosure under Exemption 6,

which is not contested by the plaintiff, and that the only information withheld beyond the

interviewee's identity would identify the interviewee, other third parties, or would reveal the pre-

decisional or deliberative thought processes of the interviewer.  Id.

The defendant contends that its withholdings are justified pursuant to the deliberative

process privilege

> to protect the open, frank discussions on matters of policy between
> subordinates and superiors; to protect against premature disclosure
> of proposed policies before they are finally adopted; and to protect
> against public confusions that might result from disclosure of
> reasons and rationales that were not in fact ultimately the grounds
> for an agency's action.

Id. at 30.

The Court agrees with the defendants' contentions that they must be allowed to make

discretionary judgments and consider policy choices in an environment protected from public

scrutiny and unnecessary disclosures or otherwise the environment "would tend to 'discourage

candid discussion within an agency.'"  Petroleum Info. Corp. v. U.S. Dep't of Interior, 976 F.2d

1429, 1434 (D.C. Cir. 1992) (quoting Access Reports v. Dep't of Justice, 926 F.2d 1192, 1195

(D.C. Cir. 1991)).  And, accordingly, as to the redactions made within the memoranda prepared

by the OIG inspectors, the Court finds that a comparison of the records reveals that the

redactions are not so inconsistent as to suggest either bad faith or improper reliance on the

deliberative process privilege on the part of the defendants.  See Pl.'s Mem., Declaration of

Benjamin R. Walker ("Walker Decl."), Ex. 17 (55 Memoranda of Record).  Instead, the Court's

review of these records reveals that the defendants' redactions appear consistent with their

position that only pre-decisional and deliberative information has been withheld.[2]  In most

circumstances, only select words or passages are redacted, see, e.g., id., Ex. 17 at 48-53; and in

the few instances where it appears that entire passages have been redacted, other indicators in the

record lead to the conclusion that the information redacted would disclose the inspectors'

analyses or conclusions.  See, e.g., id., Ex. 17 at 12-13 (withholding the inspector's "[q]uestions

and concerns" regarding conducting interviews at headquarters and field offices).  Further, the

declarations submitted by the defendants detail the OIG's inspection process and the reliance that

the OIG places on the information collected and detailed in its inspectors' work papers, both as a

general principle and with respect to the memoranda the plaintiff challenges.  See Defs.' Mem.,

Gallo Decl. ¶¶ 35-50; id., 3d Gallo Decl. ¶¶ 38-47.  Therefore, the Court concludes that the

defendants' reliance on the deliberative process privilege was properly invoked so as not to

"discourage the candid exchange of ideas, analyses, and perspectives that are required in order

for OIG to conduct a thorough, comprehensive, and independent inspection or audit."  Defs.'

---

[2]        The Court declines the plaintiff's urging to review all of the records in camera.  See Pl.'s Mem. at 30 n.3.
Upon review of the parties' filings, including the representations in the defendant's Vaughn index and the
declarations submitted with it, and having reviewed the select redacted records identified by the plaintiff, the Court
finds that in camera review is unnecessary in this case.  The record currently before the Court is sufficient to resolve
the parties' cross-motions for summary judgment.  See NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 224
(1978) ("The in camera review provision [of the FOIA] is discretionary by its terms, and is designed to be invoked
when the issue before the District Court could not be otherwise resolved; it thus does not mandate that the
documents be individually examined in every case. ").

Opp'n at 25 (citing 5 U.S.C. App. 3, § 7(b) (providing for confidentiality of employee disclosures to the Inspector General)).

However, as to the defendants' withholding of the challenged e-mail, virtually in its entirety, the Court is not convinced that the defendants have set forth a sufficient basis to meet their burden of showing the necessity for its complete redaction.  According to the defendants, the OIG uses e-mail both to communicate with interviewees and to convey information regarding its interviews and "[s]uch e-mail communications [thus can contain] both pre-decisional and deliberative [information] . . . [that] reflect[s] the thinking of the inspector regarding the information being collected . . . ."  Defs.' Mem. at 18.  The defendants represent that Exemption 5 was relied upon in this instance because "[t]he email [was] drafted by [an anonymous] third party [and] provided to [the] OIG to offer additional information for [the] OIG's inspection."  Defs.' Mem., Gallo Decl., Ex. 35 at 90-91 (stating the defendants' rationale for redacting document 105).  According to the defendants,

> [t]he information provided by the third party consists of information regarding understaffing, security, foodservice, and management issues related to a detention center [where] the source was employed.  Release of this information would reveal the pre-decisional, deliberative information OIG inspectors received in confidence, but do not necessarily use in the final OIG report.

Id.

In making a determination of whether a document is properly withheld under Exemption 5, "courts frequently examine whether 'the document is so candid or personal in nature that public disclosure is likely in the future to stifle honest communication within the agency.'"  Wilderness Soc. v. U.S. Dep't of Interior, 344 F. Supp. 2d 1, 15 (D.D.C. 2004) (quoting Coastal States, 617 F.2d at 866).  "However, in cases where there is no identifying information that

24

would link an individual to a document, this potential is unlikely." Id.  The defendants bear the burden of demonstrating, with respect to this record, that their non-disclosure was appropriate under Exemption 5.  The defendants have not met this burden because neither their declarations nor their description in the Vaughn index state specifically why the wholesale redaction of this document is warranted, given that the identity of the author is unknown and any information that might make it possible to identify the author could be redacted.  Without a more detailed description upon which the Court can rely, it can only conclude that the factual information can be selectively redacted in a manner that protects the confidentiality of the author.  The Court agrees with the plaintiff that the nature of this document appears to be similar to the 55 Memoranda of Record and thus a more tailored and selective reliance on Exemption 5 is likely appropriate, just as was undertaken with the 55 Memoranda of Record.  Accordingly, the defendants must re-evaluate this document to ensure that only properly withheld information has been redacted and either make greater disclosure of the content of the e-mail to the plaintiff or provide a more detailed rationale for their reliance on Exemption 5 as a proper basis for withholding the redacted portions of the document.

In addition to the plaintiff's challenge to the OIG's partially redacted records, the plaintiff challenges the Civil Rights Office's full withholding of select records relating to the death of detainee Maria Inamagua-Merchan, including:

> (i) [the Civil Rights Office's]"Case Opening Memorandum," (ii) notes of interviews of third parties, (iii) a "close letter to complainant's counsel," (iv) final "talking points" for use in response to media inquiries; (v) a "final report of [the Civil Rights Office's] investigation"; and (vi) an "expert report referred from [the] OIG, with attachments, prepared by [the Civil Rights Office] experts examining a detainee death and medical standards in detention facilities."

Pl.'s Mem. at 20.  The defendants have withheld these records on the ground that they are deliberative and pre-decisional.  Defs.' Opp'n at 31-32.  The defendants maintain that because the Civil Rights Office is the Department's investigator of "allegations of civil rights and civil liberties abuses," the withholding in full of the challenged documents was entirely proper.  Defs.' Mem. at 20 (citing id., McNeely Decl. ¶ 21).  As to the final report and the accompanying expert report, the defendants contend that "although the conclusions offered in the final report constitute [the Civil Rights Office's] final conclusions, they are, in fact, only recommendations as to the conclusions within [the Department] . . . [which t]he Secretary of [the Department] is free to reject."  Defs.' Opp'n at 32; see Defs.' Mem., McNeely Decl. ¶¶ 3-9; id. Supp. McNeely Decl. ¶¶ 7-19.  In regards to the "talking points," the defendants contend that they amount to nothing more than recommended statements that a spokesperson for the Department could ultimately accept or reject because no final agency "decision was made on how to respond."  Defs.' Opp'n at 32-33; see Defs.' Mem., Supp. McNeely Decl. ¶ 11.  And lastly, as to the case opening memorandum, notes, and correspondence, the defendants represent that these materials "reflect the [Civil Rights Office's] concerns, theories, conjectures, and preliminary understanding of the facts at issue, not a final view of the underlying facts."  Defs.' Mem., Supp. McNeely Decl. ¶ 11; see Defs.' Opp'n at 35.

The plaintiff does not dispute that portions of these records are "likely [to] contain information protected by the attorney-client privilege," but argues that given the character of these records, that similar to the OIG's flawed decision to withhold the entire e-mail, "it is unimaginable that [these records] do not contain significant segregable factual information." Pl.'s Mem. at 20-21.  The plaintiff seeks the Civil Rights Office's production of redacted versions of the records "that constitute factual information and [the Civil Rights Office's] objective

26

conclusions concerning those facts—e.g., conclusions concerning the circumstances of Ms. Inamagua's death, the treatment she received, the conditions of the facility where she was detained and the conduct of ICE staff." Pl.'s Reply at 9.  The plaintiff contends that because the investigation report and corresponding expert report was self-characterized by the Civil Rights Office as "final," the defendants' invocation of Exemption 5 based on their conclusion that the report is deliberative because the Secretary could reject the recommendation in the report, see Defs.' Opp'n at 32, is "specious" as there is no "basis on which to believe that the Secretary of [the Department] would have any basis or reason to revisit the factual portions of the [Civil Rights Office's] report (separate and apart from any policy recommendations)." Pl.'s Reply at 9-10.  The plaintiff represents that "the expert report is likely to contain a wealth of factual information communicated to or by the expert that can be easily segregated and should be disclosed." Id. at 11.  Further, the plaintiff contends that the notes and letter should not have been withheld in their entirety because they, "by their nature, reflect factual information conveyed during the investigation." Id. at 12.

The Court is satisfied, based on the defendants' representations, that the Civil Rights Office's final report, expert report, and "talking points" are all deliberative in that they reflect a discourse that occurred during the decision-making process concerning the Department's conclusions relating to Ms. Inamagua-Merchan's death and what strategy the Department should take regarding any litigation that may arise from the incident.  See Defs.' Opp'n at 34 (citing Defs.' Mem., McNeely Decl. ¶ 38; id., Supp. McNeely Decl. ¶¶ 8-9, 16); Heggestad, 182 F. Supp. 2d at 7 ("Deliberative documents frequently consist of 'advisory opinions, recommendations and deliberations comprising part of a process by which governmental

decisions and policies are formulated.'" (citation omitted)).  The only question remaining then is whether the records are pre-decisional.

The Court is persuaded that the "talking points" are pre-decisional.  The creation of a "talking points" document itself suggests that a public statement was anticipated at the time of its creation, and given that that no official statement has yet been made, the talking points remain ripe recommendations that are ready for adoption or rejection by the Department.  See, e.g., Sierra Club v. U.S. Dep't of Interior, 384 F. Supp. 2d 1, 19 (D.D.C. 2004) (finding that a similar "talking points" document constituted "[a] memo making recommendations or presenting options [that] reflect[ed] the essence of internal deliberations that Exemption 5 was designed to protect.").  Thus, the "talking points," being both a deliberative and pre-decisional record, fall within the deliberative process protection of Exemption 5.  However, the same is not true with regard to the final report and accompanying expert report.

Based on the record before it, the Court is unable to conclude that the final report and the expert report are pre-decisional, given that it is not clear from the record before it whether any decision was ever made by the Secretary to adopt the Civil Rights Office's recommendation. And because the records could theoretically recommend that no action be taken publicly, they could, in effect, encapsulate final agency action.  See Sears, Roebuck & Co., 421 U.S. at 152 (stating "[t]he public is only marginally concerned with reasons supporting a policy which an agency has rejected, or with reasons which might have supplied, but did not supply, the basis for a policy which was actually adopted on a different ground.  In contrast, the public is vitally concerned with the reasons which did supply the basis for an agency policy actually adopted").  "Exemption 5, properly construed, calls for disclosure of all opinions and interpretations which embody the agency's effective law and policy, and the withholding of all papers which reflect the agency's

group thinking in the process of working out its policy and determining what its law shall be." Id. at 153 (citation and internal quotations omitted).  The Court is unable to conclude that the final report and expert report are pre-decisional because it is not clear whether: (1) the final report or the expert report recommend that the Secretary even take any action on this matter (a recommendation of inaction would then in effect become final agency action, see id. at 158), (2) the records recommend action that the Secretary did not take, which would then bring the records within Exemption 5, id. at 159, or even whether (3) the Secretary considered the records at all.

Even if these records are pre-decisional, the Court cannot discern how they could be completely withheld under Exemption 5.  With respect to the case opening memorandum, the defendants have produced other interview memoranda in redacted form and certainly it would seem they could have done the same with respect to these records.  Therefore, upon review of the affidavits submitted by the defendants, the Court concludes that they have not met their burden of proving why the deliberative process protection of Exemption 5 entitles them to withhold the final report and the expert report in their entirety.  Petroleum Info. Corp., 976 F.2d at 1433. Accordingly, while portions of these records likely fall under Exemption 5 or another exemption, the defendants are nevertheless obliged to produce these records in redacted form.

**b.      Attorney-Client Privilege**

In the context of Exemption 5, "the [attorney-client] privilege . . . functions to protect communications between government attorneys and client agencies or departments, as evidenced by its inclusion in the FOIA, much as it operates to protect attorney-client communications in the private sector."  In re Lindsey, 158 F.3d 1263, 1269 (D.C. Cir. 1998).  "Thus, when the Government is dealing with its attorneys as would any private party seeking advice to protect personal interests, and needs the same assurance of confidentiality so it will not be deterred from

full and frank communications with its counselors, [E]xemption [5] applies."  Id. (quoting

Coastal States, 617 F.2d at 863) (internal quotation omitted).  Accordingly, "[t]o invoke the

[attorney-client] privilege, an agency must demonstrate that the document it seeks to withhold

(1) involves 'confidential communications between an attorney and his [or her] client' and (2)

relates to a 'legal matter for which the client has sought professional advice.'"  Judicial Watch,

Inc. v. U.S. Postal Serv., 297 F. Supp. 2d 252, 267 (D.D.C. 2004) (quoting Mead Data Cent., Inc.

v. Dep't of the Air Force, 566 F.2d 242, 252 (D.C. Cir. 1977)).  However, the attorney-client

privilege does not give the agency the ability "to withhold a document merely because it is a

communication between the agency and its lawyers."  Id. (citation omitted).  The agency must

show that the information provided to its lawyers was intended to be confidential and was not

disclosed to a third party.  Id. (citation omitted).

        The plaintiff challenges the invocation of the attorney-client privilege by the Civil Rights

Office in regards to some of the records already discussed, including the following: "(i) [the

Civil Rights Office's] 'Case Opening Memorandum,' (ii) notes of interviews of third parties, . . .

[(iii)] final 'talking points' for use in response to media inquiries; [and] (v) a 'final report of [the

Civil Rights Office's investigation.'"  Pl.'s Mem. at 20.  Again, the plaintiff does not argue that

the documents are free of any privileged information, but rather contends that the nature of the

records suggests that they contain non-privileged factual information that cannot be properly

withheld or information that was ultimately disclosed eliminating any privilege protection.  This

information included third-party information "virtually certain," the plaintiff contends, to be

contained in the interview notes and the final Civil Rights Office report, along with information

in media talking points, the content of which was intended for media disclosure.  Id. at 22.

The defendants opine that their withholding of these records under the attorney-client privilege protection of Exemption 5 is proper because "[t]he withheld information consists of legal discussions between [Department] personnel and [Department] attorneys relating to the conduct of the investigation, policy formulation and final recommendations, as well as discussions of ongoing litigation and legal aspects of [Department] business processes."  Defs.' Mem. at 24 (citing id., McNeely Decl. ¶ 38; id., Supp. McNeely Decl. ¶¶ 8-9, 16); see also Defs.' Opp'n at 34.  As to the final report, the defendants maintain that the "report was prepared under the supervision of counsel assigned to [the Civil Rights Office], and it contains legal analysis relating to the underlying allegations, and mixed legal and policy advice offered to ICE."  Defs.' Mem. at 24 (citing id., McNeely Decl. ¶ 40).  The defendants argue that disclosure within the Department, but outside of the Civil Rights Office, does not destroy the attorney-client privilege because the information withheld involved conversations among attorneys within the Department, who were not all members of the Civil Rights Office, "relating to the conduct of the investigation, policy formulation and final recommendations, as well as discussion of ongoing litigation and legal aspects of [the Department's] business processes."  Defs.' Opp'n at 34.  Because the plaintiff has not shown that the information was conveyed to persons outside of the Department, the defendants maintain that the attorney-client privilege survives.  Id. at 34-35.  The defendants additionally contend that disclosure of the final report in particular would have a chilling effect and would undermine the Civil Rights Office's "'statutory duty to provide advice on civil rights and civil liberties issues, a role that necessarily entails providing legal advice.'"  Id. at 36 (citing Defs.' Mem., Supp. McNeely Decl. ¶ 7).  The defendants state that "the disclosure of [the] information [sought by the plaintiff] would strip away the very underpinnings of the attorney-client privilege generally, as clients would be less likely to candidly raise

potential issues with counsel if they anticipated public disclosures of such matters, and the system as a whole would suffer." Defs.' Opp'n at 36 (citation omitted).

While the defendants' maintain that the plaintiff relies on mere speculation to cast doubt on the defendants' invocation of the attorney-client privilege and although the plaintiff has not shown that any information contained in the records has been shared with individuals outside of the Department, it must be remembered that the defendants bear the burden of showing that the withholding of documents is justified under the FOIA. Considering that the attorney-client privilege does not give the agency the prerogative "to withhold a document merely because it is a communication between the agency and its lawyers," Judicial Watch, 297 F. Supp. at 267 (citation omitted), the defendants' reliance on the fact that the records remained within the Department is not alone a sufficient basis to withhold the documents. Indeed on the record before it, the Court is unable to conclude that the defendants have met their burden of demonstrating that the withholding in full of the records relating to Ms. Inamagua-Merchan's death was proper. With the exception of the "talking points" document, which the Court finds was properly withheld under the deliberative process protection of Exemption 5, none of the other records have been shown to be comprised solely of privileged content. Rather, the defendants merely make generalized representations that they include privileged material. And even the plaintiff acknowledges that the defendants' representation is likely valid as to some information contained within the records, Pl.'s Mem. at 22, but these admissions do not end the matter.

Presumably counsel for the defendants relied upon certain facts when coming to their conclusions and making their candid recommendations, and also included those facts in these records. However, these circumstances facts standing alone are not sufficient to protect these

facts from disclosure simply because they were included in memoranda prepared by an attorney for a client.  See Sears, Roebuck & Co., 421 U.S. at 155-56.  The defendants acknowledge that the Department was in communication with members of Ms. Inamagua-Merchan's family and their attorney regarding Ms. Inamagua-Merchan's death, Defs.' Opp'n at 40, so to the extent family members and the estate attorney became aware of facts contained in the records, that information is not protected by the attorney-client privilege.  See Mead Data Cent., 566 F.2d at 254-55 (stating that where "the background facts provided [in the records] could easily be information which is not restricted to the [agency] personnel directly responsible for the negotiations[, that information was] . . . not confidential for purposes of th[e attorney-client] privilege"); see also Coastal States, 617 F.2d at 863 ("If facts have been made known to persons other than those who need to know them, there is nothing on which to base a conclusion that they are confidential.").

It is the defendants' burden to demonstrate that all of the information contained in these records is fully protected, and unless the defendants can show that the factual information conveyed between its counsel and its entities "was not known by or disclosed to any third party," the Court cannot grant summary judgment in their favor.  Mead Data Cent., 566 F.2d at 253-54.  The defendants' representations, while detailed, leave this question unanswered.  Because the Court does not have the basis to conclude that the information warrants a complete non-disclosure of all of these records on the basis of the defendants' representations, the defendants must at minimum either produce redacted versions of these records to the plaintiff or provide more detail as to how the specific information in the records warrants complete withholding under Exemption 5.

### 3.      Exemption 7(C)

Exemption 7(C)[3] is designed to protect the personal privacy interests of individuals

named or identified in government "records or information compiled for law enforcement

purposes," to the extent that their disclosure "could reasonably be expected to constitute an

unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C); see also U.S. Dep't of

Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 756 (1989).  In order to

determine whether a withholding is proper under Exemption 7(C), an individual's right to

privacy must be weighed against the public's right to the information.  Sussman v. United States

Marshals Serv., 494 F.3d 1106, 1115 (D.C. Cir. 2007); Davis v. Dep't of Justice, 968 F.2d 1276,

1281 (D.C. Cir. 1992).  Where a legitimate privacy interest is implicated, the requester must

"[(1)] show that the public interest sought to be advanced is a significant one, an interest more

specific than having the information for its own sake, . . . [and (2)] show the information is likely

to advance that interest."  Nat'l Archives & Records Admin. v. Favish, 541 U.S. 157, 172 (2004).

---

[3]      The defendants rely on both Exemptions 6 (which protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6)) and 7(C)  (which shields personal information in law enforcement records, id. § 552(b)(7)(C)) to withhold the handwritten witness statements, records pertaining to deceased detainees, and the "talking point" document challenged by the plaintiffs, Defs.' Mem. at 26-33.  Because the Court concludes that the defendants properly relied on Exemption 7(C) to withhold the information contained within the records discussed in this section, it need not also address the defendants' reliance on Exemption 6 relating to these records.  This is not only because one exemption is sufficient to justify the withholding of such information, but also because Exemption 7(C) offers greater protection than Exemption 6.  Therefore if an agency's withholding is proper under Exemption 7(C), it follows that the withholding is also proper under Exemption 6.  See Nat'l Archives & Records Admin. v. Favish, 541 U.S. 157, 165-66 (2004).

The plaintiff also initially alleged that "ICE improperly applied Exemptions 6 and 7(C) to withhold a portion of a June 2007 ICE Office of Public Affairs document containing talking points relating to detainee deaths." Pl.'s Mem. at 30.  The plaintiff maintained that "it is almost certain that some of the withheld information relates to Mr. Castaneda," a former ICE detainee who has since died.  Id. at 31.  The plaintiff asserts that there was no privacy interest regarding Mr. Castaneda that warranted withholding information related to him because he testified before Congress as to the medical care he received while in ICE custody, and even if any privacy interest did exist, there are sufficient public policy reasons for disclosing information pertaining to him.  Id.  While the defendants maintain that their withholding of the "talking points" record was proper because the withheld information pertains to "individuals whom ICE believed were not deceased and were the subject of ICE law enforcement actions," Defs.' Opp'n at 42 (citing id., 4th Supp. Pavlik-Keenan Decl. ¶ 12, and thus was not responsive to the plaintiff's FOIA request, the defendants have since released this information to the plaintiff.  Id.  Thus, the Court need not resolve the question of whether information within that record was properly withheld, as that issue is now moot.

It is readily apparent that the records withheld by the defendants based on Exemption 7(C) qualify as law enforcement records.  The declarations submitted by the defendants each articulate the scope of the law enforcement or investigatory responsibilities of the relevant components of the Department and attest that the records were complied to carry out those functions.  Defs.' Mem., Gallo Decl. ¶ 64; id., McNeely Decl. ¶¶ 15-21; id., Pavlik-Keenan Decl. ¶ 73.  Given the nature of the documents, the Court must consider the personal privacy interests at stake, weighed against the public's right of disclosure of the information withheld.

According to the OIG, it relied properly on Exemption 7(C) to withhold two kinds of handwritten witness statements based on its fear that the statements could be used to identify the witnesses (a potential not contested by the plaintiff), subject them to harassment, and "would shed no light on the operations and activities of [the] OIG."  Defs.' Mem. 31; id., Gallo Decl. ¶¶ 66-77; id., 3d Gallo Decl. ¶¶ 25-30.  First, regarding several handwritten notes in a journal authored by one detainee before she committed suicide, the Court agrees with the defendants that these notes are not of "any discernible public interest" that outweighs their withholding to protect "the privacy interests of [her] family."  Id., Gallo Decl. ¶ 70.  The writings of a detainee in the days leading up to her suicide are likely to contain personal information, which sensibly should be withheld for personal privacy reasons.  See Favish, 541 U.S. at 165, 167, 170 (noting that the right to personal privacy is not confined to the right to control information about oneself, concluding that with its use of the term "personal privacy," Congress "intended to permit family members to assert their own privacy rights against public intrusions," and holding the FOIA recognizes surviving family members' right to personal privacy regarding a close relative's post-suicide, death-scene images).  Because the defendants are relying on these notes as part of their

investigation into the death of the detainee, such writings fall within the scope of Exemption 7(C).

Next, regarding the handwritten notes authored by witnesses, the Court also agrees that these documents are properly withheld under Exemption 7(C), given that the defendants assert that they have already provided the plaintiff with the actual content of the notes in a typed form. Defs.' Opp'n at 38; id., 3d Gallo Decl. ¶¶ 25-28.  The Court is not persuaded that, as the plaintiff contends, handwriting exemplars are needed of all the detainees in order to identify the authors. Pl.'s Mem. at 27.  Indeed, the Court can easily surmise that someone familiar with a particular detainee's handwriting, especially penmanship possessing any distinctive flourish or stylization, could deduce the author's identity to some level of certainty without eliminating every other possible author of the submission.  And where the privacy interests and public interests in disclosure can be simultaneously protected by withholding the actual handwritten version of the notes by producing typed renditions, an appropriate balance is reached.  See Church of Scientology of Texas v. IRS, 816 F. Supp. 1138, 1160 (W.D. Tex. 1993) ("Although the FOIA does not contain an express provision requiring an agency to reproduce handwritten documents in a form other than the form in which the agency stores the document to permit disclosure of the portions of the document that are not otherwise exempt, such a requirement is implicit in the FOIA's dominant theme of full agency disclosure, its intent to open agency action to public scrutiny, and its redaction provisions."); cf. May v. Dep't of Air Force, 777 F.2d 1012, 1016 (5th Cir. 1985) (finding agency concern that releasing handwritten notes under the Privacy Act could reveal the identities of the authors "could be easily remedied by preparing a special copy of the [records], or parts thereof, typewritten or in a third-party's handwriting").  Therefore, given that the plaintiff already has the content it seeks and the public interest in disclosure is therefore

protected, the defendants' arguments for withholding the select formulation of the information which may expose the author's identity is compelling.

The defendants also maintain that they are entitled to withhold their correspondence with counsel for the estate of one deceased detainee, Ms. Inamagua-Merchan, and her relatives given that (1) medical records were attached to the her relatives' correspondence with the defendants, and (2) the counsel and relatives only supplied the records sought by the plaintiff under the auspices of assisting with the defendants' investigation of Ms. Inamagua-Merchan's death.  Defs.' Opp'n at 40.  The defendants maintain that "release of the substance of this communication would cause a clearly unwarranted invasion of the personal privacy of [the] 'decedent and her survivors and estate as they seek redress against the Government,'" and would discourage other potential complainants from providing information to the defendants and cooperating with Department investigations.  Id. at 40-41 (quoting id., Supp. McNeely Decl. ¶ 13).

The plaintiff challenges the withholding of the medical records and related correspondence on the ground that the defendants' reliance on Exemption 7(C) is improper because there is no substantive difference between the medical records maintained in this context and those records otherwise pertaining to detainees.  Pl.'s Mem. at 28-30; Pl.'s Reply at 22.  The plaintiff also maintains that no privacy interest is created by the "transmission of records to [the Civil Rights Office] by a complainant, such as a family member or an attorney," and because the complainant's information can be redacted as with any record.  Pl.'s Reply at 22.  The plaintiff argues further that there is a public interest in both the detainee's medical treatment while in the defendants' care and the circumstances of the detainee's death that outweighs any privacy interest existing in the information.  Id.

The Court agrees with the defendants that the records pertaining to Ms. Inamagua-Merchan fall within the protection of Exemption 7(C).  The records sought differ from other documents produced to the plaintiff because they pertain to the death of one specific detainee whose identity is known and they stem from communications with the detainee's family and the counsel for the detainee's estate.  While the plaintiff and the public have a general interest in the disclosure of information pertaining to detainees, this specific file is particular to a known detainee, relating to the circumstances regarding her health, detention, and death, including information provided by her family and estate counsel about the detainee.  Courts have recognized that survivors have cognizable privacy interests in information pertaining to a decedent.  See, e.g., Favish, 541 U.S. at 172.  "Exemption 7(C) recognizes that the stigma of being associated with any law enforcement investigation affords broad privacy rights to those who are connected in any way with such an investigation unless a significant public interest exists for disclosure."  Amuso v. U.S. Dept. of Justice, 600 F.Supp.2d 78, 97 (D.D.C. 2009) (citing U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. at 773-75).  Thus, in light of these principles, and the records at issue, the Court cannot find that the public interest favors disclosure for two reasons.  First, the disclosure of these communications and Ms. Inamagua-Merchan's medical records would violate the personal privacy of the detainee's surviving family members who may have claims against the defendants.  Second, the disclosure of such information could result in the discouragement of other potential complainants from cooperating with future Department investigations.  Accordingly, the public interest does not compel production of these records.

###### 4.      Exemption 7(E)

Exemption 7(E) of the FOIA protects from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law[.]"  5 U.S.C. § 552(b)(7)(E); see Long v. U.S. Dep't of Justice, 450 F. Supp. 2d 42, 79 (D.D.C. 2006); Blanton v. U.S. Dep't of Justice, 63 F. Supp. 2d 35, 49 (D.D.C. 1999); Fisher v. U.S. Dep't of Justice, 772 F. Supp. 7, 12 n. 9 (D.D.C. 1991), aff'd, 968 F.2d 92 (D.C. Cir. 1992). Thus, an agency may withhold information from disclosure where, as here, it would provide insight into its investigatory or procedural techniques.  See Morley v. Cent. Intelligence Agency, 508 F.3d 1108, 1129 (D.C. Cir. 2007) (concluding that the CIA properly withheld information revealing security clearance procedures because its release "could render those procedures vulnerable and weaken their effectiveness at uncovering background information on potential candidates").

The defendants contend that ICE's withholding of one page of a record on behalf of the Civil Rights Office was proper under Exemption 7(E) because it pertains to "the office's methods for conducting investigations, including its method of fact-finding, weaknesses or limitations in the investigations process, and information concerning the limitations on [the Civil Rights Office's] jurisdictional reach."  Defs.' Mem. at 34-35.  The plaintiff contests the defendants' withholding, asserting that because of the intended limited reach of Exemption 7(E), "[i]t is simply implausible that disclosure of significant portions of the withheld records would disclose unknown procedures or risk circumvention of the law."  Pl.'s Mem. at 22-23 n.4.

Contrary to the plaintiff's position, the Court agrees with the defendants' representations that releasing the information sought by the plaintiff would provide insight into ICE's security measures, which could circumvent those measures and compromise the safety of detainees and employees at its detention facilities where its detainees are housed.  See Defs.' Mem., Pavlik-Keenan Decl. ¶ 82 (explaining that the information withheld "relat[es] to the security at detention facilities and other locations where ICE detainees might be held [and that its reliance] could enable the detainees and members of the public to formulate strategies to circumvent security measures or calculate the level of force necessary to overcome such security"); id., Supp. Pavlik-Keenan Decl. ¶ 145 (same); id., 2d Supp. Pavlik-Keenan Decl. ¶¶ 34-37 (indicating that the withheld information contains "ICE process and protocol for accessing law enforcement and other databases upon encountering an individual who is suspected for violating immigration laws and security measures in place at detention facilities" and "to be searched pursuant to the booking process or during an[other] encounter," as well as "information relating to the security checks and protocols at detention facilities and other locations where ICE detainees might be held" and "information concerning how detention facilities screen inmates").  Accordingly, the Court finds that the defendants' one-page withholding is proper under Exemption 7(E).

## C.   The Entire Withholding of Documents

Having determined that the defendants properly invoked the aforementioned FOIA exemptions with the exceptions noted, the Court must now determine whether it properly withheld the responsive records it has declined to disclose in their entirety.  The principle that guides the Court in the assessment of this question is that if a record contains information that is exempt from disclosure, any reasonably segregable information in a document must still be released after deleting the exempt portions, unless the nonexempt portions are inextricably

intertwined with exempt portions.  5 U.S.C. § 552(b); see Stolt-Nielsen Transp. Group, Ltd. v. United States, 534 F.3d 728, 734 (D.C. Cir. 2008); Trans-Pacific Policing Agreement v. U.S. Customs Serv., 177 F.3d 1022 (D.C. Cir. 1999).  Accordingly, an agency may withhold entire documents when the "'exempt and nonexempt information are 'inextricably intertwined,' such that the excision of exempt information would . . . produce an edited document with little informational value.'"  Mays v. DEA, 234 F.3d 1324, 1327 (D.C. Cir. 2000) (quoting Neufeld v. IRS, 646 F.2d 661, 666 (D.C. Cir. 1981)).  Therefore, the Court errs if it "simply approve[s] the withholding of an entire document without entering a finding on segregability, or the lack thereof."  Powell v. U.S. Bureau of Prisons, 927 F.2d 1239, 1242 n. 4 (D.C. Cir. 1991) (quoting Church of Scientology v. Dep't of the Army, 611 F.2d 738, 744 (9th Cir.1979)).  Here, to the extent not already addressed, the Court's review of the defendants' declarations justifying the non-disclosure of records, as well as their Vaughn indices, convinces the Court that the defendants have satisfied their burden of demonstrating that all reasonably segregable information has been disclosed to the plaintiffs.

## IV.  CONCLUSION

For the foregoing reasons, the Court finds that the parties' cross-motions for summary judgment must be granted in part and denied in part.  Specifically, the defendants' motion for summary judgment is denied and the plaintiff's cross-motion is granted with respect to the defendant's reliance on Exemption 5 to withhold a disputed e-mail in its entirety, as well as a final report and expert report related to the death of Ms. Inamagua-Merchan.  Accordingly, the defendants must either produce redacted versions of these records to the plaintiff or provide more detail as to how the specific information in the records is properly withheld if they continue to rely on Exemption 5 as the basis for withholding the entire content of these documents.

However, the defendants' cross-motion for summary judgment is granted, and the plaintiff's

cross-motion for summary judgment is denied in all other respects, as the Court finds that the

defendants' searches were adequate and their reliance on Exemptions 2, 5, 6, 7(C), and 7(E) is

proper.[4]


_____/s/_____
REGGIE B. WALTON
United States District Judge

---

[4]     The Court will issue an Order consistent with this Memorandum Opinion.