IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

---

AMERICAN CIVIL LIBERTIES UNION       :

:       Civil Action No. 08-1100

:                           (RBW)

Plaintiff,       :

:

v.       :

:

UNITED STATES DEPARTMENT OF       :

HOMELAND SECURITY, et al.       :

:

Defendants.       :

## DECLARATION OF KATHERINE R. GALLO

### SUBMITTED IN SUPPORT OF OIG'S OPPOSITION TO PLAINTIFF'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND COSTS

I, Katherine R. Gallo, declare the following to be a true and correct statement of facts:

1)   I am an Assistant Counsel to the Inspector General at the U.S. Department of Homeland Security (DHS), and have been licensed to practice law in the State of Ohio since 1988; the State of Maryland since 1989; and the District of Columbia since 1990.  I currently head the Freedom of Information and Privacy Act Unit (FOIA/PA Unit) at the DHS Office of Inspector General (OIG) in Washington D.C.  I have held this position since

February 2006. I am aware of the treatment that has been

afforded to the FOIA request of the above-captioned Plaintiff,

American Civil Liberties Union (hereinafter referred to as

"ACLU" and "Plaintiff").

2)   The purpose of this declaration is to provide the Court

with an explanation regarding administrative actions OIG took in

processing Plaintiff ACLU's FOIA request, including  OIG's

extensive interactions with Plaintiff.  In recounting OIG's

administrative actions, this Declaration references prior

Declarations I filed during the merits phase of this case.

3)   The statements contained in this declaration are based upon

my personal knowledge, upon information provided to me in my

official capacity, and upon conclusions and determinations

reached and made in accordance therewith.  If called as a

witness, I could testify competently as to the facts set forth

in this declaration.

4)   I executed three prior Declarations during the merits phase

of this case on behalf of OIG.  This "Declaration" (hereinafter

referred to as "Gallo Decl.") supplements and hereby

incorporates those three prior declarations -- the First

Declaration of Katherine R. Gallo, dated January 23, 2009

("First Gallo Decl."); Second Declaration of Katherine R. Gallo,

dated March 25, 2009 ("Second Gallo Decl."); and Third

Declaration of Katherine R. Gallo, dated June 3, 2009 ("Third Gallo Decl."). See Dkt.#27.

I. OIG'S ADMINISTRATIVE PROCESSING OF PLAINTIFF'S FOIA

REQUEST

5)   On July 11, 2007, the DHS Privacy Office received Plaintiff's FOIA request. That same day, the Privacy Office acknowledged Plaintiff's request, denied Plaintiff's request for expedited review, held fees in abeyance pending quantification of records, and advised Plaintiff of the complexity of its FOIA request, invoking a 10-day extension of time beyond the statutory time limit for processing. Specifically, in its letter, the DHS Privacy Office stated:

> Due to the increasing number of FOIA requests received by this office, we may encounter some delay in processing your request. Per Section 5.5(a) of the DHS FOIA regulation, 6 C.F.R. Part 5, the Department processes FOIA requests according to their order of receipt. Although DHS' goal is to respond within 20 business days of receipt of your request, the FOIA does permit a 10-day extension of this time period. As your request seeks numerous documents that will necessitate a thorough and wide ranging search, DHS will invoke a 10-day extension for your request, as allowed by Title 5 U.S.C. § 552(a)(6)(B). If you care to narrow the scope of your request, please contact our office."[1]

Letter from Vania Lockett to ACLU (July 11, 2007)(First Gallo Decl. Ex. 2).

---

[1] Invocation of the 10-day extension triggers the "exceptional circumstances" prescribed by the Act, 5 U.S.C. § 552(a)(6)(C)(i) *et. seq.*

3

6)   The DHS Privacy Office then referred Plaintiff's FOIA
request to OIG, which OIG received the next day, July 12, 2007.
By letter of July 18, 2007, OIG acknowledged Plaintiff's request
and assigned it FOIA tracking number 2007-246.[2]   OIG also denied
Plaintiff's request for expedited review and advised Plaintiff
that its request had been placed in the queue for processing in
the order in which it was received.   OIG provided appeal rights
on its decision to deny expedited review.[3]

### A.   OIG's Search Process

7)   Upon receipt of Plaintiff's FOIA request, OIG was required
to place Plaintiff's request in OIG's "complex" FOIA tracking
system due to the great volume and complex nature of the records
requested.   This "complex" track is part of OIG's multi-track
FOIA processing tracking system.   The system has three tracks,
each of which is handled on a "first in, first out" (FIFO)
basis, as follows:

- Track 1 is for requests that meet FOIA standards for
  expedited processing.
- Track 2 is for simple requests that do not involve
  voluminous records or lengthy consultations with other
  entities.

---

[2] *See* First Gallo Decl., ¶¶ 5-16 for a more detailed chronology of OIG's administrative processing of Plaintiff's
FOIA request.
[3] OIG denied expedited review and advised Plaintiff it had 60 days to appeal this decision.  Plaintiff appealed, but
filed almost three months past the appeals deadline.  DHS therefore denied the expedited review appeal as untimely,
and advised Plaintiff of its right to seek judicial review. *See* First Gallo Decl. Ex. 8.

- Track 3 is for requests that involve sensitive or voluminous records or records for which lengthy or numerous consultations are required.[4]

8)  As a standard operating procedure, OIG works with requesters and tries to narrow the scope of voluminous requests in order to move requests from the complex track to the simple track. If a requester does not narrow the scope of a complex or voluminous request, OIG must keep the request in the complex track. Requests in the complex track will, by their very nature, take more time to process.

9)  Plaintiff's FOIA request was very complex due to the scope of potentially responsive records, as well as the substantive nature of these records. The records sought pertained to deaths of U.S. Immigration and Customs Enforcement (ICE) detainees. These records related to OIG investigations, audits, and inspections, and included records and information that originated with numerous other federal agencies, both within and outside DHS. The records also raised significant questions of privacy and confidentiality in terms of sources and complainants (including whistlebowers, anonymous sources, and private citizens), and included investigative records, medical histories, and highly sensitive personal information relating to

---

[4]Details on OIG's multi-tracking FOIA system are set forth in *Office of Inspector General FOIA Requests*, available at: http://www.dhs.gov/xfoia/editorial_0788.shtm.

detainees who had died in detention centers, including autopsy reports.   These records also raised significant privacy concerns for surviving family members of detainees.

10)   The highly sensitive nature of these records mandated that OIG very closely and carefully review each document for information that required redaction.   The fact that OIG obtained most of these records from a wide variety of sources, including individuals, private entities, as well as various government entities, mandated that OIG conduct multiple consultations with these many persons and entities to ensure proper processing. Thus, the request had to be placed in OIG's complex track.

11)   Although OIG advised Plaintiff that its request was entered into OIG's complex track, both DHS and OIG advised Plaintiff repeatedly, first in the DHS Privacy Office acknowledgement letter issued to Plaintiff on July 11, 2007, and later in subsequent OIG email communications with Plaintiff on multiple dates, that Plaintiff's request could be processed much faster if it were narrowed because it could be moved to the "simple" tracking system.[5]   *See* Exhibits A-C.

---

[5] Pursuant to 5 U.S.C. § 552(a)(6)(D)(ii), "Regulations under this subparagraph may provide a person making a request that does not qualify for the fastest multitrack processing an opportunity to limit the scope of the request in order to qualify for faster processing."   DHS regulations implementing this provision, require the same:  "A component using multitrack processing may provide requesters in its slower track(s) with an opportunity to limit the scope of their requests in order to qualify for faster processing".   6 C.F.R. § 5.5(b)(2).

**B.  OIG Worked to Develop a Productive Search for Records**

12)  As explained below, once OIG determined Plaintiff's request
fell into OIG's complex tracking system, OIG worked with
Plaintiff to obtain a list of names of deceased detainees in
order to conduct a search for records.   Once OIG had identified
the universe of responsive records, OIG next worked with
Plaintiff in an attempt to narrow the scope of records to be
processed, again in order to speed up OIG's response to the FOIA
request.

13)  The record shows that OIG called Plaintiff on November 14,
2007, to discuss Plaintiff's FOIA request.   In that discussion,
Plaintiff identified item number 2(d), the request for "reports
of investigations into the circumstances surrounding [detainees'
deaths], including all after-action reports and critical
incident reports," as the primary request that covered OIG
records.   *See* First Gallo Declaration at ¶ 18.   That same day,
November 14, 2007, OIG's Office of Investigations (INV)
attempted to search for responsive records by using the search
terms "death", "detainee", "alien". The search resulted in too
many hits, and most were non-responsive.   The OIG INV FOIA
contact then used more complex search terms such as "detainee
death," "alien die," "detainee die," "alien dead," "detainee

dead". These were also non-productive because they resulted in either no hits or very few hits. *See* First Gallo Decl. at ¶¶ 19-20. *See also* Exhibit B, Email #1 (attached to this Declaration)(internal email communications between the OIG FOIA Unit and the INV FOIA contact on search terms).[6]

14) Again, on this same day, OIG called Plaintiff back again and asked whether Plaintiff would provide OIG with a list of names of deceased detainees to facilitate OIG's search. Although Plaintiff notified OIG that "according to ICE, 66 detainees have died during this period," Plaintiff only provided OIG with a list of the names of 24 deceased detainees when it memorialized this telephone conversation in an email dated November 16, 2007.   *See* First Gallo Declaration at Exhibit 14, p. 2.

15) On November 28, 2007, the OIG FOIA unit questioned Plaintiff about the apparent conflict between the list of 24 names that Plaintiff had provided, and Plaintiff's continued request for records on 66 persons who died in ICE custody.  *See* First Gallo Declaration at Exhibit 15.  Plaintiff responded on December 3, 2007, stating that it only had a list of 24 names, and that Plaintiff had requested additional names from ICE.  *See*

---

[6] My prior Declarations filed in this case on the merits, contain more detailed descriptions of OIG's searches.  *See* First Gallo Declaration at ¶¶ 19-25; Second Gallo Declaration at ¶¶ 8-15; Third Gallo Declaration at ¶¶ 10-20.

First Gallo Declaration at Exhibit 16.  Ultimately, Plaintiff

provided OIG with a list of 67 deceased detainees on January 25,

2008.  *See* Exhibit B, Email # 4 (attached to this Declaration).

(Plaintiff had included in this list, the name of a detainee who

died in December of 2007, which was six months after submission

of Plaintiff's FOIA request to DHS in July of 2007).  *Id.*  On

the same day, January 25, 2008, the OIG FOIA unit forwarded

Plaintiff's emails and lists to OIG's Office of Investigations,

requesting a search.[7]  *Id.*

16)  By March 10, 2008, OIG's Office of Investigations had

informed the OIG FOIA unit that it had completed its record

searches using the list and subsequent names Plaintiff had

provided to OIG via a series of emails.  *See* Exhibit B, Email

#4.

17)  OIG was required to conduct an additional search, however,

due to an additional name Plaintiff provided to OIG nine months

after submitting its FOIA request.  On April 24, 2008, Plaintiff

emailed a new name to OIG (Ahmed Tander) and asked OIG to

conduct another search.  *See* First Gallo Declaration at ¶ 24.

The next day, OIG FOIA unit notified Plaintiff that because OIG

had already completed its search, Plaintiff needed to submit a

new FOIA request for Mr. Tander's records.  *See* Exhibit A, Email

#5.  Although the request required a new search, the OIG FOIA

---

[7] For a detailed OIG processing timeline, *see infra* Exhibit I.

unit -- in the interest of efficiency -- asked its Office of Investigations to conduct a search for Mr. Tander's records. OIG then included these records in its response to Plaintiff's FOIA in OIG's first interim response to Plaintiff. *Id.*

18)  In sum, OIG received Plaintiff's FOIA request in July 2007, and by November 2007, OIG and Plaintiff were engaged in extensive email communications concerning search terms and a list of deceased detainees. As of January 25, 2008, OIG had obtained a list of 67 deceased detainees from Plaintiff, and OIG used these names to search for responsive records. By March 19, 2008, OIG's Office of Investigations had informed the OIG FOIA unit that it had completed its searches using the list and subsequent names Plaintiff had provided to OIG via a series of emails.

19)  OIG then released records to Plaintiff on three separate occasions. *See* Exhibits 10-12 to Gallo's first declaration. In total, OIG obtained via its searches, approximately 7,416 pages of records. *Id.* OIG reviewed, processed, and released, approximately 2,624 pages to Plaintiff and referred approximately 4,792 pages to other components/agencies for review and direct response to the Plaintiff.

### C. OIG Worked with Plaintiff in an Attempt to Narrow the Scope of Records to Be Processed

20) Once OIG had identified the broad universe of responsive records, OIG further attempted to work with Plaintiff to narrow the scope of records to be processed, again in order to speed up OIG's ability to respond to the FOIA request. Plaintiff had no obligation to agree to OIG's proposals to speed up the processing of Plaintiff's FOIA request. However, in not agreeing to narrow its request, Plaintiff mandated that OIG keep the request in OIG's complex track.

21) OIG offered to provide Plaintiff with a narrative description relating to the OIG investigation into each detainee's death, to allow Plaintiff to select specific investigations for more detailed production. This offer would have sped up OIG's document production considerably. Plaintiff declined this proposal. *See* Exhibit B, Email # 1 (handwritten notation).

22) OIG next suggested that it provide Plaintiff with just the synopsis for each of the ROIs identified in OIG's search. OIG explained that each ROI consists of a report summary or "synopsis" and related attachments, and that each synopsis summarized both the investigation and the attachments. The synopsis is often 8-10 pages, while the attachments can

11

sometimes exceed 100 pages.  OIG therefore offered to provide

Plaintiff with all of the ROI synopses.  Plaintiff also declined

this second proposal, which again required OIG to keep

Plaintiff's request in its complex tracking system, and thus

extended the processing time for Plaintiff's request.  *See*

Exhibit A, Emails # 1, 3, and 5 (attached to this Declaration).

### D.  OIG's Subsequent Production of Records Evidenced Good Faith and Not Search Inadequacies

23)  With respect to the documents OIG produced in response to

Plaintiff's FOIA, Plaintiff attempts to re-characterize certain

OIG document productions (OIG's March 25, 2008 production and

second Vaughn Index) as evidence that OIG's search was

"improper".

24)  This Court has already held that OIG's search was

reasonable.  *See American Civil Liberties Union* v. *U.S. Dep't of*

*Homeland Security*, 738 F. Supp. 2d 93, 100 (D.D.C. 2010).

Regarding OIG's March 25, 2009 Vaughn index and records release,

these records were not produced because of Plaintiff's FOIA law

suit, but because ICE contacted OIG to request a consultation on

the records in mid-February of 2009.  During the course of this

consultation, OIG discovered that two OIG ROIs on two detainees

had not been located in OIG's prior search due to a clerical

error.  *See* Second Gallo Decl. at ¶ 12.  Because OIG's Office of

Investigations had not yet physically filed the reports at the

time OIG conducted its search, the files were not identified in the search.  *See* Second Gallo Decl. at ¶ 13.

25)  When OIG's FOIA unit learned of this clerical error, the FOIA unit decided to repeat its prior search of all Office of Investigations' files to see if any other files were not found because of filing delays.  This was a good faith attempt to ensure all responsive records were located.

26)  OIG found no other such records missed because of filing delays.  OIG did find 20 pages of non-substantive records that had been miscopied in responding previously to this FOIA request -- a clerical error.  These subsequent record productions were not, however, the result of any "withholdings" by OIG.  They were the result of unintentional clerical errors.  *See* Second Gallo Decl. at ¶¶ 14-16.[8]

## II.  OIG'S EXCEPTIONAL CIRCUMSTANCES

### A.  OIG's FOIA Staff Shortage, Heavy Work Load, and Backlog of Complex FOIA Requests Slowed Processing

27)  When OIG received Plaintiff's FOIA request in July of 2007, OIG had only one full-time employee, Ms. Nikki Gramian, OIG Paralegal FOIA Specialist, handling all OIG FOIA and Privacy Act

---

[8] This was the first case in which OIG's FOIA unit learned that a search of OIG's Investigative database could miss records that were awaiting filing. Thus, OIG's FOIA unit could not have anticipated that a search might not locate records that were awaiting filing.  At the time (2007-2008), OIG's Office of Investigations had a backlog in filing and this condition has since been remedied.

requests. At this time, OIG had 105 pending FOIA requests in its backlog, and most of these (59 requests) were complex FOIA requests. *See* Exhibit D (Gramian Decl. at ¶ 15).

28) In FY 2007, OIG had been inundated with FOIA requests due to several high profile OIG investigations and inspections in progress at the time. In fact, in just the first six months, OIG had received 218 FOIA requests – a significant number when compared to the 120 requests received the entire year before. *See* Exhibit D at ¶ 8 (Decl. of Nikki Gramian, dated May 14, 2007). By the end of FY 2007, OIG had received a total of 281 FOIA requests. *See* Exhibit E.

29) When Plaintiff's FOIA request was submitted, Ms. Gramian, as OIG's only full-time FOIA unit employee, had other pending FOIA litigation duties, including another FOIA law suit in which OIG successfully sought an Open America Stay. This law suit involved a complex FOIA request for records pertaining to the prosecution of two DHS Customs and Border Patrol agents involved in a border shooting that had received national media coverage. The shooting and the resulting OIG investigative report were also the subject of intense Congressional interest. While handling these high profile FOIA and Congressional matters, not only was Ms. Gramian the only FOIA processor on board with OIG, she was also the OIG Office of Counsel's only paralegal on staff.

30)   OIG only had one FOIA processor at this time because OIG's second FOIA processor had unexpectedly left OIG in February of 2007.   Although OIG had advertised to fill this vacancy, OIG could not complete this hire until December of 2007.   OIG also attempted to bring a contractor on board during this time to process FOIAs; however, the contractor could not be brought on board until July of 2008 because of contracting issues, security clearances, etc.

31)   In short, due to this backlog of FOIA requests, staff shortage, and the heavy influx of complex and voluminous FOIA and Congressional requests, OIG lacked the resources to immediately complete Plaintiff's FOIA request. OIG therefore placed the request in its complex tracking system.

**B.   OIG Attempted to Help Plaintiff Narrow Its Request to Speed Up Processing**

32)   As stated above, even with OIG's heavy workload and backlog, the record shows that OIG made numerous attempts to work with the requester to speed up the processing of its FOIA request by narrowing the request, etc.   *See* Exhibit A, Email # 1-5, Exhibit C, Email # 1-2.

33)   Although Plaintiff had a right to demand all records and was not required to justify why it wanted all records, Plaintiff's decision to maintain its request for "all records" was a primary cause of the "exceptional circumstances" that

15

delayed the processing of Plaintiff's FOIA request simply because the complex FOIA requests take more time. OIG had no choice but to process Plaintiff's request in queue with the other complex FOIA requests.

### III. PLAINTIFF HAD KNOWLEDGE OF THE COMPLEXITY OF ITS FOIA REQUEST AND OF OIG'S CONTINUING WORK ON THE COMPLEX REQUEST

### A. Plaintiff Had Full Knowledge that Its Request Was Complex

34)    Plaintiff had clear knowledge that the records it sought were complex, as OIG reiterated via email and in telephone discussions. OIG also reiterated to Plaintiff that it would take longer to process Plaintiff's FOIA request if it remained in this complex track, as shown in email correspondence:

- On November 16, 2007, Plaintiff memorialized an earlier telephone conversation with OIG, noting that OIG explained "that **this request is complex** because the topic is so broad. You stated that when you conducted a search using obvious search terms such as 'alien', 'death', and 'detainee' you got 3000 hits, many of which were unrelated to the request." Exhibit A, Email # 1 (emphasis added).

- On January 25, 2008, Plaintiff acknowledged a telephone conversation with OIG on that same day, stating, "As you [OIG] mentioned, the request is still in the queue and is **being treated as a complex request.**" Exhibit B, Email # 4 (emphasis added).

- On March 19, 2008, OIG asked again that Plaintiff consider narrowing its request "*[b]ecause of the volume and complexity of many of the documents* that must be reviewed to respond to your request . . . ." Exhibit A, Email # 3 (emphasis added).

- On May 12, 2008, OIG stated in an email to Plaintiff, "As I've explained before **this is a very complex request,**

with a lot of records to review so I can't estimate how
long it will take to complete processing." Exhibit C,
Email # 1 (emphasis added).

**B. ACLU Had Knowledge of OIG's Ongoing Work on the Request**

35) Plaintiff also had concrete knowledge of OIG's continued

work on Plaintiff's FOIA request long before this law suit was

filed, as shown by the above-referenced emails. *See* Exhibits A-

C. Plaintiff was also well aware that its request was in OIG's

complex FOIA tracking system. *Id.*

36) The Plaintiff's Complaint filed in this case reflects

ACLU's knowledge that OIG attempted to speed up the processing

of Plaintiff's FOIA request. Plaintiff states that in November

of 2007, seven months before filing this lawsuit, Plaintiff had

declined OIG's offer to fast track the processing of Plaintiff's

FOIA request by narrowing the request: "OIG also advised

[Plaintiff] that, should the ACLU limit the Request to only

'Reports of Investigation' prepared by OIG (excluding exhibits

to such reports and related documents), the Request could be

processed on a 'fast-track' basis." *See* Complaint, Dkt. No. 1, ¶

61.

37) Plaintiff also highlights OIG's attempt in March of 2008,

which was four months before Plaintiff filed this law suit, to

fast track Plaintiff's FOIA request by offering to speed up the

processing of Plaintiff's records: "OIG again offered to

'process the request in a more timely manner' if the ACLU would

agree to limit the scope of the Request to only the formal
Reports of Investigation" produced by OIG and not the
attachments to each report. *Id.* at ¶ 70. Plaintiff also
declined this proposal. In fact, from Paragraph 61-75 of the
Complaint, Plaintiff recounts the number of times OIG
communicated with Plaintiff regarding the scope of his FOIA
request.

## C. Plaintiff Initiated This Lawsuit After Being Advised OIG Was Processing Records

38) Plaintiff was well aware of OIG's ongoing processing of the
FOIA request at bar, and appeared to file this lawsuit only once
it learned OIG was processing records responsive to this FOIA.[9]

39) As reflected in the attached OIG administrative process
timeline (Exhibit H), OIG had more than two dozen contacts with
Plaintiff via email and/or by telephone regarding OIG's work on
Plaintiff's FOIA request. These contacts occurred on multiple
occasions dating from July 18, 2007 (six days after receipt of
Plaintiff's FOIA request, through May 13, 2008 (a little over a
month before Plaintiff filed this law suit). For example, on

---

[9] The timing of this lawsuit also appears related to the class action lawsuit
Plaintiff references in its Complaint in this case. On June 13, 2007,
Plaintiff filed a class action relating to allegations of inadequate health
care provided to detainees. *See* Dkt. No. 1, ¶ 18. Two weeks later,
Plaintiff filed this FOIA request (on June 27, 2007). *See* First Gallo
Declaration, Exhibit 1. On April 2, 2008, the U.S. District Court for the
Southern District of California stayed discovery in the class action lawsuit
plaintiff had filed and referenced in paragraph 18 of its FOIA lawsuit. (*see*
Exhibit F). Then on June 25, 2008, Plaintiff filed the instant action.

five occasions in November and December of 2007, OIG

corresponded or spoke with Plaintiff regarding search issues,

specifying the results of searches being conducted by OIG's

Office of investigations, and problems resulting from searches.

OIG also discussed with Plaintiff, whether lists of detainees

could be provided to assist in OIG's search.   In late January of

2008, ACLU provided OIG with a list of names, and in February

and March of 2008, OIG's FOIA and Investigations offices worked

on the search for records.   In March, April, and May of 2008,

Plaintiff provided additional names to OIG, and OIG continued to

recommend ways Plaintiff could narrow the scope of the request

to move it to a faster track.   *See*, OIG's administrative

timeline, attached as Exhibit H.

40)  On May 12, 2008, OIG notified Plaintiff that its request

was up in queue and that OIG had begun to process the records.

*See* Exhibit C, Email # 1.   The next day, OIG's FOIA specialist

had contacted Plaintiff via email on May 13, 2008, to ask a

question regarding OIG's ongoing processing of responsive

records.   See Gallo Decl. Exhibit C, Email # 2.   On this same

date, while Plaintiff was aware of OIG continual work on its

FOIA request, Plaintiff began to draft the Complaint it later

filed in this case. *See*, Exhibit A (Declaration of David

Shapiro, billing entries for Tom Jawetz dated May 13 – June 18,

2008, attached to Plaintiff's Motion for Award of Attorneys'

Fees and Costs).  Plaintiff then filed the Complaint at bar on

June 25, 2008, and OIG filed its first response less than a

month later, on July 23, 2008.  OIG filed its second response on

August 21, 2008, and its final response on November 13, 2008.

## IV.   OIG RE-REVIEWED CONTESTED RECORDS BECAUSE OF NEW ATTORNEY GENERAL FOIA GUIDELINES

41)  During the pendency of this litigation, President Obama

announced new FOIA policies and U.S. Attorney General Eric

Holder issued revised, mandatory FOIA guidelines that directed

federal agencies to apply a significantly different "foreseeable

harm" standard in FOIA processing.  This standard differed

significantly from the prior administration's FOIA mandate

requiring agencies to apply FOIA exemptions in withholding

information, and stating that "the U.S. Department of Justice

will defend [federal agencies' FOIA] decisions unless they lack

a sound legal basis . . . ."   *See*

http://www.justice.gov/archive/oip/011012.htm.  *See also* Third

Gallo Decl. at ¶¶ 22-24.  The new policy stated that the

"Department of Justice will defend a denial of a FOIA request

only if (1) the agency reasonably foresees that disclosure would

harm an interest protected by one of the statutory exemptions,

or (2) disclosure is prohibited by law."  *Id.* at 2 (emphasis

added).[10]   The new guidelines also directly addressed pending

matters in pending FOIA litigation:

> With regard to litigation pending on the date of the
> issuance of this memorandum, this guidance should be taken
> into account and applied if practicable when, in the
> judgment of the Department of Justice lawyers handling the
> matter and the relevant agency defendants, there is a
> substantial likelihood that application of the guidance
> would result in a material disclosure of additional
> information.

Id.

42)  Based on this significant change in Federal agency FOIA

policy, and as required by the policy, OIG re-reviewed records

that Plaintiff identified in its May 7, 2009 letter to the

Department of Justice, and that consisted of only a fraction of

the records OIG produced in response to Plaintiff's FOIA.   See

Third Gallo Declaration at ¶¶ 21-24.   OIG reviewed these records

because the Attorney General's new FOIA guidelines advised

agencies to evaluate pending FOIA litigation and to take the new

guidance into account and apply it to pending litigation "if

practicable" to do so.

43)  With the exception of two documents for handwritten

statements of witnesses which the court ruled for OIG, all of

the contested records that OIG re-reviewed and from which

information was released, were records OIG had collected/created

---

[10] Under the previous administration, agencies had been directed to withhold
information if it fell within any of the statutory exemptions without any
consideration of "foreseeable harm," with the understanding that the
Department of Justice would defend all such withholdings if challenged by
FOIA requesters.

for an OIG Inspection review that OIG had already publicly

released and published on the Internet, OIG report, "ICE

Policies Related to Detainee Deaths and the Oversight of

Immigration Detention Facilities" (OIG-08-52).

44) In conducting this inspection, OIG Inspectors memorialized

interviews and collected documents during the inspection

process, which OIG refers to as "work papers." *See* First Gallo

Decl. at ¶¶ 35-52. It is important to protect these work papers

to the extent they constitute deliberations of OIG inspectors

during the course of the inspection work. As stated in my First

Declaration:

> Thus, these work papers often contain predecisional
> information concerning deliberate processes, thoughts, and
> impressions of the OIG auditor/inspector. Specifically,
> the documents (consisting of emails, documented interviews,
> written requests for records, internal discussions, etc.)
> contain recommendations, auditors/inspectors' evaluative
> comments, opinions, analyses, suggestions and other
> subjective information that reflects the personal opinion
> of the writer about the deficiencies and weaknesses of the
> program under OIG review, and any other preliminary
> findings that are subsequently reviewed as part of the
> report-writing process.

*See* First Gallo Declaration at ¶ 43. OIG therefore originally

withheld several work papers it had created during its

Inspection review. *See also* Third Gallo Decl. at ¶¶ 37-50.

45) When OIG re-reviewed the ten documents Plaintiff

highlighted in its letter of May 7, 2009, and released

additional information, the release was because of OIG's re-

processing of the records under the Attorney General's new FOIA

Guidelines.  None of the information OIG released from these

documents pursuant to the Attorney General's new guidelines,

resulted in any public benefit because OIG had already published

on the Internet, in unredacted form, OIG's report for which

these documents were created.  *See ICE Policies Relating to*

*Detainees' Deaths and the Oversight of Immigration Detention*

*Facilities*, OIG Report No. 05-52.[11]

46)  Since the change in FOIA policy, OIG, on its own accord,

has also reviewed its responses to other prior FOIA requests.

As such, OIG is re-processing certain FOIA requests because they

are for frequently requested records and because agency review

under the new guidelines will result in a significantly greater

disclosure of documents.  For example, OIG recently re-reviewed

all of its records that OIG had previously processed in response

to a FOIA request seeking OIG's underlying records for its

Inspection review of "The Removal of the Canadian Citizen to

Syria." (OIG-08-18).  As aresult of this re-review of records,

OIG has re-released a great deal of additional information,

again, pursuant to the Attorney General's FOIA Guidelines, and

this information is currently posted in OIG's reading room.  *See*

Exhibit G.  As time permits, OIG will continue to conduct a

subsequent review of requests that OIG considers significant in

---

[11]Available at:  http://www.dhs.gov/xoig/assets/mgmtrpts/OIG_08-52_Jun08.pdf.

order to afford requesters additional information as appropriate in accordance with the Attorney General's Guidelines.

### V. NEW INFORMATION FROM THE AUTHOR OF DOCUMENT 105, NEW CIRCUMSTANCES SURROUNDING THE COMPLAINANT, AND THE PASSAGE OF TIME ALLOWED OIG TO RELEASE ADDITIONAL INFORMATION

47) The Court Order in this case also directed OIG to re-examine a two-page email for any additional release of information. DHS/OIG therefore consulted with the author of this two-page email, who notified OIG that his/her source was no longer employed at the facility referenced in the email. As a result, the author had diminished concerns regarding release of certain information because the information would no longer identify the source.

48) OIG FOIA then met with the OIG inspectors who worked on the inspection review for which the email was prepared, to determine whether releasing additional information would continue to have a chilling effect on future OIG inspection reviews and whether release would harm the inspection process. The OIG FOIA unit also informed the inspectors that the author of the email had notified the FOIA unit that the source of the information was no longer employed at the same facility, and therefore more information could be released without identifying the source.

49) The inspectors advised that after three years, the chilling effect of releasing certain deliberative information was

24

diminished based on this passage of time and on the source's change of employment.  Therefore, there was no longer a basis for withholding certain information under Exemption 5.  OIG however, continued to withhold certain identifying information under Exemption 6, an exemption that Plaintiff has not challenged.

50)  As stated above, OIG took a number of concrete and distinct steps in order to process Plaintiff's FOIA complaint.  *See* Exhibit H (timeline showing OIG's processing of Plaintiff's complaint from date of receipt on July 12, 2007 through June 25, 2008).  OIG took these steps in accordance with the agency's standard administrative processing procedures for requests in OIG's complex FOIA tracking system, in a good faith attempt to respond to Plaintiff's FOIA request as quickly and accurately as possible.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this ____ day of June 2011.

KATHERINE R. GALLO
Assistant Counsel to the Inspector General
Department of Homeland Security
Office of Inspector General