**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

AMERICAN CIVIL LIBERTIES UNION,

            Plaintiff,

        v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, <u>et al.</u>,

            Defendants.

_____

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 1:08-cv-1100 (RBW)

<u>**MEMORANDUM OPINION**</u>

The present case arises from a request for records that the plaintiff, the American Civil

Liberties Union ("ACLU"), submitted to the defendants, the Department of Homeland Security

(the "Department") and several of its component divisions—the Office for Civil Rights and Civil

Liberties ("Civil Rights Office"), the Office of Inspector General ("OIG"), and Immigration and

Customs Enforcement ("ICE"), pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C.

§ 552 (2006).  Complaint ("Compl.") ¶ 1.  Not satisfied with the defendants' production of

records responsive to its request, the plaintiff filed its Complaint in this Court.  <u>See</u> <u>id.</u>  The

parties then filed cross-motions for summary judgment, which the Court granted in part and

denied in part.  <u>ACLU v. U.S. Dep't of Homeland Security</u>, 738 F. Supp. 2d 93, 97 (D.D.C.

2010).  The plaintiff now moves for an award of $223,469.09 in attorneys' fees and costs

incurred during the course of the litigation pursuant to 5 U.S.C. § 552(a)(4)(E), Plaintiff's Motion

for an Award of Attorneys' Fees and Costs ("Mot.") at 1, which the defendants oppose,[1] Defendants' Opposition to Plaintiff's Motion for Attorneys' Fees and Costs ("Defs.' Opp'n") at 1.[2] For the following reason, the Court must grant the plaintiff's motion, minus deductions totaling $8,087.50 ($7,758.00 + 329.50).

## I.   BACKGROUND

On June 27, 2007, the plaintiff submitted a FOIA request to the Department, "seeking, inter alia, records pertaining to the deaths of immigrants [while] in [the Department's] custody." Compl. ¶ 2.  According to the plaintiff, "[s]everal of these deaths had been attributed to deficient medical care provided to those detainees despite the Government's duty to supply adequate medical care and treatment to them," and the OIG subsequently found "serious problems with the delivery of health care at four [out] of five detention facilities reviewed."  Id. ¶ 3.  Because the plaintiff perceived an "ongoing risk of death or serious bodily injury to the hundreds of thousands of people detained by ICE each year," and that the public had "[an] urgent need to be informed of the federal government's activities in this area," the plaintiff sought expedited processing of its request pursuant to 5 U.S.C. § 552(a)(6)(E) and the applicable regulations.  Id. ¶ 4.  On July 11, 2007, the Department acknowledged receipt of the request, denied the plaintiff's request for expedited processing, and referred the request to the OIG and ICE.  Defs.' Opp'n,

---

[1]      In light of the parties' consent, and for good cause, the Defendants' Unopposed Motion for Further Extension of Time is granted.  Thus, the defendants' Opposition to Plaintiff's Motion for Attorneys' Fees and Costs and the plaintiff's Reply Memorandum of Law in Further Support of Plaintiff's Motion for an Award of Attorneys' Fees and Costs ("Pl.'s Reply") are both considered to have been filed timely.

[2]      In deciding the motion for attorneys' fees, the Court also considered the following filings: the Defendants' Motion for Summary Judgment ("Defs.' Mot. Summ. J."); the Defendants' Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment ("Defs.' Mem. Summ. J."); the Plaintiff's Cross-Motion for Partial Summary Judgment ("Pl.'s Mot. Summ. J."); Memorandum of Points and Authorities in Opposition to Plaintiff's Cross-Motion for Partial Summary Judgment and in Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Defs.' Opp'n Summ. J."); the Plaintiff's Reply Memorandum in Support of Its Cross-Motion for Partial Summary Judgment ("Pl.'s Summ. J. Reply"), and the Plaintiff's Memorandum of Law in Support of Its Motion for an Award of Attorneys' Fees and Costs ("Pl.'s Mem.").

Exhibit ("Ex.") 1 (Declaration of Katherine R. Gallo ("Gallo Decl.")) ¶¶ 5-6; Compl., Ex. 2 (July

11, 2007 letter from Vania T. Lockett to Tom Jawetz) at 2-3.

      1.  <u>The OIG's Response</u>

      The OIG acknowledged receipt of the plaintiff's FOIA request on July 18, 2007, and

denied the plaintiff's request for expedited processing because, <u>inter</u> <u>alia</u>, it had failed to

"adequately demonstrate[] a particular urgency to inform the public regarding the subject matter

of [its] request."  Compl., Ex. 4 (July 18, 2007 letter from Katherine R. Gallo to Tom Jawetz) at

1.  On November 5, 2007, the plaintiff sent a letter to the OIG seeking reconsideration of the

OIG's refusal to grant expedited processing.  Compl., Ex. 8 (November 5, 2007 letter from Tom

Jawetz to Nikki Gramian) at 1.  The OIG did not act on the letter because it interpreted the

plaintiff's letter as "an appeal," which "should have been directed to" the Associate General

Counsel for General Law at the Department.  <u>Id.</u>, Ex. 24 (December 7, 2007 e-mail from Nikki

Gramian to Tom Jawetz) at 1.  The plaintiff then lodged an appeal with the Associate General

Counsel, <u>id.</u>, Ex. 26 (December 7, 2007 letter from Tom Jawetz to the Associate General

Counsel (General Law), Department of Homeland Security) at 1, which was denied on January 4,

2008, because the request was filed "well past the 60[-]day filing requirement" under 6 C.F.R. §

5.9(a), <u>id.</u>, Ex. 27 (January 4, 2008 letter from Victoria Newhouse to Tom Jawetz) at 1.

      On May 5, 2008, the plaintiff once again requested that the OIG reconsider its denial of

expedited processing.  Defs.' Opp'n, Ex. 1 (Gallo Decl.), Ex. C (May 5, 2008 e-mail exchange

between Tom Jawetz to Stephanie Kuehn) at 1.  The impetus behind the plaintiff's renewed

request for reconsideration was a New York Times article "that highlight[ed] the problem of

deaths in ICE custody," which the plaintiff believed "demonstrate[d] that the government's

efforts to investigate deaths in custody are of special importance to the public."  <u>Id.</u>  At the time

the plaintiff filed its request for reconsideration, the OIG had only released a single page of responsive records.  See Pl.'s Mot. Summ. J., Ex. 1 (Declaration of Benjamin R. Walker ("Walker Decl.")), Ex. 1 (September 27, 2007 letter from Katherine R. Gallo to Tom Jawetz) at 1. On May 12, 2008, the OIG informed the plaintiff that it would not reconsider its decision, and that it had already begun processing the plaintiff's request.  Compl., Ex. 28 (May 12, 2008 e-mail exchange between Tom Jawetz and Stephanie Kuehn).

    2.  ICE's Response

      On July 24, 1997, ICE, similar to the OIG, also denied the plaintiff's initial response for expedited processing of its FOIA request because ICE concluded that the plaintiff "failed to demonstrate a particular urgency to inform the public about the government activity involved in the request beyond the public's right to know about government activity generally."  Id., Ex. 5 (July 24, 2007 Letter from Catrina M. Pavlik-Keenan to Tom Jawetz) at 1.  On November 5, 2007, the plaintiff requested that ICE reconsider its denial of the plaintiff's request for expedited processing of the plaintiff's FOIA request, and ICE reconsidered and granted the request on November 15, 2007.  Defs. Opp'n, Ex. 11 (Declaration of Ryan Law ("Law Decl.")) ¶ 5.  ICE then provided a "final response" to the plaintiff on January 4, 2008, in which it produced 856 pages of records to the plaintiff, with only thirty-three documents containing no redactions. Compl., Ex. 11 (January 4, 2008 letter from Catrina M. Pavlik-Keenan to Tom Jawetz ("January 4, 2008 letter")) at 1-4.  ICE also withheld numerous documents under the various FOIA exemptions delineated in 5 U.S.C. § 552(b); see generally id., Ex. 11 (January 4, 2008 letter) (explaining the FOIA exemptions that justify ICE's decision to withhold certain records).

      Believing the search and ultimate production of responsive documents inadequate, the plaintiff requested on February 15, 2008, that ICE provide a Vaughn index describing the FOIA

exemptions relied upon by ICE to withhold documents.  See id., Ex. 12 (February 15, 2008 e-mails between Tom Jawetz and Catrina M. Pavlik-Keenan ("February 15, 2008 e-mails")) at 1.

ICE refused to supply the index, however, because of its policy of not creating "Vaughn Indexes for FOIA requests that are not in litigation." Id.  The plaintiffs then filed an appeal with the Office of General Counsel on March 3, 2008, "challeng[ing] the thoroughness of the search, as well as the decision to withhold, in part and in full, various records."  Compl., Ex. 22 (March 3, 2008 FOIA appeal from Tom Jawetz to ICE) at 1.  Because of the pending litigation in this Court, ICE informed the plaintiff on July 30, 2008, that it was "administratively closing this appeal." Pl.'s Mot. Summ. J., Ex. 1 (Walker Decl.), Ex. 6 (July 30, 2008 Letter from Victoria Newhouse to Tom Jawetz) at 1.

    3.   The Current Litigation

"Frustrated" by the defendants' response to its FOIA request, the plaintiff filed its Complaint in this Court on June 25, 2008.  Pl.'s Mem. at 5.  In the Complaint, the plaintiff requested that the Court issue an order (1) directing the defendants "to expedite the proceedings in this action," Compl. ¶ 83, (2) "[e]njoin[ing the d]efendants from withholding the requested [r]ecords," id. ¶ 84, (3) directing the "[d]efendants to produce the [r]ecords," id. ¶ 85, and (4) "[a]ward[ing the p]laintiff its costs and reasonable attorney[s'] fees in this action," id. ¶ 86.

Soon after the filing of the Complaint, in approximately July and August of 2008, the OIG provided two "interim responses" to the plaintiff's FOIA request, releasing approximately 1,400 pages of records and referring more than 4,000 pages to other entities.  Defs.' Mem. Summ. J., Ex. 1 (First Declaration of Katherine R. Gallo ("First Gallo Decl."), Exs. 10-11 (July 23 and August 21, 2008 letters from Katherine R. Gallo to Tom Jawetz) at 1-2.

On October 30, 2008, the parties filed a Joint Report with the Court, stating that the OIG and ICE would complete the processing of the plaintiff's request by November 14, 2008, and that the Department would search for records within its Civil Rights Office. October 30, 2008 Joint Report to the Court ("First Joint Report") at 2. The OIG then provided its "third[] and final response" on November 13, 2008, producing 321 additional pages of documents. Defs.' Mem. Summ. J., Ex. 1 (First Gallo Decl.), Ex. 12 (November 13, 2008, letter from Katherine R. Gallo to Tom Jawetz) at 1-2. Shortly thereafter, ICE produced its second "final response" on November 17, 2008, releasing 2,600 pages of additional documents, many of which were referrals from the OIG. Defs.' Mem. Summ. J., Declaration of Catrina Pavlik-Keenan ("First Pavlik-Keenan Decl."), Ex. 14 (November 17, 2008 letter from Catrina M. Pavlik to Tom Jawetz) at 1-4.

The parties then filed a second Joint Report with the Court on December 5, 2008. December 5, 2008 Joint Report to the Court ("Second Joint Report"). This Report indicated that ICE would complete its production of responsive documents by December 9, 2008, the Office of Civil Rights would complete its production by December 19, 2008, and that the OIG, ICE, and the Office of Civil Rights would produce Vaughn indexes describing their search methodologies. Id. ¶¶ 1-4. On December 19, 2008, ICE released approximately 250 additional pages of documents in its third "final response" to the plaintiff's FOIA request. Defs.' Mem. Summ. J., First Pavlik-Keenan Decl., Exs. 8, 15 (December 19, 2008 letters from Catrina M. Pavlik-Keenan to Tom Jawetz).

On January 23, 2009, the OIG provided its first Vaughn index. See Defs.' Mem. Summ. J., First Gallo Decl., Ex. 35 (OIG's Vaughn Index). About two weeks later, both the ICE and the Office of Civil Rights provided their first Vaughn indexes, and also released approximately 800

more pages of responsive documents.  See id., Declaration of James W. McNeely ("McNeely Decl."), Ex. 3 (Office of Civil Rights' Vaughn Index); id., First Pavlik-Keenan Decl., Ex. 17 (ICE's Vaughn Index).  On February 11, 2008, ICE disclosed an additional 400 pages of responsive records.  Pl.'s Mot. Summ. J., Walker Decl., Ex. 11 (February 11, 2008 letter from Catrina M. Pavlik-Keenan to Tom Jawetz).

On February 23, 2009, the parties filed a third Joint Report with the Court.  February 23, 2009 Joint Report to the Court ("Third Joint Report").  The Report stated that the "[d]efendants have now completed processing and production of all records that [the d]efendants (i) located, (ii) deemed responsive to [the p]laintiff's June 27, 2007 FOIA request[,] and (iii) deemed releasable under the FOIA."  Id. at 1.  Further, the Report set forth a timetable for resolving the case, which required the plaintiff to inform the defendants by April 6, 2009, whether it would challenge the defendants' searches and assertions of FOIA exemptions, and setting dates for the defendants to file their motion for summary judgment and for the plaintiff to cross-move for summary judgment.  Id. at 2.

The defendants continued to release documents after the Third Joint Report was issued.  "ICE initiated a second, third, and fourth search for documents on March 13, 2009, March 17, 2009, and April 14, 2009, because it became apparent to [the] ICE FOIA [office] based on its increased knowledge of the [ICE Office of Detention and Removal Operations] program responsibilities that not all offices that might reasonably have responsive documents had been searched."  Defs.' Opp'n at 10.  Pursuant to these searches, the ICE released an additional 335 pages on March 20, 2008, Defs.' Mem. Summ. J., Supplemental Declaration of Catrina Pavlik-Keenan ("Second Pavlik-Keenan Decl."), Ex. 1 (March 20, 2008 from Catrina M. Pavlik-Keenan to Tom Jawetz) at 1, while the OIG released an additional 90 pages on March 25, 2009, Pl.'s Mot.

Summ. J., Walker Decl., Ex. 12 (March 25, 2009, letter from Katherine R. Gallo to Tom Jawetz) at 1. Then, in April of 2009, ICE produced close to 6,000 pages of additional responsive records. Defs.' Mem. Summ. J., Second Pavlik-Keenan Decl., Exs. 2-4 (April 21, 24, and 28, 2008 letters from Catrina M. Pavlik-Keenan to Tom Jawetz ("April 2008 Release Letters")) at 1. In two subsequent releases on June 24 and 26, 2009, ICE released approximately 1,400 additional pages. Pl.'s Mot. Summ. J., Walker Decl., Exs. 20-21 (June 24, and 26, 2009 letters from Catrina Pavlik-Keenan to Benjamin Walker ("June 2009 Release Letters")) at 1.

Included in the June 26, 2009 release was an ICE Significant Incident Report, which concerned the January 18, 2007 death of Felix Franklin Rodriguez-Torres while in ICE custody. Pl.'s Mot. Summ. J., Walker Decl., Ex. 22 (ICE Significant Incident Report) at 1-2. As a result of identifying the death of Mr. Rodriguez-Torres, ICE conducted additional searches, Defs.' Opp'n at 10-11, which led to the identification of nine other in-custody deaths that had previously gone undisclosed, Defs.' Opp'n Summ. J., Declaration of Mary F. Loiselle, ("Loiselle Decl.") ¶ 23; Pl.'s Summ. J. Reply, Supplemental Declaration of Benjamin R. Walker, Ex. 3 (September 4, 2009 letter Catrina M. Pavlik-Keenan to Benjamin Walker). And, as a result of further searches related to these deaths, ICE produced nearly 1,200 additional pages of documents to the plaintiff on September 4 and 11, 2009. Defs.' Opp'n, Law Decl., ¶ 19.

On July 2, 2009, the defendants filed their motion for summary judgment, Defs.' Mot. Summ. J. at 1, and the plaintiff submitted its cross-motion for partial summary judgment on August 14, 2009, Pl.'s Mot. Summ. J. at 1. This Court granted in part and denied in part each party's motion, see ACLU, 738 F. Supp. 2d at 97, holding that most of the documents still retained by the defendants were exempt from disclosure, id. at 120. The Court, however, deemed the defendants' reliance on Exemption 5 to withhold a disputed e-mail and other

documents relating to the death of a detainee was improper.  Id. at 115.  As a result of the Court's ruling, the defendants produced the disputed e-mail with personally identifiable information redacted, as well as several other documents.  Defendants' Notice of Filing, Declaration of Ruby Shellaway ¶ 3.

## II.  ARGUMENT AND ANALYSIS

Under the FOIA, "[t]he court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case . . . in which the complainant has substantially prevailed."  5 U.S.C. § 552(a)(4)(E)(i).  "To award attorney[s'] fees under [the] FOIA, a court must undertake a two-step inquiry."  Campaign for Responsible Transplantation v. FDA, 593 F. Supp. 2d 236, 240 (D.D.C. 2009).  "First, the court must determine whether the claimant is 'eligible' for [an award of] attorneys' fees" because it has "substantially prevailed" in the underlying litigation.  Id. (citing Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Justice, 750 F.2d 117, 119 (D.C. Cir. 1984)).  "Second, the court must determine whether the plaintiff is 'entitled' to an award of attorneys' fees and costs."  Campaign for Responsible Transplantation, 593 F. Supp. 2d at 240 (citing Md. Dep't of Human Res. v. Sullivan, 738 F. Supp. 555, 563 (D.D.C. 1990)).  If the claimant is both eligible and entitled to an award of attorneys' fees, it can obtain compensation for its reasonable litigation costs.  Playboy Enters., Inc. v. U.S. Customs Serv., 959 F. Supp. 11, 14 (D.D.C. 1997).

A.  The ACLU's Eligibility for Attorneys' Fees

A claimant is "eligible" for an award of attorneys fees if it has "substantially prevailed" in the underlying litigation.  Pyramid Lake, 750 F.2d at 119.  "[A] complainant has substantially prevailed if the complainant has obtained relief through either – (I) a judicial order, or an enforceable written agreement or consent decree; or (II) a voluntary or unilateral change in

position by the agency, if the complainant's claim is not insubstantial."  5 U.S.C. §

552(a)(4)(E)(ii).  Under the latter provision, "a plaintiff is deemed to have 'substantially

prevailed' for purposes of § 552(a)(4)(E) if the 'litigation substantially caused the requested

records to be released.'" N.Y.C. Apparel F.Z.E. v. U.S. Customs & Border Prot. Bureau, 563 F.

Supp. 2d 217, 221 (D.D.C. 2008) (quoting Chesapeake Bay Found. v. U.S. Dep't of Agric., 11

F.3d 211, 216 (D.C. Cir. 1993)).  However, "the mere filing of the complaint and subsequent

release of the documents is insufficient to establish causation." Weisberg v. U.S. Dep't of Justice,

745 F.2d 1476, 1496 (D.C. Cir. 1984).  "Courts must consider other factors, such as whether the

agency made a good[-]faith effort to search out material and pass on whether it should be

disclosed, whether the scope of request caused delay in disclosure, and whether the agency was

burdened by other duties that delayed its response." Frye v. EPA, No. 90-3041, 1992 WL

237370, at *2 (D.D.C. Aug. 31, 1992) (internal quotation marks omitted) (quoting Weisberg, 745

F.2d at 1496).

        Prior to the plaintiff filing its Complaint in this Court, the defendants had produced fewer

than 900 pages of documents.  See Compl., Ex. 11 (January 4, 2008 letter).  During the pendency

of this litigation, however, the defendants released over 15,000 additional pages of documents.

Pl.'s Mem. at 1.  The plaintiff argues that the release of these 15,000 pages was substantially

caused by this litigation, id. at 13, while the defendants argue that these releases were part of the

administrative response to the plaintiff's FOIA request, Defs.' Opp'n at 29.  Although some of

these releases were part of the defendants' administrative response, which was delayed by

exceptional circumstances, for the reasons that follow, this Court finds that the litigation

substantially caused the defendants to release some records.

1.   The Defendants' Preparation of <u>Vaughn</u> Indexes Caused the Release of Records

FOIA litigation "substantially causes" the release of records if those records were identified as a result of the litigation.  <u>See</u> <u>Fund for Constitutional Gov't v. Nat'l Archives & Records Serv.</u>, 656 F.2d 856, 872 (D.C. Cir. 1981) ("It would . . . appear quite likely that in the absence of this litigation and the need it imposed to specifically justify each deletion [the defendant] would not have voluntarily undertaken to review those files . . . .").  This Court has found that FOIA litigation substantially caused the release of documents when the "defendant's own affidavits stated that the review of the documents from which [the released] pages were drawn was being done 'incidental to the preparation' of one of its <u>Vaugh[n]</u> affidavits." <u>Des Moines Register & Tribune Co. v. FBI</u>, 563 F. Supp. 82, 84 (D.D.C. 1983).

<u>Des Moines Register</u> mirrors the facts in this case.  There, the defendant did not produce a <u>Vaughn</u> index until it was under court order to do so.  <u>Id.</u>  Thus, the Court held that "the prosecution of [the] action could reasonably be regarded as necessary to obtain the documents first released in response to the Court's <u>Vaugh[n]</u> order." <u>Id.</u>  Here, the defendants explicitly stated that they do not provide <u>Vaughn</u> indexes in the absence of litigation.  <u>See</u> Compl., Ex. 12 (February 15, 2008 e-mails) ("We do not do <u>Vaughn</u> [i]ndexes for FOIA requests that are not in litigation."); Defs.' Mem. Summ. J., First Pavlik-Keenan Decl. ¶ 14 ("[T]he ICE FOIA office does not prepare a <u>Vaughn</u> index for a FOIA request that is not in litigation.").  After the plaintiff commenced this litigation, however, the parties reached an agreement that required the defendants to produce <u>Vaughn</u> indexes.  Second Joint Report at 2.  On the same day that ICE produced its first <u>Vaughn</u> index, it released nearly 360 pages of records.  <u>See</u> Pl.'s Mot. Summ. J., Walker Decl., Exs. 8-10 (February 6, 2009 letters from Catrina M. Pavlik-Keenan to Tom Jawetz).

The Office of Civil Rights also identified and released records as a result of preparing its first <u>Vaughn</u> index.  The Office of Civil Rights stated that "[i]n the course of further processing of responsive documents in preparation of [this] <u>Vaughn</u> index, [the Office of Civil Rights] determined that an additional 440 pages of e[-]mail communications could be released in part." Defs.' Mem. Summ. J., McNeely Decl. ¶ 14.  Thus, the defendants' own submissions admit that at least some of the documents were produced as a result of preparing <u>Vaughn</u> indexes.  These documents would therefore not have been produced without litigation; accordingly, the litigation substantially caused the defendants to release these documents.

> 2.   The Litigation Caused the Production of Documents Released After the Third Joint Report

On February 23, 2009, the parties filed a Joint Report with the Court stating that the defendants had "completed processing and production of all records" and setting forth a timetable for filing summary judgment motions.  Third Joint Report at 1-2.  This Report was a clear indication that the administrative portion of the plaintiff's FOIA request was complete.  <u>See id.</u>  However, the defendants continued to release documents after filing this Report, including a release by ICE of nearly 6,000 pages in April, Defs.' Mem. Summ. J., Second Pavlik-Keenan Decl. Exs. 2-4 (April 2008 Release Letters); 1,400 pages in June, Pl.'s Mot. Summ. J., Walker Decl., Exs. 20-21 (June 2009 Release Letters); and 1,200 pages in September of 2009,[3] Defs.' Opp'n, Law Decl. ¶ 19.

The defendants devote most of their brief to describing what it contends were exceptional circumstances that caused significant delays in responding to the plaintiff's FOIA request.  <u>See</u> Defs.' Opp'n at 6-8, 11-18, 21-25, 29-32.  The Court does not question that the defendants faced

---

[3]     The releases in September of 2009 came less than one month after the plaintiff had moved for summary judgment on August 14, 2009.

unavoidable delays in processing the plaintiff's FOIA request;[4] however, the delays do not

explain why ICE "initiated a second, third, and fourth search for documents," Defs.' Opp'n at 10,

after it had completed processing and production of all records.  Therefore, the Court concludes

that the release of these pages of records was substantially caused by the litigation.

      The defendants also argue that some of these records were released as a result of new

guidelines implemented by President Obama and Attorney General Eric Holder, and not as a

result of this litigation.  See Defs.' Opp'n at 38 ("[The] OIG and [the Civil Rights Office's]

releases of additional information were caused by the new Attorney General FOIA Guidelines,

and not as a result of [the] plaintiff's lawsuit.").[5]  The District of Columbia Circuit rejected a

similar argument in Church of Scientology of California v. Harris, 653 F.2d 584 (D.C. Cir. 1981).

In Harris, after the commencement of litigation, the Attorney General issued a letter setting forth

new guidelines for FOIA releases.  Id. at 589.  The court noted that the Attorney General's letter

"precipitated release" of the documents and was "a cause," but held that the commencement of

the litigation was the "direct cause" of the document's disclosure because without the litigation,

the documents would not have been identified or evaluated to determine whether they should be

released under the new guidelines.  Id.

      The Circuit's conclusions in Harris apply to the present case.  The Attorney General's

letter stated that "[w]ith regard to litigation pending on the date of the issuance of this

memorandum, this guidance should be taken into account and applied if practicable when . . .

there is a substantial likelihood that application of the guidance would result in a material

---

[4]      The OIG, for example, received 218 FOIA requests in the first six-months of fiscal year 2007 alone, which was nearly twice as many requests as it had received in the entire year prior.  Defs.' Opp'n at 6.

[5]      The relevancy of this argument is questionable, as the defendants argue only that the OIG and the Office of Civil Rights reviewed anew records based upon the shift in policy.  See Defs.' Opp'n at 38.  Thus, this argument, even if valid, would have no affect on the thousands of pages of records released by ICE after the filing of the Third Joint Report.

disclosure of additional information."  Defs.' Opp'n, Gallo Decl. ¶ 41.  The letter plainly states

that the plaintiff's FOIA request was eligible for review because it was already in litigation at the

time the policy change was issued.  See O'Neill, Lysaght & Sun v. Drug Enforcement Admin.,

951 F. Supp. 1413, 1423 (C.D. Cal. 1996) ("That the suit was pending at the time of the new

directives is the reason the request was eligible for reevaluation.").  Thus, while the release of

some records may have been "precipitated" by the change in policy, Harris, 653 F.2d at 589, the

release of these records was substantially caused by the litigation.  Therefore, the Court finds that

the plaintiff's litigation substantially caused the production of records released after the Third

Joint Report, and the plaintiff is "eligible" for an award of attorneys' fees.

B.  The ACLU's Entitlement to Attorneys' Fees

"Congress clearly intended the award of fees to serve two separate and distinct FOIA

objectives . . . to encourage [FOIA] suits that benefit the public interest," and to "compensat[e]

for enduring an agency's unreasonable obduracy in refusing to comply with the [FOIA]

requirements."  LaSalle Extension Univ. v. FTC, 627 F.2d 481, 484 (D.C. Cir. 1980).  To reflect

these objectives, the District of Columbia Circuit employs four factors to determine whether a

claimant is "entitled" to attorneys' fees award: "(1) the benefit to the public, if any, derived from

the case; (2) the commercial benefit to the complainant; (3) the nature of the complainant's

interest in the records sought; and (4) whether the government's withholding of records had a

reasonable basis in law."  Cuneo v. Rumsfeld, 553 F.2d 1360, 1364 (D.C. Cir. 1977).  However,

"[n]one of these factors are dispositive."  Piper v. U.S. Dep't of Justice, 339 F. Supp. 2d 13, 20

(D.D.C. 2004).

The defendants do not dispute that the first three factors favor the plaintiff's "entitlement"

to attorneys' fees.  See Defs.' Opp'n at 35 ("[T]he last factor alone essentially mandates that no

fees be awarded . . . ."). However, the defendants do argue that they had a reasonable basis in law to withhold the documents because "this Court upheld all of the exemptions asserted by ICE," and the OIG and the Office of Civil Rights "had a good faith basis in withholding [the documents the Court ordered the defendants to review] on other exemptions that ha[ve] not been challenged." Defs.' Opp'n. at 36.

The Court's finding that the plaintiff substantially prevailed based upon the release of documents prior to this Court's September 20, 2010 Order has stripped this argument of persuasiveness. Putting aside the exempt documents, the defendants did not have a reasonable basis for withholding the 8,500 pages of records that were produced after the defendants had "completed processing and production of all records," Third Joint Report at 1-2, because "defendant's failure to produce documents due to backlog or administrative issues does not constitute a 'reasonable basis in law.'" Jarno v. Dep't of Homeland Sec., 365 F. Supp. 2d 733, 740 (E.D. Va. 2005) (citing Miller v. U.S. Dep't of State, 779 F.2d 1378, 1390 (8th Cir. 1985)). In any event, "[t]he 'reasonable basis in law' factor is . . . not dispositive, and can be outweighed by the [']public benefit['] and [']commercial benefit to [the] plaintiff['] factors." Ctr. to Prevent Handgun Violence v. U.S. Dep't of Treasury, 49 F. Supp. 2d 3, 6 (D.D.C. 1999) (quoting Tax Analysts v. IRS, 1996 WL 134587 at *4 (D.D.C. Mar. 15, 1996)). Considering the immense public benefit derived from the disclosure of information concerning ten previously undisclosed deaths, and the plaintiff's total lack of any commercial benefit acquired from the disclosure, the Court finds that the even if the "reasonable basis in law" factor weighs in favor the defendants, the other factors nonetheless weigh in favor of the plaintiff being "entitled' to an award of attorneys' fees.

C.   The Reasonableness of ACLU's Request for Attorneys' Fees

After a plaintiff is deemed to be "eligible" and "entitled" to an award of attorneys' fees,

the court must determine the "lodestar: the number of hours reasonably expended multiplied by a

reasonable hourly rate." Nat'l Ass'n of Concerned Veterans v. Sec'y of Def., 675 F.2d 1319,

1323 (D.C. Cir. 1982) (internal quotation marks omitted).  "For public-interest or government

lawyers who do not have customary billing rates, courts in this circuit have frequently employed

the 'Laffey Matrix,' a schedule of fees based on years of attorney experience that was developed

in Laffey v. Northwest Airlines, Inc., 572 F. Supp. 354 (D.D.C. 1983), rev'd on other grounds,

746 F.2d 4 (D.C. Cir. 1984)."  Judicial Watch, Inc. v. U.S. Dep't of Justice, 774 F. Supp. 2d 225,

232 (D.D.C. 2011).  Additionally, "[t]he reasonableness of a fee request must be evaluated in

light of the results obtained." Nw. Coal. for Alts. to Pesticides v. Browner, 965 F. Supp. 59, 64-

65 (D.D.C. 1997) (citing City of Riverside v. Rivera, 477 U.S. 561, 572 (1986)).  "Where the

plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims,

the hours spent on the unsuccessful claim should be excluded in considering the amount of a

reasonable fee." Hensley v. Eckerhart, 461 U.S. 424, 440 (1983).

The plaintiff requests a total of $223,469.09 in attorneys' fees and costs for the expenses

incurred during the course of the litigation.  Mot. at 1.  The $223,469.09 figure appears to have

been reached in error, however.  The plaintiff requests the following fees: attorneys' fees of

$202,583.75 for Sullivan & Cromwell, Mot., Declaration of Lee Ann Anderson McCall

("McCall Decl.") ¶ 8; attorneys' fees totaling $20,227.50 for the ACLU National Prison Project,

id., Declaration of David M. Shapiro ("Shapiro Decl.") ¶ 8; and $328.34 reimbursement for the

ACLU's out-of-pocket expenses, id. ¶ 9 The sum of these requests is $223,139.59.  Therefore,

the Court will deduct $329.50 from the requested award to account for the mathematical error ($202,583.75 + $20,227.50 + $328.34 = $223,139.59).

The defendants raise three arguments against the reasonableness of the plaintiff's request: first, the attorneys' fees requested by the plaintiff are unreasonable because they "amount[] to a request for approximately $20,272.72 per page for the [eleven] pages of records even arguably produced under Court Order in this case," Def.'s Opp'n at 39; second, the "plaintiff has submitted declarations using block billing supported by quarter-hour billing,"[6] id. at 42; and third, "many of the billing entries are wholly inappropriate" id. at 41.

The defendants' first argument has no merit in light of this Court's conclusion that the plaintiff's litigation substantially caused the release of thousands of pages of records prior to the issuance of the Court's September 20, 2010 Order. Because of this voluminous release, the requested reward is reasonable "in light of the results obtained." See, e.g., Judicial Watch, Inc. v. U.S. Dep't of Commerce, 470 F.3d 363, 365 (D.C. Cir. 2006) (largely approving of an attorneys' fee award of $897,331 in a FOIA case involving the release of nearly 30,000 pages of documents); Ctr. to Prevent Handgun Violence, 49 F. Supp. 2d at 4-5 (holding that $180,266.63 in attorneys' fees in a FOIA case was reasonable); L.A. Gay & Lesbian Cmty. Servs. Ctr. v. Internal Revenue Serv., 559 F. Supp. 2d 1055, 1063 (C.D. Cal. 2008) (holding that $240,000 in attorneys' fees in a FOIA case was reasonable). The Court will now consider the defendants' other two arguments in turn.

---

[6]     Although the defendants object to the plaintiff's request on the grounds that the plaintiff has submitted entries based on block billing, the only arguments they make pertain to the increments of time used by plaintiff's counsel to track their billing, and not to the documentation of tasks performed and billed for. See In re Olson, 884 F.2d 1415, 1428 (D.C. Cir. 1989) (explaining that block billing had occurred where there were "numerous instances where the billing entries were not adequately documented," and where time sheets were "itemized on a daily basis, not by the task" performed). Accordingly, the Court will examine only the quarter-hour billing aspect of the defendants' argument.

1.   Quarter-Hour Billing

This Court has allowed quarter-hour billing in the past but has cautioned against it.  See

A.C. ex rel. Clark v. District of Columbia, 674 F. Supp. 2d 149, 156-57 (D.D.C. 2009)

(cautioning counsel that future time sheets submitted to the Court needed to reflect six-minute

increments).  The problem with the practice is that "billing by the quarter-hour, not by the tenth

is a deficient practice because it does not reasonably reflect the number of hours actually

worked."  Lopez v. S.F. Unified Sch. Dist., 385 F. Supp. 2d 981, 993 (N.D. Cal. 2005) (internal

quotation marks omitted).

The billing by Sullivan & Cromwell attorneys was calculated based on quarter-hour

increments, see Mot., McCall Decl., Ex. A (Sullivan & Cromwell Attorneys' Billing Record

("S&C Billing Record")), while the ACLU's National Prison Project attorneys used six-minute

increments, see id., Shapiro Decl., Ex. A (ACLU National Prison Projects Attorneys' Billing

Record ("NPP Billing Record")).  In order to promote the most accurate billing method in a case

involving lawyers working pro bono and assessing fees against a public entity, another district

court reduced a request based on quarter-hour billing by five percent.  See Bd. of Educ. of

Frederick Cnty. v. I.S. ex rel. Summers, 358 F. Supp. 2d 462, 470 (D. Md. 2005) ("[I]n this

matter, in which a firm representing a client on a pro bono basis now seeks to recover attorneys'

fees from a public school system, the most precise billing approach possible should be utilized to

ensure the utmost degree of accuracy. . . . [T]he [c]ourt finds that a [five percent] reduction . . .

should be applied to ensure fairness.").  Other members of this Court, however, have permitted

quarter-hour billing.  See Thomas v. District of Columbia, No. 03-1791, WL 891367 at *9-11

(D.D.C. Mar. 22, 2007); Blackman v. District of Columbia, 59 F. Supp. 2d 37, 44 (D.D.C. 1999).

The undersigned will, therefore, adopt the same approach taken by another member of this Court

and "allow [p]laintiff's counsel's quarter-hour billing increments, but caution[] counsel that future time sheets submitted to the Court must reflect billing entries in six-minute increments."[7] A.C., 674 F. Supp. 2d at 157.

    2.   The Reasonableness of Billing Entries

A court should "exclude from [its] initial fee calculation hours that were not 'reasonably expended.'" Hensley, 461 U.S. at 434. Parties must exercise "billing judgment" by "mak[ing] a good[-]faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary." Id. Relying on Hensley, the defendants object to the inclusion of what they consider "inappropriate" billing items, including,

> work done by Ms. Margaret Pfeiffer on [a] "retention letter[,"] work done by several of the attorneys on "review of Press releases by ACLU prior to the filing of the lawsuit," correspondence related to "service issue," correspondence on "publicity," "research by each attorney for the same issues," "drafting/revising of the complaint by three attorneys," and "[r]eview of draft interrogatories[."]

Defs.' Opp'n at 41 (second alteration in original) (footnote omitted). The defendants also object to the "more than 60 hours preparing the 31[-]page[ c]omplaint" and to "several entries related to 'research on reasonableness of [the defendants'] search,'" because they contend the plaintiff did not prevail on this issue. Id. at 41-42 (emphasis omitted).

    It is difficult to discern exactly which entries the defendants object to because they include no citations to particular time records, nor do they quantify the hours or fee amounts related to the challenged items. For example, three of these alleged billing items—"review of Press releases by ACLU prior to filing of the lawsuit," "research by each attorney for the same issue," and "drafting/revising of the complaint by three attorneys," are not located anywhere in

---

[7]    While the Court would not expect any future billing to be submitted in this case, the plaintiff is frequently involved in other litigation in this Court and is on notice that payment based on quarter-hour billing increments will not be condoned.

the plaintiff's billing records.  Furthermore, many of the other billing items the defendants object

to were reasonably expended in the course of the litigation in this case.  For example, the entry

"[c]orrespondence re[:] service issues," Mot., McCall Decl., Ex. A (S&C Billing Record) at 10,

is not inappropriate because it is related to the service of the Complaint, Pl.'s Reply at 24, n.10.

Similarly, neither the "review of draft interrogatories" nor "research on reasonableness of

search"[8] billings are inappropriate, see Mot., McCall Decl., Ex. A (S&C Billing Record) at 2, 4,

12, because the work was performed before the plaintiff knew that formal discovery would be

unnecessary and before the defendants had conducted some of the additional searches,[9] see Pl.'s

Reply at 24.

Ċ       The Court agrees, however, with the defendants that some of the billing entries must be

excluded from the award.  The plaintiff stated that it had excluded from the requested award

"time spent by [Sullivan & Cromwell] and ACLU attorneys on tasks not directly related to this

litigation (e.g., tasks relating to press communications)."  Pl.'s Mem. at 26 (emphasis omitted);

see also Mot., McCall Decl. at 2 n.1 (explaining that "the notations of 'Material Redacted' on the

daily time records . . . primarily indicate time entries that were excluded from the fee request").

Despite the plaintiff's attempts to exclude time invested by Sullivan & Cromwell attorneys

related to press communications, it appears that the .25 hours expended by Margaret Pfeiffer on

"[c]orrespondence re: publicity," Mot., McCall Decl., Ex. A (S&C Billing Record) at 2, was

---

[8]       In the billing records, this entry actually appears as "[l]egal research relatated to reasonableness of search."
Mot., McCall Decl., Ex. A (S&C Billing Record) at 12.

[9]       The defendants argue this billing is inappropriate because the plaintiff "did not prevail" on this issue.  Defs.'
Opp'n at 41-42.  This argument is flawed.  The plaintiff's billed for the "research related to reasonableness of search"
on October 29, 2008.  Mot., McCall Decl., Ex. A (S&C Billing Record) at 12.  Thus, this research was conducted
before the defendants had produced any Vaughn indexes, and before the parties had submitted the Third Joint
Report.  Therefore, this research would have been directed at searches performed by the defendants that were not
challenged in the plaintiff's motion for summary judgment because the plaintiff's litigation had already caused the
defendants to conduct the additional searches.

inadvertently left unredacted, and therefore must be excluded from the award.  Although perhaps

reasonably expended, the defendants object to, and the plaintiff does not attempt to justify, the

time it took to prepare the retention letter, and the Court will deduct 2.5 hours for the work

performed by Ms. Pfeiffer.  Finally, the Court finds that the hours billed by Natalie Kuehler in

drafting the Complaint are excessive.  In addition to the 53.5 hours devoted by Ms. Kuehler to

drafting, revising, and finalizing the Complaint, id., McCall Decl., Ex. A (S & C Billing Records)

at 7-8, and the fees for 3.7 hours billed for work performed by Tom Jawetz drafting and revising

the complaint, id., Shapiro Decl., Ex. A (NPP Billing Records) at 1-2, 16.5 hours are billed for

the same services performed by Benjamin Walker, id., at 11, and 2.5 hours are billed for the time

Ms. Pfeiffer spent drafting the Complaint, id., McCall Decl., Ex. A (S & C Billing Records) at 1.

Although the bulk of the work was performed by a lower-level associate, the Court finds that

76.2 hours devoted to drafting, revising, and finalizing the Complaint is excessive even for a

junior associate who may not have prior experience performing such a task.  See Apple Corps

Ltd. v. Int'l Collectors Soc'y, 25 F. Supp. 2d 480, 490-91 (D.N.J. 1998) (finding 75 hours

invested in drafting, revising, and finalizing a motion for contempt and a reply to the opposition

excessive).  Therefore, the Court will reduce the time Ms. Kuehler spent working on the

Complaint by 50%.

In summary, the Court is deducting the following billings from the plaintiff's voucher:

2.75 hours for work performed by Ms. Pfeiffer preparing "[c]orrespondence re: publicity" and

the retention letter on May 23, June 5, 6, 12, 16, and 17, 2008,[10] Mot., McCall Decl., Ex. A

(S&C Billing Record) at 1-2; and 26.75 hours Ms. Kuehler devoted to working on the

---

[10]      .25 of these hours are being deducted from Ms. Pfeiffer's billings for work performed prior to June 1, 2008, while 2.5 of these hours are being deducted from Ms. Pfeiffer's billings from June 1, 2008 to May 31, 2009. Accordingly, based on the Laffey Matrix, the Court will deduct $110.00  and $1,162.50 from the award respectively.

Complaint,[11] id. at 7-8.  Therefore, the total deduction for the billings the Court finds excessive equals $7,758.00 ([.25 x $440 + 2.5 x $465] + [13.4 x $215 +13.35 x $270] = $7,758.00).

### III.  CONCLUSION

The plaintiff is both "eligible" and "entitled" for an award of attorneys fees because the litigation substantially caused the defendants to release thousands of pages of records.  However, because of a computational error and billing entries that were not reasonable, the Court will deduct $8,087.50 from the award requested by the plaintiff.  Accordingly, the plaintiff is awarded $215,381.59 for attorneys' fees and costs.[12]

**SO ORDERED** this 15th day of September, 2011

REGGIE B. WALTON
United States District Judge

---

[11]   The time deducted will be divided equally between the work Ms. Keuhler performed prior to June 1, 2008, and the work performed from June 1, 2008 to May 31, 2009.  Thus, based on the Laffey Matrix, the Court will deduct $2,881.00 and $3,604.50 respectively.

[12]   The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.